IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| PRESIDENT DONALD J. TRUMP, an individual, REPRESENTATIVE MARIANNETTE MILLER-MEEKS, an individual, and FORMER STATE SENATOR BRADLEY ZAUN, an individual, | Case No. 4:24-cv-00449-RGE-WPK |
| Plaintiffs, | **BRIEF IN SUPPORT OF DEFENDANTS DES MOINES REGISTER AND TRIBUNE COMPANY AND GANNETT CO., INC.'S MOTION TO DISMISS** |
| vs. | |
| J. ANN SELZER, and individual, SELZER & COMPANY, DES MOINES REGISTER AND TRIBUNE COMPANY, and GANNETT CO., INC., | **ORAL ARGUMENT REQUESTED** |
| Defendants. | |

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................ 1

II.   BACKGROUND ................................................................................................. 2

    A.   The Parties ................................................................................................ 2

    B.   The Iowa Poll ........................................................................................... 2

    C.   The Amended Complaint........................................................................... 9

III.  LEGAL STANDARD........................................................................................ 11

    A.   Plaintiffs' Claims Must Be Plausible on Their Face ................................ 11

    B.   Plaintiffs' Claims Must Allege Any Fraud or Mistake with Particularity.................... 11

IV.  ARGUMENT .................................................................................................... 12

    A.   Plaintiffs Fail to Establish Statutory Standing Under ICFA .....................13

    B.   Plaintiffs Fail to Adequately Allege Fraud or Any Act That Violated ICFA .............. 16

        1.   Political Polls Are Non-Actionable Opinions and Therefore Cannot Constitute Actionable Statements of Material Fact or "Deception" ................17

        2.   Publication of the Iowa Poll Results Is Not an "Unfair Act or Practice" ..............22

    C.   Plaintiffs Do Not Allege the Publication of the Poll Was in Connection with the Sale or Advertisement of Consumer Merchandise ................................................ 24

    D.   Plaintiffs Do Not Allege That They Relied on the Iowa Poll .......................................28

    E.   Plaintiffs Assert No Plausible Claim for Fraudulent Misrepresentation ..................... 30

        1.   Plaintiffs Did Not Plead an Actionable Representation ......................................... 31

        2.   Plaintiffs Did Not Plead Any Justifiable Reliance on the Iowa Poll ..................... 31

        3.   Plaintiffs' Alleged Injuries Are Not Redressable by a Claim for Fraudulent Misrepresentation ................................................ 34

    F.   The Lawsuit Does Not State a Claim for Negligent Misrepresentation ....................... 36

        1.   Defendants Are Not in the Business or Profession of Supplying Information as Construed by Iowa Law................................................ 37

        2.   Defendants Did Not Supply the Iowa Poll to Plaintiffs for Plaintiffs' Benefit or Guidance ................................................ 38

        3.   Plaintiffs Do Not Plead Reasonable Reliance on the Polls or Proximately Caused Damages Therefrom ................................................ 39

        4.   First Amendment Considerations Bar Plaintiffs' Negligent Misrepresentation Claim ................................................40

    G.   The First Amendment Bars Plaintiffs' ICFA Claim.................................................... 41

1.  Press Defendants' Campaign Reporting Is Entitled to Protection Under the First Amendment From an ICFA or Speech-Based Tort Claim. ......................................... 42

2.  In the Alternative, Plaintiffs' Interpretation of ICFA as Applicable to Press Defendants' Political Reporting Would Fail Strict Scrutiny. ...................................... 44

V.  CONCLUSION .................................................................................................................. 48

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                      **Page(s)**

*281 Care Comm. v. Arneson*,
   638 F.3d 621 (8th Cir. 2011) .................................................................................41, 44, 45

*281 Care Comm. v. Arneson*,
   766 F.3d 774 (8th Cir. 2014) .........................................................................41, 44, 46, 47

*Abels v. Farmers Commodities Corp.*,
   259 F.3d 910 (8th Cir. 2001) ...............................................................................................12

*Andrew v. Hamilton Cnty. Pub. Hosp.*,
   960 N.W.2d 481 (Iowa 2021) ..............................................................................................17

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).............................................................................................................11

*Bass v. J.C. Penney Co., Inc.*,
   880 N.W.2d 751 (Iowa 2016) ..............................................................................................19

*Bates v. Allied Mut. Ins. Co.*,
   467 N.W.2d 255 (Iowa 1991) ..............................................................................................35

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007).............................................................................................................11

*BJC Health Sys. v. Columbia Cas. Co.*,
   478 F.3d 908 (8th Cir. 2007) ...............................................................................................12

*Boone Cnty. Comm. Credit Union v. Masel*,
   665 N.W.2d 440, 2003 WL 1050344 (Iowa Ct. App. Mar. 12, 2003)....................................40

*Burson v. Freeman*,
   504 U.S. 191 (1992).............................................................................................................45

*Citizens United v. FEC*,
   558 U.S. 310 (2010).............................................................................................................42

*Connick v. Myers*,
   461 U.S. 138 (1983).............................................................................................................42

*Cornell v. Wunschel*,
   408 N.W.2d 369 (Iowa 1987) .................................................................................34, 35, 36

*Daily Herald Co. v. Munro*,
   758 F.2d 350 (9th Cir. 1984) ...............................................................................................45

*Daniel v. Dow Jones & Co., Inc.*,
520 N.Y.S. 2d 334 (N.Y. Civ. Ct. 1987)........................................................39

*Deng v. White*,
No. 18-1672, 2019 WL 6358427 (Iowa Ct. App. Nov. 27, 2019)...........................25

*Dier v. Peters*,
815 N.W.2d 1 (Iowa 2012) ........................................................................35

*Dongguk Univ. v. Yale Univ.*,
734 F.3d 113 (2d Cir. 2013)..................................................................40, 41

*E-Shops Corp. v. U.S. Bank Nat'l Ass'n*,
678 F.3d 659 (8th Cir. 2012) ....................................................................12

*Eu v. San Francisco Cnty. Democratic Cent. Comm.*,
489 U.S. 214 (1989)................................................................................42

*Garrison v. Louisiana*,
379 U.S. 64 (1964).................................................................................42

*Gibson v. ITT Hartford Ins. Co.*,
621 N.W.2d 388 (Iowa 2001) .................................................................31, 32

*Ginsburg v. Agora, Inc.*,
915 F. Supp. 733 (D. Md. 1995)...............................................................39

*Goodman v. Performance Contractors, Inc.*,
308 F. Supp. 3d 1002 (N.D. Iowa 2018)........................................................3

*Greenley v. Laborers' Int'l Union of N. Am.*,
271 F. Supp. 3d 1128 (D. Minn. 2017)........................................................13

*Grimmett v. Freeman*,
59 F.4th 689 (4th Cir. 2023) ...................................................................44

*Gutter v. Dow Jones, Inc.*,
490 N.W.2d 898 (Ohio 1986) ...................................................................39

*Hammes v. JCLB Props. LLC*,
764 N.W.2d 552 (Iowa Ct. App. 2008).........................................................32

*Harrington v. Wilber*,
353 F. Supp. 2d 1033 (S.D. Iowa 2005) ...............................................17, 21, 22

*Hasselman v. Hasselman*,
596 N.W.2d 541 (Iowa 1999) ...................................................................40

*Hoefer v. Wisc. Educ. Assoc. Ins. Tr.*,
  470 N.W.2d 336 (Iowa 1991) ..........................................................................31

*Hunter v. Page Cnty., Iowa*,
  102 F.4th 853 (8th Cir. 2024) .........................................................................11

*Hustler Magazine, Inc. v. Falwell*,
  485 U.S. 46 (1988)............................................................................................40

*Jones v. Palmer Commc'ns, Inc.*,
  440 N.W.2d 884 (Iowa 1989) ..........................................................................17

*Lemons v. Mycro Grp. Co.*,
  667 F. Supp. 665 (S.D. Iowa 1987) .................................................................47

*Lloyd v. Drake Univ.*,
  686 N.W.2d 225 (Iowa 2004) .....................................................................30, 35

*Lockard v. Carson*,
  287 N.W.2d 871 (Iowa 1980) ..........................................................................32

*Mannino v. McKee Auto Ctr., Inc.*,
  No. 4:24–cv–SMR–HCA, 2024 WL 4884440 (S.D. Iowa Sept. 5, 2024)........15, 25

*McKee v. Isle of Capri Casinos, Inc.*,
  864 N.W.2d 518 (Iowa 2015) ..........................................................................15

*McLeodUSA Telecomm. Servs., Inc. v. Qwest Corp.*,
  469 F. Supp. 2d 677 (N.D. Iowa 2007).............................................36, 37, 39, 40

*Meredith v. Medtronic, Inc.*,
  No. 3:18-cv-00127-RGE-HCA, 2019 WL 6330677 (S.D. Iowa 2019) ....................3

*Meyer v. Grant*,
  486 U.S. 414 (1988)..........................................................................................45

*Midwest Home Distrib., Inc. v. Domco Indus. Ltd.*,
  585 N.W.2d 735 (Iowa 1998) ....................................................................34, 35, 40

*Miller v. Redwood Toxicology Lab'y, Inc.*,
  688 F.3d 928 (8th Cir. 2012) .........................................................................13

*Minn. Citizens Concerned for Life, Inc. v. Swanson*,
  692 F.3d 864 (8th Cir. 2012) .........................................................................42

*Moeller v. Samsung Electrs. Am., Inc.*,
  623 F. Supp. 3d 978 (S.D. Iowa 2022) ............................................................11

*Mohsen v. Veridian Credit Union*,
    733 F. Supp. 3d 754 (N.D. Iowa 2024)................................................................12

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964)................................................................................................42

*Newman-Green, Inc. v. Alfonzo-Larrain*,
    490 U.S. 826 (1989)..................................................................................................9

*Others First, Inc. v. Better Bus. Bureau of Greater St. Louis, Inc.*,
    829 F.3d 576 (8th Cir. 2016) ................................................................................17

*Pollmann v. Belle Plaine Livestock Auction, Inc.*,
    567 N.W.2d 405 (Iowa 1997) ...............................................................................39

*Putman v. Walther*,
    973 N.W.2d 857 (Iowa 2022) ..........................................................................34, 35

*Rossley v. Drake Univ.*,
    336 F. Supp. 3d 959 (S.D. Iowa 2018) .................................................................13

*Ryan v. Kanne*,
    170 N.W.2d 395 (Iowa 1969) ..........................................................................37, 38

*S.E. Promotions, Ltd. v. Conrad*,
    420 U.S. 546 (1975)...............................................................................................48

*Sain v. Cedar Rapids Cmty. Sch. Dist.*,
    626 N.W.2d 115 (2001) ...............................................................................37, 38, 39

*Scott v. Roberts*,
    612 F.3d 1279 (11th Cir. 2010) .............................................................................18

*Snyder v. Phelps*,
    562 U.S. 443 (2011)..........................................................................................42, 43

*Spreitzer v. Hawkeye State Bank*,
    779 N.W.2d 726 (Iowa 2009) ..........................................................................32, 33

*Stancik v. CNBC*,
    420 F.Supp.2d 800 (N.D. Ohio 2006)...................................................................39

*State ex rel. Miller v. Cutty's Des Moines Camping Club, Inc.*,
    694 N.W.2d 518 (Iowa 2005).........................................................................22, 26

*State ex rel. Miller v. Hydro Mag, Ltd.*,
    436 N.W.2d 617 (Iowa 1989) ...............................................................................29

*State ex rel. Miller v. Vertrue, Inc.*,
    834 N.W.2d 12 (Iowa 2013) ...............................................................20, 21, 22

*State v. Cutsick*,
    84 N.W.2d 554 (Iowa 1957) ........................................................................27

*Susan B. Anthony List v. Driehaus*,
    814 F.3d 466 (6th Cir. 2016) ........................................................................44

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007).........................................................................................12

*Thompson v. Kaczinski*,
    774 N.W.2d 829 (Iowa 2009) ........................................................................29

*Time Inc. v. Hill*,
    385 U.S. 374 (1967) ........................................................................................39

*Tralon Corp. v. Cedarapids, Inc.*,
    966 F. Supp. 812 (N.D. Iowa 1997).............................................................31

*Tri-Plex Tech. Servs., Ltd. v. Jon-Don, LLC*,
    241 N.E.3d 454 (Ill. 2024)............................................................................29

*Union Cnty., IA v. Piper Jaffray & Co., Inc.*,
    741 F. Supp. 2d 1064 (S.D. Iowa 2010) .....................................................39

*United States ex rel. Joshi v. St. Luke's Hosp., Inc.*,
    441 F.3d 552 (8th Cir. 2006) ........................................................................12

*United States v. Alvarez*,
    567 U.S. 709 (2012).........................................................................43, 44, 45, 47

*Van Sickle Const. Co. v. Wachovia Com. Mortg., Inc.*,
    783 N.W.2d 684 (Iowa 2010) ........................................................................30

*Washington League for Increased Transparency & Ethics v. Fox Corp.*,
    19 Wash. App. 2d 1006, 2021 WL 3910574 (Wash. Ct. App. Aug. 30, 2021)
    (unpublished op.) ....................................................................................43, 44

*West v. W. Cas. and Sur. Co.*,
    846 F.2d 387 (7th Cir. 1988) ........................................................................31

**Statutes, Rules & Regulations**

U.S. Const. amend. I ......................................................................... *passim*

Federal Rule of Civil Procedure 9 ......................................................... *passim*

Federal Rule of Civil Procedure 12 ..........................................................................11, 48

Fed. R. Civ. P. 81 ........................................................................................................11

Iowa Code § 714.16 ............................................................................................. *passim*

Iowa Code § 714H *et seq.* ................................................................................... *passim*

**Other Authorities**

Sara Doon, *Why Outlier Poll Showing Harris Winning Iowa Could Spell Trouble for Trump*, Forbes (Nov. 3, 2024)..........................................................................6, 30

CBS News, *Expert Says Polling Is A Snapshot, Not A Predictor, Of What Happens On Election Day* (Sept. 10, 2020)..........................................................19

Note, *Consumer Protection Under the Iowa Consumer Fraud Act*, 54 Iowa L. Rev. 319 (1968)........................................................................................................27

*Lease*, Merriam-Webster Dictionary, *available at* https://www.merriam-webster.com/dictionary/lease..................................................................................26

Pew Research Center, *Key things to know about U.S. polling in 2024* (Aug. 28, 2024) ............................................................................................................................18

## I.    INTRODUCTION

The President of the United States, Donald J. Trump, brings this lawsuit ostensibly to "seek[] accountability" for alleged "election interference"; but instead, his lawsuit only confirms that President Trump is a sore winner. (*See* Dkt. 23, Amended Complaint ¶ 1 ("Am. Compl.").)

