**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

PRESIDENT DONALD J. TRUMP, an individual,
REPRESENTATIVE MARIANNETTE MILLER-
MEEKS, an individual, and FORMER STATE
SENATOR BRADLEY ZAUN, an individual,

       Plaintiffs,

          v.

J. ANN SELZER, an individual, SELZER &
COMPANY, DES MOINES REGISTER AND
TRIBUNE COMPANY, and GANNETT CO.,
INC.,

       Defendants.

Case No.: 4:24-cv-00449-RGE-WPK

**PLAINTIFFS' MEMORANDUM OF
LAW IN OPPOSITION TO DEFENDANTS J. ANN
SELZER AND SELZER & COMPANY'S MOTION TO DISMISS**

## TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT .................................................................................. 1

II.   BACKGROUND ..................................................................................................... 2

  A.  Procedural History ........................................................................................... 2

  B.  Facts Set Forth in Plaintiffs' Amended Complaint ........................................ 2

III.  ARGUMENT ........................................................................................................... 7

  A.  **This Court Does Not Have Subject Matter Jurisdiction to Decide Moving Defendants' 12b6 Motion, Which Must be Denied as Moot** ........................... 7

    1.  Remand is Required as a Matter of Law ................................................ 7

    2.  **This Court Cannot Reach Moving Defendants' 12b6 Motion on the Merits** ....... 9

  B.  **Plaintiffs' Claims Are Not Barred by the First Amendment** ....................... 10

    1.  **The Defendant Polls are False Speech Not Immunized by the First Amendment** ............................................................................................ 11

    2.  **The Defendant Polls are Commercial Speech Not Warranting Any Heightened First Amendment Protection** ............................................ 13

    3.  **Moving Defendants' First Amendment Cases Are Distinguishable and Inapplicable to the Case at Bar** ..................................................... 14

  C.  **Plaintiffs Satisfied the Heightened Pleading Standards for Fraud** ............. 17

  D.  **Plaintiffs' Claims are Sufficiently Pled** ..................................................... 19

    1.  **Standard of Review** .............................................................................. 19

    2.  **Plaintiffs Properly Pled a Claim for Violation of The Iowa Consumer Fraud Act** ............................................................................ 20

    3.  **Plaintiffs Properly Pled a Claim for Fraudulent Misrepresentation** ..... 23

      a)  Defendants Made Representations When They Published their Polls in the Des Moines Register ............................................................ 23

      b)  Defendants' Representations Were False ........................................ 23

      c)  The False Representations Made by Defendants Were Material ..... 24

      d)  Defendants Made the False Representations With Scienter ............ 24

      e)  Defendants Intended to Deceive With Their False Representations .... 25

      f)  Plaintiffs Justifiably Relied on Defendants' False Representations ... 25

      g)  Plaintiffs Were Injured as a Result of Defendants' Misrepresentations ... 26

    4.  **Plaintiffs Properly Pled a Claim for Negligent Misrepresentation** ..... 26

    5.  **Plaintiffs Have Alleged Facts and Claims Justifying Piercing the Corporate Veil and so Claims Against Selzer as an Individual Should Not Be Dismissed** .. 30

IV.   CONCLUSION ...................................................................................................... 31

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                    **Page(s)**

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................................ 19, 20

*Bagelmann v. First Nat. Bank*,
  823 N.W.2d 18 (Iowa 2012)................................................................................... 26

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................................... 20

*Bill Johnson's Restaurants, Inc.*,
  461 U.S. (1983) ...................................................................................................... 11

*Board of Trustees of State Univ. of N.Y. v. Fox*,
  492 U.S. 469 (1989) ............................................................................................... 13

*Braden v. Wal-Mart Stores*,
  588 F.3d 585 (8th Cir. 2009) .................................................................................. 19

*Brandt v. Weather Channel, Inc.*,
  42 F. Supp. 2d 1344 (S.D. Fla. 1999) ............................................................... 15, 16

*Brewster v. United States*,
  542 N.W.2d 524 (Iowa 1996) ................................................................................. 29

*Briggs Transp. Co. v. Starr Sales Co.*,
  262 N.W.2d 805 (Iowa 1978)................................................................................. 30

*Burbach v. Radon Analytical*,
  652 N.W.2d 135 (Iowa 2002).................................................................................. 29

*Carlson v. Arrowhead Concrete Works*,
  445 F.3d 1046 (8th Cir. 2006) .................................................................................. 9

*Cincinnati v. Discovery Network*,
  507 U.S. 410 (1993) ............................................................................................... 13

*Davidson & Jones, Inc. v. New Hanover Cnty.*,
  41 N.C. App. 661 (1979) ........................................................................................ 29

*Energy Servs. v. Kinder Morgan Cochin*,
  80 F. Supp. 3d 963 (D. Minn. 2015)...................................................................... 10

*Filla v. Norfolk Southern Ry. Co*.,
  336 F.3d 806 (2003) ..................................................................................................... 9

*Florida Bar v. Went For It, Inc*.,
  515 U.S. 618 (1995) ................................................................................................... 13

*Foslip Pharmaceuticals, v. Metabolife Intern.*,
  92 F. Supp. 2d 891 (N.D. Iowa 2000) ...................................................................... 9

*Garrison v. Louisiana*,
  379 U.S. 64 (1964) ..................................................................................................... 12

*Gertz v. Robert Welch, Inc*.,
  418 U.S. 323 (1974) ................................................................................................... 12

*Greatbatch v. Metropolitan Federal Bank*,
  534 N.W.2d 115 (Iowa App.1995) .......................................................................... 27

*Grosjean v. American Press Co*.,
  297 U.S. 233 (1936) .............................................................................................. 15, 16

*Heuton v. Ford Motor Co.*,
  2016 U.S. Dist. LEXIS 203289 (W.D. Mo. Aug. 4, 2016) .................................... 10

*Hollander v. CBS News*,
  2017 WL 1957485 (S.D.N.Y. May 10, 2017) ..................................................... 15, 16

*IBEW v. NLRB*,
  341 U.S. 694 (1951) ................................................................................................... 11

*Illinois ex rel. Madigan v. Telemarketing Associates, Inc.*,
  538 U.S. 600 (2003) ................................................................................................... 12

*Keeton v. Hustler Magazine, Inc.*,
  465 U.S. 770 (1984) ................................................................................................... 12

*Larsen v. Pioneer Hi-Bred Int'l*,
  2007 WL 3341698 (S.D. Iowa Nov. 9, 2007) ........................................................... 9

*M&B Oil, Inc. v. Federated Mutual Insurance Company*,
  2023 WL 3163326 (8th Cir. May 1, 2023).................................................................. 8

**iv**

*Meredith v. Medtronic, Inc.*,
2019 WL 6330677 (S.D. Iowa Oct. 25, 2019) ........................................................ 20

*Midwest Home Distributor, Inc. v. Domco Indust. Ltd.*,
585 N.W.2d 735 (Iowa 1998) ............................................................................... 23

*Mujahid v. City of Kan. City*,
2019 U.S. Dist. LEXIS 250422 (W.D. Mo. Sep. 12, 2019) ...................................... 9

*Nat'l Inst. of Fam. & Life Advocs. v. Raoul*,
685 F. Supp. 3d 688 (N.D. Ill. 2023) ........................................................ 15, 16, 17

*Ohralik v. Ohio State Bar Assn.*,
436 U.S. 447 (1978) ............................................................................................. 13

*OnePoint Solutions, LLC v. Borchert*,
486 F. 3d 342 (8th Cir. 2007) ................................................................................ 8

*Owen Equipment & Erection Co. v. Kroger*,
437 U.S. 365 (1978) ........................................................................................... 8, 9

*Peel v. Atty. Registration & Disciplinary Comm'n*,
496 U.S. 91 (1990) ............................................................................................... 13

*Pitts v. Farm Bureau Life Ins. Co.*,
818 N.W.2d 91 (Iowa 2012) ............................................................................ 26, 27

*Rice v. Paladin Enters.*,
128 F.3d 233 (4th Cir. 1997) ................................................................................ 11

*Samland v. Turner Enters.*,
2012 U.S. Dist. LEXIS 106408 (D. Neb. June 18, 2012) ....................................... 10

*Spreitzer Properties, LLC v. Travelers Corp.*,
539 F. Supp. 3d 774 (N.D. Iowa 2022) ............................................................... 8, 9

*State ex rel. Att'y Gen. of Iowa v. Autor*,
991 N.W.2d 159 (Iowa 2023) ............................................................................... 18

*State ex rel. Miller v. Hydro Mag, Ltd.*,
436 N.W.2d 617 (Iowa 1989) ............................................................................... 18

