**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

| | |
|---|---|
| PRESIDENT DONALD J. TRUMP, an individual, REPRESENTATIVE MARIANNETTE MILLER-MEEKS, an individual, and FORMER STATE SENATOR BRADLEY ZAUN, an individual, | Civil Case No. 4:24-cv-449-RGE-WPK |
| *Plaintiffs*, | **DEFENDANTS J. ANN SELZER AND SELZER & COMPANY'S REPLY BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS UNDER RULE 12(b)(6)** |
| v. | |
| J. ANN SELZER, SELZER & COMPANY, DES MOINES REGISTER AND TRIBUNE COMPANY, and GANNETT CO., INC., | |
| *Defendants*. | |

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES..............................................................................................ii

INTRODUCTION .........................................................................................................1

ARGUMENT..................................................................................................................2

     I.     Plaintiffs' Claim That Election Polls and the News Coverage They Generate Can Be Labelled "Fraud" Unprotected by the First Amendment is Utterly Baseless. ..........................................................................................................2

          A.     There is No General First Amendment Exception for False Speech...........2

          B.     Election Polling is Not Commercial Speech and is Fully Protected Election News Coverage. ............................................................................5

          C.     No Case Law Supports Plaintiffs' Theory of Liability................................8

     II.     Plaintiffs' Claims are Facially Deficient Under Iowa Law. ..................................10

          A.     Plaintiffs Fail to Plead a Cognizable ICFA Claim. ...................................10

          B.     Plaintiffs Fail to Plead a Fraudulent Misrepresentation Claim..................12

          C.     Plaintiffs Fail to Plead a Negligent Misrepresentation Claim. ..................13

     III.     Piercing the Corporate Veil. ...................................................................................16

CONCLUSION .............................................................................................................16

## TABLE OF AUTHORITIES

**Cases**                                                                     **Page(s)**

*281 Care Committee v. Arneson*,
    638 F.3d 621 (8th Cir. 2011) ........................................................................3, 4, 5

*303 Creative v. Elenis*,
    600 U.S. 570 (2023)..............................................................................................7

*B & B Asphalt Co. v. T. S. McShane Co., Inc.*,
    242 N.W.2d 279 (Iowa 1976) ............................................................................13

*Banks v. Beckwith*,
    762 N.W.2d 149 (Iowa 2009) ............................................................................15

*Board of Trustees of State Univ. of N.Y. v. Fox*,
    492 U.S. 469 (1989)..............................................................................................6

*Butts v. Iowa Health Sys.*,
    863 N.W.2d 36, 2015 WL 1046119 (Iowa Ct. App. 2015) ...............................11

*Central Hudson Gas & Electric Corp. v. Public Services Commission*,
    447 U.S. 557 (1980)..............................................................................................6

*Ceran v. Reisch*,
    2020 WL 6074114 (N.D. Iowa. Sept. 9, 2020)..................................................16

*Cincinnati v. Discovery Network*,
    507 U.S. 410 (1993)..............................................................................................6

*Columbia Broadcasting System, Inc. v. Democratic Nat'l Committee*,
    412 U.S. 94 (1973)................................................................................................7

*Conveyor Co. v. Sunsource Tech. Servs.*,
    398 F.Supp.2d 992 (N.D. Iowa 2005) ...............................................................14

*Daily Herald, Inc. v. Munro*,
    838 F.2d 380 (9th Cir. 1988) ...............................................................................8

*Davidson & Jones, Inc. v. New Hanover Cnty.*,
    41 N.C. App. 661 (1979) ....................................................................................15

*FEC v. Cruz*,
    596 U.S. 289 (2022)............................................................................................11

*Florida Bar v. Went For It, Inc.*,
    515 U.S. 618 (1995)..............................................................................................6

*Garrison v. Louisiana,*
   379 U.S. 64 (1964) ............................................................................................................. 3

*Gertz v. Robert Welch, Inc.,*
   418 U.S. 323 (1974) ........................................................................................................... 3

*Hutchinson v. Miller,*
   797 F.2d 1279 (4th Cir. 1986) ......................................................................................... 12

*Joseph Burstyn v. Wilson,*
   343 U.S. 495 (1952) ........................................................................................................... 7

*Lamar v. Micou,*
   114 U.S. 218 (1885) ......................................................................................................... 11

*Lockard v. Carson,*
   287 N.W.2d 871 (Iowa 1980) .......................................................................................... 13

*Madigan v. Telemarketing Assoc., Inc.,*
   538 U.S. 600 (2003) ........................................................................................................... 3

*McGough v. Gabus,*
   526 N.W.2d 328 (Iowa 1995) .......................................................................................... 11

*Mills v. Alabama,*
   384 U.S. 214 (1966) ........................................................................................................... 8

*N.Y. Times Co. v. Sullivan,*
   376 U.S. 254 (1964) ..................................................................................................... 7, 14

*National Institute of Family and Life Advocates v. Raoul,*
   685 F.Supp.3d 688 (N.D. Ill. 2023) ................................................................................ 10

