IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| PRESIDENT DONALD J. TRUMP, an individual, REPRESENTATIVE MARIANNETTE MILLER-MEEKS, an individual, and FORMER STATE SENATOR BRADLEY ZAUN, an individual, | Case No. 4:24-cv-00449-RGE-WPK |
| Plaintiffs, | |
| v. | **DEFENDANTS DES MOINES REGISTER AND TRIBUNE COMPANY AND GANNETT CO., INC.'S REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS** |
| J. ANN SELZER, an individual, SELZER & COMPANY, DES MOINES REGISTER AND TRIBUNE COMPANY, and GANNETT CO., INC., | |
| Defendants. | |

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

LEGAL STANDARDS ................................................................................................. 1

ARGUMENT ................................................................................................................. 2

  I.  PLAINTIFFS' MOTION FOR REMAND DOES NOT MOOT PRESS DEFENDANTS' MOTION TO DISMISS ................................................................. 2

  II.  PLAINTIFFS' IOWA CONSUMER FRAUD ACT CLAIMS MUST BE DISMISSED ..... 2

      A.  Plaintiffs' Claims Do Not Relate to a Consumer Transaction ............................... 2

      B.  The Iowa Poll Cannot Form the Basis of an ICFA Claim ..................................... 4

      C.  Plaintiffs Do Not Allege Any Facts to Establish ICFA's Proximate Cause Element ......................................................................................... 5

      D.  Plaintiffs Do Not Allege Any Legally Cognizable Damages as Required by ICFA ................................................................................................ 5

  III.  PLAINTIFFS' FRAUDULENT MISREPRESENTATION CLAIMS MUST BE DISMISSED ............................................................................................................. 7

  IV.  PLAINTIFFS' NEGLIGENT MISREPRESENTATION CLAIMS MUST BE DISMISSED ............................................................................................................. 9

  V.  PLAINTIFFS' CLAIMS ARE BARRED BY THE FIRST AMENDMENT ................... 12

      A.  *The Register*'s News Reporting on the Iowa Poll Is Editorial, Not Commercial, Speech .................................................................................................................. 12

      B.  The Court Should Reject Plaintiffs' Attempt to Create a First Amendment Exception for "False" Political Speech ................................................................. 15

      C.  In the Alternative, the Amended Complaint Should Be Dismissed for Failure to Satisfy Controlling First Amendment Principles ................................................. 17

      D.  Plaintiffs Cannot Circumvent the First Amendment by Characterizing This Action as a "Case About Private Actors" ....................................................................... 21

CONCLUSION ............................................................................................................ 22

## INTRODUCTION

Plaintiffs' Opposition (Dkt. 51, "Opposition") to Press Defendants' Motion to Dismiss, (*see* Dkts. 28, 35, jointly the "Motion"), highlights the legal defects of Plaintiffs' claims. Specifically, the Opposition fails to explain how Plaintiffs have alleged viable claims under the Iowa Consumer Fraud Act or for fraudulent or negligent misrepresentation under any legal standard. The laws that Plaintiffs claim Press Defendants violated were designed to regulate commercial business practices and consumer transactions, not to constrain news reporting by a community newspaper. A simple, straight-forward application of the law requires dismissal of the Amended Complaint.

## LEGAL STANDARDS

The correct standards of review are undisputed. (*Compare* Dkt. 35 at 11–12, *with* Dkt. 51 at 10–12.) The Parties agree that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to survive a motion to dismiss, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and that the heightened pleading requirements of Rule 9(b) mandate that fraud be pleaded with particularity. *See E-Shops Corp. v. U.S. Bank Nat'l Ass'n*, 678 F.3d 659, 663 (8th Cir. 2012); Fed. R. Civ. P. 9(b). Plaintiffs do not contest that *The Register* articles and attachments appended to the Motion to Dismiss as Exhibits A–K are both incorporated by reference in the pleadings and integral to the claim. They are therefore properly in the scope of the Court's review. (Dkt. 35 at 3 n.1.)

Nevertheless, Plaintiffs declined to respond to many of the arguments raised in the Motion to Dismiss. (*See, e.g.*, Dkt. 51 at 14 (stating that the Opposition responds to only one so-called "primary argument" regarding Plaintiffs' ICFA claim).) "Courts in the Eighth Circuit have consistently acknowledged that failure to respond to arguments raised in a motion to dismiss constitutes an abandonment of that claim or concession to the opposing arguments." *Muller v. Blue*

*Diamond Growers*, 683 F. Supp. 3d 933, 937 (E.D. Mo. 2023) (quoting *Little v. U.S. Dep't of Def.*, No. 4:21-CV-1309, 2022 WL 1302759, at *3 (E.D. Mo. May 2, 2022)). This rule applies even to individual arguments on particular claims. *See, e.g.*, *Maloney v. Ameristar Casinos, Inc.*, No. 4:09-CV-0673, 2010 WL 11508769, at *2 (W.D. Mo. Mar. 9, 2010); *Espey v. Nationstar Mortg., LLC*, No. 13-2979, 2014 WL 2818657, at *11 (D. Minn. June 19, 2014). Therefore, Plaintiffs' failure to respond to Press Defendants' arguments identified below constitutes a concession regarding the correctness of Press Defendants' positions.

## ARGUMENT

## I.    PLAINTIFFS' MOTION FOR REMAND DOES NOT MOOT PRESS DEFENDANTS' MOTION TO DISMISS

Plaintiffs attempt to avoid review of the merits of their claims by arguing that Press Defendants' Motion to Dismiss is moot in light of Plaintiffs' pending Motion for Remand. (Dkt. 51 at 7–9.) For the reasons stated in Press Defendants' Opposition to Motion for Remand, incorporated herein by reference, this is not correct. (*See* Dkt. 48.) This case was properly removed via snap removal; the Court had diversity jurisdiction at the time of removal; and President Trump's subsequent attempt to destroy diversity jurisdiction is not permitted, *inter alia*, under Rule 15. (*Id.*) As such, the Court should rule on Press Defendants' Motion to Dismiss with respect to each of Plaintiffs' claims.