President Trump seeks to punish Iowa's largest newspaper, the *Des Moines Register* ("*The Register*"), which is published by the Des Moines Register & Tribune Co., and its parent company, Gannett Co., Inc. ("Gannett"), which is the nation's largest publisher of local newspapers, including *USA Today*. (*The Register* and Gannet are referenced herein collectively as the "Press Defendants.") In challenging the political campaign reporting of *The Register*, a community newspaper, President Trump's claims derive from his frequent inveighing against whatever he may deem to be "fake news." In particular, President Trump complains about the Iowa Poll that was conducted by long-time Iowa pollster, J. Ann Selzer, and published on November 2 and 3, 2024, by *The Register*. President Trump's grievance is that the Iowa Poll had Vice President Kamala Harris leading him by 3 percentage points, 47% to 44%. However, on November 7, 2024, President Trump beat Harris in Iowa by 56% to 42%. President Trump apparently believes this somehow demonstrates that the mainstream media is not only biased against him, but engaged in "election interference." (*Id.*) However, no court in this country has ever recognized a cause of action based on the publication of "fraudulent news." This is no time to start. The very notion is an affront to the First Amendment of the United States Constitution.

To borrow a phrase, the Amended Complaint is a piece of "political theater" that amounts to "nothing more than a work of fantasy." (*Id.* ¶ 60) There is no legal basis for President Trump to obtain the relief he seeks; indeed, such relief would violate free speech principles. President Trump attempts to punish press coverage of which he disapproves through tortured application of the Iowa

Consumer Fraud Act, as well as through frivolous tort claims for fraudulent misrepresentation and negligent misrepresentation. If he had his way, such claims would become weapons for any political candidate to challenge any press coverage they do not like. However, his claims all fail to state a cause of action on which relief can be granted.

Now, solely for the purpose of attempting to avoid being in federal court, he has enlisted U.S. Representative Mariannette Miller-Meeks and former Iowa State Senator Bradley Zaun to join his misguided crusade. But their claims suffer the same inadequacies and do nothing to save this lawsuit from dismissal.

The Amended Complaint must be dismissed with prejudice.

## II.    BACKGROUND

### A.    The Parties

Plaintiffs in this case—President Trump, Rep. Miller-Meeks, and Former State Senator Zaun—all invoke their official titles in the caption of their lawsuit, but nonetheless purport to sue in their individual capacities. Defendants are J. Ann Selzer ("Selzer") and her polling firm, Selzer & Company (collectively also referred to as "Selzer"); *The Register*; and Gannett. As admitted by Plaintiffs, Selzer is widely regarded as one of the best political pollsters in the nation. (*Id.* ¶ 36.) Selzer had conducted polls for publication by *The Register* since 1987.

### B.    The Iowa Poll

This lawsuit focuses on the Iowa Poll, conducted by Selzer and published by *The Register*. The Iowa Poll polls likely voters in the State of Iowa regarding political races. *The Register* became the first newspaper in the nation to sponsor a statewide opinion poll when it conducted the first Iowa Poll in 1943. While Plaintiffs suggest that Selzer and *The Register* conducted two polls related to the 2024 election cycle, the so-called "Harris Poll" and the so-called "Congressional

Poll," (Am. Compl. ¶¶ 1, 3), there was only one: the Iowa Poll, which is how it is referred to in the articles at issue. For the Iowa Poll, Selzer polled likely voters in Iowa regarding the presidential and federal congressional races at multiple points in time, including in June, September, and October 2024. Plaintiffs' lawsuit is predicated on the results of the Iowa Poll conducted in October 2024.

On November 2, 2024, *The Register* published an article in its digital edition that provided the results of the Iowa Poll related to the presidential race. (Ex. A.)[1] Those results showed then-Vice President Harris leading President Trump by three points (47% to 44%), which was within the poll's 3.4% margin of error. (Ex. A at A-2.) The article stated that a Harris victory would be a "shocking development," and Selzer herself stated that it would have been "hard for anybody to say they saw this coming," especially since neither candidate had campaigned in Iowa following the primaries. (*Id.* at A-1, A-2, A-3.) However, the article noted that "[a] greater share of [President Trump's] supporters than [Harris's] say they are extremely or very enthusiastic about their pick." (*Id.* at A-5.)

---

[1] The Amended Complaint incorporates by reference a high volume of documents and records not appended thereto, including numerous *Register* articles reporting on the Iowa Poll. (*See, e.g.*, Am. Compl. ¶¶ 1, 3, 13, 71, 73.) From among those many documents, attached hereto are Exhibits A–K, which reflect the three principal articles from *The Register* reporting on the results of the Iowa Poll, as well as and their attachments. (*See id.* ¶ 1 (linking to the article with the presidential poll results), ¶ 3 (linking to the article with the congressional poll results), ¶ 73 (linking to the editorial that contains a downloadable file of all poll questions and results).)

This Court should take judicial notice of these documents because they are "necessarily embraced by the pleadings," are "incorporated by reference," and are "integral to [Plaintiffs'] claim[s]." *Goodman v. Performance Contractors, Inc.*, 308 F. Supp. 3d 1002, 1007 (N.D. Iowa 2018) (quotations and citations omitted). Indeed, the Amended Complaint makes more than 100 references to the Iowa Poll, and Plaintiffs' entire lawsuit is predicated on the Iowa Poll and *The Register* articles about it. (*See* Am. Compl., *passim*.) Therefore, these Exhibits are foundational and integral to the claims, and they "provide[] necessary context for the facts alleged in [the] Plaintiffs' complaint." *See Meredith v. Medtronic, Inc.*, No. 3:18-cv-00127-RGE-HCA, 2019 WL 6330677, at 1 (S.D. Iowa 2019).

The November 2 article provided extensive detail about how each candidate fared with respect to likely voters in various demographic categories. For example, the poll results showed Harris leading all independent voters, independent women, women in general, those living in cities, those with a college degree, and voters over age 65. (*Id.* at A-6, A-7, A-9.) But the poll showed President Trump ahead—and sometimes far ahead—with independent men, men in general, those identifying as evangelicals, and rural voters. (*Id.* at A-6, A-9.) The poll results revealed that different voting groups had different motivations for voting, with a majority of Harris supporters stating that "the future of the democracy" was their most important issue, while President Trump's supporters were focused on inflation and the economy. (*Id.* at A-10.) The article also noted that only "a small universe of people" who previously supported President Trump switched their vote. (*Id.* at A-12.)

In addition, the November 2 article provided a description of how the Iowa Poll was conducted. (*Id.* at A-13, A-14.) The description was as follows:

**About the Iowa Poll**

The Iowa Poll, conducted October 28-31, 2024, for *The Des Moines Register* and Mediacom by Selzer & Co. of Des Moines, is based on telephone interviews with 808 Iowans ages 18 or older who say they will definitely vote or have already voted in the 2024 general election for president and other offices.

Interviewers with Quantel Research contacted 1,038 Iowa adults with randomly selected landline and cell phone numbers supplied by Dynata. Interviews were administered in English. Responses were adjusted by age, sex, and congressional district to reflect the general population based on recent census data.

Questions based on the sample of 808 Iowa likely voters have a maximum margin of error of plus or minus 3.4 percentage points. This means that if this survey were repeated using the same questions and the same methodology, 19 times out of 20, the findings would not vary from the true population value by more than plus or minus 3.4 percentage points. Results based on smaller samples of respondents— such as by gender or age—have a larger margin of error.

(*Id.* at A-13, A-14.)

Attached to the November 2 article was a poll questionnaire. (Ex. B.) The questionnaire identified each of the eight presidential polling questions listed and the responses for each in the polling rounds in October 2024, September 2024, June 2024, February 2024, March 2023, and November 2021. (*See generally* Ex. B). It showed that President Trump led former President Biden by 18 points in June 2024 polling, but that President Trump's lead had shrunk to four points when polling was repeated in September 2024 following Harris's nomination. (*Id.* at B-2.) The questionnaire also contained additional methodological details, including the sample size and margin of error for each specific question each time it was asked. (*See generally id.*)

On November 3, *The Register* published an article focusing on congressional races in its digital edition and also published two articles about the Iowa Poll in its print edition. (Exs. C, D, E, F.) With respect to the congressional races, the results suggested that, across the state, voters were "virtually tie[d] in [their] preference for a Democrat or a Republican for the U.S. House of Representatives," with Democrats having a slight edge. (Ex. D at D-2.) The article noted that it was "the first time since September 2020 that Democrats have held a statewide lead in the generic congressional ballot." (*Id.*) In particular, the results showed that voters in the first congressional district preferred the Democratic candidate over the Republican candidate by 16 points, "the largest in the district in any Iowa Poll this year." (*Id.* at D-5.) This was noteworthy, because Rep. Miller-Meeks, the Republican candidate in the first congressional district, had "defeated Bohannan[, the Democratic candidate in the first congressional district,] in 2022 by nearly 7 percentage points." (*Id.* at D-3.) Despite the poll results suggesting a 16-point differential, the article noted that "[e]lection forecasters rate the race as a toss-up." (*Id.* at D-5.) The article also stated that, with respect to likely voters in the first congressional district, the ten percent of respondents who did not express a preference for either the Democratic or Republican category could be broken down

as follows: "3% other, 2% wouldn't vote, 3% note sure/don't remember, 2% don't want to tell." (*Id.* at D-3.) The article also detailed the state of the other three congressional races. (*Id.* at D-6 through D-9.) Finally, the article concluded with the same "About the Iowa Poll" explanation from the article regarding the presidential polling results. (*Id.* at D-10.)

The November 3 digital article regarding the congressional polling results also provided the poll questionnaire. (*Id.* at D-10., D-11; Ex. E.) This questionnaire showed the Republican candidate in the Iowa's first congressional district ("CD1" on the questionnaire), who was Rep. Miller-Meeks, steadily losing ground between February 2024 and October 2024. (Ex. E at E-4.) This questionnaire also contained the same methodological details, including the sample size and margin of error for each specific question each time it was asked. (*See generally id.*)

Immediately after the release of the Iowa Poll, President Trump completely rebuked it.[2] To be clear, Plaintiffs disclaim any reliance on the results of the Iowa Poll. In their Amended Complaint, they state these poll results inherently lacked credibility and could be disregarded, alleging that the poll results were "so implausible that no objective pollster could honestly have advanced it," (Am. Compl. ¶ 54), and that "*every other* mainstream Iowa poll . . . showed President Trump comfortably ahead." (*Id.* ¶ 56 (emphasis in original).)

On November 5, 2024, the election took place with the following results: President Trump won the presidential election in Iowa, Rep. Miller-Meeks was re-elected to represent U.S. House Iowa District 1, and Zaun lost his State Senate re-election bid. (*Id.* ¶¶ 1, 3, 6.)

---

[2] The day the poll results were published, President Trump publicly declared that the Iowa Poll was "a fake poll done by a Trump hater who oversampled, by a lot, Democrats." (*See* Sara Doon, *Why Outlier Poll Showing Harris Winning Iowa Could Spell Trouble for Trump*, Forbes (Nov. 3, 2024) (cited and incorporated in the Amended Complaint at ¶ 70), *available at* https://www.forbes.com/sites/saradorn/2024/11/03/why-outlier-poll-showing-harris-winning-iowa-could-spell-trouble-for-trump/.)

Immediately following the election, both Selzer and *The Register* conducted a review of the Iowa Poll. On November 17, *The Register* published their findings and provided the following: (1) an editorial on the review, (Ex. G); (2) a memorandum by Selzer entitled, "Results of Internal Investigation of final Iowa Poll," (Ex. H); (3) two reports containing the complete Iowa Poll questionnaires with weighting and historical data, (Exs. I, K); and (4) the cross-tabs of the polling data, (Ex. J.). (Am. Compl. ¶ 73.)