*State ex rel. Miller v. Pace*,
677 N.W.2d 761 (Iowa 2004) ............................................................................... 18

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998) ................................................................................................ 9

*Streambend Props. II, LLC v. Ivy Tower Minneapolis, LLC*,
781 F.3d 1003 (8th Cir. 2015) ............................................................................ 17

*Summerhill v. Terminix, Inc.*,
637 F.3d 877 (8th Cir. 2011) ....................................................................... 17, 19

*The Conveyor Co. v. Sunsource Tech. Servs.*,
398 F.Supp.2d 992 (N.D. Iowa 2005) ................................................................ 27

*Topchian v. JPMorgan Chase Bank, N.A.*,
760 F.3d 843 (8th Cir. 2014) .............................................................................. 19

*U.S. ex rel. Raynor v. Nat'l Rural Utils. Co-op. Fin. Corp.*,
690 F.3d 951 (8th Cir. 2012) .............................................................................. 17

*Van Sickle Const. Co. v. Wachovia Com. Mortg.*,
783 N.W.2d 684 (Iowa 2010) ....................................................................... 27, 28

*Vincent v. Dakota, Minnesota & E. R.R. Corp.*,
200 F.3d 580 (8th Cir. 2000) .............................................................................. 10

*Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
425 U.S. 748 (1976) ............................................................................................ 12

*Warner v. Chase Home Fin. LLC*,
530 F. App'x 614 (8th Cir. 2013) ......................................................................... 9

*Wash. League for Increased Transparency & Ethics v. Fox News*,
2021 WL 3910574 (Wash. Ct. App. Aug. 30, 2021) ..................................... 15, 16

*Young v. Midwest Div. RMC*,
2022 U.S. Dist. LEXIS 100987 (W.D. Mo. June 3, 2022) .................................. 10

*Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*,
471 U.S. 626 (1985) ............................................................................................ 13

**Statutes**

28 U.S.C. § 1332 ..................................................................................................... 8

28 U.S.C. § 1332(a)(1) ............................................................................................ 9

28 U.S.C. § 1447(c) ................................................................................................................ 8, 9

Iowa Code § 50.48(2)(a) ........................................................................................................ 22

**Rules**

Fed. R. Civ. P. 12(h)(3) ........................................................................................................... 8

Fed R. Civ. P. 12(b)(6) ........................................................................................................ 1, 20

**Other Authorities**

Restatement (Second) of Torts §§ 525-552 ................................................................................ 12

SB 1909 ................................................................................................................................ 16, 17

## I.    PRELIMINARY STATEMENT

Plaintiffs, President Donald J. Trump ("President Trump"), Representative Mariannette Miller-Meeks ("Representative Miller-Meeks"), and Former State Senator Bradley Zaun ("Zaun") submit this Memorandum of Law in Opposition to the Motion to Dismiss pursuant to Fed R. Civ. P. 12(b)(6) (the "12b6 Motion") filed by Defendants J. Ann Selzer ("Selzer") and Selzer & Company's ("S&C") (Selzer and S&C together the "Moving Defendants"). (Dkt. 33). All arguments herein apply with equal force against and should be considered by this Court with respect to the Motion to Dismiss filed by the other Defendants, Des Moines Register and Tribune Company ("DMR") and Gannett Co., Inc. ("Gannett") (Dkt. 35).

As an initial matter, the Court no longer has subject matter jurisdiction and, as a matter of law, must deny Moving Defendants' 12b6 Motion as moot, without any consideration on the merits. Indeed, Plaintiffs have already filed their Motion for Remand to Iowa District Court for Polk County (the "Remand Motion") [Dkt. 30], which presents an open-and-shut argument: two of the three Plaintiffs (Representative Miller-Meeks and Zaun) are citizens of Iowa, while three of the four Defendants (Selzer, S&C, and DMR) are also citizens of Iowa. Therefore, the parties are not completely diverse, thus remand to State Court is required, and Moving Defendants' 12b6 Motion may not be litigated in this Court—full stop.

Alternatively, if this Court had subject matter jurisdiction and the ability to consider the merits (which it does not), Moving Defendants' First Amendment arguments are red herrings that are inapplicable to Plaintiffs' allegations, or in the alternative, are premature without discovery. And many of Moving Defendants' arguments go to the sufficiency and weight of the evidence that will be adduced as the case moves forward, and not to the adequacy of Plaintiffs' allegations of wrongdoing against Defendants, which are all assumed to be true at this stage. Moving Defendants

try to reframe and trivialize Plaintiffs' well-pleaded consumer fraud, fraudulent misrepresentation, and negligent misrepresentation claims (*see* Amended Complaint, [Dkt. 23], "Am. Compl."), as non-actionable "fraudulent news" grievances, while hiding behind a blanket First Amendment immunity defense created from whole cloth. (Moving Defendants' Memorandum of Law ("Def. Mem.") [Dkt. 33-1], p.1). But no such blanket immunity exists.

Accordingly, the 12b6 Motion must be denied.

## II.    BACKGROUND

### A.  Procedural History

Plaintiff President Trump filed this lawsuit in the Iowa District Court for Polk County on December 16, 2024. [Dkt. 1-1]. Defendants then removed the case to the United States District Court for the Southern District of Iowa, Central Division, utilizing the controversial "snap removal" tactic. [Dkt. 1]. Plaintiffs filed their Amended Complaint on January 31, 2025. [Dkt. 23]. Plaintiffs filed their Remand Motion on February 21, 2025. [Dkt. 30]. That same day, Defendants filed their respective 12b6 Motions. [Dkt. 33; Dkt. 35].

### B.  Facts Set Forth in Plaintiffs' Amended Complaint

This action, which arises under the Iowa Consumer Fraud Act, Iowa Code Chapter 714H, including § 714H.3(1) and related provisions, as well as under Iowa common law, including fraudulent misrepresentation and negligent misrepresentation, relates to Defendants' deliberate publication of multiple manipulated and incorrect polls mere days before Election Day last year. Critically, Representative Miller-Meeks and Zaun are citizens of Iowa; Selzer, S&C, and DMR are also citizens of Iowa. (Am. Compl. ¶¶ 21-25).

The first poll at issue was conducted by Selzer and S&C, and published online by DMR and Gannett in the *Des Moines Register* and other Gannett-owned outlets including nationally distributed *USA Today*, on November 2, 2024, and in print on November 3, 2024, relating to the

presidential race between President Trump and former Vice President Kamala Harris ("Harris") (the "Harris Poll"). *Id*. ¶ 1. Contrary to reality and tortiously defying credulity, Defendants' Harris Poll, published three days before Election Day, purported to show Harris leading President Trump in Iowa by three points (47%-44%) (*Id.* ¶ 2). The Poll was a sham and intentionally misleading. President Trump won Iowa by *over thirteen* points (56%-42.7%). *Id*. ¶ 2. Before this astonishing *sixteen-point* polling miss, Selzer brazenly claimed: "It's hard for anybody to say they saw this coming . . . . Harris has clearly leaped into a leading position." *Id*. However, as Selzer knew, there was a perfectly good reason nobody "saw this coming"—because a three-point lead for Harris in deep-red Iowa was not reality; it was election-manipulating fiction. *Id*.

The second poll at issue was also conducted by Selzer and S&C, and published by DMR and Gannett in the online and print versions of the *Des Moines Register* on November 2, 2024 and November 3, 2024, respectively, and purported to show that incumbent Representative Miller-Meeks trailed by sixteen points (53%-37%) against Democrat challenger Christina Bohannan in the race for Iowa's 1st Congressional District (the "Congressional Poll") (the Harris Poll and Congressional Poll together, the "Defendant Polls" or the "Polls"); Representative Miller-Meeks ultimately won the 1st District by two-tenths of a point (50.1%-49.9%). *Id*. ¶ 3. Defendants also intentionally published multiple other wildly incorrect polls about the Iowa Congressional races just before Election Day—all favoring Democrats. *Id*. ¶¶ 93-98

As pled in the Amended Complaint, there is overwhelming evidence that the Defendant Polls were not statistical anomalies but instead were deliberately manipulated. *Id*. ¶¶ 76-77. As Manhattan Institute senior fellow James Piereson wrote, Selzer's "miss" was *beyond* extreme:

> The Selzer Poll, with a margin of error of 3.4, missed the real outcome by 16 points, or by as many as five standard deviations from the true result as revealed on election day. What are the odds of drawing such a sample by legitimate means? Answer:

roughly one time in 3.5 million trials. In other words, given these odds, the results in the Iowa poll likely did not come about by "honest error."