*Ohralik v. Ohio State Bar Assn.,*
   436 U.S. 447 (1978) ........................................................................................................... 6

*Palleson v. Jewell Co-op. Elevator,*
   219 N.W.2d 8 (Iowa 1974) .............................................................................................. 15

*Spreitzer v. Hawkeye State Bank,*
   779 N.W.2d 726 (Iowa 2009) .......................................................................................... 13

*State ex rel. Att'y Gen. of Iowa v. Autor,*
   991 N.W.2d 159 (Iowa 2023) .......................................................................................... 10

*Sw. Publ'g Co. v. Horsey,*
   230 F.2d 319 (9th Cir. 1956) ........................................................................................... 12

*Telescope Media Grp. v. Lucero*,
 936 F.3d 740 (8th Cir. 2019) ...................................................................................7

*Trump v. Clinton*,
 653 F.Supp.3d 1198 (S.D. Fla. 2023) ..............................................................1, 16

*Trump v. Trump*,
 189 N.Y.S.3d 430 (N.Y. Sup. Ct. 2023) ...................................................................1

*United States v. Alvarez*,
 567 U.S. 709 (2012)..........................................................................................passim

*United States v. Nat'l Treasury Employees Union*,
 513 U.S. 454 (1995) ....................................................................................................7

*Va. Bd. of Pharmacy v. Virginia Citizens Consumer Council,
 Inc.*, 425 U.S. 748 (1976) .........................................................................................3

*Van Sickle Const. Co. v. Wachovia Com. Mortg.*,
 783 N.W.2d 684 (Iowa 2010) ..................................................................................14

*Washington League for Increased Transparency & Ethics v. Fox News*,
 2021 WL 3910574 (Wash. Ct. App. 2021).............................................................9

**Statutes**

Iowa Code § 714H.2 .......................................................................................................10

Iowa Code § 714H.3 ................................................................................................10, 11

**Other Authorities**

Presidential Memoranda, *Preventing Abuses of the Legal System and the Federal Court*,
 March 22, 2025 (https://www.whitehouse.gov/presidential-
 actions/2025/03/preventing-abuses-of-the-legal-system-and-the-federal-court/) ......................1

Restatement (Second) of Torts § 328D ......................................................................15

Restatement (Second) of Torts § 531 ..........................................................................13

Restatement (Second) of Torts § 538 ..........................................................................12

Restatement (Second) of Torts § 552 ..........................................................................14

William L. Prosser, *Handbook of the Law of Torts* § 105 (4th ed. 1971) ......................12

William Shakespeare, *Macbeth*, Act 5, Scene 5...........................................................16

**Rules**

Fed. R. Civ. P. 11(b)(2) .................................................................................................................1

**INTRODUCTION**

Plaintiffs' claim that election polling and reporting can be sanctioned as "consumer fraud" is frivolous, lacking any basis in law or fact. Defendant J. Ann Selzer's Motion to Dismiss explained that the First Amendment bars such a cause of action for "false news" because it is antithetical to constitutional history and tradition, ignores decades of jurisprudence where litigants attempted to expand the limited categories of unprotected speech, and lacks precedent in any jurisdiction. Selzer Defs.' Br. Supp. Mot. to Dismiss ("Br."), ECF No. 33 at 1-2, 5-13. Plaintiffs fail to address any of these issues, and their opposition makes it painfully clear the claims were never "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." Fed. R. Civ. P. 11(b)(2). Not only are they unable to name *a single case* applying or approving their theory of liability, Plaintiffs *fail even to cite* the leading Supreme Court case rejecting a generalized First Amendment exception for "false speech," *United States v. Alvarez*, 567 U.S. 709, 718 (2012) (plurality opinion) (*see* Br. 1, 6, 8, 11). When Plaintiffs bother to cite any authority at all, they offer a mashup of out-of-context case references and misleading partial citations that misapply some of the most rudimentary First Amendment concepts.[1]

---

[1] The absence of any good faith basis for bringing this case is ironic given President Trump's directive that the Attorney General "seek sanctions against those who engage in frivolous, unreasonable, and vexatious litigation," Presidential Memoranda, *Preventing Abuses of the Legal System and the Federal Court*, March 22, 2025 (https://www.whitehouse.gov/presidential-actions/2025/03/preventing-abuses-of-the-legal-system-and-the-federal-court/) (quoting Fed. R. Civ. P. 11(b)(2)). It is doubly ironic given Plaintiff's litigation history. *See, e.g.*, *Trump v. Clinton*, 653 F.Supp.3d 1198, 1210, 1233 (S.D. Fla. 2023) (finding lead Plaintiff to be a "prolific and sophisticated litigant who is repeatedly using the courts to seek revenge on political adversaries" and awarding $937,989.39 in sanctions for a "completely frivolous" defamation suit), *appeal docketed* 23-10387; *Trump v. Trump*, 189 N.Y.S.3d 430, 432-33, 446 (N.Y. Sup. Ct. 2023) (ordering payment of defendant's legal fees for bringing for an action targeting "ordinary newsgathering activities … at the very core of protected First Amendment activity").