## II.   PLAINTIFFS' IOWA CONSUMER FRAUD ACT CLAIMS MUST BE DISMISSED

### A.    Plaintiffs' Claims Do Not Relate to a Consumer Transaction

Plaintiffs do not state a claim under the Iowa Consumer Fraud Act, and the Opposition does nothing to change that fact. The heart and soul of ICFA is that the plaintiff is *required* to bring the claim as a consumer of the actionable consumer merchandise. *Mannino v. McKee Auto Ctr.*,

*Inc.*, No. 4:23-cv-00262, 2024 WL 4884440, at *3 (S.D. Iowa Sept. 5, 2024). This is not what Plaintiffs pleaded, and their Opposition does not explain or cure these pleading deficiencies.

First, Plaintiffs do not contest that they are not "consumers" of "consumer merchandise" as required to state a claim under ICFA. (Dkt. 35 at 13–16.) ICFA limits a cause of action only to a "*consumer* who suffers an ascertainable loss of money or property" with respect to some "*consumer merchandise.*" Iowa Code §§ 714H.3(1), .5(1) (emphasis added). But Plaintiffs do not—and cannot—allege they have been harmed through a consumer transaction with Press Defendants. No Plaintiff asserts that his or her claims are based on purchasing *The Register* for his or her personal benefit, nor do Plaintiffs attempt to explain why they should not be required to do so to state a claim under ICFA.

Second, the Motion demonstrates that Plaintiffs made no competent allegation that the Iowa Poll was done "in connection with the . . . sale . . . of consumer merchandise" as required under ICFA. *Id.* § 714H.3; *see also Butts v. Iowa Health Sys.*, No. 13-1034, 2015 WL 1046119, at *9 (Iowa Ct. App. Mar. 11, 2015) (affirming summary judgment on ICFA claim where defendant did "not offer or sell consumer merchandise"). Plaintiffs offer conclusory denials of their pleading deficiencies, but they present no well-pleaded factual allegations or arguments to support these denials. (Dkt. 51 at 12.) Instead, Plaintiffs only claim that ICFA as a general matter requires a lesser showing than common law fraud. (*Id.*) But this comparison of legal standards is irrelevant when the pleaded allegations fail to satisfy the ICFA standard under the private-right-of-action provisions of Iowa Code chapter 714H. (Dkt. 35 at 24–28.)

Plaintiffs attempt to avoid these pleading deficiencies by arguing for the first time in their Opposition that they suffered some kind of personal harm, even though such purported personal harm is not alleged in the Amended Complaint. They now claim that their "individual

reputation[s]" or "personal identit[ies]" are interrelated or otherwise linked to their professional reputations and identities such that any harm they suffered in their professional capacities is also harm they suffered in their individual capacities. (Dkt. 51 at 14–16.) This misses the mark. The alleged harm Plaintiffs claim to have suffered had nothing to do with whether they purchased or even read *The Register* or the Iowa Poll results. Moreover, as noted, these allegations are not contained in Plaintiffs' Amended Complaint, so this Court may not consider them. *See Seneca Cos., Inc. v. D&H United Fueling Sols., Inc.*, No. 4:24-cv-00023, 2024 WL 5440858, at *4 (S.D. Iowa July 29, 2024) (allegations of fact "outside the pleading"—including those stated "in support of . . . the pleading"—that seek to "provide[] some substantiation for" the Complaint "are not considered" (quoting *Gibb v. Scott*, 958 F.2d 814, 816 (8th Cir. 1992))).

### B.    The Iowa Poll Cannot Form the Basis of an ICFA Claim

Plaintiffs allege the conduct that violated ICFA was the Iowa Poll, claiming it was: (1) a prohibited "deception"; or (2) an "unfair act or practice." (Am. Compl. ¶¶ 116–17.) In their Opposition, Plaintiffs characterize the Iowa Poll as "false" because it: (1) "falsely portrayed that [Vice President] Harris was leading President Trump in Iowa by three points, just days before the election, despite President Trump ultimately winning in Iowa by 13%"; (2) "falsely reported that [Rep. Miller-Meeks] was trailing her Democratic opponent . . . by sixteen points, . . . despite her ultimately winning by a very tight margin of 0.2%"; and (3) "falsely reported a strong surge in Democratic turnout and votes, just days before Zaun's race," causing him to lose. (Dkt. 51 at 14–16.)

The Iowa Poll is a non-actionable opinion and cannot form the basis for Plaintiffs' "deception" and "unfair practice" claim. Plaintiffs do not substantively contest that the Iowa Poll results are non-actionable statements of opinion. (*See* Dkt. 35 at 16–24.) Nor do they contest in

any way that the Iowa Poll and reporting on it cannot constitute "material facts" as required under ICFA. (*Id.*) Under ICFA, "a claimant alleging an unfair practice, deception, fraud, false pretense, false promise, or misrepresentation *must prove that the prohibited practice related to a material fact or facts*." Iowa Code § 714H.3(1) (emphasis added). The determination of whether a statement is an opinion or potentially actionable statement of fact is a question of law for this Court to decide. *Others First, Inc. v. Better Bus. Bureau of Greater St. Louis, Inc.*, 829 F.3d 576, 580–81 (8th Cir. 2016); *Andrew v. Hamilton Cnty. Pub. Hosp.*, 960 N.W.2d 481, 489 (Iowa 2021). Because it is undisputed that the polls are not "material facts" for purposes of ICFA, Plaintiffs fail to state a claim under the statute.