The editorial explained that the internal review took "the form of testing plausible theories against available data," and Selzer and *The Register* concluded that "no likely single culprit has emerged to explain the wide disparity" between the poll results and the actual vote. (Ex. G at G-1.) *The Register* and Selzer considered a number of wide-ranging theories, including (1) the possibility that demographics were skewed; (2) whether the poll failed "to detect the shift found nationally among men of color toward Trump"; (3) whether the polling, which concluded the Thursday before the election, "fail[ed] to capture late-deciders"; (4) whether the poll's weighting was flawed; and (5) whether voters' recollection of their previous voting history should "have been included as a weighting factor." (*Id.* at G-2.) The editorial candidly admitted that "[s]ome critics ha[d] accused the Iowa Poll of a Democratic bias." (*Id.*) However, statistician Nate Silver, who rates pollsters, had performed a calculation to determine whether any such bias was present, and, "[a]cross 54 Iowa Polls, he found a negligible result, a 0.1% tilt toward Democrats, a smaller bias figure than for all but one of the 25 top-rated polls." (*Id.*) The editorial noted that, prior to the Iowa Poll, Selzer had announced it would be her last. (*Id.*) The editorial concluded with *The Register*'s promise "to evolve and find new ways to accurately take the pulse of Iowans on state and national issues." (*Id.* at G-3.)

Selzer's internal investigation memorandum contains an in-depth "data-heavy" analysis of seven possible theories for the disparity between the October poll results and the actual vote, including the ones discussed in the November 17 editorial and some additional theories. (*See generally* Ex. H.) Those additional theories included a comparison with Wisconsin's exit poll data to determine if the Iowa Poll's demographics were skewed, a consideration of Newtonian physics ("[a]ction leads to reaction," meaning it is possible that the poll results could have animated either party), and the possibility that respondents lie. (*Id.* at H-12, H-13.) In the end, after considering all of these theories, Selzer "found nothing to illuminate the miss" and stated that she would "continue to be puzzled by the biggest miss of [her] career." (*Id.* at H-1.)

Of the two questionnaire reports appended to the November 17 editorial, the first questionnaire report listed (1) all ten polling questions and 14 demographic questions; and (2) the response data from previous iterations of the Iowa Poll and previous election cycles. (Ex. I.) The second questionnaire report included both the weighted and unweighted October 2024 response data for each question. (Ex. K.)

The cross-tabs included with the November 17 editorial were comprised of 145 tables of raw data. (Ex. J.) These tables included the verbatim text of all polling and demographic questions, the responses to all of the questions, the number of respondents for each question (including the unweighted and weighted responses), and the results described as percentages and raw numbers. (*Id.*). With these tables, the responses to each question could be cross-referenced against demographics to see how the weighting of the raw data impacted the final results. (*Id.*)

The release of the Iowa Poll questionnaire was consistent with *The Register*'s "long practice" of publishing the questionnaires, and the release of "the poll's full demographics,

crosstabs and weighted and unweighted data, as well as a technical explanation from Selzer detailing her review," was done "[f]or transparency." (Ex. G at G-1.)

All the above-described materials regarding the Iowa Poll were provided to the public free of charge. Despite Plaintiffs' repeated asides that the Iowa Poll articles and the November 17 editorial were formerly "publicly available" but are now "hidden" behind a paywall, (Am. Compl., *passim* fns. 4–14), the digital versions of the articles linked throughout the Amended Complaint continue to be available for any person to read free of charge—as long as the user has not exceeded their periodic allotment of free digital *Register* articles.

### C.    The Amended Complaint

On December 16, 2024, President Trump filed this lawsuit—as the sole Plaintiff and in his individual capacity—in the Iowa District Court for Polk County against the Defendants. (Dkt. 1-1.) In his Petition, he alleged only one claim: a violation of the Iowa Consumer Fraud Act ("ICFA"), Iowa Code § 714H *et seq*. (Dkt. 1-1.) The next day, on December 17, 2024, Gannett properly removed the lawsuit to this Court. (*See generally* Dkt. 1.)

On January 31, 2025, Plaintiffs filed an Amended Complaint before this Court. (*See* Am. Compl.) The Amended Complaint added two additional Plaintiffs—Rep. Miller-Meeks and Zaun—as transparent and impermissible "jurisdictional spoilers." *See Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 830 (1989); (*see also generally* Am. Compl.). The Amended Complaint also added two additional claims: fraudulent misrepresentation and, in the alternative, negligent misrepresentation. (Am. Compl. ¶¶ 135–63.)

President Trump makes the purpose of his lawsuit clear: "This action . . . seeks accountability for brazen election interference committed by the Defendants in favor of now-defeated former Democratic presidential candidate Kamala Harris . . . , along with other Democrat

candidates, through use of a manipulated, incorrect, and improperly leaked [Iowa Poll]." (*Id.* ¶ 1.) President Trump asserts that "[t]he odds of a pollster with Selzer's experience and track record innocently missing *both* President Trump's *and* Representative Miller-Meeks' races by the same margin, sixteen points, and favoring the Democrat candidates with both 'misses,' are outside the reasonable range of error." (*Id.* ¶ 4.) He claims this was not "merely a coincidence" and that, instead, the Iowa Poll was an "attempt[] to corruptly influence and interfere in the outcome of the 2024 Presidential Election and other key elections." (*Id.* ¶ 5.) He asserts Selzer "manipulated" the Iowa Poll which then "impacted many other elections," including that of Miller-Meeks and Zaun. (*Id.* ¶ 6.)

President Trump's conspiracy theory then goes beyond this poll or even these Defendants. According to President Trump, "Defendants and their cohorts in the Democrat Party hoped that the [Iowa Poll] would create a false narrative of inevitability for Harris in the final week of the 2024 Presidential Election, to drive down enthusiasm among Republicans" and that "they had similar hopes" for the other races. (*Id.* ¶ 8.) President Trump alleges:

> For too long, left-wing pollsters—knowing that polls *can, and often do,* materially impact elections—have attempted to influence electoral outcomes through manipulated polls that are not grounded in widely accepted polling methodologies and have unacceptable error rates. While Selzer is not the only pollster to engage in this corrupt practice, she had a huge platform and following, resulting in a significant and impactful opportunity to deceive voters.

(*Id.* ¶ 11.) In short, President Trump claims "Selzer's polling 'miss' was not an astonishing coincidence—it was intentional." (*Id.* ¶ 14.)

Despite claiming, on the one hand, that Selzer had a stellar reputation and had earned a position of trust that would have presumably led to the credence of her polling, President Trump also asserts on the other that "Selzer has quietly used her polls to attempt to influence recent elections in favor of Democrats." (*Id.* ¶¶ 36–37, 42.) He claims "Selzer knows" that "manipulated

polls create a narrative of inevitability for Democrat candidates, increase[] enthusiasm and turnout among Democrats, decrease[] enthusiasm and turnout among Republicans, and deceive[] the public into believing that Democratic candidates are performing better than they really are." (*Id.* ¶ 42.) And he claims that "given Selzer's position of trust before November 5, 2024, she had the power to influence campaign spending and strategy, change public perception of races, and even impact the outcome of elections." (*Id.* ¶ 43.)

## III.    LEGAL STANDARD

Because this case was properly removed from Iowa state court, the applicable federal standards of review must apply in adjudicating this Motion. *Hunter v. Page Cnty., Iowa*, 102 F.4th 853, 874 (8th Cir. 2024) ("[M]atters removed to federal court are governed by the current federal pleading standard."); *see* Fed. R. Civ. P. 81(c)(1).

### A.    Plaintiffs' Claims Must Be Plausible on Their Face

Under Federal Rule of Civil Procedure 12(b)(6), this Court will grant a motion to dismiss for failure to state a claim upon which relief can be granted "unless the complaint alleges facts sufficient 'to raise a right to relief above the speculative level.'" *Hunter*, 102 F.4th at 874 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "The complaint must state a claim that is 'plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.

### B.    Plaintiffs' Claims Must Allege Any Fraud or Mistake with Particularity

In addition, the ICFA and fraudulent misrepresentation claims are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *Moeller v. Samsung Electrs. Am.,*

11

*Inc.*, 623 F. Supp. 3d 978, 986 (S.D. Iowa 2022); *Mohsen v. Veridian Credit Union*, 733 F. Supp. 3d 754, 773 (N.D. Iowa 2024). This is because "Rule 9(b) applies to *all* averments of fraud or mistake," which necessarily includes ICFA and fraudulent misrepresentation claims. *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007) (internal quotation omitted) (emphasis added); *see also Mohsen*, 733 F. Supp. 3d at 773 ("ICFA claims are subject to Fed. R. Civ. P. 9(b)'s heightened pleading standard . . . .").

Rule 9(b) requires a party "alleging fraud or mistake" to "state *with particularity* the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b) (emphasis added). "Under Rule 9(b), a plaintiff must plead 'such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby.'" *BJC Health Sys. v. Columbia Cas. Co.*, 478 F.3d 908, 917 (8th Cir. 2007) (quoting *Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 920 (8th Cir. 2001)). In other words, a plaintiff's complaint "must set forth the 'who, what, when, where, and how' surrounding the alleged fraud." *E-Shops Corp. v. U.S. Bank Nat'l Ass'n*, 678 F.3d 659, 663 (8th Cir. 2012) (quoting *United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 556 (8th Cir. 2006)). This "requires more than . . . conclusory and generalized allegations." *St. Luke's Hosp., Inc.*, 441 F.3d at 557.

## IV.    ARGUMENT

Plaintiffs' three claims—violation of ICFA, fraudulent misrepresentation, and negligent misrepresentation—are legally deficient and must be dismissed in their entirety. Though Plaintiffs plead three separate counts, all three are comprised of just one underlying claim: an attack on the publication of the articles and poll results, under the theory that publication thereof was fraudulent.

(Am. Compl. ¶¶ 120–21, 144, 157, 159–60.) It is unambiguous from the face of the Amended Complaint that Plaintiffs' claims are meritless and must be dismissed with prejudice.

### A.      Plaintiffs Fail to Establish Statutory Standing Under ICFA

Plaintiffs do not allege the type of consumer harm that is meant to be protected by ICFA. "In contrast to Article III standing, which addresses 'the constitutional power of a federal court to resolve a dispute,' statutory standing 'is simply statutory interpretation: the question it asks is whether [the legislature] . . . has accorded this injured plaintiff the right to sue the defendant to redress [the plaintiff's] injury.'" *Greenley v. Laborers' Int'l Union of N. Am.*, 271 F. Supp. 3d 1128, 1139 (D. Minn. 2017) (quoting *Miller v. Redwood Toxicology Lab'y, Inc.*, 688 F.3d 928, 934 (8th Cir. 2012)); *see also Rossley v. Drake Univ.*, 336 F. Supp. 3d 959, 965 (S.D. Iowa 2018) ("This requirement is distinct from the issue of whether the plaintiff has constitutional standing under Article III and instead requires courts to consider whether the plaintiff 'has a cause of action under the statute' in question.").

ICFA provides the following standing requirement: "A consumer who suffers an ascertainable loss of money or property as the result of a prohibited practice or act in violation of this chapter may bring an action at law to recover actual damages." Iowa Code § 714H.5(1). The scope of "prohibited practices and acts" under ICFA is set forth as follows:

> A person shall not engage in a practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection with the advertisement, sale, or lease of **consumer merchandise**, or the solicitation of contributions for charitable purposes.

*Id.* § 714H.3(1) (emphasis added). ICFA defines "[c]onsumer" as "a natural person or the person's legal representative." *Id.* § 714H.2(3). And it defines "[c]onsumer merchandise" as "merchandise offered for sale or lease, or sold or leased, primarily for personal, family, or household purposes."

13

*Id.* § 714H.2(4). "Merchandise," in turn, is defined as "any objects, wares, goods, commodities, intangibles, securities, bonds, debentures, stocks real estate or services." *Id.* §§ 714H.2(6), 714.16(e).

Plaintiffs' Amended Complaint endeavors to effectively rewrite ICFA and eliminate the statute's foundation requirement of a consumer transaction. ICFA clearly requires that the conduct in question be "***in connection with* the *advertisement, sale or lease* of *consumer merchandise*.**" However, in their Amended Complaint, Plaintiffs impermissibly attempt to remove the effect of the word "consumer" in the phrase "consumer merchandise" as used in Iowa Code § 714H.3(1) (emphasis added). Plaintiffs cite the definition of "consumer" and then cite the definition of "merchandise"; but they completely omit the definition of the *key* term: "consumer merchandise." (Am. Compl. ¶¶ 106, 108, 115.) In other words, Plaintiffs ignore the legislature's directive in Iowa Code § 714H.2(4) and interpose their own definition of "consumer merchandise" by merely combining the separately defined terms "consumer" and "merchandise." Then, as discussed more fully below, Plaintiffs entirely ignore the requirement that the prohibited conduct be "in connection with advertisement, sale, or lease" of the defined "consumer merchandise." *See* Iowa Code § 714H.3(1). They make no allegation about this requirement at all. Indeed, Plaintiffs' claims have nothing whatsoever to do with a consumer transaction; rather, they are expressly about purported "election interference." (Am. Compl. ¶ 1.) As such, Plaintiffs are asking this Court to rewrite ICFA for their individual benefit. They seek to transform the Iowa Consumer Fraud Act into a generalized "Iowa Fraud Act," applicable to any individual grievance they can personally imagine. This is unlawful.