Selzer's deceptive "miss" caused extensive harm:

> It is more likely that someone deliberately manipulated the sample so that it included too many Democrats, or simply made up the numbers as they came in for the purpose of giving confidence to Harris voters and worry for Trump supporters, or to bring national attention to a poll taken in a state not regarded as competitive. The poll did receive national attention and was widely discussed. Selzer appeared on television interviews to talk about the poll and its implications. If the goal was to promote the poll, then the gambit succeeded—at least until election day, when it was revealed to be ridiculously far off the mark.

*Id.* (quoting James Piereson, *Statistical questions about the Iowa poll,* THE NEW CRITERION (Nov. 12, 2024), https://newcriterion.com/dispatch/statistical-questions-about-the-iowa-poll/).

But that's not all—the Defendant Polls were premised upon a statistical improbability and were plagued by unprecedented and foreseeable security breaches.

First, President Trump won Iowa by over eight points and nearly ten points, respectively, in the 2020 and 2016 Presidential Elections. President Trump certainly could not have trailed Harris by three points in Iowa at any time in the 2024 cycle. (Am. Compl. ¶ 7).

Second, Selzer's polling in the presidential race was completely disconnected from all other mainstream polling. Although Selzer had polled President Trump leading Joe Biden by eighteen points, she suddenly claimed after Harris supplanted Biden that President Trump's lead was only four points. *Id*. ¶¶ 53-55. Meanwhile, *every other* mainstream Iowa poll showed President Trump comfortably ahead, and by significantly more than Selzer presented. A poll conducted September 27-28, 2024 by Cygnal showed President Trump ahead by seven points; a poll conducted November 1-2, 2024 by Emerson College showed President Trump ahead by nine points; a poll conducted November 2-3, 2024 by InsiderAdvantage showed President Trump ahead by seven points; a poll conducted November 2-3, 2024 by SoCal Strategies showed President

Trump ahead by seven points; and a second poll conducted November 2-3, 2024 by SoCal Strategies showed President Trump ahead by eight points. *Id*. ¶ 56.

Third, even Harris's internal polling showed that she never led President Trump. *Id*. ¶ 57.

Fourth, in each of the highest-stakes races—President, Governor, and Senator—from 2016 to 2022, the Republican won in Iowa and did so by a convincing margin. *Id*. ¶ 58. A three-point lead by a Democrat candidate for President would have been remarkably out of line compared to election results in the prior four cycles. *Id*.

Fifth, other pollsters who frequently work in swing states, such as Quinnipiac University, did not even poll Iowa in 2024, assuming, correctly, that it was a lock for President Trump. When major news outlets reported on swing states, Iowa was never included. *Id*. ¶ 59.

Sixth, given that Representative Miller-Meeks defeated Bohannan by nearly seven points in 2022 (53.4%-46.6%), Selzer's projection that Bohannan led Miller-Meeks by sixteen points in the rematch constituted a *twenty-three-point* swing in Bohannan's favor—a statistical improbability and an absurd inference given the absence of any significant events or developments that might explain such a dramatic change. *Id*. ¶ 85. Even a poll from a few weeks earlier (Sept. 30 to Oct. 1, 2024) by the Democrat Party had Bohannan up only four points (50%-46%); a poll from the end of August by Normington, Petts & Associates *for the Bohannan Campaign* had showed the race tied at 47% each—Selzer's Congressional Poll was twelve points off from even the Democrats' optimistic projection; indeed, Iowa's 1st District is normally an R+3 seat, according to the Cook Political Report, as confirmed by the fact that President Trump had won it in 2020 by three points, and Kim Reynolds won it in 2018 by three points. *Id*. ¶¶ 86-89.

And, to top it all off, Defendants leaked the Harris Poll to Democrat operatives before publication. *Id*. ¶ 65. Selzer also leaked the Harris Poll to her nephew, an intern at Gallup. *Id*. ¶ 68. This was the only time Defendants breached their policy of secrecy with Selzer's polls. *Id*. ¶ 61.

The fabricated Defendant Polls had the foreseeable and intended effect of influencing voter behavior, demoralizing Republican supporters, and distorting media narratives in the final stretch before voting. *Id*. ¶¶ 3, 5–6, 42–51. Defendants, led by Selzer, fanned the flames even further by grabbing national headlines with a carefully orchestrated all-out media blitz. *Id*. ¶¶ 70-71.

Plaintiffs were damaged by the Defendant Polls, in multiple respects. President Trump sustained actual damages by having to expend extensive time and resources, including direct federal campaign expenditures, to mitigate and counteract the harms of the Defendants' conduct. *Id*. ¶ 131.

Representative Miller-Meeks was subjected to a costly recount that would not have occurred if not for the combined impact of the Harris Poll and the Congressional Poll on her race. Not only did the Harris Poll and the Congressional Poll substantially contribute to forcing Representative Miller-Meeks into an electoral struggle, but she, like many other consumers who read the *Des Moines Register*, was also deceived by the Harris Poll and the Congressional Poll. *Id*. ¶¶ 90-92, 132.

Similarly, Zaun, a longtime Iowa State Senator, was negatively impacted by the fraudulent polling released by Defendants. *Id*. ¶¶ 6, 100–102, 133. However, Zaun was not as fortunate as President Trump and Representative Miller-Meeks, as he was defeated in his re-election bid after the Harris Poll gave an artificial boost to Democratic turnout and morale. *Id*. Plaintiff Zaun was deceived by Defendants' conduct. *Id*.

Defendant Selzer ultimately retired in disgrace less than two weeks after the election, a tacit admission of her culpability. *Id.* ¶¶ 9, 72.

The Amended Complaint, on its face, sufficiently sets forth Plaintiffs' case for damages in the wake of Defendants' choice to weaponize polling as a tool for manipulating elections and securing increased profit. *Id.* ¶ 18.

## III.    ARGUMENT

### A.    This Court Does Not Have Subject Matter Jurisdiction to Decide Moving Defendants' 12b6 Motion, Which Must be Denied as Moot

For the reasons set forth in the Remand Motion, this Court does not have jurisdiction to decide the 12b6 Motion, and the case must be remanded to Iowa District Court for Polk County. [Dkt. 30].

#### 1.    Remand is Required as a Matter of Law

This case presents an extremely straightforward, black-and-white configuration of non-diverse party citizenship that unequivocally requires remand as a matter of law. Plaintiff President Trump is a citizen of Florida, Plaintiffs Representative Miller-Meeks and Zaun are citizens of Iowa, Defendants Selzer, S&C, and DMR are citizens of Iowa, and Defendant Gannett is citizen of Delaware and New York. (Am. Compl. at ¶¶ 20-26). Therefore, this case has citizens of Iowa on both the Plaintiff and Defendant sides. Since there is not complete diversity of citizenship between and among the parties, this Court does not have subject matter jurisdiction, and the action must be remanded to the Iowa District Court for Polk County. There is no discretion available to the Court; with subject matter jurisdiction lacking, remand is required—full stop. This Court may not adjudicate *any* dispute in the absence of subject matter jurisdiction, let alone *this* dispute between non-diverse parties on matters of state law.

"Complete diversity of citizenship exists where no defendant holds citizenship in the state where any plaintiff holds citizenship." *OnePoint Solutions, LLC v. Borchert*, 486 F. 3d 342, 346 (8th Cir. 2007). Diversity of citizenship jurisdiction under 28 U.S.C. § 1332 requires an amount in controversy greater than $75,000 *and* complete diversity among the litigants. Regardless of how a case got to federal court, the case *must* be remanded if, at any time, it appears that the district court lacks subject matter jurisdiction, which means that both the amount in controversy and complete diversity requirements must be met for a case to be removed to, and remain in, federal court. 28 U.S.C. § 1447(c); *see also* Fed. R. Civ. P. 12(h)(3). "[A]n absence of complete diversity makes a federal forum unavailable." *M&B Oil, Inc. v. Federated Mutual Insurance Company*, 2023 WL 3163326, at *3 (8th Cir. May 1, 2023).

"If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case *shall* be remanded." *Id*. (emphasis added). As Section 1447(c) makes plain, [this] matter [lack of diversity] can be brought to the court at any time before final judgment is entered." *Spreitzer Properties, LLC v. Travelers Corp*., 539 F. Supp. 3d 774, 784 (N.D. Iowa 2022) (granting remand for lack of diversity) (emphasis added). It matters not whether diversity existed in the first instance. *Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365, 374 (1978) ("Thus it is clear that the respondent could not originally have brought suit in federal court . . . since citizens of Iowa would have been on both sides of the litigation. Yet the identical lawsuit resulted when she amended her complaint. Complete diversity was destroyed just as surely as if she had sued [an Iowa defendant] initially."). In other words, loss of diversity upon amendment of a lawsuit deprives a federal district court of subject matter jurisdiction just the same as if diversity had not existed at the time the suit was commenced, because "in the plain language of the statute, the

'matter in controversy' could not be 'between . . . citizens of different States." *Id.* (quoting 28 U.S.C. § 1332(a)(1)).