This case is built entirely on a tissue of shopworn campaign rhetoric and fever-dream conspiracy theories, yet even accepting Plaintiffs' wild factual assertions as true, the Complaint lacks any plausible legal theory on which to grant relief. The allegations of "fraudulent news" are an affront to basic First Amendment law, and Plaintiffs continue to butcher elementary concepts like duty, reliance, causation, and damages under Iowa law. The Court should dismiss the Amended Complaint.

## ARGUMENT

### I.     Plaintiffs' Claim That Election Polls and the News Coverage They Generate Can Be Labelled "Fraud" Unprotected by the First Amendment is Utterly Baseless.

Plaintiffs complain that Selzer's motion attempts to "trivialize" their claims but that would be a redundancy. Pls.' Mem. Opp. Selzer Defs.' Mot. to Dismiss ("Pl. Opp."), ECF No. 52 at 2. Their effort to mask the plain fact they are seeking to penalize "false news" contrary to our constitutional traditions boils down to two risible propositions: (1) that polls are "products" and must be analyzed as "commercial speech" because "creating polls is Selzer's job," and (2) that polls conducted to assess voter sentiment as part of election coverage are not "news." Pl. Opp. 14. Plaintiffs cite nothing to support these astonishing conclusions that fly in the face of hornbook First Amendment law, and they entirely ignore the constitutional analysis in the Motion to Dismiss. *See* Br. at 6-13.

### A.     There is No General First Amendment Exception for False Speech.

Plaintiffs assert Defendants are "hiding behind a blanket First Amendment immunity defense created from whole cloth," Pl. Opp. 2, but they overlook entirely the historic constitutional bar against penalizing "false news" and the First Amendment rule that speech is presumptively protected unless it falls into a specific exception. Br. at 6-10. True, the unprotected categories include two that turn on falsity—defamation and fraud—but the Supreme Court has expressly

rejected attempts to borrow from those categories to create a broader exception applicable to false statements. *Alvarez*, 567 U.S. at 718 (there is no "general exception to the First Amendment for false statements"). This case does not involve any claim for defamation, nor does it involve any actual allegation of fraud, as previously explained. Br. at 7-8, 10-12. Plaintiffs repeatedly use the word "fraud" as an incantation, but as the Court made clear, "[s]imply labeling an action one for 'fraud' … will not carry the day." *Madigan v. Telemarketing Assoc., Inc.*, 538 U.S. 600, 617 (2003). Any attempt to bring a fraud claim without satisfying its essential elements "would support swift dismissal." *Id*.

Rather than address Defendants' analysis or any of the cases cited, Plaintiffs offer a random collection of one-liners from defamation and commercial speech cases to suggest false speech generally lacks First Amendment protection. Pl. Opp. 12. The obvious problem with this is that it is *precisely* the line of argument the Supreme Court rejected in *Alvarez*. Responding to the government's citation of *the same cases* that now appear in Plaintiffs' opposition—*Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974); *Garrison v. Louisiana*, 379 U.S. 64 (1964); *Va. Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976); and *Madigan*, 538 U.S. 600— the Court explained that "isolated statements in some earlier decisions do not support the Government's submission that false statements, as a general rule, are beyond constitutional protection." *Alvarez*, 567 U.S. at 718-19. It emphasized that the Court "has never endorsed the categorical rule the Government advances: that false statements receive no First Amendment protection." *Id*. at 719. The Eighth Circuit reached the same conclusion in another case that neither Plaintiffs nor their supporting *Amicus* cite, noting "Supreme Court precedent does not currently recognize knowingly false speech as a category of unprotected speech." *281 Care Comm. v. Arneson*, 638 F.3d 621, 635 (8th Cir. 2011).

Undaunted by this, and without the slightest whiff of legal authority, Plaintiffs posit that "[f]alse statements—whether on the pages of a newspaper or elsewhere—are a species of fraud and do not enjoy immunity from tort liability when the speaker makes the statements with knowledge of falsity or reckless disregard for truth or falsity." Pl. Opp. 12. *Really?* No court has ever said so, and *Alvarez* explained why it is illegitimate to mix and match theories as Plaintiffs do here in an attempt to create a general category of unprotected false speech. The Court observed that the "knowing falsity and reckless disregard" standard was drawn from defamation law and exists to ensure the *narrowness* of that exception. It refused to extend defamation liability rules outside that specific category because doing so would "expand[] liability in a different, far greater realm of discourse and expression." *Alvarez*, 567 U.S. at 719. Doing so "inverts the rationale for the exception," and the Court concluded "[a] rule designed to tolerate certain speech ought not to blossom to become a rationale for a rule restricting it." *Id*. at 720. The Eighth Circuit specifically rejected applying defamation principles to "false" political speech because it would create "an unprecedented and vast exception to First Amendment guarantees." *Arneson*, 638 F.3d at 634-35 (quotation omitted).