### C.    Plaintiffs Do Not Allege Any Facts to Establish ICFA's Proximate Cause Element

Plaintiffs do not contest that the Iowa Poll did not proximately cause them any consumer injury. ICFA requires that any loss be the "result of a practice or act prohibited" by the statute. *Mannino*, 2024 WL 4884440, at *3. If Plaintiffs did not "rel[y] on the statement"—*i.e.*, rely on the Iowa Poll results—they "cannot prove that the statement was the proximate cause of [their] injury." *Tri-Plex Tech. Servs., Ltd. v. Jon-Don, LLC*, 241 N.E.3d 454, 462 (Ill. 2024); *see also State ex rel. Miller v. Hydro Mag, Ltd.*, 436 N.W.2d 617, 621 (Iowa 1989). Though they argue they were each "harmed" in various abstract ways, (Dkt. 35 at 14–17), none of them so much as insinuates that they engaged in any consumer conduct in reliance on the polls. As there are no allegations that Plaintiffs *relied* on the Iowa Poll, there is no proximate causation pleaded and thus no ICFA claim.

### D.    Plaintiffs Do Not Allege Any Legally Cognizable Damages as Required by ICFA

Finally, ICFA provides a private right of action only for consumers who have "suffer[ed] an ascertainable loss of money or property as the result of a prohibited practice or act." Iowa Code

§ 714H.5(1).[1] ICFA itself defines "actual damages" as "all compensatory damages proximately caused by the prohibited practice or act that are reasonably ascertainable in amount." *Id.* § 714H.2.

In responding to Press Defendants' so-called "primary" argument regarding their ICFA claim, Plaintiffs recount their alleged injuries: (1) President Trump suffered harm to his "reputation, his image, and his viability as a candidate"; (2) Rep. Miller-Meeks "was subjected to a costly and stressful recount process . . . which imposed reputational, financial, and emotional costs to her in a variety of ways"; and (3) Zaun suffered "personal, reputational, and professional harm." (Dkt. 51 at 14–16.) Regardless of how many times Plaintiffs reiterate these alleged injuries, none of them are remediable under ICFA as a matter of law.

Courts analyzing ICFA have rejected claims when a party has neither a contractual nor property interest in the consumer merchandise in dispute. *See McKee v. Isle of Capri Casinos, Inc.*, 864 N.W.2d 518, 533 (Iowa 2015); *Mannino*, 2024 WL 4884440, at *9; *cf. Blackford v. Prairie Meadows Racetrack & Casino, Inc.*, 778 N.W.2d 184, 190 (Iowa 2010). Courts likewise conclude that a plaintiff fails to show an ascertainable loss as a matter of law where the plaintiff does not incur any out-of-pocket expenses. *See Poller v. Okoboji Classic Cars, LLC*, 960 N.W.2d 496, 523 (Iowa 2021); *McKee*, 864 N.W.2d at 533; *Becirovic v. Malic*, No. 24-0219, 2024 WL 4759228, at *10 (Iowa Ct. App. Nov. 13, 2024).

Here, Plaintiffs have not, as a matter of law, adequately alleged "an ascertainable loss of money or property" or out-of-pocket expenses that is redressable through an ICFA claim. Indeed,

---

[1] Plaintiffs parenthetically suggest they do not need to show damages to establish an ICFA claim. (Dkt. 51 at 12 (quoting *State ex rel. Miller*, 436 N.W.2d at 622).) This suggestion is based on an inapplicable citation to case law under the Attorney General ICFA statute, *not* the private-right-of-action ICFA statute which indisputably controls the present case. *Compare* Iowa Code § 714.16, *with id.* § 714H.5. Given that Plaintiffs proceed to acknowledge that they are required to "ple[a]d harm in support of their [ICFA] claim," (*see* Dkt. 51 at 14), their misplaced citation to a case interpreting the Attorney General ICFA statute should be ignored.

President Trump and Zaun concede that their only harm was reputational and professional, and neither allege they ever purchased *The Register*. (Dkt. 51 at 14–16.) Rep. Miller-Meeks alleges that she "was subjected to a costly . . . recount process" and purchased the print edition containing the Iowa Poll, (*id.* at 15), but nowhere in the Amended Complaint do Plaintiffs allege that Rep. Miller-Meeks personally incurred any out-of-pocket expenses in the recount or that the value of the print edition purchased is somehow less than the product as represented. Accordingly, Plaintiffs' ICFA claim should be dismissed as a matter of law.

## III. PLAINTIFFS' FRAUDULENT MISREPRESENTATION CLAIMS MUST BE DISMISSED

Given their inability to establish a violation of the ICFA, Plaintiffs have added claims for fraudulent misrepresentation and negligent misrepresentation to their Amended Complaint. These claims are also deficiently pleaded.

First, Plaintiffs do not meaningfully engage with Press Defendants' argument that Plaintiffs failed to plead an actionable representation because the Iowa Poll results are non-actionable statements of opinion, not of fact. (*See* Dkt. 35 at 31.) Plaintiffs argue that the Iowa Poll should be considered a "representation" because it was "presented as [an] authoritative, data-driven assessment[] of voter preferences" and was "promoted . . . with headlines and editorial commentary endorsing [its] accuracy."[2] (Dkt. 51 at 16.) But none of these new arguments—to the extent they can be considered—counter or are inconsistent with the reality that the Iowa Poll results are non-actionable statements of opinion. (*See* Dkt. 35 at 17–22.) Further, Plaintiffs mischaracterize their own pleading with these new claims. Plaintiffs' support for their claims about the way in which the Iowa Poll was "presented" are quotes from *third parties* like Rachel Maddow,

---

[2] Plaintiffs' citation to the *Midwest Home Distributor* case for their proposition is inapt; the questions of representation, materiality, and falsity were expressly not in dispute in that case. *Midwest Home Distrib., Inc. v. Domco Indust. Ltd.*, 585 N.W.2d 735, 742 (Iowa 1998).

not from Defendants. (*See* Am. Compl. ¶ 78.) Plaintiffs do not explain how a statement by a third party could transform the Iowa Poll results into an actionable representation.