Plaintiffs' Amended Complaint seems to acknowledge this fatal defect in its claims. Plaintiffs assert they qualify as "'consumer[s]'" within the meaning of the statute, having

"acquired, read, and been deceived by" the Iowa Poll. (Am. Compl. ¶¶ 112–14.) Thereby, they acknowledge they must show *more* than merely being natural persons, but at the same time, they do *not* allege they purchased a copy of *The Register* (or subscribed to *The Register*) because of the Iowa Poll. While Rep. Miller-Meeks alleges she purchased *The Register*, that allegation is omitted from the claims for relief because Rep. Miller-Meeks makes clear she is "a regular reader" of *The Register*. (*Compare id.* ¶ 21, *with id.* ¶ 113.) As pleaded, her purchase of *The Register* had nothing to do with any alleged fraud or deception with respect to the Iowa Poll.

In addition, ICFA requires some sort of contractual privity. Claims under the statute rise or fall on the existence and breach of a contract between the parties. *See Mannino v. McKee Auto Ctr., Inc.*, No. 4:24–cv–SMR–HCA, 2024 WL 4884440, at *3 (S.D. Iowa Sept. 5, 2024) ("The Iowa Supreme Court has rejected claims under the ICFA when a party does not have a contractual right to the property in dispute.); *see also McKee v. Isle of Capri Casinos, Inc.*, 864 N.W.2d 518, 532 (Iowa 2015) ("If [Plaintiff] had no contractual right to the bonus, and we have already determined she did not, then she could not have suffered an ascertainable loss of money or property when she was denied that bonus."). Plaintiffs do not assert any such relationship here.

Finally, Plaintiffs do not allege any ascertainable damages that qualify for relief. ICFA provides certain explicit limitations on damages. For example, ICFA makes clear that, *inter alia*: (1) campaign contributions do not qualify as damages, *see* Iowa Code § 714H.3(1); (2) expenditures on behalf of a separate legal entity (such as a campaign or federal office) do not qualify as damages, *see id.* § 714H.2(3); (3) plaintiffs cannot sue for alleged damages incurred by other individuals, *see id.* § 714H.5(1); and (4) an individual can only obtain equitable relief after a finding that there was a violation of ICFA, *see id.* § 714H.5.

Here, Plaintiffs' allegations of damages are as follows: President Trump asserts he "sustained actual damages by having to expend extensive time and resources, including direct federal campaign expenditures to mitigate and counteract the harms of the Defendants' conduct." (Am. Compl. ¶ 131.) Rep. Miller-Meeks asserts she "sustained actual damages due to the need to expend extensive time and resources, to mitigate and counteract the harms of the Defendants' conduct." (*Id.* ¶ 132.) Zaun's assertion of damages is limited to "the loss of his Senate seat." (*Id.* ¶ 133.) Plaintiffs provide no basis to claim that an alleged loss of time (even "extensive" time) constitutes actual damages under ICFA. Nor do they provide a basis to claim that an alleged expenditure of vague and undefined (and therefore unascertainable) "resources" constitute actual damages under ICFA. Moreover, as mentioned above, neither President Trump nor Rep. Miller-Meeks can assert damages on behalf of their campaigns. President Trump cannot sue on behalf of any person other than himself. And Zaun had no right (contractual or otherwise) to an Iowa State Senate seat and, therefore, cannot seek damages for the loss of it.

Pursuant to all these requirements imposed by the legislature before a party can state a claim under ICFA, Plaintiffs lack statutory standing in this case. Their ICFA claim must be dismissed.

### B.    Plaintiffs Fail to Adequately Allege Fraud or Any Act That Violated ICFA

The alleged facts as pleaded by Plaintiffs demonstrate that the publication and release of the Iowa Poll were *not* acts prohibited by ICFA. Plaintiffs allege only two bases under ICFA's list of prohibited acts: that Defendants' publication of the poll was (1) a prohibited "deception"; and (2) an "unfair act or practice." (Am. Compl. ¶¶ 116–18); *cf.* Iowa Code § 714H.3(1). But in fact, Defendants' conduct was neither. Indeed, the opposite is true: Defendants' actions—*i.e.*, conducting a political poll and publishing articles discussing, analyzing, and opining upon the results—are emphatically permissible and ***protected*** activities under the law.

1.    **Political Polls Are Non-Actionable Opinions and Therefore Cannot Constitute Actionable Statements of Material Fact or "Deception"**

Plaintiffs claim that Defendants engaged in deceptive conduct by releasing the Iowa Poll results, which allegedly caused consumers to be misled as to the candidates who led their respective races. (Am. Compl. ¶ 116.) Plaintiffs allege that a poll result suggesting "who is winning the race in question and by how much" constitutes a statement of "material fact[]." (*Id.*) But Plaintiffs entirely misunderstand ICFA's standards and definitions: the Iowa Poll and results are *non-actionable opinions*, not "material facts."

Under ICFA, "'[d]eception' means an act or practice that is likely to mislead a substantial number of consumers as to a material fact or facts." Iowa Code § 714H.2(5). The statute thereby requires that any statement constituting an act of deception must be a statement of *fact*.

The determination of whether a statement is an opinion or actionable statement of fact is a question of law for this Court to decide. *Others First, Inc. v. Better Bus. Bureau of Greater St. Louis, Inc.*, 829 F.3d 576, 580–81 (8th Cir. 2016); *see Andrew v. Hamilton Cnty. Pub. Hosp.*, 960 N.W.2d 481, 489 (Iowa 2021) (noting that "[w]hether a statement is one of fact or opinion" is to be determined by the court). Courts will assess the totality of the circumstances to determine whether a statement is a fact or opinion. *Others First*, 829 F.3d at 580–81. Among the factors to be considered are "the precision and specificity of the statement"; "the verifiability of the statement"; and "the literary context in which the statement was made." *Harrington v. Wilber*, 353 F. Supp. 2d 1033, 1041 (S.D. Iowa 2005) (citing *Jones v. Palmer Commc'ns, Inc.*, 440 N.W.2d 884, 891–92 (Iowa 1989)).

The Iowa Poll and articles discussing its results are not actionable statements of material fact under ICFA for several reasons: first, they are the product of an expert's opinion as to a proper methodology in collecting and analyzing statistical data; second, they are simply snapshots in time

of randomized samples, neither predictions of the future nor a guarantee of any outcome; and third, they did not motivate or inform any alleged consumer purchase of merchandise by any Plaintiff.

First, the Iowa Poll methodology and the data comprising its results are reflections of Selzer's opinion of her preferred procedures in conducting a presidential poll in the State of Iowa in 2024. Even among expert, respected professional pollsters, there is disparity on how a poll is conducted. For example, pollsters make different choices about weighting response data. "All good polling relies on statistical adjustment called 'weighting,' which makes sure that the survey sample aligns with the broader population on key characteristics." Pew Research Center, *Key things to know about U.S. polling in 2024* (Aug. 28, 2024), *available at* https://www.pewresearch.org/short-reads/2024/08/28/key-things-to-know-about-us-election-polling-in-2024/. "[P]olls by Gallup and The New York Times/Siena College adjusted on eight and 12 variables, respectively," and Pew "typically adjust[s] on 12 variables." *Id.* By contrast, for the Iowa Poll, Selzer weighted data based on three variables: age, sex, and congressional district. (Ex. H.) Insofar as there are multiple ways to conduct a poll—including, *inter alia*, how and when to collect the underlying data and how to weight and assess that data—each polling expert's decision about their methodology and analysis will necessarily affect the results. In other words, poll results are definitionally expert opinions, not statements of fact.

Second, the Iowa Poll, and indeed all polls in general, are not intended to be—and self-evidently cannot be—a guarantee of a future election performance. *See Scott v. Roberts*, 612 F.3d 1279, 1283 (11th Cir. 2010). Rather, polls are a collection, collation, and analysis of statistical data collected through randomized samples; they merely reflect a snapshot of that randomized sample at a particular moment in time. *See id.* ("[O]pinion polls of random selections of voters are **snapshots with margins of error**, and campaigns are, to say the least, dynamic projects.")

(emphasis added); *see also* CBS News, *Expert Says Polling Is A Snapshot, Not A Predictor, Of What Happens On Election Day* (Sept. 10, 2020) (quoting expert statements that "[p]olls are only as good as their methodology," that they are "snapshots in time," and that "[t]hey may or may not predict what happens with Election Day"), *available at* https://www.cbsnews.com/pittsburgh/news/expert-says-polling-a-snapshot-of-what-happens-on-election-day/.

Integral to the publication of the poll, Defendants published an extensive write-up about how the Iowa Poll was performed, the questions that comprised the poll, the tabulated results from the poll respondents, and the factors upon which Selzer weighted the responses. (*See generally* Exs. C, F, I, K.) Plaintiffs do ***not*** allege that any of the underlying polling data is incorrect or that the published methodology was not implemented precisely as described. This is fatal to their ICFA deception claim. *See, e.g.*, *Bass v. J.C. Penney Co., Inc.*, 880 N.W.2d 751, 764 (Iowa 2016) (rejecting an ICFA claim alleging misrepresentations as to shipping and handling charges when underlying documentation "plainly demonstrated" exactly what those charges would be). Readers and commentators were free to accept, question, or entirely reject the poll's results to the extent they agreed or disagreed with its conclusions.

Plaintiffs identify no defect in the poll's methodology or Defendants' disclosures that would stray into the realm of an actionable statement of fact. Instead, Plaintiffs merely contend that *something* must be amiss because the poll results deviated from the final election results. But this is the logic of conspiracy, not of law; and this contention is not and cannot be pleaded with the particularity required by Rule 9(b). Defendants never claimed, nor have Plaintiffs alleged that Defendants claimed, that the Iowa Poll would definitively match the final election results.

Indeed, the very article publishing the poll conceded that "[a] victory for Harris **would be a shocking development**." (Ex. A at A-1 (emphasis added).) Furthermore, the results of the poll itself also found that the gap between the two presidential candidates was less than the margin of error, meaning it was within the contemplation of the poll results that President Trump could win the election. (*Id.* at A-2.) And by their own admission, Plaintiffs are fully aware that the poll could not possibly purport to guarantee a future outcome: they refer to three other instances over the preceding six years in which Selzer's poll results did not match final election results. (Am. Compl. ¶¶ 38–40.)

The Amended Complaint leaves no doubt that the Iowa Poll was understood by all, including Plaintiffs, to be nothing more than a statement of opinion based upon an analysis of a set of randomly sampled statistical data collected over a short three-day period. Under no reading of the Amended Complaint can the poll results be described as a statement of fact.

Third, even if the Iowa Poll results *could* be considered statements of "fact," such statements nevertheless do not satisfy ICFA's requirement that they concern a "material fact." In their Amended Complaint, Plaintiffs allege that the "only material facts that matter when it comes to polling [are] who is winning the race and by how much." (*Id.* ¶ 116.) However, under ICFA, "material" does not mean merely "important," "newsworthy," "interesting," or any other generic term subject to Plaintiffs' misuse; rather, it is a legally defined term of art. A statement of fact is only "material" under ICFA if it creates "misleading impression . . . involv[ing] information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product." *State ex rel. Miller v. Vertrue, Inc.*, 834 N.W.2d 12, 34 (Iowa 2013) (citation and internal quotations omitted). In *Vertrue*, the Iowa Supreme Court held that "underlying performance terms of [a] membership offer were material as they presumably constituted **the most important factor**

affecting consumers' decisions to enter into a long-term obligation to pay . . . monthly premiums." *Id.* at 37 (emphasis added).

In this case, of course, Plaintiffs make no allegations whatsoever that the Iowa Poll results affected "their choice of, or conduct regarding" *The Register* or any other consumer product or merchandise. *Cf. id.* Again, neither President Trump nor Zaun plead that they purchased—or even considered purchasing—*The Register*. Rep. Miller-Meeks alleges that she regularly read *The Register* without any regard to the publication of the Iowa Poll. (*See* Am. Compl. ¶ 21.) She does *not* plead that she chose to buy it or read it specifically because it contained the Iowa Poll results.

On the face of the Amended Complaint, the Iowa Poll and its results did not affect Plaintiffs' consumer behavior in any way, whether with respect to *The Register* (the alleged merchandise at issue) or otherwise. As a result, Plaintiffs have alleged no statement of ***material*** fact as required for a colorable claim of deception under ICFA.

In consideration of the totality of the circumstances, therefore, it is clear that Plaintiffs have failed to allege any actionable predicate deceptive conduct by any Defendant. On their face, the substance and context of the published poll results made clear exactly what the poll did and did not represent. The poll results reflected a snapshot in time, capturing data from a randomized sample and applying expert opinion and methodology thereto. (Ex. F.) The results merely opined as to what happen in a future election, noted that the applicable margin of error exceeded either presidential candidate's lead, and conceded that a hypothetical victory for then-Vice President Harris "would be . . . shocking." (Ex. A at A-1.) The poll results did ***not*** state that Ms. Harris was guaranteed to win or make any other specific, verifiable assertion of fact. *Cf. Harrington*, 353 F. Supp. 2d at 1041 (considering "the precision and specificity of" and "verifiability of the statement" in determining whether a statement is of fact or opinion). And the literary context in which the

21

statements were made, *i.e.*, the newspaper article reporting the poll results, provides all the necessary background to its readers to make absolutely clear that the poll results are a statement of opinion. *See id.*

Plaintiffs' claim that Defendants engaged in an act of "deception" under ICFA is entirely unsupported by either the facts as pleaded or the law, and the claim must be dismissed. (Am. Compl. ¶ 116.)