Therefore, even *arguendo*, if this Court found that Gannett properly removed the case in the first instance, this Court no longer has subject matter jurisdiction. As the Eighth Circuit has observed, "[t]he language of section 1447(c) *mandates* a remand of the case (to the state court from which it was removed) whenever the district court concludes that subject-matter jurisdiction is nonexistent." *Filla v. Norfolk Southern Ry. Co.*, 336 F.3d 806, 809 (2003) (emphasis added). This non-discretionary mandate is based on the immutable principle that "[w]hen there is a lack of complete diversity of citizenship among the parties, the Court *cannot exercise jurisdiction* over the case, and it *must be remanded* to state court where plaintiffs chose to sue defendants and where it belongs." *Spreitzer Properties*, 539 F. Supp. 3d at 784; *see also Foslip Pharmaceuticals, v. Metabolife Intern.*, 92 F. Supp. 2d 891, 909 (N.D. Iowa 2000) (granting remand for lack of diversity). Accordingly, this case must be remanded to the Iowa District Court for Polk County.

### 2.    This Court Cannot Reach Moving Defendants' 12b6 Motion on the Merits

It is black-letter law that the Court must rule on the Remand Motion without reaching Moving Defendants' 12b6 Motion on the merits. This is because the Court cannot issue orders on other motions unless the Court has subject matter jurisdiction. *See, Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93–95 (1998) ("assuming jurisdiction for the purpose of deciding the merits . . . carries the courts beyond the bounds of authorized judicial action and thus offends fundamental principles of separation of powers"); *Carlson v. Arrowhead Concrete Works*, 445 F.3d 1046, 1052-53 (8th Cir. 2006) ("In every federal case the court must be satisfied that it has jurisdiction before it turns to the merits of other legal arguments."); *Warner v. Chase Home Fin. LLC*, 530 F. App'x 614, 614-15 (8th Cir. 2013); *Larsen v. Pioneer Hi-Bred Int'l*, No. 4:06-CV-0077-JAJ, 2007 WL 3341698, at *1 (S.D. Iowa Nov. 9, 2007); *Mujahid v. City of Kan. City*, 2019 U.S. Dist. LEXIS

250422, at *2 (W.D. Mo. Sep. 12, 2019) ("The question of subject matter jurisdiction must be resolved before the defendant's motion to dismiss may be considered, and a federal court must remand for lack of subject matter jurisdiction notwithstanding the presence of other motions pending before the court"); *Young v. Midwest Div. RMC*, 2022 U.S. Dist. LEXIS 100987, at *4 (W.D. Mo. June 3, 2022) ("The question of subject matter jurisdiction must be resolved before the defendant's motion to dismiss may be considered, and a federal court must remand for lack of subject matter jurisdiction notwithstanding the presence of other motions pending before the court"); *Heuton v. Ford Motor Co.*, 2016 U.S. Dist. LEXIS 203289, at *3 (W.D. Mo. Aug. 4, 2016) ("Initially it is noted that although plaintiff's motion for remand was filed subsequent to the motion to dismiss, this issue will be considered first in order to resolve the question of subject matter jurisdiction."); *Samland v. Turner Enters.*, 2012 U.S. Dist. LEXIS 106408, at *7 (D. Neb. June 18, 2012); *All. Energy Servs. v. Kinder Morgan Cochin*, 80 F. Supp. 3d 963, 973 (D. Minn. 2015) ("because the Court grants Plaintiff's Motion to Remand, it does not address the merits of Defendants' Partial Motion to Dismiss"); *Vincent v. Dakota, Minnesota & E. R.R. Corp.*, 200 F.3d 580, 582 (8th Cir. 2000) ("[The District Court] recognized that if the RLA did not preempt Vincent's claims, no subject matter jurisdiction would exist, and therefore remand would be required").

### B.  Plaintiffs' Claims Are Not Barred by the First Amendment

Selzer and S&C argue that "Plaintiffs' claims are barred by the First Amendment," purportedly because "there is no such thing as a claim for 'fraudulent news.'" (Def. Mem. at 1). But it is these Moving Defendants who fabricate a "cause of action" for an imaginary tort of "fraudulent news," when in fact, Plaintiffs have not brought a claim for "fraudulent news" or for that matter, *any claim* involving news—Defendants were not engaged in any news reporting. Rather, Defendants intentionally (or at minimum, negligently) disseminated false polling data for

increased profit and readership.  As Selzer herself said: "*And the polling industry is predicated on getting people to pay money for their products*." (Am. Compl. ¶ 74) (emphasis added). Defendants were selling a *product* to consumers—polls—not reporting the news. This is why Plaintiffs' claims are justifiably pled as statutory consumer fraud, fraudulent misrepresentation, and negligent misrepresentation—not as a disagreement with a news story. Merely because false material (in this case the for-profit Defendant Polls) appeared in a newspaper does not transform that material into news. In fact, one does not *promote* the news. One *reports* the news. Selzer did not engage in reporting—she went on a whirlwind promotional tour across numerous mainstream media outlets to advertise and hype the Defendant Polls. *Id*. ¶¶ 70, 78-81. Her business, and the business of S&C, is for-profit polling, and the business of DMR and Gannett is selling newspapers and subscriptions for profit. *Id*. ¶¶ 24, 25, 115. Selzer's sensationalized and fabricated Defendant Polls helped Defendants do exactly that—sell products and profit. Simply put, the Defendant Polls were *false* speech, and *commercial* speech at that. The Defendant Polls were, on their own, not news events in any sense of the word "news"; these Polls, like any other poll, were for-profit *products* that were paid for by DMR and Gannett, and *created* by Selzer and S&C in exchange for payment.

### 1.    The Defendant Polls are False Speech Not Immunized by the First Amendment

As an initial matter, the Amended Complaint pleads extensive facts that at minimum, give rise to an inference that the Defendant Polls were false.  And, at the motion to dismiss stage, the issue is not whether the Defendant Polls *were* false, but whether Plaintiffs have *pled* that the Polls were false, since Plaintiffs' allegations must be treated as true. "[F]alse statements are not immunized by the First Amendment right to freedom of speech." *Bill Johnson's Restaurants, Inc.*, 461 U.S. at 743 (1983). Moreover, the First Amendment does not protect aiding, abetting, or committing a tort or other civil violation.  *IBEW v. NLRB*, 341 U.S. 694, 705 (1951); *Rice v.*

*Paladin Enters.*, 128 F.3d 233, 267 (4th Cir. 1997). And, pertinent here, the First Amendment does not protect the myriad conduct associated with fraudulent speech. *Illinois ex rel. Madigan v. Telemarketing Associates, Inc.*, 538 U.S. 600, 612 (2003) ("the First Amendment does not shield fraud"). There are many species of fraud: common law fraud, statutory types of fraud, and the torts of intentional misrepresentation and negligent misrepresentation (Restatement (Second) of Torts §§ 525-552). At issue here is Iowa statutory consumer fraud and fraudulent misrepresentation.

False statements—whether on the pages of a newspaper or elsewhere—are a species of fraud and do not enjoy immunity from tort liability when the speaker makes the statements with knowledge of falsity or reckless disregard for truth or falsity, as Plaintiffs have more than sufficiently pleaded here. As alleged in the Amended Complaint, Defendants disseminated to Plaintiffs and other consumers multiple polls—including the Defendant Polls—that were so utterly divorced from reality, so statistically unsupportable, and so inconsistent with any objective data, and on top of that subject to security breaches, that it can reasonably be inferred that Defendants knew or should have known that the content of the polls was false. (Am. Compl. ¶¶ 52-61, 65-68, 73, 76, 77, 83-89). Misconduct of this nature has nothing to do with the First Amendment and everything to do with spreading falsehoods to unsuspecting consumers for profit.

The Supreme Court articulated the guiding principle underpinning false speech: "There is 'no constitutional value in false statements of fact.'" *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 776 (1984) (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974)). Thus, "untruthful speech" is not "protected for its own sake." *Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 (1976). In summary, "the knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection." *Garrison v. Louisiana*, 379 U.S. 64, 75 (1964).