The Court likewise explained that fraud is a different and unique category because it is confined to false claims made to "secure moneys or other valuable considerations [such as] offers of employment." *Alvarez*, 567 U.S. at 723; *see also id*. at 734 (Breyer, J., concurring) ("Fraud statutes…typically require proof of a misrepresentation that is material, upon which the victim relied, and which caused actual injury."). To expand the concept of fraud "absent any evidence that the speech was used to gain a material advantage" would unleash "a broad censorial power unprecedented in this Court's cases or in our constitutional tradition." *Id*. at 723; *see also Arneson*, 638 F.3d at 634 n.2 (rejecting application of fraud principles "to all knowingly false speech"

because "the Supreme Court has carefully limited the boundaries of what is considered fraudulent speech"). Expanding the concept of fraud in the way Plaintiffs advocate here would cast a chilling effect that "the First Amendment cannot permit if free speech, thought, and discourse are to remain a foundation of our freedom." *Alvarez*, 567 U.S. at 723.

Defendants explained the limited nature of the fraud exception and how Plaintiffs cannot avoid the First Amendment by merely crying fraud. Br. at 10-12. And, consistent with the reasoning in *Alvarez* and *Arneson*, Defendants also observed that accepting Plaintiffs' theory of liability would eviscerate the First Amendment because it has no limiting principle. *Id*. at 12-13. Plaintiffs' response? Silence, except for the argument that would (or should) embarrass a first-year law student—that Selzer's polls and the *Register* are "consumer products" and "commercial speech" because they operate for-profit businesses. Pl. Opp. 11-14. *See also Amicus* Br. of Center for American Rights at 4 ("CAR Br."). That is no response at all.

**B.    Election Polling is Not Commercial Speech and is Fully Protected Election News Coverage.**

Plaintiffs' opposition is littered with assertions that election polls are not "news" but are "for profit *products* that were paid for by DMR and Gannett, and *created* by Selzer and S&C in exchange for payment." Pl. Opp. 11 (overemphasis in original). They describe Selzer's discussion of her findings in news interviews as "commercial promotional efforts." *Id*. at 13. And they conclude Selzer's polls "were *false* speech, and *commercial* speech at that." *Id*. at 11 (again, overemphasis in original). Plaintiffs are so committed to this line of argument that they quote three times (with underscoring and in italics) a statement Selzer made in a Fox News interview that "the polling industry is predicated on getting people to pay money for their products." *Id*. at 11, 14, 28. But this is not the mic-drop moment Plaintiffs assume it is.

Instead, as with "fraud," it is another example of where a word does not mean what Plaintiffs seem to think it means. *See*, *e.g.*, Inigo Montoya; Br. 7. And it reveals the central flaw at the core of Plaintiffs' case. They assume that because Selzer & Company and the *Register* are for-profit businesses, "Plaintiffs' claims are justifiably pled as statutory consumer fraud, fraudulent misrepresentation, and negligent misrepresentation—not as a disagreement with a news story." Pl. Opp. 11. Plaintiffs cite no authority to support this obvious fallacy—for none exists—and the few cases they do cite merely attest to the existence of the commercial speech doctrine. *Id*. at 13. "Commercial speech" is not speech someone was paid to produce, as Plaintiffs evidently think. The commercial speech doctrine set forth in *Central Hudson Gas & Electric Corp. v. Public Services Commission,* 447 U.S. 557 (1980), applies to advertising—speech proposing commercial transactions. Worse still, Plaintiffs fail to quote those parts of the cases they cite that undermine the bases for their argument.[2] And Plaintiffs' errors are not limited to sins of omission.[3] Lacking any support for their central load-bearing premise about commercial speech, Plaintiffs' case collapses.

---

[2] *See*, *e.g.*, *Board of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 482 (1989) ("[S]peech that proposes a commercial transaction…is what defines commercial speech" and not just "speech for profit …. Some of our most valued forms of fully protected speech are uttered for a profit.") (citations omitted); *Ohralik v. Ohio State Bar Assn*., 436 U.S. 447, 457-58 (1978) (distinguishing between regulation of in-person solicitation by lawyers and "political expression or an exercise of associational freedom"); *Florida Bar v. Went For It, Inc*., 515 U.S. 618, 634-35 (1995) ("[T]his case … concerns pure commercial advertising.").

[3] Both Plaintiffs and supporting *Amicus* quote part of a sentence from *Cincinnati v. Discovery Network*, 507 U.S. 410, 423 (1993) that "much of the material in ordinary newspapers is commercial speech," presumably to support their position that newspapers and those who provide news analysis are, or can be, "commercial speakers" subject to fraud claims. Pl. Opp. 13; CAR Br. 4. However, far from supporting their argument, the Supreme Court made that observation solely to explain why the commercial speech doctrine was irrelevant to an ordinance governing the placement of news boxes on city streets. *Discovery Network*, 507 U.S. at 426-28 ("[T]he distinction Cincinnati has drawn has absolutely no bearing on the interests it has asserted").