Second, Plaintiffs have not alleged in any cognizable fashion how the Iowa Poll or its results were false. Plaintiffs allege that the poll results were false simply because they deviated from the final election results. (Dkt. 51 at 16–17.) But they have not alleged any falsity *with respect to the poll itself*. To state a cognizable claim with particularity, Plaintiffs must allege a false representation, but a polling "error" is not a falsehood, and disagreement with a poll is not enough to establish a false representation with particularity as required by Rule 9(b). *See BJC Health Sys. v. Columbia Cas. Co.*, 478 F.3d 908, 918 (8th Cir. 2007) (finding allegations deficient under Rule 9(b) where "complaint expresses disagreement with the conclusion of the second actuarial analysis, but it does not specify where and how the analysis falls short").

Third, Plaintiffs fail to allege facts supporting that the representations at issue are material as a matter of law. Plaintiffs instead rely on the wholly conclusory assertion that the Iowa Poll results were "material" because "[p]olling affects voter turnout and enthusiasm" and "Selzer [is] known for her extraordinary influence over expectations for the results of Iowa and national elections." (Dkt. 51 at 17.) However, with respect to fraudulent misrepresentation, a fact is only material if it is "likely to affect [a consumer's] choice of, or conduct regarding, *a product*." *State ex rel. Miller v. Vertrue, Inc.*, 834 N.W.2d 12, 34 (Iowa 2013) (emphasis added) (internal quotations omitted). Plaintiffs did not allege that the Iowa Poll results affected their choice to purchase *The Register* or any other consumer product. They have therefore failed to sufficiently allege materiality.

Fourth, Plaintiffs do not contest Press Defendants' argument that Plaintiffs failed to plead the requisite justifiable reliance on the Iowa Poll results. Under Iowa law, Plaintiffs must have

affirmatively "acted in reliance on the truth of the representation and [been] justified in relying on the representation." *Gibson v. ITT Hartford Ins. Co.*, 621 N.W.2d 388, 400 (Iowa 2001). Plaintiffs cannot satisfy this requirement with only their conclusory assertion that "[e]ach Plaintiff read and relied on the election coverage at issue, and had every right to do so." (Dkt. 51 at 19.) They must allege the specific actions they undertook in reliance on the poll results as "truth" and why they were justified in doing so. Plaintiffs allege no such acts. Rep. Miller-Meeks alleges she purchased a newspaper, President Trump alleges his campaign incurred unidentified expenditures, and Zaun alleges no responsive acts whatsoever. (Am. Compl. ¶¶ 21, 101, 131.) No act by any Plaintiff is alleged to have been undertaken *in reliance on* the poll as a statement of truth. *Cf. Gibson*, 621 N.W.2d at 400. Further, Plaintiffs do not allege that their reliance was justified; rather, they allege the opposite, claiming the poll results were not credible on their face. (Am. Compl. ¶¶ 56–62.)

Finally, Plaintiffs fail to plausibly state an injury redressable by a claim for fraudulent misrepresentation. Instead, they merely refer the Court to their arguments under ICFA "[t]o avoid redundancy." (Dkt. 51 at 19.) But fraudulent misrepresentation only allows for two specific types of damages: the loss of the benefit of a bargain or the loss of out-of-pocket expenses. *Midwest Home Distrib.*, 585 N.W.2d at 741. Plaintiffs allege neither.

## IV.    PLAINTIFFS' NEGLIGENT MISREPRESENTATION CLAIMS MUST BE DISMISSED

The elements of fraudulent misrepresentation and negligent misrepresentation are similar, and Plaintiffs plead their negligent misrepresentation claim as an alternative to their fraudulent misrepresentation claim if the Court finds that the alleged "misrepresentations were not intentional." (Am. Compl. ¶ 147.) As with their ICFA and fraudulent misrepresentation claims, Plaintiffs have failed to adequately plead this claim.

First, Plaintiffs did not sufficiently plead that Press Defendants are "in the business or profession of supplying information" to Plaintiffs such that Press Defendants owed them any duty. Plaintiffs' only response is that Press Defendants had a generic pecuniary interest in the dissemination of the Iowa Poll, and therefore were acting in their "professional capacity." (Dkt. 51 at 21.) But this argument misses the point: Plaintiffs have not pleaded—and could not plead—that Press Defendants (1) acted in an advisory capacity for Plaintiffs' benefit; (2) were aware that Plaintiffs would rely on the Iowa Poll results; or (3) *intended* for Plaintiffs to use said information in any way, shape, or form. *Conveyor Co. v. Sunsource Tech. Servs., Inc.*, 398 F.Supp.2d 992, 1013–14 (N.D. Iowa 2005). Plaintiffs attempt to avoid dismissal by claiming that there is "no clear guidance" as to whether a party is in the business or profession of supplying information to others, and that the Court should accordingly use its discretion to find that Press Defendants were in fact in such business or profession as a matter of law. (Dkt. 51 at 20–21.) This is impermissible. Press Defendants have cited ample guidance clarifying that they are *not* in the class of defendants contemplated by the Iowa courts. (Dkt. 35 at 37–38 (collecting cases).)

Second, Plaintiffs claim the difference between the Iowa Poll results and the later election results "leav[e] no other explanation" than misconduct or negligence consistent with the *res ipsa loquitur* doctrine. (Dkt. 51 at 22–23.) Plaintiffs' invocation of *res ipsa loquitur* is nonsensical; the doctrine is only implicated in situations where circumstances make it impossible to prove causation. *Norberg v. Labor Ready, Inc.*, 384 F. Supp. 2d 1328, 1332 (S.D. Iowa 2005) ("*Res ipsa loquitur* . . . fills the gap where there is no direct evidence of causation and an inference of negligence is permissible from the fact of injury itself."). This is not such a case. Plaintiffs identify no injury requiring a causation analysis; even if they had, Plaintiffs make no effort to explain why their claim is cannot be pleaded by direct allegations. *Res ipsa loquitur* has no place in this case.