### 2. Publication of the Iowa Poll Results Is Not an "Unfair Act or Practice"

Just as the publication of the Iowa Poll and its results is not actionable "deception" under ICFA, it is not an actionable "unfair act or practice." (Am. Compl. ¶¶ 117–18.) Under ICFA, "[u]nfair practice means an act or practice which causes substantial, unavoidable injury to consumers that is not outweighed by any consumer or competitive benefits which the practice produces." Iowa Code §§ 714.16(1)(i), 714H.2(9). Here again, ICFA reinforces its applicability to *consumer* harm and requires (1) "unfair" business conduct, and (2) a consumer injury that is not only "substantial," but also "***unavoidable***." *Id.* § 714.16(1)(i) (emphasis added).

As to the requirement of unfair commercial conduct, Iowa law is clear that the statute prohibits "unscrupulous ***business*** practices," such as a sale or advertisement. *State ex rel. Miller v. Cutty's Des Moines Camping Club, Inc.*, 694 N.W.2d 518, 525 (Iowa 2005) (emphasis added); *see also Vertrue, Inc.*, 834 N.W.2d at 34 (applying the statute to advertising and marketing conduct). The only alleged "unfair" conduct in this case is the publication of newspaper articles about Selzer's poll—not the sale or advertisement of the newspaper. As discussed above, the publication of the articles is a protected speech activity, is not an inherently commercial act, and bears no qualities of general "unfairness." *Cutty's*, 694 N.W.2d at 525.

Further, as to the requirement of a substantial and unavoidable consumer harm, Plaintiffs helpfully enumerate their alleged "injuries," none of which is a consumer harm, demonstrably

substantial, or remotely unavoidable. The only injuries alleged are (1) the Plaintiffs' feeling that they "were badly deceived and misled"; (2) President Trump's decision to "divert campaign and financial resources to Iowa" after reading the poll; (3) the fact that Rep. Miller-Meeks' had to "fight a recount that never should have happened"; and (4) "the loss of [Zaun's] Senate seat." (Am. Compl. ¶¶ 117–18, 133.) At the outset, as discussed above, none of these are consumer injuries giving rise to an ICFA claim. They are—at most—conceptual and self-inflicted injuries based on Plaintiffs' own apparent misunderstanding of the nature of political polls, which are simple expert opinions as discussed above.

The first alleged injury—being "badly deceived and misled"—is contradicted by Plaintiffs' own allegations stating definitively that they knew all along that "President Trump certainly could not have trailed Harris by three points in Iowa at any time in the 2024 cycle." (Am. Compl. ¶ 7.) As discussed further below, the Plaintiffs do *not* allege that they credited the poll results or relied on them to make any consumer decision; they do not allege this in the Amended Complaint because they in fact did no such thing. Plaintiffs were not in fact "deceived" by the Iowa Poll and were perfectly capable of disregarding its analysis and conclusion based on their own certainty of its inaccuracy. To the extent they were "deceived and misled," such an injury was easily avoidable if Plaintiffs (together with their very well-staffed and capable campaigns) simply read the published underlying polling data and reached their own conclusions about their import.

The second alleged injury—the Trump campaign's purported diversion of "campaign and financial resources to Iowa"—is not a consumer injury suffered by President Trump in his individual capacity, nor does it flow from the publication of the poll. (*See id.* ¶ 117.) To the extent President Trump and his campaign made any strategic decision to expend time and campaign funds

in Iowa, those expenditures were not paid to any of the Defendants nor were they in any other way beneficial to the Defendants.

The final two alleged injuries—Rep. Miller-Meeks's recount procedures and Zaun's electoral loss—are not substantial and unavoidable consumer injuries, and they have no plausible alleged causal connection to the publication of the Iowa Poll whatsoever. They cannot be predicate injuries upon which to state a claim of an unfair act or practice under ICFA.

Simply put, in order to state a claim based on an alleged unfair act or practice, ICFA requires Plaintiffs to plead both a *plausible* fraudulent act by the Defendants and a ***plausible*** concrete consumer injury that was both substantial and unavoidable. They have failed to do either in this case. Plaintiffs have not sufficiently pleaded any conduct by Defendants that is prohibited by ICFA. The Amended Complaint fails to identify any predicate act by any of the Defendants that could plausibly be deemed to be "deception" or "unfair acts or practices" under the statute.[3] Accordingly, all ICFA claims must be dismissed in their entirety.

### C.    Plaintiffs Do Not Allege the Publication of the Poll Was in Connection with the Sale or Advertisement of Consumer Merchandise

Plaintiffs fail to state a cognizable ICFA claim because they do not plead any plausible basis upon which this Court could conclude that Defendants' actions in conducting and publishing the Iowa Poll were done in connection with the sale of consumer merchandise.

---

[3] In a strained "kitchen-sink" pleading effort, the Amended Complaint states that the poll was "deceptive, misleading, unfair, and *the result* of concealment, suppression, and omission of material facts." (*See* Am. Compl. ¶¶ 120–21 (emphasis added).) This smattering of general verbiage is not consistent with the language of the statute and states no claim thereunder. *Cf.* Iowa Code § 714H.3 (no mention of a prohibitive practice that is the "result" of something). Rather, the Amended Complaint's only pleaded (but insufficient) claims of violative conduct are that the poll was a "deception" or an "unfair act or practice." (*See* Am. Compl. ¶¶ 116–18.) To the extent Plaintiffs intended to plead additional forms of allegedly violative conduct, they did not do so with sufficient particularity to meet the standard set forth in Rule 9(b).

The purpose of ICFA's private right of action is to protect individual consumers, and the statute therefore requires that the allegedly wrongful conduct to have a direct relational nexus to a consumer activity. *Mannino*, 2024 WL 4884440, at *3 (citing *Deng v. White*, No. 18-1672, 2019 WL 6358427, at *5 (Iowa Ct. App. Nov. 27, 2019)). The statutory language itself enforces this requirement by mandating that consumer plaintiffs demonstrate that the conduct that allegedly violates ICFA was done "in connection with the advertisement, sale, or lease of consumer merchandise[.]" Iowa Code § 714H.3.

ICFA and Iowa case law define the relevant terms and phrases incorporated into this commerce requirement. "'[C]onsumer merchandise' means merchandise offered for sale or lease, or sold or leased, primarily for personal, family, or household purposes." Iowa Code § 714H.2(4).[4] For purposes of this lawsuit, Plaintiffs allege the "merchandise" at issue consists of *The Register*'s "physical newspapers" and "online newspapers."[5] (Am. Compl. ¶ 115.)

The term "'[s]ale' means any sale or offer for sale of consumer merchandise for cash or credit." Iowa Code § 714H.2(8). The term "[a]dvertisement' includes the attempt by publication, dissemination, solicitation, or circulation to induce directly or indirectly any person to enter into

---

[4] Because the entire thrust of Plaintiffs' Amended Complaint is that the "merchandise" impacted their respective careers as politicians, it is a stretch for them to claim that they used it "primarily for *personal, family, or household purposes*." *Id.* (emphasis added). To allow Plaintiffs to bring a claim based on alleged professional use of a good or service would be an improper (and huge) expansion of the reach of ICFA.

[5] Plaintiffs also nominally allege that the merchandise in this case includes any "other content that contained the [poll]." (Am. Comp. ¶ 115.) This allegation, however, is impermissibly vague and wildly overbroad. Plaintiffs' claim would then encompass every article, interview, podcast, political advertisement, opinion piece, or book that discusses (even unfavorably) the Iowa Poll and its results, written or spoken by anyone (including non-parties) in any medium or forum. Defendants cannot possibly know, let alone have control over, all of the potential "content that contained" the results of the poll at issue, nor is every such piece of "content" consumer merchandise. Plaintiffs' only cognizable allegation regarding any "merchandise" in this lawsuit, therefore, covers only *The Register*'s physical and digital newspaper.

any obligation to acquire any title or interest in any merchandise." Iowa Code § 714H.2(2) (incorporating the definition of the term as set forth in Iowa Code § 714.16(1)(a)).[6]

Finally, the phrase "in connection with," as explained by the Iowa Supreme Court, "is commonly defined as 'related to, linked to, or associated with,'" and in the context of a consumer fraud claim, requires a showing of "some relation or nexus" between the prohibited act and the merchandise in question. *Cutty's Des Moines Camping Club*, 694 N.W.2d at 526 (citations and quotations omitted).

Synthesizing these definitions, the law is clear: Plaintiffs must plead that they were harmed by Defendants' prohibited conduct that was ***related to the sale or advertisement of The Register's newspaper*** in order to state a claim for an ICFA violation. Plaintiffs have not done so. To the contrary, in fact, Plaintiffs affirmatively claim that the allegedly violative conduct was ***politically***—not commercially—motivated. Plaintiffs allege (however implausibly) that the publication of the poll was for the sole purpose of "manufacturing fake support for Democrat candidates in order to interfere in the elections." (Am. Compl. ¶ 41.) And the gravamen of Plaintiffs' alleged harm is that they were "misled" by this poll as to their respective positions in their elections. (Am. Compl. ¶¶ 116–21.) Even if that were true (though it plainly is not), it only confirms that neither the alleged harmful conduct—*i.e.*, publishing and releasing the poll—nor the alleged harm itself—*i.e.*, President Trump's professed fear of losing the election—were "in

---

[6] Unlike "sale" and "advertisement," ICFA does not define the term "lease"; however, the widely understood and plain language meaning of the term is "a contract by which one conveys real estate, equipment, or facilities for a specified term and for a specified rent." *See Lease*, Merriam-Webster Dictionary, *available at* https://www.merriam-webster.com/dictionary/lease. No construction of the Amended Complaint can conceivably implicate any "lease" under the statute, nor does the Amended Complaint make any such allegation.

connection with" the "sale" or "advertisement" of "consumer merchandise." *Cf.* Iowa Code § 714H.3.

Furthermore, Plaintiffs did not plead that the publication of the Iowa Poll had any nexus whatsoever to their purchase of *The Register*. Indeed, neither President Trump nor Zaun even alleged that they purchased *The Register* at all. And while Rep. Miller-Meeks pleads that she purchased a copy of *The Register* containing the results of the Iowa Poll at issue, she also admits that she is a "regular reader of the *Des Moines Register*." (Am. Compl. ¶ 21.) She did not plead that the act of Press Defendants publishing or disseminating the Iowa Poll affected her decision to purchase a paper that she already regularly purchased and read.

Furthermore, the Plaintiffs concede that the articles and poll results were made freely and publicly available, meaning none of the Plaintiffs were required to engage in any consumer purchase whatsoever to read the articles about the results of the poll. (*Id.* ¶ 1 n.1, ¶ 3 n.4, ¶¶ 119, 142, 162.) Therefore, the publication of the poll results was not an act in connection with the sale or advertisement of the merchandise as required by ICFA.

Finally, Plaintiffs do not plead that the publication of the Iowa Poll had any nexus to any advertisement for *The Register*. As is clear from its definition, the purpose of an advertisement is meant to induce a consumer to enter into a transaction to purchase merchandise. *See* Iowa Code § 714H.2(2); *State v. Cutsick*, 84 N.W.2d 554, 556 (Iowa 1957) ("[A]dvertising is a method, in a broad sense, of soliciting the public to purchase the wares advertised."); *see also* Note, *Consumer Protection Under the Iowa Consumer Fraud Act*, 54 Iowa L. Rev. 319, 325 (1968) ("Virtually every type of ***sales appeal*** made to ***customers*** . . . can be brought within the 'advertisement' definition [under ICFA]." (emphasis added)). There is nothing in the Iowa Poll or the articles referencing it that amounts to any attempt to "induce" Plaintiffs to purchase *The Register*—it

simply is not a call to action to purchase anything at all. Plaintiffs admit as much in their Amended Complaint, as they claim that the purpose of Press Defendants' release of the poll was alleged "election inference," (Am. Compl. ¶ 1), not an attempt to sell newspapers or gain subscribers. And relevant here again is the fact that the articles were admittedly published and available to the public *free of charge*, which vitiates any claim that the publication of the poll was meant to incite their purchase. The Amended Complaint therefore fails to allege a connection to any advertisement under ICFA.[7]

In short, Plaintiffs have failed to plead the foundational requirement that the allegedly wrongful conduct has a relational nexus to the sale or advertisement of any consumer merchandise. Nor have Plaintiffs sufficiently pleaded that they were harmed "in connection with" the "sale" or "advertisement" of *The Register*. *Cf.* Iowa Code § 714H.3. Therefore, Plaintiffs' ICFA claim must be dismissed.

### D. Plaintiffs Do Not Allege That They Relied on the Iowa Poll

ICFA also requires any claimed damages be proximately caused by the prohibited conduct. Iowa Code § 714H.5(1); § 714.16(2)(a). The statute does not independently define "proximate cause," but the Iowa Supreme Court has held that the question of "proximate cause" is also rightly

---

[7] If Plaintiffs nevertheless attempt to claim the publication of the Iowa Poll and its results was somehow an "advertisement," ICFA then specifically exempts the claims. It provides:

> This chapter *shall not apply* to . . . the newspaper, magazine, publication, or other print media in which the advertisement appears, including the publisher of the newspaper, magazine, publication, or other print media in which the advertisement appears, . . . including an employee, agent, or representative of the publisher, newspaper, magazine, publication or other print media . . . .