### 2.    The Defendant Polls are Commercial Speech Not Warranting Any Heightened First Amendment Protection

"[C]ommercial speech [enjoys] a limited measure of protection, commensurate with its subordinate position on in the scale of First Amendment values,' and is subject to 'modes of regulation that might be impermissible in the realm of noncommercial expression.'" *Board of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 477 (1989) (quoting *Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447, 456 (1978)); *see also Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 620 (1995)."There is no longer any room to doubt that what has come to be known as 'commercial speech' is entitled to the protection of the First Amendment, albeit to protection somewhat less extensive than that afforded 'noncommercial speech.'" *Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*, 471 U.S. 626, 637 (1985). And, "much of the material in ordinary newspapers is commercial speech." *Cincinnati v. Discovery Network*, 507 U.S. 410, 423 (1993). With commercial speech, the government may in appropriate circumstances regulate both "inherently misleading" speech and even "potentially misleading" speech. *Peel v. Atty. Registration & Disciplinary Comm'n*, 496 U.S. 91, 110 (1990).

Here, the Moving Defendants argue that the Defendant Polls were political speech. (Def. Mem. at 9-10).  But the Defendant Polls were commercial speech—and false speech at that. As set forth *supra*, Defendants were not reporting news. Selzer and S&C created the Defendant Polls, then promoted them, no different than the promotion of any other commercial product. Selzer's media blitz across numerous mainstream media outlets in the aftermath of the release of the Harris Poll provides ample evidence of these commercial promotional efforts. (Am. Compl. ¶¶ 70, 78-81). For example, on Rachel Maddow's MSNBC television program, Selzer breathlessly declared of the Harris Poll: "I don't see how anybody would look at those numbers and the history in Iowa in the past eight to twelve years and think that these numbers could have been foretold." *Id.* ¶ 81.

Selzer's numerous television and other media appearances were in the service of promoting her polling and her polling business. Merely because the Defendant Polls garnered news coverage does not mean the Polls themselves were news; the Polls were created by Selzer's for-profit polling business, S&C, which, as Selzer admits "*is predicated on getting people to pay money for their products*." *Id*. ¶ 74) (emphasis added).

### 3.    Moving Defendants' First Amendment Cases Are Distinguishable and Inapplicable to the Case at Bar

The Moving Defendants cite multiple inapplicable cases in support of their erroneous assertion that Plaintiffs' claims are barred by the First Amendment. They hide behind their blanket assertion that the Defendant Polls are "news," even though the Polls were—by Selzer's own admission—for-profit products created to attract attention and revenue. Selzer and S&C seek to retroactively characterize the Polls as bona fide "news" (*see* Def. Mem. at 6-12) rather than as the paid-for products that the Polls really are and were intended to be from the beginning. Indeed, their position that the Polls were "news" is impossible to square with the fact that Gannett and DMR *paid* Selzer and S&C to create the Polls; and for that matter, they pay Selzer and S&C for *all* the polls that they create for Gannett and DMR because creating polls is Selzer's job. At bottom, the Moving Defendants urge this Court to accept that the paid polling products and services they provide are somehow "news." But legitimate "news" *is not bought and paid for*, or created in exchange for money; legitimate "news" involves events of public interest that occur at the local, regional, national, or world levels. Newspapers report on events that occur due to the actions of *other* parties ranging from ordinary people to world leaders—but creating a product for public consumption, such as a sensationalized incorrect poll that attracts attention, does not transform that created product into "news." Newspapers cannot create "news" out of thin air by paying for a consumer product to fill their pages. Ironically, the Moving Defendants argue that "Plaintiffs try

to pound their square peg into a round hole without any attempt to reconcile the constitutional mismatch" (Def. Mem. at 5); but it is these Defendants who are moving the goal posts as to what constitutes "news' by trying to fit their square peg of a for-profit consumer product into a round hole of "news."

None of the cases cited by the Moving Defendants change this paradigm. (Def. Mem. at 1, 6) (citing *Hollander v. CBS News*, 2017 WL 1957485 (S.D.N.Y. May 10, 2017), *aff'd but vacated on other grounds sub nom. Hollander v. Garrett*, 710 Fed. Appx. 35 (2d Cir. 2018) (dismissal of RICO claim predicated on alleged wire fraud against various news organizations for their reporting on the 2016 presidential election); *Wash. League for Increased Transparency & Ethics v. Fox News*, 2021 WL 3910574 (Wash. Ct. App. Aug. 30, 2021) (affirming dismissal of claims under the Washington Consumer Protection Act against Fox News for allegedly false reporting about COVID-19); *Nat'l Inst. of Fam. & Life Advocs. v. Raoul*, 685 F. Supp. 3d 688, 695 (N.D. Ill. 2023) (enjoining application of Illinois Consumer Fraud Act to anti-abortion advocacy); *Grosjean v. American Press Co*., 297 U.S. 233, 245-50 (1936) (striking down "tax on lying" against newspapers); *Brandt v. Weather Channel, Inc*., 42 F. Supp. 2d 1344, 1345-46 (S.D. Fla. 1999), *aff'd*, 204 F.3d 1123 (11th Cir. 1999) (seeking to hold the Weather Channel liable for incorrect forecast). Moving Defendants' cases all have features that makes them easily distinguishable from the case at bar: they involved either (i) grievances about *reporting* on legitimate *news* matters, not on a matter that a newspaper itself created out of thin air, (ii) nakedly content-based speech discrimination by the government, (iii) taxation of speech, or (iv) speech that was alleged to be intentionally false or fraudulent.

In *Hollander*, the plaintiff labeled "various articles, commentary, and broadcasts" as "wire fraud," but could not make his RICO case because he failed to identify any "scheme or artifice to

defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises[.]" 2017 WL 1957485, at *4. That was a different case altogether because the plaintiff's grievance related to reporting about actual news, not to a product created by the media defendants themselves. *Hollander* is further inapplicable because RICO is an altogether different theory of recovery that involves establishing a predicate *crime*. *Id*. Similarly, *Wash. League for Increased Transparency* also involved grievances about the manner of reporting on the subject of COVID-19, one of the most substantial and legitimate news stories in recent history. 2021 WL 3910574, at *1. *Grosjean* involved a challenge by newspaper publishers to a Louisiana state law that required them to pay a tax for the mere privilege of engaging in their business, an obviously impermissible government restraint on the freedom of the press that has no bearing on the case at bar. 297 U.S. 233, 245. And *Brandt* is distinguishable because there was no allegation there of intentional fraud or falsity, and in any event, weather is clearly a news event that occurs naturally rather than by creation of a service provider. 42 F. Supp.2d at 1345-46.

Lastly, *Raoul* (which, as discussed below, actually furthers Plaintiffs' case) is distinguishable for a different reason: it involved an application for a preliminary injunction in the context of a facial challenge to a particular provision of the Illinois Consumer Fraud Act known as SB 1909, which regulated statements about reproductive health made by "limited service pregnancy centers" but did not regulate such statements by abortion clinics and other medical providers, making the law a form of content-based discrimination that was not narrowly tailored— an issue that has no bearing whatsoever on the matters at bar. 685 F. Supp. at 696, 703. If anything, *Raoul* supports Plaintiffs' position that consumer fraud laws do apply to deceptive statements: the Court there opined that Illinois's Consumer Fraud Act *would* still apply to regulating false statements by the pregnancy centers so long as there was no content-based discrimination.

But, more importantly, another way to address this alleged deception or failure to provide material facts is by enforcing the Consumer Fraud Act as it existed without SB 1909. Defendant Raoul's [Illinois Attorney General] own Deputy Attorney General publicly stated that the Consumer Fraud Act—without SB 1909's explicit inclusion of Centers and sidewalk counselors and explicit exclusion of abortion providers—would address the alleged concerns. And it would do so without blatant content and viewpoint discrimination.

*Id.* at 704-705.

In summary, none of these cases related to a product or service that any of the media outlets in question created for profit; instead, Moving Defendants' cases related either to impermissible restraints on legitimate news reporting or to plainly protected expressive conduct lacking any element of fraud or falsity.

### C. Plaintiffs Satisfied the Heightened Pleading Standards for Fraud

Plaintiffs satisfied any heightened pleading standards that may apply in the present case to their various claims. Under Rule 9(b), to plead fraud with particularity, "the complaint must plead such facts as the time, place, and content of the defendant's false representations, as well as the details of the defendant's fraudulent acts, including when the acts occurred, who engaged in them, and what was obtained as a result." *U.S. ex rel. Raynor v. Nat'l Rural Utils. Co-op. Fin. Corp.*, 690 F.3d 951, 955 (8th Cir. 2012). Where multiple defendants are involved, the complaint must "inform each defendant of the nature of his alleged participation in the fraud," and "specify the time, place, and content of" each defendant's false representations. *Streambend Props. II, LLC v. Ivy Tower Minneapolis, LLC*, 781 F.3d 1003, 1013 (8th Cir. 2015). In short, the complaint must allege the "who, what, when, where, and how" of the alleged fraud. *Summerhill v. Terminix, Inc*., 637 F.3d 877, 880 (8th Cir. 2011).