But wait, there's more. The problem is not just that Plaintiffs lack any legal authority for their baseless legal assertions; it is that they aggressively ignore overwhelming precedent to the contrary. The Supreme Court and the Eighth Circuit frequently reaffirm the very basic concept that speakers do not "shed their First Amendment protections by employing the corporate form to disseminate their speech. This fact underlies our cases involving everything from movie producers to book publishers to newspapers." *303 Creative v. Elenis*, 600 U.S. 570, 594 (2023). Rather, "commercial and corporate entities, including utility companies and newspapers, have received First Amendment protection" because they "contribute to the discussion, debate, and the dissemination of information and ideas that the First Amendment seeks to foster." *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 751-52 (8th Cir. 2019) (citations omitted). Cases supporting this constitutional truism are almost too numerous to mention.[4]

Plaintiffs' bald assertion that opinion polling during a presidential election is not "news" is even more nonsensical. Like its other core premises, this claim is backed by zero authority, except this time, Plaintiffs don't even go through the motion of citing case law. Rather, they issue the imperious decree that "legitimate 'news' is *not bought and paid for*, or created in exchange for money," Pl. Opp. 14, which merely restates the fallacy that for-profit news organizations lack

---

[4] *See, e.g, United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 465, 470 (1995) (the First Amendment protects federal employees' right to "seek compensation for their expressive activities in their capacity as citizens" as well as "the public's right to read and hear what the employees [produce]"); *Columbia Broadcasting System, Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 117 (1973) ("The power of a privately-owned newspaper to advance its own political, social, and economic views is bounded by only two factors: first, the acceptance of a sufficient number of readers—and hence advertisers—to assure financial success; and, second, the journalistic integrity of its editors and publishers."); *N.Y. Times Co. v. Sullivan,* 376 U.S. 254, 266 (1964) ("That the Times was paid for publishing the advertisement is as immaterial in this connection as is the fact that newspapers and books are sold."); *Joseph Burstyn v. Wilson*, 343 U.S. 495, 501 (1952) ("That books, newspapers, and magazines are published and sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment."). There are no contrary cases.

constitutional protection. Under Plaintiffs' theory, the First Amendment excludes news organizations if they pay opinion writers, expert analysts, or, as in this case, a top-notch pollster to measure voter sentiment.

"[L]egitimate 'news,'" Plaintiffs proclaim, "involves events of public interest that occur at the local, national, or world levels." *Id*. This is a bizarre assertion given that presidential elections obviously fit the bill and in light of the "practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs" including "discussions of candidates, structures and forms of government, the manner in which government is operated or should be operated, and all such matters relating to political processes." *Mills v. Alabama*, 384 U.S. 214, 218-19 (1966). Election polling is part of this process and is protected by the First Amendment. *Daily Herald, Inc. v. Munro*, 838 F.2d 380, 384 (9th Cir. 1988). As the Supreme Court observed, the Constitution "specifically selected the press, which includes not only newspapers, books, and magazines, but also humble leaflets and circulars … to play an important role in the discussion of public affairs." *Mills*, 384 U.S. at 219 (invalidating Alabama Corrupt Practices Act prohibition of publishing political editorials on election day) (citation omitted). Defendants' activities are the essence of what is historically understood to be "legitimate news."

But that is the problem with this case in a nutshell. Plaintiffs throw around terms like "fraud," "product," and "election interference" without any serious attempt to connect them to relevant legal doctrines and, for the most part, without citation to any legal authority. Contrary to the thrust of Plaintiffs' opposition, the use of italics cannot substitute for citing cases.

### C.    No Case Law Supports Plaintiffs' Theory of Liability.

Neither Plaintiffs nor their supporting *Amicus* cites a single case supporting their theory of liability, while Defendants identified the smattering of cases that quickly dismissed attempts to

bring such frivolous claims. Br. 1, 7, 12-13. Plaintiffs group the cases together to try to distinguish them *en masse*, but to no avail. Pl. Opp. 15-16. Their main argument is that each of the cited cases involved "*reporting* on legitimate *news* matters, not on a matter that a newspaper itself created out of thin air," but that merely reinforces Plaintiffs' fundamental misunderstanding of the "news" concept. They also posit that the cited cases involved "speech that was alleged to be intentionally false or fraudulent," *id*. at 15, which is not different from what Plaintiffs allege here and only confirms why dismissal of those cases is so on-point. Otherwise, Plaintiffs merely try to nitpick nonmaterial factual differences without addressing the ways the cases undermine their central premise that news can be punished as "fraud."

Notably, Plaintiffs try to distinguish *Washington League for Increased Transparency & Ethics v. Fox News*, 2021 WL 3910574 (Wash. Ct. App. 2021) ("*WASHLITE*") by observing it involved "grievances about the manner of reporting on the subject of COVID-19, one of the most substantial and legitimate news stories in recent history." Pl. Opp. at 16. But one might say the same thing about reporting on the 2024 presidential election. *See*, *e.g*., *Amicus* CAR at 4-5 ("In this instance, the Register's reporting on a presidential campaign is reporting on a 'particularly newsworthy fact' … which is not commercial speech, even when run in a newspaper."). For its part, *Amicus* suggests that the *WASHLITE* plaintiff's inability to cite any authority "for the proposition that false statements about threats to public health, even if recklessly made, fall within any exception to the First Amendment … does not mean that such authority does not exist." CAR Br. 5-6 n.1. Perhaps. But if any cases that support their claims are out there, it is incumbent on

Plaintiffs or *Amicus* to cite them, but they have not.[5] In the United States there is no such thing as a claim for "fraudulent news," Br. at 1, so the Amended Complaint should be dismissed.