Third, Plaintiffs continue to rely on conclusory allegations by third parties in making their *res ipsa* argument. (*See* Dkt. 51 at 21, 23 (citing Am. Compl. ¶ 76).) Specifically, in paragraphs 76 and 77 of their Amended Complaint, Plaintiffs quote an opinion piece by pundit James Piereson regarding his view of the likelihood of the Iowa Poll result's departure from the election results. (Am. Compl. ¶¶ 76–77.) Plaintiffs do not make their own independent allegations on these points, but instead appear to rely on Mr. Piereson's quotes for the truth of the matter asserted. (Dkt. 51 at 23.) A third party's politically motivated opinion about likelihoods does not support Plaintiffs' conclusory legal claim that it is "impossible to explain" the results without presuming negligence. Plaintiffs' mere conclusion—that statistical improbability establishes negligence—is entitled no deference. *See McDonough v. Anoka Cnty.*, 799 F.3d 931, 945 (8th Cir. 2015) ("[A]llegations that are no more than conclusions . . . are not entitled to the assumption of truth.").

Fourth, to plead a negligent misrepresentation claim, Plaintiffs must allege that they are the type of people for whose benefit and guidance the information at issue was intended. (Dkt. 35 at 38 (citing *Sain v. Cedar Rapids Cmty. Sch. Dist.*, 626 N.W.2d 115, 123 (Iowa 2001)).) Plaintiffs did not and cannot in good faith plead that Press Defendants supplied the results of the Iowa Poll to Plaintiffs for their benefit or guidance, which alone is fatal to their claim. *See McLeodUSA Telecomm. Servs., Inc. v. Qwest Corp.*, 469 F. Supp. 2d 677, 692 (N.D. Iowa 2007). Nowhere in their Opposition do Plaintiffs attempt to address this fundamental defect. Indeed, they cannot: courts routinely dismiss claims for negligent misrepresentation against general circulation news publications for this reason. (*See* Dkt. 35 at 39 (collecting cases).)

Finally, as discussed *supra*, Plaintiffs do not and cannot reasonably plead any justifiable reliance on the Iowa Poll or that the Iowa Poll was the proximate cause of any recoverable damages. (Dkt. 35 at 39–40.) Plaintiffs do not address these defects in their Opposition.

11

In the absence of any argument as to the elements of their claim, Plaintiffs suggest instead that their allegations regarding a "leak" of the Iowa Poll results (while nearly contemporaneous with the publication of the same) is alone sufficient to plead a claim for negligent misrepresentation. (Dkt. 51 at 22.) But they offer no explanation of the alleged leak's impact on any of the elements of a negligent misrepresentation claim. It has no bearing on the nature of Press Defendants' business, their intent as to Plaintiffs' reliance, the alleged falsity of the Iowa Poll results or knowledge thereof, Plaintiffs' lack of reliance, or proximate causation of any damages. In other words, allegations about the "leak" are nothing more than vague aspersions with no relevance whatsoever to the claims at issue. Plaintiffs completely fail to state a claim for negligent misrepresentation.

## V.    PLAINTIFFS' CLAIMS ARE BARRED BY THE FIRST AMENDMENT

The arguments advanced in Plaintiffs' Opposition are squarely at odds with established First Amendment principles. The complete lack of supporting legal authority for numerous propositions proclaimed throughout the Opposition should not escape this Court's notice. As set forth below, the First Amendment requires dismissal of Plaintiffs' claims.

### A.    *The Register*'s News Reporting on the Iowa Poll Is Editorial, Not Commercial, Speech

Apparently recognizing the First Amendment problems with challenging editorial speech, Plaintiffs frame *The Register*'s news coverage of the Iowa Poll as "no different than the promotion of any other commercial product" subject to the lesser protections of commercial speech. (Dkt. 51 at 28.) Plaintiffs are wrong. They cite no authority for their position because none exists.[3] Even

---

[3] Plaintiffs' argument is incorrect as a matter of law. A "journalist's article is not commercial advertising, commercial promotion, or commercial speech." *Gmurzynska v. Hutton*, 355 F.3d 206, 210 (2d Cir. 2004). The "non-commercial nature of a journalist's article cannot be overcome by [a] plaintiff claiming [that] an improper purpose motivated the publisher to run the article." *Croton*

their *amicus* supporter disagrees with them: "the Register's reporting on a presidential campaign is reporting on a 'particularly newsworthy fact,' . . . *which is not commercial speech, even when run in a newspaper*." (Dkt. 38-1 at 4–5 (emphasis added) (citation omitted).)

Commercial speech is speech that "does no more than propose a commercial transaction." *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 421 (1993)[4]; *accord Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 n. 24 (1976) ("There are common sense differences between speech that does no more than propose a commercial transaction and other varieties."). *The Register*'s challenged reporting did not propose *any* commercial transaction, let alone "solely" a commercial transaction. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980). The newspaper's campaign coverage was unquestionably news reporting on the upcoming federal election campaigns in Iowa, and Plaintiffs repeatedly concede as much. (Am. Compl. ¶¶ 1–3, 84, 157; Dkt. 51 at 2–3.) Contrary to Plaintiffs' argument, *The Register*'s reporting on the Iowa Poll results in the midst of the 2024 presidential and congressional election cycles is core political speech that "occupies the highest rung of the hierarchy of First Amendment values[,] and is entitled to special protection." *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011) (quotation omitted); *Republican Party of Minn. v. White*, 536 U.S. 765, 774 (2002) (speech about electoral process is "at the core of our First Amendment freedoms") (quotation omitted).

---

*Watch Co. v. Nat'l Jeweler Mag., Inc.*, No. 06 Civ. 662, 2006 WL 2254818, at *10 (S.D.N.Y. Aug. 7, 2006).

[4] Plaintiffs' citation to *City of Cincinnati* on page 27 of their Opposition misleadingly omits the following italicized portion from the sentence they quote, which also compels the rejection of their commercial speech argument here: "[M]uch of the material in ordinary newspapers is commercial speech and, conversely . . . *the editorial content in respondents' promotional publications is not what we have described as 'core' commercial speech*." 507 U.S. at 423 (emphasis added).