*Id.* § 714H.4(1)(c) (emphasis added). It is undisputed that *The Register* is a newspaper and that the Des Moines Register is its publisher. (Am. Compl. ¶ 25.) Gannett, as owner of the Des Moines Register, (Am. Compl. ¶ 26), is also a publisher under the statute. Should the Court entertain the idea that the Iowa Poll is an "advertisement" for *The Register* for purposes of ICFA, this exception fully bars Plaintiffs' ICFA claim.

framed as a "scope-of-liability issue," *i.e.*, that liability must be limited to "'harms that result from risks created by the actor's wrongful conduct, but for no others.'" *Thompson v. Kaczinski*, 774 N.W.2d 829, 838 (Iowa 2009) (quoting Restatement (Third) of Torts § 29, cmt. e). In other words, when there is no wrongful conduct pleaded (as in the present case), there are no attendant risks of harm that would satisfy the proximate cause requirement under ICFA.

Furthermore, ICFA itself indicates what would be required to show proximate cause: reliance on the fraudulent act by the consumer when entering into a consumer transaction. Prior to the existence of the private right of action under ICFA, the Iowa AG was expressly ***not*** required to prove its own reliance on the fraudulent act; however, the private right of action statute removed that exception. *Compare* Iowa Code § 714.16(7) ("[I]t is not necessary in an action for reimbursement or an injunction, to allege or to prove reliance . . . ."), *with* Iowa Code § 714H.3 (requiring that a defendant have the "intent that others rely" on the fraudulent conduct to be liable). The requirement that private plaintiffs establish proximate cause can only be understood to require such reliance. Iowa Code § 714H.3, 714.2(a).

"The Iowa Consumer Fraud Act was patterned after the Illinois Consumer Fraud Act[,]" so we may look to Illinois courts' application of their own consumer fraud act for guidance. *See State ex rel. Miller v. Hydro Mag, Ltd.*, 436 N.W.2d 617, 621 (Iowa 1989). And the Illinois Supreme Court recently confirmed that reliance is ***required*** to prevail on a private right of action under the statute: "In order to establish the element of proximate causation, a plaintiff must prove that it was actually deceived by the misrepresentation. If the plaintiff has neither seen nor heard a deceptive statement, it cannot have relied on the statement and, consequently, cannot prove that the statement was the proximate cause of its injury." *Tri-Plex Tech. Servs., Ltd. v. Jon-Don, LLC*, 241 N.E.3d 454, 462 (Ill. 2024) (citation omitted).

Simply put, none of the Plaintiffs pleads that they relied on the Iowa Poll when engaging in any consumer conduct, much less that any such reliance was justified. Plaintiffs do not even superficially plead that they relied on the articles or poll data, nor do they allege that the underlying poll data was inaccurate. Only approximately 72 hours passed between the first publication of the poll and the close of the election in Iowa. (*See* Am. Compl. ¶¶ 1–3.) Plaintiffs do not identify a single act from that period that demonstrates their reliance on the articles in question to make a consumer purchase decision of any kind.[8] And Zaun's race was not even covered by the poll, so there was nothing for him to even rely upon to his detriment as a consumer.

Plaintiffs do not and cannot plead reliance on the Iowa Poll in any consumer decision. Therefore, they can neither plead nor show proximate cause, and their claims must be dismissed. *Cf.* Iowa Code § 714H.5; § 714.16(2)(a).

### E.    Plaintiffs Assert No Plausible Claim for Fraudulent Misrepresentation

In addition to their attempt to manipulate the purpose and use of ICFA, Plaintiffs also attempt to abuse Iowa's common law of fraudulent misrepresentation to avoid the constitutional protections of free speech and free press. To assert a claim for fraudulent misrepresentation, a plaintiff must plead and ultimately prove the following: "'(1) representation, (2) falsity, (3) materiality, (4) scienter, (5) intent to deceive, (6) reliance, and (7) resulting injury and damage.'" *Van Sickle Const. Co. v. Wachovia Com. Mortg., Inc.*, 783 N.W.2d 684, 687 (Iowa 2010) (*quoting Lloyd v. Drake Univ.*, 686 N.W.2d 225, 233 (Iowa 2004)).

---

[8] The obvious reason Plaintiffs do not allege any acts of reliance is because no such reliance in fact occurred. President Trump publicly made clear that he affirmatively rejected—not relied upon—the results of the poll. The Amended Complaint cites directly to an article in Forbes that reports President Trump's dismissal the Iowa Poll within 24 hours of its publication as "a fake poll done by a Trump hater who oversampled, by a lot, Democrats." (*See* Am. Compl. ¶ 70 (citing Sara Dorn, *Why Outlier Poll Showing Harris Winning Iowa Could Spell Trouble for Trump*, Forbes (Nov. 3, 2024).)

At minimum, Plaintiffs have failed to sufficiently plead several of those elements. As with their ICFA claim, this Court must reject Plaintiffs' attempt to use the tort of fraudulent misrepresentation to silence speech they do not like.

### 1.    Plaintiffs Did Not Plead an Actionable Representation

Plaintiffs plead that the alleged misrepresentations at issue are the Iowa Poll results, where there were allegedly "false misrepresentations of the state of the races." (Am. Compl. ¶ 138.) This contention demonstrates a fundamental misunderstanding both of the concept of opinion polling and the law of fraudulent misrepresentation.

As stated in detail above, the Iowa Poll is not an action representation, because it is an *opinion*. (*See supra* Section IV(B)(1).) This is underscored by Plaintiffs' understanding that other "mainstream" polls published at the time showed different results. (Am. Compl. ¶ 56.) A poll result cannot be a "fact" if the result can vary based on who conducted the poll, and how.

"[U]nder Iowa law, 'a mere statement of honest opinion' does not give rise to a claim for fraud." *Tralon Corp. v. Cedarapids, Inc.*, 966 F. Supp. 812, 827 (N.D. Iowa 1997) (quoting *Hoefer v. Wisc. Educ. Assoc. Ins. Tr.*, 470 N.W.2d 336, 340 (Iowa 1991) (citing *West v. W. Cas. and Sur. Co.*, 846 F.2d 387, 393 (7th Cir. 1988) ("A statement that merely expresses an opinion . . . does not constitute an actionable misrepresentation.")). The Iowa Poll was just that: an opinion. As such, it, as a matter of law, is not an actionable "representation" for the purpose of a fraudulent misrepresentation claim.

### 2.    Plaintiffs Did Not Plead Any Justifiable Reliance on the Iowa Poll

To state a claim for fraudulent misrepresentation, Plaintiffs must allege that they "acted in reliance on the truth of the representation and [were] justified in relying on the representation[.]" *Gibson v. ITT Hartford Ins. Co.*, 621 N.W.2d 388, 400 (Iowa 2001). There can be no liability unless the alleged misrepresentation "increased the risk" of a plaintiff acting in reliance on it. *See*

*Spreitzer v. Hawkeye State Bank*, 779 N.W.2d 726, 736 (Iowa 2009). In other words, to show reliance, a plaintiff must plead that they took an action (or refrained from taking an action) because of the representation at issue.

But acting in reliance on an alleged misrepresentation is not enough: a plaintiff must also plead that the reliance was ***justified***. *See id.* at 737; *Hammes v. JCLB Props. LLC*, 764 N.W.2d 552, 556 (Iowa Ct. App. 2008); *Lockard v. Carson*, 287 N.W.2d 871, 878 (Iowa 1980). In determining whether a plaintiff's reliance on a defendant's alleged misrepresentation was justified, Iowa courts do not apply an objective standard of care; rather, Iowa courts employ a subjective test, considering whether "plaintiffs, ***in view of their own information and intelligence***, had a right to rely on the representations" when taking or refraining from a particular action. *Hammes*, 764 N.W.2d at 556 (emphasis added); *Lockard*, 287 N.W.2d at 878; *Spreitzer*, 778 N.W.2d at 737 ("[T]he justified standard followed in Iowa means the reliance does not necessarily need to conform to the standard of a reasonably prudent person, but depends on the qualities and characteristics of the particular plaintiff and the specific surrounding circumstances.").

In their Amended Complaint, Plaintiffs make the bald allegation that they "justifiably relied on the Defendant Polls." (Am. Compl. ¶ 143.) However, simply reciting the element is not sufficient to state a claim that satisfies the *Iqbal*/*Twombley* standard, much less one that comports with Rule 9(b).

First, as discussed above, Plaintiffs do not plead any facts to support the claim that they took any particular action of any kind in reliance on the article or poll results. But Iowa law requires that they have affirmatively "***acted*** in reliance on the truth of the representation." *See Gibson*, 621 N.W.2d at 400 (emphasis added). It is not enough for Rep. Miller-Meeks to allege that she purchased a newspaper; she must have done so ***in reliance on*** the substance of the poll results.

(Am. Compl. ¶ 21.) It is not enough for Zaun to allege that he lost his election, because that is not an affirmative act that he undertook in reliance on the poll results. (Am. Compl. ¶¶ 8, 101.) And it is not enough for President Trump to allege he was personally "deceived" by the poll results. (Am. Compl. ¶ 112.) The facts in the Amended Complaint, taken as true, reveal that the Plaintiffs took no detrimental action of any kind in reliance on the poll results.

Furthermore, even if any of the Plaintiffs pleaded that they took some action in reliance on the published poll results, they do no plead that their reliance was ***justified***. *See Spreitzer*, 779 N.W.2d at 736. In fact, Plaintiffs allege that the poll results were unreliable on their face such that Plaintiffs could not have justifiably relied on them. (*Id.* ¶¶ 56–60.) Plaintiffs' allegations thereby defeat their own fraudulent misrepresentation claim. They allege that the Iowa Poll was "so implausible that no objective pollster could honestly have advanced it," (Am. Compl. ¶ 54), and that "***every other*** mainstream Iowa poll also showed President Trump comfortably ahead." (*Id.* ¶ 56 (emphasis in original).) They further allege their understanding of multiple previous Selzer polls that did not match the final election results, including the 2022 Iowa Attorney General election, the 2018 Iowa governor election, and Iowa's 2020 U.S. Senate race. (*Id.* ¶¶ 38–40.) In other words, Plaintiffs allege ***both*** (1) that Selzer's polling was a not credible because it departed from other polls available at the time and she had other historical misses; ***and*** (2) that Plaintiffs were nevertheless justifiably deceived by it. (*Compare id.* ¶ 143, with *id.* ¶¶ 56–60.) Both cannot be true.

The allegations in Plaintiffs' Amended Complaint, taken together, demonstrate that Plaintiffs took no direct action in reliance on the publication of the poll results, and furthermore, they would not have been justified in doing so.

3.  **Plaintiffs' Alleged Injuries Are Not Redressable by a Claim for Fraudulent Misrepresentation**

Plaintiffs allege they were harmed by the publication of the poll results based on a vaguely purported negative impact on their campaigns and on the electoral process more generally. They allege they were "injured by the fraudulence of the Defendant Polls . . . [because] as readers of the *Des Moines Register* and Selzer's polls, [they] were entitled to accurate information, not to be misled by fraudulent misrepresentations." (Am. Compl. ¶ 144.) However, these are not the kinds of harms a claim for fraudulent misrepresentation can redress. Rather, Iowa law recognizes two forms of damages in fraudulent misrepresentation cases: (1) out-of-pocket damages and (2) benefit-of-the-bargain damages (plus consequential damages). *See Midwest Home Distrib., Inc. v. Domco Indus. Ltd.*, 585 N.W.2d 735, 739–41 (Iowa 1998). Neither exists on the face of the pleaded facts.

First, out-of-pocket damages allow a plaintiff to recover a "pecuniary loss suffered as a result of the recipient's reliance upon the misrepresentation[.]" *Putman v. Walther*, 973 N.W.2d 857, 864 (Iowa 2022). They are calculated by giving "the defrauded party the difference between the value of what the party has parted with and the value of what the party has received." *Midwest Home Distrib.*, 585 N.W.2d at 739; *see also Cornell v. Wunschel*, 408 N.W.2d 369, 380 (Iowa 1987). None of the Plaintiffs plead that they "parted with" anything in their individual capacity as a result of the poll, nor that they failed to receive the expected return value. The only Plaintiff to allege a pecuniary loss of any kind is President Trump, who claims that he paid "direct federal campaign expenditures," though he does not allege the nature of the expenditures, where they were incurred, to whom they were paid, whether the expenditures were paid by him individually or by his campaign, or whether his campaign didn't receive the political campaign value for what they paid. (*Cf.* Am. Compl. ¶ 131.) Plaintiffs have failed to state any claim for out-of-pocket damages.