Here, despite Defendants' claims to the contrary, (Def. Mem. at 5, 15-19), the Amended Complaint satisfies this standard in full. The Amended Complaint alleges that Selzer and her company S&C created a manipulable Harris Poll and Congressional Poll, and then actually

manipulated them. (Am. Comp. ¶¶ 1–4, 53, 76–77). It further alleges that DMR and Gannett purchased those Defendant Polls for publication and used them to boost profits, e.g. drive subscriptions and web traffic. *Id*. ¶¶ 24–26, 74. Selzer is alleged to have acted with knowledge of the falsity of the Defendant Polls, including to inflate Democratic support, and by altering her methodology to favor Harris and other Democratic candidates. *Id*. ¶¶ 55–56, 76–77. DMR and Gannett are alleged to have knowingly disseminated those results despite their inaccuracy. *Id*. ¶¶ 1, 25–26, 60.

Defendants' assertion that "Plaintiffs fail to state a cognizable ICFA claim because they do not plead . . . [that] the Iowa Poll[s] were done in connection with the sale of consumer merchandise," Dkt. 35 p. 24, is without merit. The Supreme Court of Iowa has recognized that ICFA claims "are not the same as common law fraud actions." *State ex rel. Att'y Gen. of Iowa v. Autor*, 991 N.W.2d 159, 167 (Iowa 2023) (quoting *State ex rel. Miller v. Hydro Mag, Ltd.*, 436 N.W.2d 617, 622 (Iowa 1989) ("We conclude the Iowa Consumer Fraud Act was not merely a codification of common-law fraud . . . [it] provides broader protection to the citizens of Iowa by eliminating common-law fraud elements of reliance and damages."). Simply stated, it is well-settled that the ICFA "permits relief upon a lesser showing that the defendant made a misrepresentation or omitted a material fact with the intent that others rely upon the . . . omission." *State ex rel. Miller v. Pace*, 677 N.W.2d 761, 770 (Iowa 2004) (cleaned up). Here, Plaintiffs have carried their burden of making such a showing and have adequately pleaded their ICFA claim in the Amended Complaint.

In fact, the false representations—which Defendants intended their audience to rely upon—are detailed in the Amended Complaint: the Harris Poll falsely reported that Harris was leading President Trump in Iowa by three points, when President Trump ultimately won by more than

thirteen. *Id*. ¶ 2. The Congressional Poll falsely claimed that Democrat Bohannan led Plaintiff Representative Miller-Meeks by sixteen points, when Miller-Meeks actually won by 0.2%. *Id*. ¶ 3. These representations were published on November 2 and 3, 2024—just three days before the election—and were featured prominently in the DMR's print and online editions. *Id*. ¶¶ 1–3.

The Amended Complaint provides substantial detail as to why these representations were not merely inaccurate but fraudulent—including that the polls contradicted every other major poll conducted at the time. (Am. Comp. ¶ 56). Even Harris's internal polling never showed her leading. *Id*. ¶ 57. Selzer's own prior polling had shown Trump leading Biden by eighteen points—yet, suddenly and without explanation, she claimed Trump's lead had reversed to a three-point deficit against Harris. *Id*. ¶ 53.

Taken together, these allegations provide far more than the minimal detail required by Rule 9(b). Plaintiffs have identified (1) the who—Selzer, S&C, DMR, Gannett; (2) the what—false polling data; (3) the when—November 2–3, 2024, (4) the where—published in DMR and elsewhere; and (5) the how—manipulated data, improper leaks, and financial motive. That is more than sufficient to meet the heightened pleading standards for fraud. *Summerhill*, 637 F.3d at 880 (8th Cir. 2011).

### D.  Plaintiffs' Claims are Sufficiently Pled

#### 1.    Standard of Review

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up); *accord Braden v. Wal-Mart Stores*, 588 F.3d 585, 594 (8th Cir. 2009). "The essential function of a complaint under the Federal Rules of Civil Procedure is to give the opposing party fair notice of the nature and basis or grounds for a claim, and a general indication of the type of litigation involved." *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d

843, 848 (8th Cir. 2014) (cleaned up). The Court must accept as true all factual allegations in the complaint, but not its legal conclusions. *Iqbal*, 556 U.S. at 678–79.

A plausible claim for relief "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678. A plaintiff must "nudge their claims across the line from conceivable to plausible, else their complaint must be dismissed." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (cleaned up). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (cleaned up). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Meredith v. Medtronic, Inc.*, No. 3:18-cv-127-RGE-HCA, 2019 WL 6330677, at *3 (S.D. Iowa Oct. 25, 2019) (providing a recitation of the standard on Fed. R. Civ. P. 12(b)(6) motions to dismiss).

### 2. Plaintiffs Properly Pled a Claim for Violation of The Iowa Consumer Fraud Act

Moving Defendants' primary argument with respect to Plaintiffs' claim for violation of the Iowa Consumer Fraud Act is that Plaintiffs did not suffer damages. [Dkt. 33, pp. 13-18]. This is not true—Plaintiffs adequately pled harm in support of their claim under the Iowa Consumer Fraud Act.

Plaintiffs seek redress for the significant harm they suffered not only as ordinary consumers, but as consumers with a dramatically heightened interest in the subject matter, since they were all candidates for public office directly impacted by the Defendant Polls, and all suffered harm directly attributable to Defendants' choice to weaponize polling as a tool for manipulating elections and driving profits. (Am. Comp. ¶¶ 13–15, 18, 92, 102).

First, with respect to Plaintiff President Trump, the Harris Poll falsely indicated that Harris was leading President Trump in Iowa by three points, just days before the election, despite President Trump ultimately winning the state by 13%. *Id*. ¶¶ 2, 13-14. This false representation created a misleading narrative of Democratic momentum leading into election day and harmed President Trump's reputation, his image, and his viability as a candidate. It was an issue he had to address publicly at a moment when he was tremendously strained for time and each minute of his day had a direct impact on his personal and political future. *Id*. The Harris Poll was intended to and did in fact dampen enthusiasm and turnout among Republican voters, impacting an extensive effort by President Trump to do the exact opposite. *Id*. As a politician, President Trump's individual reputation is very much interrelated and tied up in his professional reputation, and so the damage to him politically also hurt him individually, and vice versa. Finally, President Trump read the false poll in the Des Moines Register and was harmed as a deceived consumer of Defendants' product. *Id*. ¶ 20.

Second, with respect to Plaintiff Representative Mariannette Miller-Meeks, the Congressional Poll falsely reported that she was trailing her Democratic opponent, Christina Bohannan, by sixteen points, just days before the election, despite her ultimately winning by a very tight margin of 0.2%. *Id*. ¶¶ 3, 90–91. Defendants' misrepresentations undermined Representative Miller-Meeks' viability as an incumbent and sent a false signal to voters and donors that her race was hopeless, damaging morale at a critical moment. *Id*. She was subjected to a costly and stressful recount process that would certainly would not have occurred but for Defendants' misconduct, and which imposed reputational, financial, and emotional costs to her in a variety of ways. *Id*. Defendants inappropriately attempt to introduce facts not set forth in the Amended Complaint and not properly before the Court on a motion to dismiss when they argue that "Under

Iowa law, the State of Iowa—not Rep. Miller-Meeks or her campaign—paid for the recount." (Def. Mem. of Law [Dkt. 33] at 4 (citing to Iowa Code § 50.48(2)(a))). But Defendants have mischaracterized Iowa's statute on recount expenses. While it is true that when the margin of an election is less than one percent the candidate requesting the recount need not post a $500 bond to the county auditor, Iowa Code § 50.48(2)(a)(2, this says nothing about the significant legal costs the winning candidate incurs to defend her victory. The 2024 recount process involved a recount conducted in each of the First Congressional District of Iowa's twenty counties, and each recount board was staffed by a lawyer retained by the winning campaign. Thus, Congresswoman Miller-Meeks did not get, as defendants claim, a "free" recount.

As with President Trump, Congresswoman Miller-Meeks' reputation as a capable and competitive representative is inextricably linked to her personal identity, so the political damage she endured also constituted individual harm. *Id*. Last, but definitely not least, Representative Miller-Meeks is a regular consumer of the *Des Moines Register*, purchased the print edition containing the poll, and was misled and harmed by Defendants' false product. *Id*. ¶ 21.