## II.    <u>Plaintiffs' Claims are Facially Deficient Under Iowa Law.</u>

Even setting aside the First Amendment barriers to each of Plaintiffs' claims, they fail on their own accord, as Plaintiffs continue to butcher elementary concepts like duty, reliance, causation, and damages.

### A.    Plaintiffs Fail to Plead a Cognizable ICFA Claim.

The Court can easily resolve the ICFA claim because Plaintiffs concede the absence of a necessary element. An ICFA claim lies for victims of "deception" and "fraud" only when "in connection with the advertisement, sale, or lease of *consumer merchandise*." Iowa Code § 714H.3 (2020) (emphasis added). But as Defendants' opening brief explained, Selzer's polls are not "consumer merchandise" because they are not sold or leased "primarily for personal, family, or household purposes." Br. at 17 (quoting Iowa Code § 714H.2(4) (ICFA section defining "consumer merchandise")). In response, Plaintiffs do not assert Selzer's polls qualify as "consumer merchandise" but only that "the Supreme Court of Iowa has recognized that ICFA claims 'are not the same as common law fraud actions.'" Pl. Opp. at 18 (quoting *State ex rel. Att'y Gen. of Iowa v. Autor*, 991 N.W.2d 159, 167 (Iowa 2023)).

---

[5] Plaintiffs make much of *National Institute of Family and Life Advocates v. Raoul*, 685 F.Supp.3d 688, 695 (N.D. Ill. 2023), a *cf* cite in Defendants' motion to dismiss. Pl. Opp. 16-17. But the dictum they quote refers to a hypothetical application of a consumer fraud law to misrepresentations about the provision of medical services. 685 F.Supp.3d at 704-05. It provides no helpful authority here.

This is true—and it is precisely why their ICFA claim fails. Common law fraud need not involve "consumer merchandise,"[6] but a claim under the ICFA does. Iowa Code § 714H.3. Plaintiffs' response does not even attempt to argue Selzer's polls qualify under the statute, so their ICFA claim is facially deficient. *See Butts v. Iowa Health Sys.*, 863 N.W.2d 36, 2015 WL 1046119, at *8 (Iowa Ct. App. 2015) (table) (ICFA does not apply when defendant "does not offer or sell consumer merchandise").

Plaintiffs' remaining arguments fare no better. With respect to damages, Selzer's brief explained that because Plaintiffs filed this suit in their individual capacities they are precluded from claiming "damage" to their campaigns. Br. at 14 (citing *FEC v. Cruz*, 596 U.S. 289, 294 (2022) (a campaign is "a legal entity distinct from the candidate.")). In response, Plaintiffs assert Mr. Trump had to "address" the Selzer poll "publicly at a moment when he was tremendously strained for time" and Ms. Miller-Meeks had to endure a "stressful" recount. Pl. Opp. at 21. Plaintiffs have confused "distraction" with legal harm. Separately, Ms. Miller-Meeks protests that the Court should accept her allegation that she paid for a recount, yet under Iowa law the government, not Miller-Meeks' campaign, covers those costs. Ms. Miller-Meeks insists that by citing the Iowa statute Defendants "inappropriately attempt to introduce facts not set forth in the Amended Complaint." Pl. Opp. at 12. But this is a matter of law, not fact, and, in any event, statutes are subject to judicial notice. *Lamar v. Micou*, 114 U.S. 218, 223 (1885). To the extent Miller-Meeks suggests the recount may have added legal expenses, this, again, at most affected her campaign, which is not a party to this case.

---

[6] *See McGough v. Gabus*, 526 N.W.2d 328, 331 (Iowa 1995) ("The elements of fraud are: (1) representation, (2) falsity, (3) materiality, (4) scienter, (5) intent to deceive, (6) justifiable reliance, and (7) resulting injury and damage.").

For Zaun, Plaintiffs' damages theory boils down to an assertion that Selzer's poll affected how Iowans voted. But "Federal courts do not sit to award post-election damages to defeated candidates." *Hutchinson v. Miller*, 797 F.2d 1279, 1287-88 (4th Cir. 1986); *see also Sw. Publ'g Co. v. Horsey*, 230 F.2d 319, 322-23 (9th Cir. 1956) (noting "there may be not less than a thousand factors which enter into the vagaries of an election" and holding that "loss of an election" damages are unrecoverable because they are "speculative and conjectural"). Based on the plain text of the ICFA and under basic principles of tort law, the Court must dismiss Plaintiffs' statutory fraud claim.