To support their flawed argument that the challenged reporting constitutes commercial speech, Plaintiffs next attempt to expand the definition of commercial speech far beyond its well-established reach—*i.e.*, ads proposing a commercial transaction—to cover any speech by a for-profit entity. However, Plaintiffs cannot sidestep the First Amendment by proclaiming without authority that Press Defendants were "selling a *product* to consumers—polls—not reporting the news." (Dkt. 51 at 24.) This theory was invalidated decades ago, and for good reason. It ignores that both the conduct of the underlying polls themselves and *The Register*'s reporting of their results are protected under the First Amendment. *See Mills v. Alabama*, 384 U.S. 214, 218 (1966) ("major purpose" of the First Amendment [i]s to protect "free discussion of . . . [political] candidates"); *Daily Herald Co. v. Munro*, 838 F.2d 380, 384 (9th Cir. 1988) (political polling "requires a discussion between pollster and voter" and the poll itself is "speech protected by the First Amendment"). That the "business" of Press Defendants is "selling newspapers and subscriptions for profit" is of no moment. (Dkt. 51 at 24.) The Supreme Court has repeatedly held that speech is "protected even though it is carried in a form that is 'sold' for profit[.]" *City of Cincinnati*, 507 U.S. at 420; *see also Smith v. California*, 361 U.S. 147, 150 (1959) (books); *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952) (motion pictures); *Murdock v. Pennsylvania*, 319 U.S. 105, 110 (1943) (religious pamphlets "invit[ing] the purchase of books"); *New York Times v. Sullivan*, 376 U.S. 254, 266 (1964) (political issue advertisement).

If civil liability could be triggered merely by alleging publication with a profit motive, the First Amendment's protection for political campaign speech would be rendered meaningless. *See Harte Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989) ("If a profit motive could somehow strip communications of the otherwise available constitutional protection, our [protective precedents] . . . would be little more than empty vessels."). As the Supreme Court has

emphasized, "[i]f a newspaper's profit motive were determinative, all aspects of its operations—from the selection of news stories to the choice of editorial position—would be subject to regulation if it could be established that they were conducted with a view toward increased sales. ***Such a basis for regulation would clearly be incompatible with the First Amendment***." *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 385 (1973) (emphasis added).

**B.    The Court Should Reject Plaintiffs' Attempt to Create a First Amendment Exception for "False" Political Speech**

In our constitutional system, a claim for "fraudulent news" does not exist. Full stop. The remedy for disagreement with political speech one does not like is counter-speech—not court-enforced damages under the guise of commercial regulations. *281 Care Comm. v. Arneson*, 766 F.3d 774, 793 (8th Cir. 2014) ("Especially as to political speech, counterspeech is the tried and true buffer and elixir.").

In derogation of these principles, Plaintiffs are pursuing an action against Press Defendants for "distorting media narratives in the final stretch before voting." (Dkt. 51 at 6.) In *United States v. Alvarez*, 567 U.S. 709, 718 (2012), however, the Supreme Court reaffirmed there is no "general exception to the First Amendment for false statements." "This comports with the common understanding that some false statements are inevitable if there is to be an open and vigorous expression of views in public and private conversation, expression the First Amendment seeks to guarantee." *Id.* Accordingly, to safeguard our "profound national commitment to the principle that debate on public issues should be uninhibited robust, and wide-open," *Sullivan*, 376 U.S. at 270, speech is presumptively shielded by the First Amendment unless it falls within one of a small number of narrowly defined categories. *Alvarez*, 576 U.S. at 717. Those categories, informed by history and tradition, do not include a general proscription of "false speech." *Id.* at 719 ("The Court

has never endorsed the categorial rule . . . that false statements receive no First Amendment protection."). Without question, these narrow categories may not be elasticized to include "fake news" about election campaigns, as the First Amendment stands resolutely against demands to regulate "truth" in political reporting. Such attempts are subject to strict scrutiny and are presumptively unconstitutional—even when the alleged fraud in political speech consists of "knowingly false speech." *281 Care Comm. v. Arneson*, 638 F.3d 621, 634. n.2 (8th Cir. 2011).

In *Alvarez*, the Court reiterated that false statements are only unprotected when there is some "legally cognizable harm associated with [the] false statement." *Alvarez*, 567 U.S. at 719. Accordingly, Plaintiffs' claims based on "false speech" cannot be maintained unless they demonstrate a legally cognizable harm.[5] To do so, Plaintiffs claim that this suit fits into one of the *Alvarez* exceptions because it rises to the level of fraud. *Id*. Although on the surface "fraud" is a category of speech outside the First Amendment's protection, "[simply] labeling an action one for 'fraud,' of course, will not carry the day." *Illinois ex. rel. Madigan v. Telemarketing Assocs.*, 538 U.S. 600, 617 (2003). A fraud claim imposes "exacting" requirements to ensure "sufficient breathing room for protected speech[,]" and a "[f]alse statement alone" does not result in liability. *Id*. at 620. Needless to say, even accepting as true that Plaintiffs decided to devote unplanned time and money to their respective campaigns for office, inspired by their own speculation that *The*

---

[5] Plaintiffs claim that the alleged "cognizable injury" animating this lawsuit is not election interference attributable to purported "fake news," but rather injury to "President Trump's individual reputation[, which] is very much interrelated and tied up in his professional reputation[.]" (Dkt. 51 at 14.) This argument suggests that the Amended Complaint's consumer fraud and common law misrepresentation claims attempt to evade the strict First Amendment limitations and defenses applicable to allegations of reputational injury by a public official, which is governed by defamation law. Of course, no defamation claim has been or could be asserted here based on *The Register*'s truthful and accurate reporting.

*Register*'s reporting of the Iowa Poll results might sway voters, that is of course not a legally cognizable injury. It is how democracy works.