34

Second, benefit-of-the-bargain damages are intended to place "the defrauded party 'in the same financial position as if the fraudulent misrepresentation had been in fact true." *Cornell*, 408 N.W.2d at 380 (quoting Dan B. Dobbs, *Handbook on the Law of Remedies* § 9.2, at 595 (1973)). Benefit-of-the-bargain damages are available for economic injuries and are generally awarded when a fraudulent misrepresentation occurs in the context of a transaction. *See id.* at 382 (quoting Dobbs, § 9.2, at 602)("'[D]eceit is an economic, not a dignitary tort, and resembles, in the interests it seeks to protect, a contract claim more than a tort claim.'"); *Midwest Home Distrib.*, 585 N.W.2d at 741–42 (distributor agreement); *Putman*, 973 N.W.2d at 864 (sale of property); *Bates v. Allied Mut. Ins. Co.*, 467 N.W.2d 255, 260 (Iowa 1991) (insurance agreement); *Lloyd*, 686 N.W.2d at 232–33 (employment agreement).

Moreover, the Restatement provision adopted by Iowa courts limits the application of benefit-of-the-bargain damages in fraudulent misrepresentation cases by requiring that such damages be based on an underlying contract ***with the defendant***. Restatement (Second) of Torts § 549; *see also, e.g.*, *Cornell*, 408 N.W.2d at 380 (noting Iowa's adoption of Section 549 of the Restatement). "When the plaintiff has not entered into any transaction with the defendant but has suffered his pecuniary loss through reliance upon the misrepresentation in dealing with a third person," then benefit-of-the-bargain damages are not the appropriate measure of damages. Restatement (Second) of Torts § 549, cmt. g. In other words, where the plaintiff and the defendant are not parties to an underlying contract, only out-of-pocket damages apply, and not benefit-of-the-bargain damages. *See, e.g.*, *Dier v. Peters*, 815 N.W.2d 1, 9–11 (Iowa 2012) (deeming financial support of child paid by man allegedly misled to believe he was the father as "out-of-pocket" damages). This categorically applies to any expense paid out for any reason to non-parties to this action in relation to Plaintiffs' respective campaign activities.

35

The goal of benefit-of-the-bargain damages is to put a plaintiff "in the same financial position as if the fraudulent misrepresentation **_had in fact been true_**." *Cornell*, 408 N.W.2d at 380 (emphasis added) (quoting Dobbs, § 9.2, at 595). This principle of the law reveals the complete mismatch between the Plaintiffs' claims and the available remedies. As discussed above, political polls cannot be "true" or "false" vis-à-vis final election results. Even assuming the poll results could have been "true" in the way Plaintiffs plead, the counterfactual means that the goal of the damages would be to put President Trump in the financial position he would have been in if he had *lost* the election. This calculation of damages is neither pleaded nor calculable.

In sum, Plaintiffs simply are not eligible for out-of-pocket **_or_** benefit-of-the-bargain damages because the publication of the poll results was not made within the context of any transaction or ongoing business relationship between Plaintiffs and Defendants, and Plaintiffs did not incur any out-of-pocket expenses as a result of that publication.

### F.    The Lawsuit Does Not State a Claim for Negligent Misrepresentation

Plaintiffs also each assert a claim for negligent misrepresentation against Defendants for their publication of the Iowa Poll, the elements of which are:

> (1) the defendant was in the business or profession of supplying information to others; (2) the defendant intended to supply information to the plaintiff or knew that the recipient intended to supply it to the plaintiff; (3) the information was false; (4) the defendant knew or reasonably should have known that the information was false; (5) the plaintiff reasonably relied on the information in the transaction that the defendant intended the information to influence; (6) and the false information was the proximate cause of damage to the plaintiff.

*McLeodUSA Telecomm. Servs., Inc. v. Qwest Corp.*, 469 F. Supp. 2d 677, 692 (N.D. Iowa 2007) ("*McLeod*"). The Amended Complaint's mere incantation of some of these elements are both conclusory and fail as a matter of law, and their claim for negligent misrepresentation should accordingly be dismissed.

### 1.    Defendants Are Not in the Business or Profession of Supplying Information as Construed by Iowa Law

Plaintiffs imply that Defendants operate "in the business or profession of supplying information to others." (Am. Compl. ¶ 150 (quoting *Sain v. Cedar Rapids Cmty. Sch. Dist.*, 626 N.W.2d 115, 123 (2001)), and as such owed a duty of care to "foreseeable third parties [specifically, Plaintiffs] as members of a limited class of persons who would be contemplated to use and rely upon the [Iowa Poll]." (Am. Compl. ¶ 149 (quoting *Sain*, 626 N.W.2d at 123).) Plaintiffs evidently presumed that this element would be satisfied simply because Press Defendants are publishers of a newspaper. But upon analysis of the law, the Court will find that Press Defendants do ***not*** operate in the business or profession of supplying information to others as that element is applied under Iowa law, and the claim for negligent misrepresentation therefore fails.

Whether a defendant operated in the business of supplying information to others is a fact-specific inquiry. *Sain*, 626 N.W.2d 115 at 125. This inquiry establishes whether "the defendant was under the 'duty' necessary to sustain the claim" for negligent misrepresentation. *McLeod*, 469 F. Supp. 2d at 692 (citing *Conveyor Co. v. Sunsource Tech. Servs.*, Inc., 398 F.Supp.2d 992, 1013 (N.D. Iowa 2005)). Accordingly, Iowa law examines the nature of the relationship between the purveyor and consumer of information, and "not the subject matter of the transaction between the plaintiff and the defendant[.]" *Sain*, 626 N.W.2d 115 at 125. On this basis, Iowa courts have "recognized professionals such as accountants, abstractors, [] attorneys," and high-school guidance counselors as individuals in the business or profession of supplying information who thus have the requisite duty of care. *Sain*, 626 N.W. 2d at 123 (citing *Ryan v. Kanne*, 170 N.W.2d 395, 402 (Iowa 1969)). And, critically, "a person in the profession of supplying information for the guidance of others acts *in an advisory capacity* and is manifestly aware of the use that the information will be

put, and *intends* to supply it *for that purpose*." *Conveyor Co.*, 398 F.Supp.2d at 1014 (emphases added).

Defendants cannot be said to be "recognized professionals" who acted in an "advisory capacity" for Plaintiffs. They were not retained by Plaintiffs (or anyone) to conduct and publish the Iowa Poll for any individual's advisory benefit. Plaintiffs do not plead (and cannot plead) that Defendants conducted the poll and published its results *for the purpose and intent of advising* Plaintiffs or their respective campaigns. Accordingly, while Press Defendants are publishers of a newspaper, they were not "in the business or profession of supplying information" under Iowa law. On this basis alone, Plaintiffs' claims for negligent misrepresentation should be dismissed.

### 2. Defendants Did Not Supply the Iowa Poll to Plaintiffs for Plaintiffs' Benefit or Guidance

Plaintiffs claim that they, as "foreseeable third parties as members of a limited class of persons who would be contemplated to use and rely upon" the Iowa Poll were entitled to a duty of care by Defendants to publish accurate polling. (Am. Compl. ¶ 149.) Plaintiffs once again misapprehend Iowa law. Although the Iowa Supreme Court recognizes an advisor's duty to third parties, it only extends "to persons for whose benefit and guidance the [professional advisor] *knows* the information is *intended*." *Sain*, 626 N.W.2d at 123 (quoting *Ryan*, 170 N.W.2d at 403) (emphasis added). "Instead of using foreseeability of harm to limit the scope of the duty of care, [Iowa courts] rel[y] upon a stricter standard of knowledge." *Id*.

No Plaintiff claims that the Iowa Poll was conducted and published for the intent of their own individual consumption, nor that Defendants had knowledge of any such intent. The Iowa Poll was *not* intended for Plaintiffs—they concede that the Iowa Poll was published to the *general public*. (Am. Compl. ¶ 1.) Moreover, Plaintiffs do not claim that Defendants *knew* Plaintiffs would rely upon the Polls in making campaign-related decisions and/or expenditures. No facts, whether

alleged in the Amended Complaint or otherwise true, suggest that Defendants knew or intended that any of the Plaintiffs would rely on the Iowa Poll for "guidance." *See Sain*, 626 N.W.2d at 123.

Courts have consistently dismissed negligent misrepresentation claims against general circulation newspapers for precisely this reason. *See Gutter v. Dow Jones, Inc.*, 490 N.W.2d 898, 900 (Ohio 1986) (holding that "a newspaper reader . . . does not fall within a special limited class" of permissible plaintiffs); *see also Ginsburg v. Agora, Inc.*, 915 F. Supp. 733, 739 (D. Md. 1995) ("The publication is offered to the general public and the information provided in the publication is of a general nature, that is, it is not specifically tailored to [the] financial situation of any individual subscriber."); *Stancik v. CNBC*, 420 F.Supp.2d 800, 807–08 (N.D. Ohio 2006). A contrary result would in effect extend liability to all the world, risking unbounded exposure and imposing on the press "the 'intolerable burden' of demonstrating . . . that its efforts to determine the accuracy of any given report were reasonable." *Ginsburg*, 915 F. Supp at 19 (citing *Daniel v. Dow Jones & Co., Inc.*, 520 N.Y.S. 2d 334, 339 (N.Y. Civ. Ct. 1987); *see also Time Inc. v. Hill*, 385 U.S. 374, 389 (1967).

Because Plaintiffs do not and cannot plead that the Iowa Poll was for their "benefit and guidance," nor that Defendants had actual knowledge that the Plaintiffs' campaigns would rely on the Iowa Poll, their claims for negligent misrepresentation fail.

### 3. Plaintiffs Do Not Plead Reasonable Reliance on the Polls or Proximately Caused Damages Therefrom

To state a claim for negligent misrepresentation, Plaintiffs must also plead that they "reasonably relied on the information in the transaction that the [Defendants] intended the information to influence[.]" *McLeod*, 469 F. Supp. 2d at 692. Importantly, like a claim for fraudulent misrepresentation, reliance must be ***justified***. *See Union Cnty., IA v. Piper Jaffray & Co., Inc.*, 741 F. Supp. 2d 1064, 1112 (S.D. Iowa 2010) (citing *Pollmann v. Belle Plaine Livestock*

*Auction, Inc.*, 567 N.W.2d 405, 409–10 (Iowa 1997); *Midwest Home Distrib., Inc.*, 585 N.W.2d at 743. As detailed above in Section IV(E)(2) herein, Plaintiffs do not plead any reliance on the Iowa Poll, justified or otherwise. Accordingly, their claims for negligent misrepresentation fail.

Furthermore, Plaintiffs must also demonstrate that the allegedly "false information was the proximate cause of damage to the plaintiff." *McLeod*, 469 F. Supp. 2d at 692. Put differently, Plaintiffs must establish "that, but for [Defendants'] negligence . . . [P]laintiffs' injury would not have occurred." *Boone Cnty. Comm. Credit Union v. Masel*, 665 N.W.2d 440 (Table), 2003 WL 1050344, at *4 (Iowa Ct. App. Mar. 12, 2003) (citing *Hasselman v. Hasselman*, 596 N.W.2d 541, 545 (Iowa 1999)). As discussed above, Plaintiffs' have identified no compensable damages whatsoever, much less any support for a claim that any damages were proximately caused by Defendants' conduct. (*See supra* Sections IV(A), (E)(3).) As such, Plaintiffs' claims for negligent misrepresentation should be dismissed.

### 4.    First Amendment Considerations Bar Plaintiffs' Negligent Misrepresentation Claim

In addition to Plaintiffs' failure to sufficiently plead all elements of a negligent misrepresentation claim, First Amendment and common law considerations coalesce to impose a critical limitation on tort claims sounding in negligent misrepresentation. Because Plaintiffs are public officials, heightened First Amendment protections apply to all torts involving speech about Plaintiffs, including those arising out of allegedly negligent statements. *See Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 129 (2d Cir. 2013) (holding public figures may sustain a claim premised on speech "only if the statement was made 'with knowledge that it was false or with reckless disregard of whether it was false or not,'" which is true "regardless of the claim at issue" (quoting *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 52 (1988))). Indeed, "a public figure cannot circumvent [this] strict actual malice standard imposed by the First Amendment by calling his claim for

defamation by a different name (tort)." *Id.* at 128 (citations omitted). Put simply, negligence is not enough. Plaintiffs must plausibly allege that Press Defendants published the Iowa Poll with actual malice. Plaintiffs have not done so and *cannot* do so.

Accordingly, Plaintiffs' claim for negligent misrepresentation fails as a matter of law and should be dismissed.

### G.    The First Amendment Bars Plaintiffs' ICFA Claim

The Court need not reach the First Amendment issues at the heart of this case because Plaintiffs lack statutory standing, and their ICFA and common law claims fail as a matter of law. Nevertheless, established free speech principles provide an independent basis mandating dismissal. The First Amendment prohibits Plaintiffs from employing ICFA and the common law to censor the press or penalize statements about political campaigns.

First, interpreting Plaintiffs' claims as applicable to federal election polling—as Plaintiffs attempt to do here—would render them unconstitutional. Reporting on political campaigns is at the zenith of First Amendment protections. Plaintiffs attempt to abuse ICFA and the common law to punish alleged political misinformation, but "there is no free pass around the First Amendment." *281 Care Comm. v. Arneson*, 766 F.3d 774, 783 (8th Cir. 2014) ("*281 Care Comm. II*").