Finally, with respect to Plaintiff Zaun, the Harris Poll and Congressional Poll falsely reported a strong surge in Democratic turnout and votes, just days before Zaun's race. *Id*. ¶ 2. This false narrative of Democratic momentum hurt Zaun's race in Iowa Senate District 22, where he ultimately lost to his Democratic challenger, Matt Blake, by a narrow margin of four points. *Id*. ¶ 6. As context, in his two most recent victories, Zaun won the race for the 20th District by nineteen points and over two points in 2016 and 2020, respectively. *Id*. ¶ 100. The Harris Poll was intended to and did in fact energize Democratic voters and depress Republican turnout, which directly undermined Zaun's campaign strategy and contributed to his defeat. *Id*. ¶¶100-102. As with the other Plaintiffs, Zaun's reputation and professional standing were bound up in his role as an elected

official, and the political loss caused by the Defendants' conduct inflicted personal, reputational, and professional harm. *Id*. Finally, Zaun read the Harris Poll coverage in the Des Moines Register and was harmed as a consumer of Defendants' product. *Id*. ¶ 102.

### 3. Plaintiffs Properly Pled a Claim for Fraudulent Misrepresentation

Plaintiffs properly pled a claim for fraudulent misrepresentation. The elements of fraudulent misrepresentation are: (1) representation; (2) falsity; (3) materiality; (4) scienter; (5) intent to deceive; (6) justifiable reliance; and (7) resulting injury. *Midwest Home Distributor, Inc. v. Domco Indust. Ltd.*, 585 N.W.2d 735 (Iowa 1998). Each of the factors for fraudulent misrepresentation are plausibly and compellingly alleged with specificity in Plaintiff's Amended Complaint.

#### a) *Defendants Made Representations When They Published their Polls in the Des Moines Register*

Defendants made express representations to consumers, including Plaintiffs, in the most attention-grabbing manner possible. (Am. Compl. ¶¶ 66, 13). The Defendant Polls were presented as authoritative, data-driven assessments of voter preferences. *Id*. ¶¶ 3, 49-51, 78. Defendants promoted these Polls with headlines and editorial commentary endorsing their accuracy. *Id*. ¶ 78. This conduct constitutes a representation under applicable Iowa law. *Midwest Home Distributor*, 585 N.W.2d at 735.

#### b) *Defendants' Representations Were False*

President Trump won Iowa by more than thirteen points, consistent with all available election data, electoral reality, and the findings of all mainstream polling other than Selzer, demonstrating that the Harris Poll—and the three-point deficit reported therein—was false information. (Am. Comp. ¶ 2). Representative Miller-Meeks won her race by a margin of 0.2%, a

result that is unreconcilable with the sixteen-point deficit reflected in the Congressional Poll. *Id*. ¶ 3. Thus, the results of the polls were false.

### c)    The False Representations Made by Defendants Were Material

The evidence shows the materiality of the false representations made by Defendants outlined in the foregoing paragraphs. Polling affects voter turnout and enthusiasm, and Defendants ensured their false polling data was material: they calculated the timing, manner and damaging effect of its release. (Am. Comp. ¶¶ 42, 61, 65–66, 78). Selzer was known for her extraordinary influence over expectations for the results of Iowa and national elections. *Id*. ¶ 44. Political strategists and campaign advisors explicitly acknowledged that Selzer's polling shaped voter perception. *Id*. ¶¶ 45–46. The false polling data was released strategically just three days before the election, styled as a "leak," and employed the use of social media, all demonstrating a design to make the poll results go "viral" and be as impactful as possible. *Id*. ¶¶ 1, 2, 3, 65, 66. The strategy was in fact effective, and the Harris Poll dominated national and international headlines in the days before the election. *Id*. ¶ 70.

### d)    Defendants Made the False Representations With Scienter

Defendants knew that their polling results were implausible and contradicted by all reliable information available at the time. *Id*. ¶¶ 38, 56-60, 80. Statistical analysis conducted after the inaccuracy of the polls was exposed, indicates that the odds of Selzer's 2024 polling errors occurring by chance were 1 in 3.5 million. *Id*. ¶ 76. This alone is certainly demonstrative of scienter sufficient to proceed past the motion to dismiss stage.

But the facts as pled show far more than just likelihood with respect to Defendants' scienter. Selzer had a growing pattern of polling errors that favored Democrats in recent years. *Id*. ¶ 38. She inaccurately reported outcomes in 2018, 2020, and 2022 races—always in favor of Democratic candidates. *Id*. ¶¶ 38–40. This is a pattern of inaccuracy that a professional pollster

like Selzer could not have plausibly failed to observe. It shows that Selzer—and Defendants generally—knew or should have known her polling process was broken and no longer yielding accurate results. This is important context, because when Selzer obtained such an absurd result in the Harris Poll and Congressional Poll—far beyond the scope of what is reasonability—her choice to release the results despite her knowledge of her growing pattern of unreliability shows exactly the type of scienter required under Iowa law for a claim of fraudulent misrepresentation. Selzer abruptly retired from polling within two weeks of the election, a common indicator of a guilty mindset and further support for Defendants' scienter in making such false representations. *Id*. ¶¶ 9, 72.

      e)     *Defendants Intended to Deceive With Their False Representations*

Defendants had an intent to deceive the public and improperly influence the elections when they published the false polling data in the *Des Moines Register*. As set forth in the Amended Complaint, the Harris Poll was leaked by Defendants early to Democratic operatives in violation of Defendants' long-established confidentiality practices. *Id*. ¶ 65. For the same reasons explained above with respect to the scienter requirement, Selzer knew the polling information was false. Despite this, working together with the other Defendants, there was an organized and concerted effort to maximize the impact of false and fraudulent poll information, including a media blitz. *Id*. ¶¶ 78-81.

      f)     *Plaintiffs Justifiably Relied on Defendants' False Representations*

Plaintiffs, like millions of other citizens, justifiably relied on the Defendant Polls. Importantly, Plaintiffs President Trump, Representative Miller-Meeks, and Zaun all consumed (i.e. read) the polls through the *Des Moines Register*. *Id*. ¶¶ 20-22. Each Plaintiff read and relied on the election coverage at issue, and had every right to do so, given Defendants' reputation. *Id*. The Defendant Polls were published in a manner that solicited trust from the reader and Selzer had

an industry-wide reputation for accuracy that the Moving Defendants traded on. *Id*. ¶¶ 3, 36. Her

polling for DMR and Gannett had long been thought of as the gold standard. *Id*. ¶ 139.

g)    *Plaintiffs Were Injured as a Result of Defendants'*
*Misrepresentations*

Plaintiffs previously outlined in Section II.B.2. titled "Plaintiffs Properly Pled a Claim for

Violation of The Iowa Consumer Fraud Act," how each Plaintiff was harmed by Defendants'

conduct. To avoid redundancy, Plaintiffs incorporate these arguments by reference and will not

repeat them here.

In view of the foregoing, Plaintiffs have set forth a plausible claim for fraudulent

misrepresentation under Iowa state law.

### 4.    Plaintiffs Properly Pled a Claim for Negligent Misrepresentation

Plaintiffs properly pled a claim for negligent misrepresentation. "Iowa has adopted the

definition of the tort of negligent misrepresentation found in the Restatement (Second) of Torts."

*Bagelmann v. First Nat. Bank*, 823 N.W.2d 18, 30 (Iowa 2012) (citing *Pitts v. Farm Bureau Life*

*Ins. Co.*, 818 N.W.2d 91, 111 (Iowa 2012). The elements include:

(1) One who, in the course of his business, profession or employment, or in any
other transaction in which he has a pecuniary interest, supplies false information
for the guidance of others in their business transactions, is subject to liability for
pecuniary loss caused to them by their justifiable reliance upon the information, if
he fails to exercise reasonable care or competence in obtaining or communicating
the information.

(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited
to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and
guidance he intends to supply the information or knows that the recipient intends
to supply it; and

(b) through reliance upon it in a transaction that he intends the information to
influence or knows that the recipient so intends or in a substantially similar
transaction.

*Id*. The Supreme Court of Iowa has explicitly held that when it comes to negligent misrepresentation, "those liable are only those who supply information in an advisory capacity and are manifestly aware of how the information will be used and intend to supply it for that purpose." *Van Sickle Const. Co. v. Wachovia Com. Mortg.*, 783 N.W.2d 684, 691 (Iowa 2010) (cleaned up).