### B.      Plaintiffs Fail to Plead a Fraudulent Misrepresentation Claim.

Plaintiffs' fraudulent misrepresentation claim also fails at the threshold. The "representations" they purport to rely on are the findings of Selzer's poll, but that has nothing to do with fraud. The "representation" element pertains to a statement made to induce another into entering a transaction, such as a false statement made by a seller to a buyer. William L. Prosser, *Handbook of the Law of Torts* § 105, at 684 (4th ed. 1971); *see Alvarez*, 567 U.S. at 722-23 (distinguishing false statements generally from fraud, which is designed to "secure moneys or other valuable considerations, [like] offers of employment"). Yet Plaintiffs point to no representations by Selzer for the purpose of inducing *anyone* (much less Plaintiffs) into a purchase.

Plaintiffs also botch the elements of materiality, scienter, and intent to deceive. They insist "[p]olling affects voter turnout and enthusiasm," Pl. Opp. at 24, apparently under the belief that "material" means "something important to the public." It doesn't. Rather, materiality refers to whether a defendant made a false representation about a sufficiently critical aspect of a transaction that affected the plaintiff's decision about whether to proceed. Restatement (Second) of Torts § 538 (Am. L. Inst. 1977). Same with scienter. A plaintiff must establish that the defendant not only made a knowingly false material statement but did so while making a representation to plaintiff

about a contemplated transaction.[7] Likewise with intent to deceive. The plaintiff must show not just that the defendant made false representation with knowledge of its falsity, but did so in the context of attempting to deceive a plaintiff into entering into a transaction.[8] On all three elements, Plaintiffs are cutting out the transaction inducement element of fraud—the *sine qua non* ingredient that makes fraud a cognizable cause of action—and hoping the Court doesn't notice the misdirection.

On justifiable reliance, Plaintiffs assert they and "millions of other citizens" relied on Selzer's poll. Pl. Opp. at 25. Yet again, Plaintiffs attempt to bypass the transaction aspect of fraud. Justifiable reliance means that a defendant justifiably relied on a representation by a plaintiff when deciding whether to enter a transaction. *See Spreitzer v. Hawkeye State Bank*, 779 N.W.2d 726, 737 (Iowa 2009) ("[T]he entire context *of the transaction* is considered to determine if the justifiable-reliance element has been met." (emphasis added)); *Lockard v. Carson*, 287 N.W.2d 871, 878 (Iowa 1980) (describing justifiable reliance element by reference to "a party to a transaction"). If justifiable reliance were not tethered to an induced transaction, gamblers would sue ESPN analysts for failed sports bets, claiming they "justifiably relied" on the sports expertise of the network's on-air talent. That is not how tort law works.

### C. Plaintiffs Fail to Plead a Negligent Misrepresentation Claim.

Plaintiffs' negligent misrepresentation claim also fails out of the gate because Selzer had no legal duty to supply them with information. Plaintiffs correctly note that under Iowa law "those

---

[7] *See* Restatement (Second) of Torts § 531 ("One who makes a fraudulent misrepresentation is subject to liability … for pecuniary loss suffered by [plaintiff] through their justifiable reliance in the type of transaction in which he intends or has reason to expect their conduct to be influenced.").

[8] *See B & B Asphalt Co. v. T. S. McShane Co., Inc.*, 242 N.W.2d 279, 284 (Iowa 1976) ("The element of intent to deceive is closely related" to scienter and "is ordinarily established from the same evidence which proves the element of scienter.").

liable are only those who supply information in an advisory capacity and are manifestly aware of how the information will be used and intend to supply it for that purpose." Pl. Opp. at 27 (quoting *Van Sickle Const. Co. v. Wachovia Com. Mortg.*, 783 N.W.2d 684, 691 (Iowa 2010) (cleaned up)). But Plaintiffs ignore their own statement of the law and never explain how Selzer "supplied information" to them "in an advisory capacity."

Selzer had no contract with Plaintiffs, express or implied, and Plaintiffs do not argue otherwise. The cases they cite hold that when a party hires an expert to supply information, that expert can be liable to the one who engaged them if the performance of those duties falls below the standard of care. Plaintiffs claim "[n]o clear guideline exists to define whether a party is in the business of supplying information." Pl. Opp., at 27 (quoting *Conveyor Co. v. Sunsource Tech. Servs.*, 398 F.Supp.2d 992, 1015 (N.D. Iowa 2005)), but that is irrelevant. The pertinent question is whether Selzer had a legal duty to supply *Plaintiffs* with information.[9] She did not, and Plaintiffs offer no authority creating a legal duty between a pollster and the politicians whose public support the pollster measures.

Plaintiffs ask the Court to hold that newspapers and pollsters are, for purposes of negligent misrepresentation, "in the business of supplying information." Pl. Opp. at 27. In short, they are asking the Court to hold that consumers of news should have a cause of action against news providers that get a story wrong through negligence. But that request is squarely foreclosed by *New York Times v. Sullivan*. 376 U.S. at 287-88 (evidence against newspaper supporting "at most a finding of negligence" was "constitutionally insufficient to show the recklessness … required

---

[9] *See* Restatement (Second) of Torts § 552 cmt. h (liability for negligent misrepresentation exists only as "to those persons for whose benefit and guidance it is supplied").

for a finding of actual malice"). In any event, Plaintiffs provide no case law to support their position.