A claim of "fraud" based on news reporting should not withstand scrutiny under the First Amendment. Permitting Plaintiffs' claim to proceed on this basis would violate a fundamental premise of free speech by granting Plaintiffs "freewheeling authority to declare new categories of speech outside the scope of the First Amendment." *United States v. Stevens*, 559 U.S. 460, 472 (2010). That would be a "startling and dangerous" proposition, subject to no principled limitation. *Id*. at 470. The First Amendment will not tolerate such a result.

### C.    In the Alternative, the Amended Complaint Should Be Dismissed for Failure to Satisfy Controlling First Amendment Principles

Even assuming—contrary to established First Amendment principles—that *The Register*'s political campaign reporting is not endowed with immunity from an ICFA or misrepresentation claim, the Amended Complaint nevertheless cannot evade the constitutional privileges and defenses that otherwise apply to tort claims premised on speech about public officials. In *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 56 (1988), the Supreme Court made clear that the same First Amendment defenses applicable to defamation suits govern intentional tort claims arising out of published statements concerning a public official-plaintiff. Namely, public officials cannot recover on such a claim without showing that the publication (i) "contains a false statement of fact," (ii) "made with 'actual malice,' *i.e.*, with knowledge that the statement was false or with reckless disregard as to whether or not it was true*." 485 U.S. at 56 (emphasis added) (citation omitted). *Hustler*'s logic is dispositive of Plaintiffs' claims here.

First, Plaintiffs cannot, as a matter of law, establish that Press Defendants' reporting of poll results of which Plaintiffs disapprove are "provably false" because the statements at issue necessarily relate to the future: the outcome of presidential and congressional elections in Iowa

that had not yet occurred. *See 281 Care Comm. II*, 766 F.3d at 795 (invalidating a Minnesota campaign law penalizing allegedly knowingly false communications about ballot initiatives, holding that such speech was a "statement of conjecture about the future state of affairs should the ballot question pass or fail" and, thus, could not be deemed provably false). The poll results published by *The Register* on November 2 and 3, 2024, represent an inherently evaluative assessment of public sentiment about the respective candidates at a particular point in time. As a snapshot of randomized samples of voter support subject to the vicissitudes of the electorate, polling results do not qualify as falsified facts for First Amendment purposes merely because they did not align with the ultimate election outcome. *See Scott v. Roberts*, 612 F.3d 1279, 1283 (11th Cir. 2010) ("[O]pinion polls of random selections of voters are *snapshots with margins of error*, and campaigns are, to say the least, dynamic projects." (emphasis added)).

Second, the Constitutional "actual malice" standard forecloses Plaintiffs' claims. To carve out the "breathing space" needed such that "protected speech is not discouraged," *Harte-Hanks Commc'ns*, 491 U.S. at 686 (internal quotation omitted), the *Sullivan* Court established the "actual malice" standard, 376 U.S. at 279–80—which both Plaintiffs and their *amicus* acknowledge governs the Amended Complaint's speech-based tort claims. (Dkt. 51 at 26-27; Dkt. 38-1 at 5, 7.) This standard requires proof that the defendant published a false statement with knowledge that it was false, or with reckless disregard as to its truth or falsity.[6] *Sullivan*, 376 U.S. at 270; *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 511 n.30 (1984); *Carr v. Bankers Tr. Co.*, 546 N.W.2d 901, 904 (Iowa 1996).

---

[6] "Reckless disregard" has been defined as publishing while actually entertaining "serious doubts as to the truth of publication," *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968), or publishing while subjectively possessing a "high degree of awareness of the probable falsity of the publication," *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964).

"The standard of actual malice is a daunting one." *Howard v. Antilla*, 294 F.3d 244, 252 (1st Cir. 2002) (internal quotation omitted). It requires clear and convincing proof of Press Defendants' state of mind at the time the poll results were published. *Blessum v. Howard Cnty. Bd. of Supervisors,* 295 N.W.2d 836, 843 (Iowa 1980). Proof of negligence alone is insufficient. *Sullivan*, 376 U.S. at 279–80.

The Amended Complaint contains no specific factual allegations that support Plaintiffs' conclusory recitation that Press Defendants made "knowingly false misrepresentations." (Am. Compl. ¶ 140.) This omission *a fortiori* establishes the absence of actual malice. There are no allegations that support that *The Register* published the results of either a presidential or congressional election poll that intentionally erred in favor of the Democratic candidate. There are no allegations that Press Defendants purposefully relied on an unrepresentative sample or skewed demographics; used recklessly falsified or distorted polling data; deliberately prepared biased or misleading questionnaires; or knowingly adopted a flawed polling methodology. Nor are there any allegations that *The Register* had information from voters that contradicted the published poll results, or that the newspaper's personnel made any statements or conducted themselves in a manner indicating that they knew the polling results were incorrect.

In the absence of any such allegations, Plaintiffs make much of the pre-publication leak of the Iowa Poll's results, albeit without alleging any facts tying Press Defendants to the disclosure. (Am. Compl. ¶¶ 61, 65.) Plaintiffs' theory—that their allegations regarding the leak plausibly support a claim of an "abandonment of objectivity" in *The Register*'s reporting—is unavailing. (Am. Compl. ¶ 62.) As a matter of black-letter constitutional law, alleged political bias or slant in news coverage is insufficient to demonstrate actual malice. *See Donald J. Trump for President, Inc. v. WP Co. LLC*, No. 20-636, 2023 WL 1765193, *5 (D.D.C. Feb. 3, 2023) (reasoning that an

"unadorned claim of animus and bias cannot save [a] deficient pleading" of actual malice) (citation omitted); *Trump v. Cable News Network, Inc.*, No. 22-61842, 2023 WL 4845589, *5 (S.D. Fla. July 28, 2023) *reconsid. denied*, 2023 WL 8433599 (S.D. Fla. Dec. 5, 2023) ("Acknowledging that CNN acted with political enmity does not save this case; the Complaint alleges no false statement of fact."), *appeal pending*, No. 23-14044 (11th Cir. 2023).