Second, and in the alternative, Plaintiffs' weaponization of ICFA in this context cannot survive the strict scrutiny that restricts the government's ability to penalize Press Defendants' speech that they deem objectionable. The Eighth Circuit has expressly rejected the notion that even knowingly false political speech—unlike *The Register*'s careful, accurate, and objective reporting here—can be bootstrapped within commercial fraud principles because such a claim fails to provide sufficient breathing room for protected speech. *281 Care Comm. v. Arneson*, 638 F.3d

621, 634 n.2 (8th Cir. 2011) ("*281 Care Comm. I*"). The linchpin of the Amended Complaint's

theory of recovery therefore has no traction as a matter of constitutional law.

### 1.    Press Defendants' Campaign Reporting Is Entitled to Protection Under the First Amendment From an ICFA or Speech-Based Tort Claim.

Plaintiffs' claims amount to a frontal assault on the First Amendment, which embodies "a

profound national commitment to the principle that debate on public issues should be uninhibited,

robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). As the U.S.

Supreme Court has emphasized, "speech concerning public affairs is more than self-expression; it

is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964). For that

reason, "speech on public issues occupies the highest rung of the hierarchy of First Amendment

values, and is entitled to special protection." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting

*Connick v. Myers*, 461 U.S. 138, 145 (1983)). It follows that "[t]he First Amendment 'has its fullest

and most urgent application' to speech uttered during a campaign for political office." *Citizens

United v. FEC*, 558 U.S. 310, 339 (2010) (quoting *Eu v. San Francisco Cnty. Democratic Cent.

Comm.*, 489 U.S. 214, 223 (1989)). Indeed, "[p]rotection of political speech is the very stuff of the

First Amendment." *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 871 (8th

Cir. 2012) (internal quotations and citation omitted).

Plaintiffs cannot overcome the First Amendment's protection for *The Register*'s news

reporting on a paramount matter of public interest—"the most consequential election in memory"

(Am. Compl. ¶ 5)—under the guise of protecting the public from harm by misusing IFCA and

Iowa's common law. In *Snyder v. Phelps*, the Supreme Court ruled that speech on a "matter [ ] of

public concern" could not be restricted even though it directly harmed the plaintiff by intentionally

inflicting emotional distress in violation of state law. 562 U.S. at 451–52. Although the abhorrent

speech at issue in *Snyder* "inflict[ed] great pain," it was immunized from liability under the First

Amendment "to ensure that we do not stifle public debate." *Id*. at 460–61. Thus, to safeguard uninhibited public discourse, speech must be fully protected when, as here, it addresses "a subject of general interest and of value and concern to the public." *Id*. at 453 (internal quotation and citation omitted).

A recent case in Washington state, which similarly involved a consumer protection law claim challenging political speech, reinforces the core teaching of the *Snyder* case. *See Washington League for Increased Transparency & Ethics v. Fox Corp.*, 19 Wash. App. 2d 1006, 2021 WL 3910574 (Wash. Ct. App. Aug. 30, 2021) ("*WASHLITE*") (unpublished op.). In *WASHLITE*, the plaintiff claimed that Fox News violated Washington's Consumer Protection Act ("CPA") "by making statements, on-air, downplaying the danger posed by the coronavirus, describing the pandemic as a 'hoax,' and accusing government officials and media organizations of exaggerating the danger posed by COVID-19 in an attempt to undermine [then] former President Donald J. Trump." *Id.* at *1 (footnote omitted). Recognizing that the allegedly actionable statements "clearly implicate matters of public concern and receive special First Amendment protections," (*id*. at *4), the *WASHLITE* court rejected the CPA claim based on established First Amendment principles:

> [Plaintiff] cites no authority for the proposition that false statements about threats to public health, *even if recklessly made*, fall within any exception to the First Amendment. To the contrary, the Supreme Court in *Alvarez* disavowed the principle that false expressions in general receive a lesser degree of constitutional protections simply by virtue of being false.

*Id*. at *5 (emphasis added); *see also United States v. Alvarez,* 567 U.S. 709, 717, 718 (2012) (holding the Stolen Valor Act invalid because it was not confined to the "few historic and traditional categories" of expression "where the law allows content-based regulation of speech") (internal quotations and citations omitted); *238 Care Comm. I,* 638 F.3d at 633–34 ("We find that the Supreme Court has never placed knowingly false campaign speech categorically outside the protection of the First Amendment and we will not do so today.").

43

So too here, where Plaintiffs' claims against a community newspaper—for truthfully reporting information of unquestioned news value on a matter of "political concern to all Americans"—violate the First Amendment. *WASHLITE*, 2021 WL 3910574, at *4. Plaintiffs' usurpation of ICFA and Iowa tort law to punish allegedly false political speech, *"absent any evidence that the speech was used to gain a material advantage, . . .* would give government a broad censorial power unprecedented in this Court's cases or in our constitutional tradition." *Alvarez*, 567 U.S. at 723 (emphasis added); *see also id.* at 731–32 (Breyer, J., concurring) ("Laws restricting false statements about philosophy, religion, history, the social sciences, the arts, and the like" raise grave First Amendment concerns). Contrary to Plaintiffs' allegations, there is no general government power to punish alleged political falsehoods outside very narrow exceptions which do not apply in this (*i.e.*, defamation, fraud, and perjury).[9]  To hold otherwise would put the "government in the unseemly position of being the arbiter of truth about political speech." *281 Care Comm. I*, 638 F.3d at 635–36. Under our constitutional system, that determination is committed to voters in the State of Iowa.

### 2.    In the Alternative, Plaintiffs' Interpretation of ICFA as Applicable to Press Defendants' Political Reporting Would Fail Strict Scrutiny.

Alternatively, even accepting Plaintiffs' erroneous proposal that ICFA applies to Press Defendants' reporting of polling results in the midst of presidential and congressional elections, the statute's application in this context would nevertheless be subject to the most exacting level of constitutional scrutiny. *281 Care Comm. II*, 766 F.3d at 784 ("Here, because the speech at issue occupies the core of the protection afforded by the First Amendment, we apply strict scrutiny to

---

[9] In addition to the Eighth Circuit's decision in *281 Care Comm. II*, other post-*Alvarez* circuit court decisions have invalidated state laws punishing election campaign misinformation—even where the laws were restricted to deliberately or recklessly falsified speech. *See, e.g.*, *Grimmett v. Freeman*, 59 F.4th 689 (4th Cir. 2023); *Susan B. Anthony List v. Driehaus*, 814 F.3d 466 (6th Cir. 2016).

legislation attempting to regulate it."). Accordingly, Plaintiffs must demonstrate that their interpretation of ICFA is "necessary to serve a compelling state interest and . . . is narrowly drawn to achieve that end." *Burson v. Freeman*, 504 U.S. 191, 198 (1992). The burden of justifying restrictions on political speech under the strict scrutiny standard is "well-nigh insurmountable." *Meyer v. Grant*, 486 U.S. 414, 425 (1988). The Amended Complaint cannot survive strict scrutiny.

First, Plaintiffs' claims serve no compelling government interest. Plaintiffs urge that ICFA prevents allegedly false campaign speech from misleading voters to influence election outcomes. (Am. Compl. ¶¶ 126–130.) However, no court has held that the government has *any* interest in policing such speech, much less a compelling one. *Daily Herald Co. v. Munro*, 758 F.2d 350, 362 (9th Cir. 1984) (Norris, J., concurring) ("[T]he State cites no authority, and I know of none, for the proposition that government may restrict the collection and broadcasting of information about the political process out of concern for its impact on voting behavior."). Plaintiffs' ICFA claim capsizes the First Amendment by transforming its central purpose of ***protecting*** political speech into a basis for regulating—or even prohibiting—it.

The Eighth Circuit has unequivocally rejected the use of general fraud principles to manufacture an interest in proscribing political speech, even where the speech is knowingly false:

> To the extent that defendants also argue in favor of application of fraud principles to all knowingly false speech, we reject the argument, noting the Supreme Court has carefully limited the boundaries of what is considered fraudulent speech. It has not included all false speech, or even all knowingly false speech.

*281 Care Comm. I*, 638 F.3d at 634 n.2. This reasoning compels dismissal of the Amended Complaint.

Second, the misuse of ICFA and Iowa's common law is not actually necessary to remedy the purported fraud. The First Amendment requires that any law's "chosen restriction on the speech at issue be 'actually necessary' to achieve its interest." *Alvarez*, 567 U.S. at 725 (internal citations

45

omitted). Even indulging the fiction that ICFA can be stretched to prevent voters from exposure to purportedly false information regarding the results of a political poll, Plaintiffs must allege factual evidence of a "direct causal link" between such information and the harm alleged in the Amended Complaint, *i.e.*, a pecuniary loss or an election outcome actually altered by the information reported. *Id*; *see 281 Care Comm. II*, 766 F.3d at 790. No such facts are alleged here that justify penalizing Press Defendants' speech under the rubric of a consumer fraud claim.

Plaintiffs' claims for relief are not justified by their unsupported allegations of "brazen election interference." (Am. Compl. ¶ 1.) Iowa voters voted in favor of President Trump and Rep. Miller-Meeks. (*Id.* ¶ 2.) These electoral victories alone bely any causal link between the claims and any government interest in preserving voting integrity and fair elections. And the Iowa Poll did not poll voters ***at all*** with respect to Zaun's campaign. In short, Plaintiffs' claims are not "actually necessary" to avoid the purported harm alleged in the Amended Complaint—a harm that is worse than conjectural and is in fact nonexistent. 281 *Care Comm*. *II*, 766 F.3d at 791 ("Such conjecture about the effects and dangers of false statements equates to implausibility as far as this analysis goes, because, when the statute infringes core political speech, we tend to not take chances."). This Court should take no chance on infringing the First Amendment in service of Plaintiffs' claims. ICFA cannot be conscripted by candidates for political office to target press campaign coverage based on faux election-interference claims.

Third, obvious less-restrictive means exist to protect any conceivable government interest in limiting Defendants' speech. "There is no reason to presume that counter-speech would not suffice to achieve the interests advanced and is a less restrictive means, certainly, to achieve the same end goal." *281 Care Comm*. *II*, 766 F.3d at 793. Indeed, with respect to speech on political campaign issues, the Eighth Circuit has observed, "Possibly there is no greater arena wherein

46

counterspeech is at its most effective. It is the most immediate remedy to an allegation of falsity." *Id*. The application of this principle is acutely warranted in this context, where the opportunities for counter-speech are manifest and President Trump himself has repeatedly criticized—both before and after the election, and in unabashed terms—the Iowa Poll. (Am. Compl. ¶ 13.) "Such 'back and forth' is the way of the world in election discourse." *281 Care Comm. II*, 766 F.3d at 795. Moreover, the Amended Complaint points out that "*every other* mainstream Iowa poll" correctly predicted the election's outcome in favor of President Trump (Am. Compl. ¶ 56 (emphasis in original)), underscoring that "[t]he remedy for speech that is false is speech that is true." *Alvarez*, 567 U.S. at 727. President Trump ignores that his own bully pulpit, together with the results of the other polls Plaintiffs cite, provide more than ample means to counter the specious election interference allegations saturating the Amended Complaint. This alone demonstrates that Plaintiffs' interpretation of ICFA and Iowa's common law "is not narrowly tailored to achieve the [purported] goal." *281 Care Comm*. *II*, 766 F.3d at 794 ("[C]ounterspeech, alone, establishes a viable less restrictive means of addressing the preservation of fair and honest elections . . . and preventing fraud on the electorate.").

Finally, fundamental First Amendment principles also bar the Amended Complaint's demand for injunctive relief. Even if Plaintiffs could somehow state a cognizable claim (though as described above, they cannot), injunctions directed against speech are presumptively invalid under the First Amendment—even where such speech is alleged to be actionable at law. Indeed, courts routinely refuse to award injunctive relief directed at speech on the basis that the injunction would constitute an unconstitutional prior restraint. *See Lemons v. Mycro Grp. Co.*, 667 F. Supp. 665, 667 (S.D. Iowa 1987) ("[G]enerally, the First Amendment prohibits prior restraint through injunction, and torts against the person such as defamation may not be enjoined[.] There is usually

an adequate remedy at law to redress injury to personal rights.") (internal citations omitted); *see also United Youth Careers, Inc. vs. City of Ames*, 412 F. Supp. 2d 994, 1002 (S.D. Iowa 2006) ("Prior restraints on protected speech are particularly disfavored because 'a free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand.'" (quoting *S.E. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975))).

For all of these reasons, Plaintiffs' foundational misconstruction of Iowa law cannot satisfy strict scrutiny, and their claims must be rejected.

## V.    CONCLUSION

For the reasons stated above, this Court should grant Defendants Des Moines Register and Tribune Company and Gannett Co., Inc.'s Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6) and dismiss the Amended Complaint with prejudice.

Defendants Des Moines Register and Tribune Company and Gannett Co., Inc. respectfully request to be heard at oral argument on this Motion.

Dated February 21, 2025

**FAEGRE DRINKER BIDDLE & REATH LLP**

/s/ Nick Klinefeldt
Nicholas A. Klinefeldt, AT0008771
David Yoshimura, AT0012422
801 Grand Avenue, 33rd Floor
Des Moines, IA, 50309
Telephone: (515) 248-9000
Fax: (515) 248-9010
Email: *Nick.Klinefeldt@Faegredrinker.com*
        *David.Yoshimura@Faegredrinker.com*

**ATTORNEYS FOR DEFENDANTS DES MOINES REGISTER AND TRIBUNE COMPANY AND GANNETT CO., INC.**