While the breakdown of the elements differs, essentially all the analysis with respect to Plaintiffs having properly pled a claim for fraudulent misrepresentation applies to the claim for negligent misrepresentation, and for the sake of brevity, will not be repeated.

Defendants contend that they "cannot be said to be 'recognized professionals' who acted in an 'advisory Capacity,'" because Plaintiffs cannot plead that "Defendants conducted the poll and published its results for the purpose and intent of advising Plaintiffs or their respective campaigns." [Dkt. 35], p. 38 (quoting *The Conveyor Co. v. Sunsource Tech. Servs.*, 398 F.Supp.2d 992, 1014 (N.D. Iowa 2005)). Yet, the *Conveyor* court recognizes no such prerequisite for a successful negligent misrepresentation claim. *The Conveyor*, 398 F.Supp.2d at 1014. On the contrary, the court in *Conveyor* recognized the position of the Iowa Court of Appeals, which stated that "[n]o clear guideline exists to define whether a party is in the business of supplying information." *Conveyor Co.*, 398 F. Supp. 2d at 1015 (quoting *Greatbatch v. Metropolitan Federal Bank*, 534 N.W.2d 115, 117 (Iowa App.1995)). The court concluded that "the court, not the jury, decides whether defendants were in the business of supplying information as a matter of law, in light of the facts, because the defendants' duty is always a matter for the court to decide." *Id*. (quotations omitted).

Here, the Court should certainly exercise its discretion to conclude that Defendants are parties "in the business of supplying information." *Id.* As publishers in the private sector, Moving Defendants are the very embodiment of "professional purveyors of information." *Id*. at 1016.

In addition, Plaintiffs note that Defendants were acting in their professional capacity when they prepared and published the Defendant Polls, and there can be no dispute that the facts as pled support that Defendants each had a pecuniary interest in the Harris Poll and the Congressional Poll. (Am. Comp. ¶ 1-4). Specifically, Selzer and S&C prepared the poll for DMR and Gannett to help DMR and Gannett sell newspapers and digital subscriptions and each Defendant was doing their job with the underlying goal of making money on the polling enterprise. *Id*. ¶¶ 1, 23–26; *Id*. ¶ 1 fn. 1. Selzer has even admitted the financial incentive behind her work—"*[a]nd the polling industry is predicated on getting people to pay money for their products*." *Id*. ¶ 74. Defendants intended and succeeded in generating enormous buzz across the nation and around the world just days before a presidential election from their publication of the false poll data. *Id*. ¶ 70. Under the circumstances, Defendants were exactly the type of entities that "supply information in an advisory capacity . . . [and] are in a position to weigh the use for the information against the magnitude and probability of the loss that might attend the use of the information if it is incorrect." *Van Sickle Const. Co. v. Wachovia Com. Mortg.*, 783 N.W.2d 684, 691 (Iowa 2010).

Further, the facts pled in Plaintiffs' Amended Complaint also establish that, even assuming *arguendo* that Defendants can establish there was no intentional misconduct, there can be no doubt that their conduct was grossly negligent and breached a duty owed to Plaintiffs.

First, the results of the Defendant Polls were so absurdly inaccurate that—while best explained by intentional conduct—are impossible to explain without at least negligent conduct in designing, executing, and analyzing the data from the Polls. (Am. Comp. ¶¶ 2-4, 76). Selzer herself was unable to explain the inaccuracy of the Harris Poll or otherwise provide an explanation to the public—leaving no explanation other than intentional misconduct or negligence. *Id*. ¶¶ 73-74. Thus, the facts as pled establish that Defendants were at least negligent in preparing the poll. *See,*

*e.g. Burbach v. Radon Analytical Lab'ys*, 652 N.W.2d 135, 138 (Iowa 2002), *as amended on denial of reh'g* (Oct. 25, 2002) (explaining that the lower court erred in dismissing a negligent misrepresentation case where the Defendants had "knowledge that its report would be reviewed and potentially relied upon by a limited but foreseeable class of persons.").

Second, there are ample facts pled supporting Defendants' negligence in protecting the Harris Poll from leaking. First, as pled by Plaintiff, DMR had a "longstanding policy of secrecy" and there were likewise industry standards for protection of polling information, a policy they didn't adhere to in this case. (Am. Comp. ¶¶ 61, 68). Selzer admitted she showed the Harris Poll to her nephew. *Id*. ¶ 68. She did this, despite knowing her nephew worked at a competing polling company, and that the information was highly valuable and sensitive. *Id.* ¶ 61, 65-66, 68. Such conduct is a clear breach of even the lowest standards of care for protecting sensitive information. *Id*.; s*ee, e.g. Davidson & Jones, Inc. v. New Hanover Cnty.*, 41 N.C. App. 661 (1979) (explaining that "a complete binding contract between the parties is not a prerequisite to a duty to use due care in one's actions . . . [and an] architect, in the performance of his contract with his employer, is required to exercise the ability, skill, and care customarily used by architects upon such projects.").

Moreover, both the results of the Defendant Polls and the leak of the Harris Poll are the types of events that would not have occurred absent a failure to exercise ordinary care, and so the doctrine of *res ipsa loquitur* applies here to both forms of negligence. A *res ipsa* inference is appropriate where "(1) the injury is caused by an instrumentality under the exclusive control of the defendant, and (2) the occurrence is such as in the ordinary course of things would not happen if reasonable care had been used." *Brewster v. United States*, 542 N.W.2d 524, 529 (Iowa 1996). Here, Defendants alone possessed the polling data since they themselves collected, analyzed, and

published this information. (Am. Comp. ¶ 3). In addition, the statistical odds of the error, 1 in 3.5 million, make the results of poll something that cannot be explained absent intentional conduct or negligence. *Id*. ¶ 76. Likewise, despite a thorough investigation into the matter after the fact, Defendants have not publicly suggested that there was any hack or other interference by third parties that could explain the leak of the poll absent negligence. *Id*. ¶ 65. Thus, Plaintiffs have adequately pled Defendants' negligent conduct, and in general, properly pled a claim for negligent misrepresentation.

### 5. Plaintiffs Have Alleged Facts and Claims Justifying Piercing the Corporate Veil and so Claims Against Selzer as an Individual Should Not be Dismissed

The Court should not dismiss Plaintiffs' claims against Selzer as an individual. Defendants' primary argument in support of dismissal against Selzer individually are that the circumstances for piercing do not apply here and that Plaintiffs have not pled facts in support of piercing the corporate veil. Dkt 33 at 21. This is not true. Defendants Selzer and S&C misstate and misapply the law. "A corporate officer is individually liable for fraudulent corporate acts which he or she participated in or committed." *Briggs Transp. Co. v. Starr Sales Co.*, 262 N.W.2d 805, 808 (Iowa 1978). Here, Selzer is accused of fraud no less than 8 times in Plaintiffs' Amended Complaint—it is the very basis of the entire lawsuit. (Am. Comp. ¶¶ 1-5, 14, 16, 38, 41, 76, 77). As just one example, Defendants pled that the results of the various races, compared to the Defendant Polls, showed that "Defendants, led by Selzer, were manufacturing fake support for Democrat candidates in order to interfere in the elections." *Id.* ¶ 41. Having pled sufficient facts for piercing the corporate veil, there is no basis to dismiss the claims against Selzer individually.

## IV.    CONCLUSION

For the foregoing reasons, the Court should decline to decide Moving Defendants' motion to dismiss; but should it reach the merits, the motion lacks any legal or factual basis and should be denied in its entirety.

Dated: April 1, 2025

Respectfully Submitted,

By:   /s/ Edward Andrew Paltzik
      Edward Andrew Paltzik (*pro hac vice*)
      **BOCHNER PLLC**
      1040 Avenue of the Americas, 15th Fl.
      New York, New York 10018
      516-526-0341
      edward@bochner.law


      /s/ Alan R. Ostergren
      ALAN R. OSTERGREN
      Attorney at Law
      Alan R. Ostergren, PC
      500 East Court Avenue
      Suite 420
      Des Moines, Iowa 50309
      (515) 297-0134
      alan.ostergren@ostergrenlaw.com

      *Counsel to Plaintiffs President Donald J. Trump, Representative Mariannette Miller-Meeks, and Former State Senator Bradley Zaun*

31

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 1 2025, I caused a true and correct copy of the foregoing Plaintiffs' Memorandum of Law in Opposition to Defendants J. Ann Selzer and Selzer & Company's Motion to Dismiss to be served on all counsel of record via the Court's CM/ECF system.

Dated: April 1, 2025                                    /s/ Edward Andrew Paltzik
                                                        Edward Andrew Paltzik, Esq.