Plaintiffs shift to a new theory for their negligent misrepresentation claim, now arguing Selzer negligently failed to prevent the poll from "leaking." But there are several problems with this. First, it's not in the Amended Complaint. Second, Selzer owed no legal duty to Plaintiffs not to "leak" the poll; it's *Selzer's poll*, and Plaintiffs do not allege Selzer had any contractual or legal duty to keep the results a secret. Third, the theory fails basic logic: Plaintiffs fail to explain how they possibly could have suffered legal harm from a poll *intended* for public release that was released just hours after the alleged "leak." And fourth, Plaintiffs argue "a complete binding contract between the parties is not a prerequisite to a duty to use due care," Pl. Opp. 29 (quoting *Davidson & Jones, Inc. v. New Hanover Cnty.*, 41 N.C. App. 661, 666 (1979)), but there must be *some* relationship between the parties (for example, quasi-contract) for a duty to exist, but there is none here.

Nor may Plaintiffs create a duty between the parties by invoking *res ipsa loquitur*. This narrow doctrine allows a fact-finder to infer a breached legal duty when an injury happens which (1) was caused by an instrumentality under the exclusive control and management of the defendant, and (2) ordinarily would not occur if reasonable care had been used. *Banks v. Beckwith*, 762 N.W.2d 149 (Iowa 2009). Medical instruments left inside surgery patients and barrels falling on building occupants are classic examples. *See* Restatement (Second) of Torts § 328D cmt. a (barrels); *id.* cmt. d (surgical sponges). But *res ipsa loquitur* cannot *create* a legal duty, it is simply a method of establishing a breach of an existing duty. *See Palleson v. Jewell Co-op. Elevator*, 219 N.W.2d 8, 13 (Iowa 1974) ("The doctrine of *res ipsa loquitur* is only a rule of evidence, not of substantive tort law."). Plaintiffs fail to plead a plausible cause of action under any theory.

III.    **Piercing the Corporate Veil.**

The Court should also reject Plaintiffs' attempt to pierce the corporate veil by citing the "fraud" exception to the protection of the corporate form. Pl. Opp. at 30. As explained above, what Plaintiffs allege in this case is not "fraud" and even had they identified a relevant cause of action, they have not come close to supporting its elements. Therefore, they cannot pierce the corporate veil on claims I and II. *See Ceran v. Reisch*, 2020 WL 6074114, at *9 (N.D. Iowa. Sept. 9, 2020) (dismissing attempt to pierce the corporate veil when the plaintiff could not sustain the underlying fraud claim). Finally, Plaintiffs provide no explanation for how the negligent misrepresentation claim (claim III) can support piercing the corporate veil. There is no exception to the corporate veil for claims based in negligence.

## CONCLUSION

This lawsuit is, as the Bard put it, a tale "full of sound and fury, signifying nothing." William Shakespeare, *Macbeth*, Act 5, Scene 5. Once you get past the groundless assertions, campaign-style hyperbole, and overheated conspiracy theories, there is nothing left. No legal basis whatsoever supports the claims, and Plaintiffs' opposition to the motions to dismiss reveals both shocking unfamiliarity with basic concepts of First Amendment law and a disregard of the pleading requirements for fraud or misrepresentation under Iowa law. As one court summed it up in another of President Trump's attacks on free speech: "This case should never have been brought. Its inadequacy as a legal claim was evident from the start. No reasonable lawyer would have filed it. Intended for a political purpose, none of the counts of the amended complaint stated a cognizable legal claim." *Trump v. Clinton*, 653 F.Supp.3d at 1207. The Court should dismiss this case with prejudice.

Dated: April 15, 2025

Respectfully Submitted,

/s/ *Robert Corn-Revere*

Robert Corn-Revere*†
   (DC Bar No. 375415)
Conor T. Fitzpatrick*
   (Mich. Bar No. P78981)
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION (FIRE)
700 Pennsylvania Ave., SE; Suite 340
Washington, DC 20003
(215) 717-3473
bob.corn-revere@thefire.org
conor.fitzpatrick@thefire.org

Greg H. Greubel
   (Iowa Bar No. AT0015474)
Adam Steinbaugh*
   (Cal. Bar No. 304829)
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION (FIRE)
510 Walnut St., Suite 900
Philadelphia, PA 19106
(215) 717-3473
greg.greubel@thefire.org
adam@thefire.org

Matthew A. McGuire
   (Iowa Bar No. AT0011932)
NYEMASTER GOODE, P.C.
700 Walnut St., Suite 1300
Des Moines, IA 50309
(515) 283-8014
mmcguire@nyemaster.com

*Attorneys for Defendants J. Ann Selzer and Selzer & Company*

* *Admitted pro hac vice.*
† *Lead counsel*

17

**CERTIFICATE OF SERVICE**

The undersigned certifies that a true copy of the foregoing document was served upon all

parties of record through the Court's CM/ECF electronic filing system.

/s/ *Robert Corn-Revere*