All that remains is the Amended Complaint's speculation that *The Register* was part of a conspiracy "to paint an incorrect and cynical picture of the downward trajectory for President Trump" solely because the newspaper reported the results of a prominent Iowa poll that happened to get it wrong.[7] (Am. Compl. ¶ 55.) This amounts to mere conjecture and is precisely the sort of conclusory claim that courts have routinely rejected as insufficient to plead actual malice. *Nelson Auto Center, Inc. v. Multimedia Holdings Corp.*, 951 F.3d 952, 958 (8th Cir. 2020) ("[E]very circuit that has considered the matter has applied the *Iqbal/Twombly* standard and held that a defamation suit may be dismissed for failure to state a claim where the plaintiff has not pled facts sufficient to give rise to a reasonable inference of actual malice.") (internal quotations and citation omitted).

---

[7] The Amended Complaint's speculation about ill motives—supposedly evinced by Press Defendants' publication of the Iowa Poll "to improperly influence the outcome of the 2024 Presidential Election and other electoral races" (Am. Compl. ¶ 129)—misses the constitutional mark. "[W]hile such a bad motive may be deemed controlling for purposes of tort liability in other areas of the law, . . . the First Amendment prohibits such a result in the area of public debate about public figures." *Hustler*, 485 U.S. at 53. Further, as used in the First Amendment context, "actual malice" "has nothing to do with bad motive or ill will." *Harte-Hanks Commc'ns.*, 491 U.S. at 666 n.7. Thus, under *Sullivan*, a plaintiff cannot demonstrate actual malice "merely through a showing of ill will or 'malice' in the ordinary sense of the term." *Stevens v. Iowa Newspapers, Inc.*, 728 N.W.2d 823, 831 (Iowa 2007) (quoting *Harte-Hanks Commc'ns*, 491 U.S. at 666).

**D.    Plaintiffs Cannot Circumvent the First Amendment by Characterizing This Action as a "Case About Private Actors"**

Plaintiffs repeatedly assert that because this suit involves private rights of action rather than direct government regulation of speech, the First Amendment does not apply. (*See* Dkt. 51 at 23-26.) This assertion is both puzzling and wrong. It is puzzling because Plaintiffs contend that this case has "nothing to do with the First Amendment," while also conceding that the actual malice standard set forth in *Sullivan*—a standard rooted in the First Amendment—is "the proper standard" to apply to *The Register*'s reporting. (*See* Dkt. 51 at 23, 26 (citing *Sullivan*, 376 U.S. at 254; *Harte-Hanks Comms.*, 491 U.S. at 666).) Plaintiffs' position thus contradicts itself: if *The Register*'s invocation of the First Amendment is nothing but a "red herring," as Plaintiffs claim, no basis would exist for the actual malice standard to apply. (*Cf.* Dkt. 51 at 1, 25)

Setting aside the internal dissonance of Plaintiffs' argument, it is also erroneous. When done pursuant to state law, the First Amendment does not concern itself with *who* is attempting to restrict speech but, rather, whether application of state law is appropriately limited pursuant to the First Amendment. Put another way, unconstitutional application of state law to suppress protected speech—whether by a private individual via a tort action or direct government regulation of speech—is tantamount to state suppression of speech. That is why in *Sullivan*, which itself involved a private tort cause of action, the Supreme Court analyzed whether the "law applied by the Alabama courts [was] constitutionally deficient for failure to provide the safeguards for freedom of speech and of the press" required by the Constitution. 376 U.S. at 264; *see also Price v. Viking Penguin, Inc.*, 881 F.2d 1426, 1430 (8th Cir. 1989) ("As the Bill of Rights became applicable to the states, the [F]irst [A]mendment became increasingly viewed as a limit on state defamation law."); *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777 (1986) ("[T]he

need to encourage debate on public issues . . . in [] governmental-restriction cases is of concern in a similar manner in . . . case[s] involving a private suit for damages.").[8]

Indeed, state and federal courts across the country have consistently and routinely imposed constitutional constraints on tort liability for decades, especially in the First Amendment context. *See, e.g.*, *Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (applying First Amendment to private defamation, invasion of privacy, and intentional infliction of emotional distress claims); *Falwell*, 485 U.S. at 46 (applying First Amendment to private intentional infliction of emotional distress claim); *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 916–17 (1982) (applying First Amendment to private tort claims arising from economic consequences of boycott); *Malin v. Quad-City Times*, 964 N.W.2d 10 (Iowa Ct. App. 2021) (affirming verdict in favor of newspaper and journalist defendants on intentional interference with contract claim where jury instructions "essentially precluded liability if the jury found the defendants' actions were protected by the First Amendment").

Here, then, the First Amendment is no "red herring." (*See* Dkt. 51 at 1, 25.) Rather, it is the rampart providing refuge for *The Register*'s protected political speech.

## **CONCLUSION**

The Court should grant Press Defendants' Motion in full and dismiss all claims with prejudice.

---

[8] In fact, these "constitutional constraints on speech-based civil liability have deep roots, stretching back to the Framing era." Eugene Volokh, *Tort Liability and the Original Meaning of the Freedom of Speech, Press, and Petition*, 96 Iowa L. Rev. 249, 250 (2010).

Dated: April 15, 2025

**FAEGRE DRINKER BIDDLE & REATH LLP**

*/s/ Nick Klinefeldt*
Nicholas A. Klinefeldt, AT0008771
David Yoshimura, AT0012422
801 Grand Avenue, 33rd Floor
Des Moines, Iowa 50309-8003
Telephone: (515) 248-9000
Facsimile: (515) 248-9010
Email: *nick.klinefeldt@faegredrinker.com*
        *david.yoshimura@faegredrinker.com*

**ATTORNEYS FOR PRESS DEFENDANTS DES MOINES REGISTER AND TRIBUTE COMPANY AND GANNETT CO., INC.**

## **CERTIFICATE OF SERVICE**

I certify that on April 15, 2025, I electronically filed the foregoing with the Clerk of Court using the ECF system, which will send notification of such filing to all parties participating in the Court's electronic filing system.


*/s/  Paulette Ohnemus*_____