IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| PRESIDENT DONALD J. TRUMP, an individual,<br><br>      Plaintiff,<br><br>vs.<br><br>J. ANN SELZER, and individual, SELZER & COMPANY, DES MOINES REGISTER AND TRIBUNE COMPANY, and GANNETT CO., INC.,<br><br>      Defendants. | Case No. 4:24-cv-00449-RGE-WPK<br><br>**BRIEF IN SUPPORT OF DEFENDANTS DES MOINES REGISTER AND TRIBUNE COMPANY AND GANNETT CO., INC.'S MOTION TO DISMISS REVISED AMENDED COMPLAINT**<br><br>**ORAL ARGUMENT REQUESTED** |

## TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................................................... 1

II.   BACKGROUND ........................................................................................................ 2

    A.  The Parties .......................................................................................................... 2

    B.  The Iowa Poll ..................................................................................................... 2

    C.  Procedural History and The Revised Amended Complaint ........................................ 8

III.  LEGAL STANDARD ................................................................................................ 13

IV.  ARGUMENT ............................................................................................................ 14

    A.  The First Amendment Bars President Trump's ICFA Claim ..................................... 15

        1.  Press Defendants' Campaign Reporting Is Entitled to Protection Under the First
            Amendment from an ICFA or Speech-Based Tort Claim ................................... 16

        2.  In the Alternative, President Trump's Interpretation of ICFA as Applicable to
            Press Defendants' Political Reporting Would Fail Strict Scrutiny ...................... 18

    B.  President Trump Fails to Establish Statutory Standing Under ICFA ......................... 22

    C.  President Trump Fails to Adequately Allege Fraud or Any Act That Violated
        ICFA ................................................................................................................ 25

        1.  Political Polls Are Non-Actionable Opinions and Therefore Cannot Constitute
            Actionable Statements of Material Fact or "Deception" ..................................... 26

        2.  Publication of the Iowa Poll Results Is Not an "Unfair Act or Practice" ............ 31

    D.  President Trump Does Not Allege the Publication of the Poll Was in Connection with
        the Sale or Advertisement of Consumer Merchandise ............................................. 34

    E.  President Trump Does Not Allege That He Relied on the Iowa Poll ......................... 38

    F.  President Trump Asserts No Plausible Claim for Fraudulent Misrepresentation ....... 40

        1.  President Trump Did Not Plead an Actionable Representation............................. 40

        2.  President Trump Did Not Plead Any Justifiable Reliance on the Iowa Poll ........ 41

        3.  President Trump's Alleged Injuries Are Not Redressable by a Claim for
            Fraudulent Misrepresentation .......................................................................... 43

    G.  The Lawsuit Does Not State a Claim for Negligent Misrepresentation ..................... 45

        1.  Defendants Are Not in the Business or Profession of Supplying Information as
            Construed by Iowa Law .................................................................................. 46

2. Defendants Did Not Supply the Iowa Poll to President Trump for His Benefit or Guidance ............................................................................................................. 47

3. President Trump Does Not Plead Reasonable Reliance on the Polls or Proximately Caused Damages Therefrom ............................................................. 49

4. First Amendment Considerations Bar President Trump's Negligent Misrepresentation Claim ...................................................................................... 50

V. CONCLUSION ...................................................................................................... 50

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*281 Care Comm. v. Arneson*,
    638 F.3d 621 (8th Cir. 2011) ...................................................................15, 18, 19

*281 Care Comm. v. Arneson*,
    766 F.3d 774 (8th Cir. 2014) ............................................................15, 18, 20, 21

*Abels v. Farmers Commodities Corp.*,
    259 F.3d 910 (8th Cir. 2001) ...................................................................................14

*Andrew v. Hamilton Cnty. Pub. Hosp.*,
    960 N.W.2d 481 (Iowa 2021) ..................................................................................26

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..................................................................................................13

*Bass v. J.C. Penney Co., Inc.*,
    880 N.W.2d 751 (Iowa 2016) ..................................................................................28

*Bates v. Allied Mut. Ins. Co.*,
    467 N.W.2d 255 (Iowa 1991) ..................................................................................44

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..................................................................................................13

*BJC Health Sys. v. Columbia Cas. Co.*,
    478 F.3d 908 (8th Cir. 2007) ...................................................................................14

*Boone Cnty. Cmm. Credit Union v. Masel*,
    665 N.W.2d 440, 2003 WL 1050344 (Iowa Ct. App. Mar. 12, 2003).....................49

*Burson v. Freeman*,
    504 U.S. 191 (1992)..................................................................................................19

*Citizens United v. FEC*,
    558 U.S. 310 (2010)..................................................................................................16

*Connick v. Myers*,
    461 U.S. 138 (1983)..................................................................................................16

*Cornell v. Wunschel*,
    408 N.W.2d 369 (Iowa 1987) ............................................................................44, 45

*Daily Herald Co. v. Munro*,
    758 F.2d 350 (9th Cir. 1984) ...................................................................................19

iv

*Daniel v. Dow Jones & Co., Inc.*,
  520 N.Y.S. 2d 334 (N.Y. Civ. Ct. 1987)................................................................48

*Deng v. White*,
  No. 18-1672, 2019 WL 6358427 (Iowa Ct. App. Nov. 27, 2019)...........................34

*Dier v. Peters*,
  815 N.W.2d 1 (Iowa 2012) ......................................................................................45

*Dongguk Univ. v. Yale Univ.*,
  734 F.3d 113 (2d Cir. 2013).....................................................................................50

*E-Shops Corp. v. U.S. Bank Nat'l Ass'n*,
  678 F.3d 659 (8th Cir. 2012) ...................................................................................14

*Eu v. San Francisco Cnty. Democratic Cent. Comm.*,
  489 U.S. 214 (1989).................................................................................................16

*Garrison v. Louisiana*,
  379 U.S. 64 (1964)...................................................................................................16

*Gibson v. ITT Hartford Ins. Co.*,
  621 N.W.2d 388 (Iowa 2001) ............................................................................41, 42

*Ginsburg v. Agora, Inc.*,
  915 F. Supp. 733 (D. Md. 1995) ........................................................................14, 48

*Goodman v. Performance Contractors, Inc.*,
  308 F. Supp. 3d 1002 (N.D. Iowa 2018).....................................................................3

*Greenley v. Laborers' Int'l Union of N. Am.*,
  271 F. Supp. 3d 1128 (D. Minn. 2017).....................................................................22

*Grimmett v. Freeman*,
  59 F.4th 689 (4th Cir. 2023) ....................................................................................18

*Gutter v. Dow Jones, Inc.*,
  490 N.W.2d 898 (Ohio 1986) ..................................................................................48

*Hammes v. JCLB Props. LLC*,
  764 N.W.2d 552 (Iowa Ct. App. 2008).....................................................................41

*Harrington v. Wilber*,
  353 F. Supp. 2d 1033 (S.D. Iowa 2005) ......................................................26, 30, 31

*Hasselman v. Hasselman*,
  596 N.W.2d 541 (Iowa 1999) ..................................................................................49

*Hoefer v. Wisc. Educ. Assoc. Ins. Tr.*,
  470 N.W.2d 336 (Iowa 1991) ................................................41

*Hunter v. Page Cnty., Iowa*,
  102 F.4th 853 (8th Cir. 2024) ................................................13

*Hustler Magazine, Inc. v. Falwell*,
  485 U.S. 46 (1988) ................................................50

*Jones v. Palmer Commc'ns, Inc.*,
  440 N.W.2d 884 (Iowa 1989) ................................................26

*Lemons v. Mycro Grp. Co.*,
  667 F. Supp. 665 (S.D. Iowa 1987) ................................................21

*Lloyd v. Drake Univ.*,
  686 N.W.2d 225 (Iowa 2004) ................................................40, 44

*Lockard v. Carson*,
  287 N.W.2d 871 (Iowa 1980) ................................................41

*Mannino v. McKee Auto Ctr., Inc.*,
  No. 4:24–cv–SMR–HCA, 2024 WL 4884440 (S.D. Iowa Sept. 5, 2024) ................................................24, 34

*McKee v. Isle of Capri Casinos, Inc.*,
  864 N.W.2d 518 (Iowa 2015) ................................................24

*McLeodUSA Telecomm. Servs., Inc. v. Qwest Corp.*,
  469 F. Supp. 2d 677 (N.D. Iowa 2007) ................................................46, 49

*Meredith v. Medtronic, Inc.*,
  No. 3:18-cv-00127-RGE-HCA, 2019 WL 6330677 (S.D. Iowa 2019) ................................................3

*Meyer v. Grant*,
  486 U.S. 414 (1988) ................................................19

*Midwest Home Distrib., Inc. v. Domco Indus. Ltd.*,
  585 N.W.2d 735 (Iowa 1998) ................................................43, 44, 49

*Miller v. Redwood Toxicology Lab'y, Inc.*,
  688 F.3d 928 (8th Cir. 2012) ................................................22

*Minn. Citizens Concerned for Life, Inc. v. Swanson*,
  692 F.3d 864 (8th Cir. 2012) ................................................16

*Moeller v. Samsung Electrs. Am., Inc.*,
  623 F. Supp. 3d 978 (S.D. Iowa 2022) ................................................13

*Mohsen v. Veridian Credit Union,*
  733 F. Supp. 3d 754 (N.D. Iowa 2024)..........................................................13, 14

*New York Times Co. v. Sullivan,*
  376 U.S. 254 (1964)....................................................................................16

*Newman-Green, Inc. v. Alfonzo-Larrain,*
  490 U.S. 826 (1989)......................................................................................9

*Others First, Inc. v. Better Bus. Bureau of Greater St. Louis, Inc.,*
  829 F.3d 576 (8th Cir. 2016) ....................................................................15, 26

*Pollmann v. Belle Plaine Livestock Auction, Inc.,*
  567 N.W.2d 405 (Iowa 1997) .........................................................................49

*Putman v. Walther,*
  973 N.W.2d 857 (Iowa 2022).....................................................................43, 44

*Rossley v. Drake Univ.,*
  336 F. Supp. 3d 959 (S.D. Iowa 2018) ..............................................................22

*Ryan v. Kanne,*
  170 N.W.2d 395 (Iowa 1969) .....................................................................47, 48

*S.E. Promotions, Ltd. v. Conrad,*
  420 U.S. 546 (1975)....................................................................................22

*Sain v. Cedar Rapids Cmty. Sch. Dist.,*
  626 N.W.2d 115 (2001) .........................................................................46, 47, 48

*Scott v. Roberts,*
  612 F.3d 1279 (11th Cir. 2010) ......................................................................27

*Snyder v. Phelps,*
  562 U.S. 443 (2011)................................................................................16, 17

*Spreitzer v. Hawkeye State Bank,*
  779 N.W.2d 726 (Iowa 2009) ....................................................................41, 42

*Stancik v. CNBC,*
  420 F.Supp.2d 800 (N.D. Ohio 2006)................................................................48

*State ex rel. Miller v. Cutty's Des Moines Camping Club, Inc.,*
  694 N.W.2d 518 (Iowa 2005).....................................................................31, 35

*State ex rel. Miller v. Hydro Mag, Ltd.,*
  436 N.W.2d 617 (Iowa 1989) .........................................................................38

*State ex rel. Miller v. Vertrue, Inc.*,
    834 N.W.2d 12 (Iowa 2013) ..................................................................30, 31

*State v. Cutsick*,
    84 N.W.2d 554 (Iowa 1957) ............................................................................37

*Susan B. Anthony List v. Driehaus*,
    814 F.3d 466 (6th Cir. 2016) ...........................................................................18

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007)..........................................................................................13

*Thompson v. Kaczinski*,
    774 N.W.2d 829 (Iowa 2009) ..........................................................................38

*Time Inc. v. Hill*,
    385 U.S. 374 (1967) .........................................................................................49

*Tralon Corp. v. Cedarapids, Inc.*,
    966 F. Supp. 812 (N.D. Iowa 1997)................................................................41

*Tri-Plex Tech. Servs., Ltd. v. Jon-Don, LLC*,
    241 N.E.3d 454 (Ill. 2024) ...............................................................................39

*Union Cnty., IA v. Piper Jaffray & Co., Inc.*,
    741 F. Supp. 2d 1064 (S.D. Iowa 2010) ........................................................49

*United States ex rel. Joshi v. St. Luke's Hosp., Inc.*,
    441 F.3d 552 (8th Cir. 2006) ...........................................................................14

*United States v. Alvarez*,
    567 U.S. 709 (2012)...........................................................................17, 18, 19, 21

*Van Sickle Const. Co. v. Wachovia Com. Mortg., Inc.*,
    783 N.W.2d 684 (Iowa 2010) ..........................................................................40

*Washington League for Increased Transparency & Ethics v. Fox Corp.*,
    19 Wash. App. 2d 1006, 2021 WL 3910574 (Wash. Ct. App. Aug. 30, 2021)................17, 18

*West v. W. Cas. and Sur. Co.*,
    846 F.2d 387 (7th Cir. 1988) ...........................................................................41

**Statutes, Rules & Regulations**

28 U.S.C. § 1292(b) ...............................................................................................11

Federal Rule of Appellate Procedure 41 ...............................................................11

Federal Rule of Appellate Procedure 42 ........................................................................10

Federal Rule of Civil Procedure 9 ......................................................................... *passim*

Federal Rule of Civil Procedure 12 ..........................................................9, 13, 32, 50

Federal Rule of Civil Procedure 81 ............................................................................13

Iowa Code § 714.16 ............................................................................................... *passim*

Iowa Consumer Fraud Act, Iowa Code § 714H *et seq.* ......................................... *passim*

**Other Authorities**

U.S. Const. Amendment I ........................................................................................ *passim*

CBS News, *Expert Says Polling Is A Snapshot, Not A Predictor, Of What
Happens On Election Day* (Sept. 10, 2020) ............................................................28

Dan B. Dobbs, *Handbook on the Law of Remedies* § 9.2 (1973) .................................44

Sara Dorn, *Why Outlier Poll Showing Harris Winning Iowa Could Spell Trouble
for Trump* ...........................................................................................................6, 39

54 Iowa L. Rev. 319, 325 (1968) .................................................................................37

I.    **INTRODUCTION**[1]

While the President of the United States, Donald J. Trump, brings this lawsuit ostensibly

to "seek[] accountability" for alleged "election interference," his asserted claims only confirm that

President Trump is a sore winner. (*See* ECF No. 81, Revised Amended Complaint ¶ 1 ("Rev. Am.

Compl.").)

President Trump seeks to punish Iowa's largest newspaper, the *Des Moines Register* ("*The*

*Register*"), which is published by the Des Moines Register & Tribune Co., and its parent company,

Gannett Co., Inc. ("Gannett"), which is the nation's largest publisher of local newspapers,

including *USA Today*. (*The Register* and Gannett are referenced herein collectively as "Press

Defendants.") In challenging the political campaign reporting of *The Register*, a community

newspaper, President Trump's claims derive from his frequent inveighing against what he deems

"fake news." In particular, President Trump complains about the Iowa Poll that was conducted by

long-time Iowa pollster, J. Ann Selzer, and published on November 2 and 3, 2024, by *The Register*.

President Trump's grievance is that the Iowa Poll had Vice President Kamala Harris leading him

by 3 percentage points, 47% to 44%. However, on November 7, 2024, President Trump beat Harris

in Iowa by 56% to 42%. President Trump apparently believes this somehow demonstrates that the

mainstream media is not only biased against him, but engaged in "election interference." (*Id.*)

However, no court in this country has ever recognized a cause of action based on the publication

---

[1] The legal arguments included herein in support of Press Defendants' Motion to Dismiss President Trump's Revised Amended Complaint are not materially or substantively different from those included in Press Defendants' February 21, 2025, Motion to Dismiss the Amended Complaint. (ECF. No. 35.) Those arguments have merely been repurposed to account for (1) the revisions to the Amended Complaint, as directed by this Court, (ECF. No. 65), and (2) Press Defendants' decision to lead with their First Amendment arguments given, *inter alia*, recent and repeated actions by President Trump and his administration aimed at targeting the press and undermining fundamental free speech protections.

1

of "fraudulent news." This is no time to start. The very notion is an affront to the First Amendment of the United States Constitution.

To borrow a phrase, the Revised Amended Complaint is a piece of "political theater" that amounts to "nothing more than a work of fantasy." (*Id.* ¶ 52) There is no legal basis for President Trump to obtain the relief he seeks; indeed, such relief would violate free speech principles. President Trump is attempting to punish press coverage of which he disapproves through tortured application of the Iowa Consumer Fraud Act, as well as through frivolous tort claims for fraudulent misrepresentation and negligent misrepresentation. If he had his way, such claims would become weapons for any political candidate to challenge any press coverage they do not like. However, his claims all fail to state a cause of action on which relief can be granted.

The Revised Amended Complaint must be dismissed with prejudice.

## II.    BACKGROUND

### A.    The Parties

While President Trump invokes his official title in the caption of his lawsuit, he nonetheless purports to sue in his individual capacity. Defendants are J. Ann Selzer ("Selzer") and her polling firm, Selzer & Company (collectively also referred to as "Selzer"); *The Register*; and Gannett. As President Trump admits, Selzer is widely regarded as one of the best political pollsters in the nation. (*Id.* ¶ 28.) Selzer had conducted polls for publication by *The Register* since 1987.

### B.    The Iowa Poll

This lawsuit focuses on the Iowa Poll, conducted by Selzer and published by *The Register*. The Iowa Poll polls likely voters in the State of Iowa regarding political races. *The Register* became the first newspaper in the nation to sponsor a statewide opinion poll when it conducted the first Iowa Poll in 1943. While President Trump suggests that Selzer and *The Register* conducted multiple polls related to the 2024 election cycle, including the so-called "Harris Poll" and

2

"Defendants' Other" polls, (Rev. Am. Compl. ¶¶ 1, 75-85), there was only one: the Iowa Poll, which is how it is referred to in the articles at issue. For the Iowa Poll, Selzer polled likely voters in Iowa regarding the presidential and federal congressional races at multiple points in time, including in June, September, and October 2024. President Trump's lawsuit is predicated on the results of the Iowa Poll conducted in October 2024.

On November 2, 2024, *The Register* published an article in its digital edition that provided the results of the Iowa Poll related to the presidential race. (Ex. A.)[2] Those results showed then-Vice President Harris leading President Trump by three points (47% to 44%), which was within the poll's 3.4% margin of error. (Ex. A at A-2.) The article stated that a Harris victory would be a "shocking development," and Selzer herself stated that it would have been "hard for anybody to say they saw this coming," especially since neither candidate had campaigned in Iowa following the primaries. (*Id.* at A-1, A-2, A-3.) However, the article noted that "[a] greater share of [President Trump's] supporters than [Harris's] say they are extremely or very enthusiastic about their pick." (*Id.* at A-5.)

---

[2] The Revised Amended Complaint incorporates by reference a high volume of documents and records not appended thereto, including numerous *Register* articles reporting on the Iowa Poll. (*See, e.g.*, Rev. Am. Compl. ¶¶ 1, 8, 9, 63, 65.) From among those many documents, attached hereto are Exhibits A–K, which reflect the three principal articles from *The Register* reporting on the results of the Iowa Poll, as well as their attachments. (*See id.* ¶ 1 (linking to the article with the presidential poll results) and ¶ 65 (linking to the editorial that contains a downloadable file of all poll questions and results).)

This Court should take judicial notice of these documents because they are "necessarily embraced by the pleadings," are "incorporated by reference," and are "integral to [Plaintiff's] claim[s]." *Goodman v. Performance Contractors, Inc.*, 308 F. Supp. 3d 1002, 1007 (N.D. Iowa 2018) (quotations and citations omitted). Indeed, the Revised Amended Complaint makes more than 100 references to the Iowa Poll, and Plaintiff's entire lawsuit is predicated on the Iowa Poll and *The Register* articles about it. (*See* Rev. Am. Compl., *passim.*) Therefore, these Exhibits are foundational and integral to the claims, and they "provide[] necessary context for the facts alleged in [the] Plaintiffs' complaint." *See Meredith v. Medtronic, Inc.*, No. 3:18-cv-00127-RGE-HCA, 2019 WL 6330677, at 1 (S.D. Iowa 2019).

The November 2 article provided extensive detail about how each candidate fared with respect to likely voters in various demographic categories. For example, the poll results showed Harris leading all independent voters, independent women, women in general, those living in cities, those with a college degree, and voters over age 65. (*Id.* at A-6, A-7, A-9.) But the poll showed President Trump ahead—and sometimes far ahead—with independent men, men in general, those identifying as evangelicals, and rural voters. (*Id.* at A-6, A-9.) The poll results revealed that different voting groups had different motivations for voting, with a majority of Harris supporters stating that "the future of the democracy" was their most important issue, while President Trump's supporters were focused on inflation and the economy. (*Id.* at A-10.) The article also noted that only "a small universe of people" who previously supported President Trump switched their vote. (*Id.* at A-12.)

In addition, the November 2 article provided a description of how the Iowa Poll was conducted. (*Id.* at A-13, A-14.) The description was as follows:

### About the Iowa Poll

The Iowa Poll, conducted October 28-31, 2024, for *The Des Moines Register* and Mediacom by Selzer & Co. of Des Moines, is based on telephone interviews with 808 Iowans ages 18 or older who say they will definitely vote or have already voted in the 2024 general election for president and other offices.

Interviewers with Quantel Research contacted 1,038 Iowa adults with randomly selected landline and cell phone numbers supplied by Dynata. Interviews were administered in English. Responses were adjusted by age, sex, and congressional district to reflect the general population based on recent census data.

Questions based on the sample of 808 Iowa likely voters have a maximum margin of error of plus or minus 3.4 percentage points. This means that if this survey were repeated using the same questions and the same methodology, 19 times out of 20, the findings would not vary from the true population value by more than plus or minus 3.4 percentage points. Results based on smaller samples of respondents—such as by gender or age—have a larger margin of error.

(*Id.* at A-13, A-14.)

DMS_US.372387465.1

Attached to the November 2 article was a poll questionnaire. (Ex. B.) The questionnaire identified each of the eight presidential polling questions listed and the responses for each in the polling rounds in October 2024, September 2024, June 2024, February 2024, March 2023, and November 2021. (*See generally* Ex. B). It showed that President Trump led former President Biden by 18 points in June 2024 polling, but that President Trump's lead had shrunk to four points when polling was repeated in September 2024 following Harris's nomination. (*Id.* at B-2.) The questionnaire also contained additional methodological details, including the sample size and margin of error for each specific question each time it was asked. (*See generally id.*)

On November 3, *The Register* published an article focusing on congressional races in its digital edition and also published two articles about the Iowa Poll in its print edition. (Exs. C, D, E, F.) With respect to the congressional races, the results suggested that, across the state, voters were "virtually tie[d] in [their] preference for a Democrat or a Republican for the U.S. House of Representatives," with Democrats having a slight edge. (Ex. D at D-2.) The article noted that it was "the first time since September 2020 that Democrats have held a statewide lead in the generic congressional ballot." (*Id.*) The article concluded with the same "About the Iowa Poll" explanation from the article regarding the presidential polling results. (*Id.* at D-10.)

The November 3 digital article regarding the congressional polling results also provided the poll questionnaire. (*Id.* at D-10., D-11; Ex. E.) This questionnaire also contained the same methodological details, including the sample size and margin of error for each specific question each time it was asked. (*See generally id.*)

DMS_US.372387465.1

Immediately after the release of the Iowa Poll, President Trump completely rebuked it.[3] To be clear, President Trump disclaims any reliance on the results of the Iowa Poll. In his Revised Amended Complaint, President Trump states these poll results inherently lacked credibility and could be disregarded, alleging that the poll results were "so implausible that no objective pollster could honestly have advanced it," (Rev. Am. Compl. ¶ 46), and that "*every other* mainstream Iowa poll . . . showed President Trump comfortably ahead." (*Id.* ¶ 48 (emphasis in original).)

On November 5, 2024, the election took place. President Trump won the presidential election in Iowa. (*Id.* ¶ 2.)

Immediately following the election, both Selzer and *The Register* conducted a review of the Iowa Poll. On November 17, *The Register* published their findings and provided the following: (1) an editorial on the review, (Ex. G); (2) a memorandum by Selzer entitled, "Results of Internal Investigation of final Iowa Poll," (Ex. H); (3) two reports containing the complete Iowa Poll questionnaires with weighting and historical data, (Exs. I, K); and (4) the cross-tabs of the polling data, (Ex. J.). (Rev. Am. Compl. ¶ 65.)

The editorial explained that the internal review took "the form of testing plausible theories against available data," and Selzer and *The Register* concluded that "no likely single culprit has emerged to explain the wide disparity" between the poll results and the actual vote. (Ex. G at G-1.) *The Register* and Selzer considered a number of wide-ranging theories, including (1) the possibility that demographics were skewed; (2) whether the poll failed "to detect the shift found

---

[3] The day the poll results were published, President Trump publicly declared that the Iowa Poll was "a fake poll done by a Trump hater who oversampled, by a lot, Democrats." (*See* Sara Dorn, *Why Outlier Poll Showing Harris Winning Iowa Could Spell Trouble for Trump*, Forbes (Nov. 3, 2024) (cited and incorporated in the Revised Amended Complaint at ¶ 62), *available at* https://www.forbes.com/sites/saradorn/2024/11/03/why-outlier-poll-showing-harris-winning-iowa-could-spell-trouble-for-trump/.)

6

nationally among men of color toward Trump"; (3) whether the polling, which concluded the Thursday before the election, "fail[ed] to capture late-deciders"; (4) whether the poll's weighting was flawed; and (5) whether voters' recollection of their previous voting history should "have been included as a weighting factor." (*Id.* at G-2.) The editorial candidly admitted that "[s]ome critics ha[d] accused the Iowa Poll of a Democratic bias." (*Id.*) However, statistician Nate Silver, who rates pollsters, had performed a calculation to determine whether any such bias was present, and, "[a]cross 54 Iowa Polls, he found a negligible result, a 0.1% tilt toward Democrats, a smaller bias figure than for all but one of the 25 top-rated polls." (*Id.*) The editorial noted that, prior to the Iowa Poll, Selzer had announced it would be her last. (*Id.*) The editorial concluded with *The Register*'s promise "to evolve and find new ways to accurately take the pulse of Iowans on state and national issues." (*Id.* at G-3.)

Selzer's internal investigation memorandum contains an in-depth "data-heavy" analysis of seven possible theories for the disparity between the October poll results and the actual vote, including the ones discussed in the November 17 editorial and some additional theories. (*See generally* Ex. H.) Those additional theories included a comparison with Wisconsin's exit poll data to determine if the Iowa Poll's demographics were skewed, a consideration of Newtonian physics ("[a]ction leads to reaction," meaning it is possible that the poll results could have animated either party), and the possibility that respondents lie. (*Id.* at H-12, H-13.) In the end, after considering all of these theories, Selzer "found nothing to illuminate the miss" and stated that she would "continue to be puzzled by the biggest miss of [her] career." (*Id.* at H-1.)

Of the two questionnaire reports appended to the November 17 editorial, the first questionnaire report listed (1) all ten polling questions and 14 demographic questions; and (2) the response data from previous iterations of the Iowa Poll and previous election cycles. (Ex. I.) The

second questionnaire report included both the weighted and unweighted October 2024 response data for each question. (Ex. K.)

The cross-tabs included with the November 17 editorial were comprised of 145 tables of raw data. (Ex. J.) These tables included the verbatim text of all polling and demographic questions, the responses to all of the questions, the number of respondents for each question (including the unweighted and weighted responses), and the results described as percentages and raw numbers. (*Id.*). With these tables, the responses to each question could be cross-referenced against demographics to see how the weighting of the raw data impacted the final results. (*Id.*)

The release of the Iowa Poll questionnaire was consistent with *The Register*'s "long practice" of publishing the questionnaires, and the release of "the poll's full demographics, crosstabs and weighted and unweighted data, as well as a technical explanation from Selzer detailing her review," was done "[f]or transparency." (Ex. G at G-1.)

All the above-described materials regarding the Iowa Poll were provided to the public free of charge. Despite President Trump's repeated asides that the Iowa Poll articles and the November 17 editorial were formerly "publicly available" but are now "hidden" behind a paywall, (Rev. Am. Compl., *passim* nn. 4–14), the digital versions of the articles linked throughout the Revised Amended Complaint continue to be available for any person to read free of charge—as long as the user has not exceeded their periodic allotment of free digital *Register* articles.

### C.    Procedural History and The Revised Amended Complaint

On December 16, 2024, President Trump filed this lawsuit—as the sole Plaintiff and in his individual capacity—in the Iowa District Court for Polk County against the Defendants. (ECF No. 1-1.) In his Petition, he alleged only one claim: a violation of the Iowa Consumer Fraud Act ("ICFA"), Iowa Code § 714H *et seq*. (ECF No. 1-1.) The next day, on December 17, 2024, Gannett properly removed the lawsuit to this Court. (*See generally* ECF No. 1.)

8

On January 31, 2025, President Trump filed an Amended Complaint before this Court. The Amended Complaint added two additional Plaintiffs—Representative Mariannette Miller-Meeks ("Rep. Miller-Meeks") and former State Senator Bradly Zaun ("Zaun")—as transparent and impermissible "jurisdictional spoilers." *See Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 830 (1989). The Amended Complaint also added two additional claims: fraudulent misrepresentation and, in the alternative, negligent misrepresentation.

Pursuant to a joint briefing schedule that the parties submitted to, and that was accepted by, this Court, the parties simultaneously briefed Plaintiffs' motion to remand and Defendants' motions to dismiss the Amended Complaint. (ECF Nos. 19, 20.) The Parties completed the briefing of those motions on April 17. (ECF Nos. 57, 60, 61.)

On May 23, 2025, the Court issued an order denying Plaintiffs' motion to remand. (ECF No. 65.) As part of that order, the Court vacated Plaintiffs' Amended Complaint as a nullity and specifically ordered that "Bradley Zaun and Mariannette Miller-Meeks are terminated as plaintiffs." (*Id.* at 11) The Court further ordered that President Trump had "seven days from the date of this order to file a revised version of the Amended Complaint, ECF No. 23, omitting Zaun and Miller-Meeks as plaintiffs, and deleting any allegations included solely to support their claims." (*Id.*) No other changes were permitted by the Court. (*Id.*)[4]

On May 30, 2025, the original deadline for President Trump to file his revised Amended Complaint, President Trump instead filed a Motion for Stay of All Remaining Deadlines. (ECF No. 66 ¶ 8.) By that motion, President Trump sought a complete stay of all deadlines, including

---

[4] *See infra* at n. 6 for a discussion of the ways in which President Trump's Revised Amended Complaint violates the Court's May 23, 2025, Order, along with Press Defendants' request that the Court either disregard such allegations or strike them pursuant to Federal Rule of Civil Procedure 12(f)(1).

the Court-ordered deadline to file his revised Amended Complaint, until after the resolution of the not-yet-filed Petition for Permission to Appeal in the Eighth Circuit. (*Id.*) Plaintiffs then filed their Petition for Permission to Appeal on June 2, 2025. (*See* Ex. L: 8th Cir. Dkt., 6/2/25 Petition for Permission to Appeal.)

On June 6, 2025, the Court denied President Trump's Motion for Stay, finding "the movant has not, as yet, shown a strong likelihood of success or the presence of irreparable harm." ((ECF No. 70 at 2.)) However, the Court extended President Trump's deadline to file the revised Amended Complaint until July 18, 2025. (*Id.*) In other words, consistent with its prior order setting a deadline of June 6, the Court required President Trump to file his revised Amended Complaint regardless of the Eighth Circuit's decision on the petition for appeal.

Then, on June 30, 2025, President Trump changed his course of action: he filed a notice of voluntary dismissal pursuant to Rule 41(a)(1)(A)(i), (ECF No. 71); he filed a notice of withdrawal of his petition in the Eighth Circuit, (Ex. L, 6/30/25 Stipulation for Dismissal); and he refiled his lawsuit in state court. Press Defendants immediately moved to strike the notice of voluntary dismissal, (ECF No. 72), as well as the Eighth Circuit notice. (Ex. L, 6/30/25 Motion to Strike.)

On July 2, 2025, the Court granted Press Defendants' motion to strike. (ECF No. 78 at 3.) Specifically, the Court ruled: "Because Trump's appeal confers jurisdiction to the Eighth Circuit over aspects of this case, Trump must first dismiss the appeal before voluntarily dismissing the district court case." (*Id.* at 2.) Further, the Court noted the Parties disagreed over whether the appeal was "docketed" and ruled that, "[r]egardless of whether the appeal has been docketed, Trump did not file a motion to dismiss the appeal in the district court, *see* Fed. R. App. P. 42(a), nor in the circuit court, *see id.* 42(b)." (*Id.* at 2–3.)

10

On July 3, 2025, the Eighth Circuit issued a Judgment: "The petition for permission to appeal pursuant to 28 U.S.C. Section 1292(b) is denied. The stipulation for dismissal and motion to strike are denied as moot." (Ex. L, 7/3/25 Judgment.) On that same day, the Eighth Circuit also issued a Mandate: "In accordance with the judgment of July 3, 2025, and pursuant to the provisions of Federal Rule of Appellate Procedure 41(a), the formal mandate is hereby issued in the above-styled matter. (*Id.*, 7/3/25 Mandate.)

On July 8, 2025, Plaintiffs filed a Motion to Recall Mandate and Modify Opinion in the Eighth Circuit. (*Id.*, 7/8/25 Motion to Recall Mandate.) On July 18, 2025, Press Defendants filed their opposition to that motion and the Selzer Defendants joined it. (*Id.*, 7/18/25 Response in Opposition to Motion to Recall Mandate.) On July 24, 2025, the Eighth Circuit issued an order denying the Motion to Recall Mandate. (*Id.*, 7/24/25 Order.)

At the end of the day on July 18, 2025, his deadline to file his revised Amended Complaint, President Trump filed a Renewed Motion to Stay, requesting that "the Court stay the requirement to file an amended complaint for 30 days following the Eighth Circuit's disposition of the motion". (ECF No. 83.) Defendants promptly resisted. (ECF Nos. 84–85.) On July 23, 2025, the Court denied President Trump's Renewed Motion to Stay, finding President Trump "has not shown a strong likelihood of success or the presence of irreparable harm." (ECF. No. 86.) The Court further ordered President Trump to "file an amended complaint, as previously ordered by the Court, ECF No. 65 at 11, no later than **5:00 p.m. Central Time on Friday, July 25, 2025.**" (*Id.* (emphasis in original).)

On July 25, 2025, President Trump finally filed his Revised Amended Complaint. (ECF No. 88.) The Revised Amended Complaint makes the purpose of President Trump's lawsuit clear: "This action . . . seeks accountability for brazen election interference committed by the Defendants

in favor of now-defeated former Democratic presidential candidate Kamala Harris []through use of a manipulated, incorrect, and improperly leaked [Iowa Poll]." (*Id.* ¶ 1.) President Trump claims the polling "miss" was not "merely a coincidence" and that, instead, the Iowa Poll was an "attempt[] to corruptly influence and interfere in the outcome of the 2024 Presidential Election and other key election[.]." (*Id.* ¶ 78.)

According to President Trump, "Defendants and their cohorts in the Democrat Party hoped that the [Iowa Poll] would create a false narrative of inevitability for Harris in the final week of the 2024 Presidential Election, to drive down enthusiasm among Republicans[.]" (*Id.* ¶ 4.) President Trump alleges:

> For too long, left-wing pollsters—knowing that polls *can, and often do,* materially harm elections—have attempted to influence electoral outcomes through manipulated polls that are not grounded in widely accepted polling methodologies and have unacceptable error rates. While Selzer is not the only pollster to engage in this corrupt practice, she had a huge platform and following, resulting in a significant and impactful opportunity to deceive voters.

(*Id.* ¶ 7.) In short, President Trump claims "Selzer's polling 'miss' was not an astonishing coincidence—it was intentional." (*Id.* ¶ 10.)

Despite claiming, on the one hand, that Selzer had a stellar reputation and had earned a position of trust that would have presumably led to the credence of her polling, President Trump also asserts on the other that "Selzer has quietly used her polls to attempt to influence recent elections in favor of Democrats." (*Id.* ¶¶ 28-29, 34.) He claims "Selzer knows" that "manipulated polls create a narrative of inevitability for Democrat candidates, increase[] enthusiasm and turnout among Democrats, decrease[] enthusiasm and turnout among Republicans, and deceive[] the public into believing that Democratic candidates are performing better than they really are." (*Id.* ¶ 34.) And he claims that "given Selzer's position of trust before November 5, 2024, she had the

12

power to influence campaign spending and strategy, change public perception of races, and even harmfully impact the outcome of elections." (*Id.* ¶ 35.)

## III.    LEGAL STANDARD

Because this case was properly removed from Iowa state court, the applicable federal standards of review must apply in adjudicating this Motion. *Hunter v. Page Cnty., Iowa*, 102 F.4th 853, 874 (8th Cir. 2024) ("[M]atters removed to federal court are governed by the current federal pleading standard."); *see* Fed. R. Civ. P. 81(c)(1).

Under Federal Rule of Civil Procedure 12(b)(6), this Court will grant a motion to dismiss for failure to state a claim upon which relief can be granted "unless the complaint alleges facts sufficient 'to raise a right to relief above the speculative level.'" *Hunter*, 102 F.4th at 874 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "The complaint must state a claim that is 'plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.

In addition, the ICFA and fraudulent misrepresentation claims are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *Moeller v. Samsung Electrs. Am., Inc.*, 623 F. Supp. 3d 978, 986 (S.D. Iowa 2022); *Mohsen v. Veridian Credit Union*, 733 F. Supp. 3d 754, 773 (N.D. Iowa 2024). This is because "Rule 9(b) applies to *all* averments of fraud or mistake," which necessarily includes ICFA and fraudulent misrepresentation claims. *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007) (internal quotation omitted) (emphasis

13

added); *see also Mohsen*, 733 F. Supp. 3d at 773 ("ICFA claims are subject to Fed. R. Civ. P. 9(b)'s heightened pleading standard . . . .").

Rule 9(b) requires a party "alleging fraud or mistake" to "state *with particularity* the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b) (emphasis added). "Under Rule 9(b), a plaintiff must plead 'such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby.'" *BJC Health Sys. v. Columbia Cas. Co.*, 478 F.3d 908, 917 (8th Cir. 2007) (quoting *Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 920 (8th Cir. 2001)). In other words, a plaintiff's complaint "must set forth the 'who, what, when, where, and how' surrounding the alleged fraud." *E-Shops Corp. v. U.S. Bank Nat'l Ass'n*, 678 F.3d 659, 663 (8th Cir. 2012) (quoting *United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 556 (8th Cir. 2006)). This "requires more than . . . conclusory and generalized allegations." *St. Luke's Hosp., Inc.*, 441 F.3d at 557.

## IV.   ARGUMENT

The Revised Amended Complaint constitutes a brazen frontal assault on the First Amendment disguised as a run of the mill consumer fraud complaint alleging violation of ICFA, fraudulent misrepresentation, and negligent misrepresentation. (Rev. Am. Compl. ¶¶ 94–115, 16–126, 127–44.) The President's apparent consternation over "fake news" and "fraudulent" reporting does not give him a pass when it comes to constitutional free speech protections. Indeed, each of President Trump's claims "necessarily run[s] counter to the societal right to free and unhampered dissemination of information embodied by the First Amendment." *Ginsburg v. Agora*, Inc., 915 F. Supp. 733, 739 (D. Md. 1995) (citation modified). For this reason, the First Amendment is dispositive of the entire action. Independent from the First Amendment, it is apparent from the

face of the Revised Amended Complaint alone that President Trump's claims are meritless and must be dismissed with prejudice.

### A.    The First Amendment Bars President Trump's ICFA Claim

This lawsuit is prohibited by the First Amendment. *See* U.S. Const. amend. I. The Revised Amended Complaint's causes of action are constitutionally invalid as a matter of law for multiple reasons. *First*, President Trump's proposed interpretation of the law—*i.e.*, that it penalizes Press Defendants' federal election reporting—would render the laws on which his claims are based unconstitutional. *The Register*'s news coverage challenged by President Trump does not fall into any traditional category of unprotected speech. The opposite is true; political campaign reporting is at the zenith of First Amendment protection. President Trump's attempts to misuse ICFA and Iowa's common law to generate a new exception to the First Amendment must fail because "there is no free pass around the First Amendment." *281 Care Comm. v. Arneson*, 766 F.3d 774, 783 (8th Cir. 2014) ("*281 Care Comm. II*").

*Second*, and in the alternative, President Trump's weaponization of ICFA in this context cannot survive the strict scrutiny that restricts the government's ability to penalize Press Defendants' speech that he deems objectionable. The Eighth Circuit has expressly rejected the notion that even knowingly false political speech—unlike *The Register*'s careful, accurate, and objective reporting here—can be bootstrapped within commercial fraud principles because such a claim fails to provide sufficient breathing room for protected speech. *281 Care Comm. v. Arneson*, 638 F.3d 621, 634 n.2 (8th Cir. 2011) ("*281 Care Comm. I*"). The linchpin of the Revised Amended Complaint's theory of recovery therefore has no traction as a matter of constitutional law.

1.    **Press Defendants' Campaign Reporting Is Entitled to Protection Under the First Amendment from an ICFA or Speech-Based Tort Claim**

The First Amendment embodies "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). As the U.S. Supreme Court has emphasized, "speech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964). For that reason, "speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983)). It follows that "[t]he First Amendment 'has its fullest and most urgent application' to speech uttered during a campaign for political office." *Citizens United v. FEC*, 558 U.S. 310, 339 (2010) (quoting *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989)). Indeed, "[p]rotection of political speech is the very stuff of the First Amendment." *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 871 (8th Cir. 2012) (internal quotations and citation omitted).

President Trump cannot overcome the First Amendment's protection for *The Register*'s news reporting on a paramount matter of public interest—"the most consequential election in memory" (Rev. Am. Compl. ¶ 78)—under the guise of protecting the public from harm by misusing ICFA and Iowa's common law. In *Snyder v. Phelps*, the Supreme Court ruled that speech on a "matter [ ] of public concern" could not be restricted even though it directly harmed the plaintiff by intentionally inflicting emotional distress in violation of state law. 562 U.S. at 451–52. Although the abhorrent speech at issue in *Snyder* "inflict[ed] great pain," it was immunized from liability under the First Amendment "to ensure that we do not stifle public debate." *Id*. at 460–61. Thus, to safeguard uninhibited public discourse, speech must be fully protected when, as here, it

16

addresses "a subject of general interest and of value and concern to the public." *Id*. at 453 (internal quotation and citation omitted).

A recent case in Washington state, which similarly involved a consumer protection law claim challenging political speech, reinforces the core teaching of the *Snyder* case. *See Washington League for Increased Transparency & Ethics v. Fox Corp.*, 19 Wash. App. 2d 1006, 2021 WL 3910574 (Wash. Ct. App. Aug. 30, 2021) ("*WASHLITE*") (unpublished op.). In *WASHLITE*, the plaintiff claimed that Fox News violated Washington's Consumer Protection Act ("CPA") "by making statements, on-air, downplaying the danger posed by the coronavirus, describing the pandemic as a 'hoax,' and accusing government officials and media organizations of exaggerating the danger posed by COVID-19 in an attempt to undermine [then] former President Donald J. Trump." *Id.* at *1 (footnote omitted). Recognizing that the allegedly actionable statements "clearly implicate matters of public concern and receive special First Amendment protections," (*id*. at *4), the *WASHLITE* court rejected the CPA claim based on established First Amendment principles:

> [Plaintiff] cites no authority for the proposition that false statements about threats to public health, *even if recklessly made*, fall within any exception to the First Amendment. To the contrary, the Supreme Court in *Alvarez* disavowed the principle that false expressions in general receive a lesser degree of constitutional protections simply by virtue of being false.

*Id*. at *5 (emphasis added); *see also United States v. Alvarez,* 567 U.S. 709, 717, 718 (2012) (holding the Stolen Valor Act invalid because it was not confined to the "few historic and traditional categories" of expression "where the law allows content-based regulation of speech") (internal quotations and citations omitted); *238 Care Comm. I,* 638 F.3d at 633–34 ("We find that the Supreme Court has never placed knowingly false campaign speech categorically outside the protection of the First Amendment and we will not do so today.").

So too here, where President Trump's claims against a community newspaper—for truthfully reporting information of unquestioned news value on a matter of "political concern to

17

all Americans"—violate the First Amendment. *WASHLITE*, 2021 WL 3910574, at \*4. President

Trump's usurpation of ICFA and Iowa tort law to punish allegedly false political speech, "*absent*

*any evidence that the speech was used to gain a material advantage, . . .* would give government

a broad censorial power unprecedented in this Court's cases or in our constitutional tradition."

*Alvarez*, 567 U.S. at 723 (emphasis added); *see also id.* at 731–32 (Breyer, J., concurring) ("laws

restricting false statements about philosophy, religion, history, the social sciences, the arts, and the

like" raise grave First Amendment concerns). Contrary to President Trump's allegations, there is

no general government power to punish alleged political falsehoods outside very narrow

exceptions which do not apply in this (*i.e.*, defamation, fraud, and perjury).[5] To hold otherwise

would put the "government in the unseemly position of being the arbiter of truth about political

speech." *281 Care Comm. I*, 638 F.3d at 635–36. Under our constitutional system, that

determination is committed to voters in the State of Iowa.

> **2.    In the Alternative, President Trump's Interpretation of ICFA as Applicable to Press Defendants' Political Reporting Would Fail Strict Scrutiny**

Alternatively, even accepting President Trump's erroneous proposal that ICFA applies to

Press Defendants' reporting of polling results in the midst of a presidential election, the statute's

application in this context would nevertheless be subject to the most exacting level of

constitutional scrutiny. *281 Care Comm. II*, 766 F.3d at 784 ("Here, because the speech at issue

occupies the core of the protection afforded by the First Amendment, we apply strict scrutiny to

legislation attempting to regulate it."). Accordingly, President Trump must demonstrate that his

---

[5] In addition to the Eighth Circuit's decision in *281 Care Comm. II*, other post-*Alvarez* circuit court decisions have invalidated state laws punishing election campaign misinformation— even where the laws were restricted to deliberately or recklessly falsified speech. *See, e.g.*, *Grimmett v. Freeman*, 59 F.4th 689 (4th Cir. 2023); *Susan B. Anthony List v. Driehaus*, 814 F.3d 466 (6th Cir. 2016).

interpretation of ICFA is "necessary to serve a compelling state interest and . . . is narrowly drawn to achieve that end." *Burson v. Freeman*, 504 U.S. 191, 198 (1992). The burden of justifying restrictions on political speech under the strict scrutiny standard is "well-nigh insurmountable." *Meyer v. Grant*, 486 U.S. 414, 425 (1988). The Revised Amended Complaint cannot survive strict scrutiny.

First, President Trump's claims serve no compelling government interest. President Trump urges that ICFA prevents allegedly false campaign speech from misleading voters to influence election outcomes. (Rev. Am. Compl. ¶¶ 111–113.) However, no court has held that the government has *any* interest in policing such speech, much less a compelling one. *Daily Herald Co. v. Munro*, 758 F.2d 350, 362 (9th Cir. 1984) (Norris, J., concurring) ("[T]he State cites no authority, and I know of none, for the proposition that government may restrict the collection and broadcasting of information about the political process out of concern for its impact on voting behavior."). President Trump's ICFA claim capsizes the First Amendment by transforming its central purpose of ***protecting*** political speech into a basis for regulating—or even prohibiting—it.

The Eighth Circuit has unequivocally rejected the use of general fraud principles to manufacture an interest in proscribing political speech, even where the speech is knowingly false:

> To the extent that defendants also argue in favor of application of fraud principles to all knowingly false speech, we reject the argument, noting the Supreme Court has carefully limited the boundaries of what is considered fraudulent speech. It has not included all false speech, or even all knowingly false speech.

*281 Care Comm. I*, 638 F.3d at 634 n.2. This reasoning compels dismissal of the Revised Amended Complaint.

Second, the misuse of ICFA is not actually necessary to remedy the purported fraud. The First Amendment requires that any law's "chosen restriction on the speech at issue be 'actually necessary' to achieve its interest." *Alvarez*, 567 U.S. at 725 (internal citations omitted). Even

19

indulging the fiction that ICFA can be stretched to prevent voters from exposure to purportedly false information regarding the results of a political poll, President Trump must allege factual evidence of a "direct causal link" between such information and the harm alleged in the Revised Amended Complaint, *i.e.*, a pecuniary loss or an election outcome actually altered by the information reported. *Id*; *see 281 Care Comm. II*, 766 F.3d at 790. No such facts are alleged here that justify penalizing Press Defendants' speech under the rubric of a consumer fraud claim.

President Trump's claims for relief are not justified by his unsupported allegations of "brazen election interference." (Rev. Am. Compl. ¶ 1.) Iowa voters voted in favor of President Trump. (*Id.* ¶ 2.) This electoral victory alone belies any causal link between the claims and any government interest in preserving voting integrity and fair elections. In short, President Trump's claims are not "actually necessary" to avoid the purported harm alleged in the Revised Amended Complaint—a harm that is worse than conjectural and is in fact nonexistent. 281 *Care Comm. II*, 766 F.3d at 791 ("Such conjecture about the effects and dangers of false statements equates to implausibility as far as this analysis goes, because, when the statute infringes core political speech, we tend to not take chances."). This Court should take no chance on infringing the First Amendment in service of President Trump's claims. ICFA cannot be conscripted by candidates for political office to target press campaign coverage based on faux election-interference claims.

Third, obvious less-restrictive means are available to protect any conceivable government interest in limiting Defendants' speech. "There is no reason to presume that counter-speech would not suffice to achieve the interests advanced and is a less restrictive means, certainly, to achieve the same end goal." *281 Care Comm. II*, 766 F.3d at 793. Indeed, with respect to speech on political campaign issues, the Eighth Circuit has observed, "Possibly there is no greater arena wherein counterspeech is at its most effective. It is the most immediate remedy to an allegation of falsity."

*Id.* The application of this principle is acutely warranted in this context, where the opportunities for counter-speech are manifest and President Trump himself has repeatedly criticized—both before and after the election, and in unabashed terms—the Iowa Poll. (Rev. Am. Compl. ¶ 9.) "Such 'back and forth' is the way of the world in election discourse." *281 Care Comm. II*, 766 F.3d at 795. Moreover, the Revised Amended Complaint points out that "*every other* mainstream Iowa poll" correctly predicted the election's outcome in favor of President Trump (Rev. Am. Compl. ¶ 48 (emphasis in original)), underscoring that "[t]he remedy for speech that is false is speech that is true." *Alvarez*, 567 U.S. at 727. President Trump ignores that his own bully pulpit, together with the results of the other polls the Revised Amended Complaint cites, provide more than ample means to counter the specious election interference allegations saturating the Revised Amended Complaint. This alone demonstrates that President Trump's interpretation of ICFA "is not narrowly tailored to achieve the [purported] goal." *281 Care Comm*. *II*, 766 F.3d at 794 ("[C]ounterspeech, alone, establishes a viable less restrictive means of addressing the preservation of fair and honest elections . . . and preventing fraud on the electorate.").

Finally, fundamental First Amendment principles also bar the Revised Amended Complaint's demand for injunctive relief. Even if President Trump could somehow state a cognizable claim (although as described below, he cannot), injunctions directed against speech are presumptively invalid under the First Amendment—even where such speech is alleged to be actionable at law. Indeed, courts routinely refuse to award injunctive relief directed at speech on the basis that the injunction would constitute an unconstitutional prior restraint. *See Lemons v. Mycro Grp. Co.*, 667 F. Supp. 665, 667 (S.D. Iowa 1987) ("[G]enerally, the First Amendment prohibits prior restraint through injunction, and torts against the person such as defamation may not be enjoined[.] There is usually an adequate remedy at law to redress injury to personal rights.")

DMS_US.372387465.1

(internal citations omitted); *see also United Youth Careers, Inc. vs. City of Ames*, 412 F. Supp. 2d 994, 1002 (S.D. Iowa 2006) ("Prior restraints on protected speech are particularly disfavored because 'a free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand.'" (quoting *S.E. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975))).

For all of these reasons, President Trump's foundational misconstruction of Iowa law cannot satisfy strict scrutiny, and his claims must be rejected.

### B.    President Trump Fails to Establish Statutory Standing Under ICFA

President Trump does not allege the type of consumer harm that is meant to be protected by ICFA. "In contrast to Article III standing, which addresses 'the constitutional power of a federal court to resolve a dispute,' statutory standing 'is simply statutory interpretation: the question it asks is whether [the legislature] . . . has accorded this injured plaintiff the right to sue the defendant to redress [the plaintiff's] injury.'" *Greenley v. Laborers' Int'l Union of N. Am.*, 271 F. Supp. 3d 1128, 1139 (D. Minn. 2017) (quoting *Miller v. Redwood Toxicology Lab'y, Inc.*, 688 F.3d 928, 934 (8th Cir. 2012)); *see also Rossley v. Drake Univ.*, 336 F. Supp. 3d 959, 965 (S.D. Iowa 2018) ("This requirement is distinct from the issue of whether the plaintiff has constitutional standing under Article III and instead requires courts to consider whether the plaintiff 'has a cause of action under the statute' in question.").

ICFA provides the following standing requirement: "A consumer who suffers an ascertainable loss of money or property as the result of a prohibited practice or act in violation of this chapter may bring an action at law to recover actual damages." Iowa Code § 714H.5(1). The scope of "prohibited practices and acts" under ICFA is set forth as follows:

> A person shall not engage in a practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with

the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection with the advertisement, sale, or lease of ***consumer merchandise***, or the solicitation of contributions for charitable purposes.

*Id.* § 714H.3(1) (emphasis added). ICFA defines "[c]onsumer" as "a natural person or the person's legal representative." *Id.* § 714H.2(3). And it defines "[c]onsumer merchandise" as "merchandise offered for sale or lease, or sold or leased, primarily for personal, family, or household purposes." *Id.* § 714H.2(4). "Merchandise," in turn, is defined as "any objects, wares, goods, commodities, intangibles, securities, bonds, debentures, stocks real estate or services." *Id.* §§ 714H.2(6), 714.16(e).

President Trump's Revised Amended Complaint endeavors to effectively rewrite ICFA and eliminate the statute's foundation requirement of a consumer transaction. ICFA clearly requires that the conduct in question be "***in connection with* the *advertisement, sale or lease of consumer merchandise*.**" However, in the Revised Amended Complaint, President Trump impermissibly attempts to remove the effect of the word "consumer" in the phrase "consumer merchandise" as used in Iowa Code § 714H.3(1) (emphasis added). President Trump cites the definition of "consumer" and then cites the definition of "merchandise"; but completely omits the definition of the *key* term: "consumer merchandise." (Rev. Am. Compl. ¶¶ 97, 99, 104.) In other words, President Trump ignores the legislature's directive in Iowa Code § 714H.2(4) and interposes his own definition of "consumer merchandise" by merely combining the separately defined terms "consumer" and "merchandise." Then, as discussed more fully below, President Trump entirely ignores the requirement that the prohibited conduct be "in connection with advertisement, sale, or lease" of the defined "consumer merchandise." *See* Iowa Code § 714H.3(1). President Trump makes no allegation about this requirement at all. Indeed, President Trump's claims have nothing whatsoever to do with a consumer transaction; rather, they are expressly about

23

purported "election interference." (Rev. Am. Compl. ¶ 1.) As such, President Trump is asking this Court to rewrite ICFA for his individual benefit. He seeks to transform the Iowa Consumer Fraud Act into a generalized "Iowa Fraud Act," applicable to any individual grievance he can personally imagine. This is unlawful.

President Trump's Revised Amended Complaint seems to acknowledge this fatal defect in its claims. President Trump asserts that he qualifies as a "'consumer'" within the meaning of the statute, having "acquired, read, and been deceived by" the Iowa Poll. (Rev. Am. Compl. ¶ 103.) Thereby, he acknowledges he must show *more* than merely being a natural person, but at the same time, he does *not* allege he purchased a copy of *The Register* (or subscribed to *The Register*) because of the Iowa Poll.

In addition, ICFA requires some sort of contractual privity. Claims under the statute rise or fall on the existence and breach of a contract between the parties. *See Mannino v. McKee Auto Ctr., Inc.*, No. 4:24–cv–SMR–HCA, 2024 WL 4884440, at *3 (S.D. Iowa Sept. 5, 2024) ("The Iowa Supreme Court has rejected claims under the ICFA when a party does not have a contractual right to the property in dispute.); *see also McKee v. Isle of Capri Casinos, Inc.*, 864 N.W.2d 518, 532 (Iowa 2015) ("If [Plaintiff] had no contractual right to the bonus, and we have already determined she did not, then she could not have suffered an ascertainable loss of money or property when she was denied that bonus."). President Trump does not assert any such relationship here.

Finally, President Trump does not allege any ascertainable damages that qualify for relief. ICFA provides certain explicit limitations on damages. For example, ICFA makes clear that, *inter alia*: (1) campaign contributions do not qualify as damages, *see* Iowa Code § 714H.3(1); (2) expenditures on behalf of a separate legal entity (such as a campaign or federal office) do not qualify as damages, *see id.* § 714H.2(3); (3) plaintiffs cannot sue for alleged damages incurred by

other individuals, *see id.* § 714H.5(1); and (4) an individual can only obtain equitable relief after a finding that there was a violation of ICFA, *see id.* § 714H.5.

Here, President Trump's allegations of damages are merely that he "sustained actual damages by having to expend extensive time and resources, including direct federal campaign expenditures to mitigate and counteract the harms of the Defendants' conduct." (Rev. Am. Compl. ¶ 114.) He provides no basis to claim that an alleged loss of time (even "extensive" time) constitutes actual damages under ICFA. Nor does he provide a basis to claim that an alleged expenditure of vague and undefined (and therefore unascertainable) "resources" constitute actual damages under ICFA. Moreover, as mentioned above, President Trump cannot assert damages on behalf of his campaign. President Trump cannot sue on behalf of any person other than himself.

Pursuant to all these requirements imposed by the legislature before a party can state a claim under ICFA, President Trump lacks statutory standing in this case. His ICFA claim must be dismissed.

## C.  President Trump Fails to Adequately Allege Fraud or Any Act That Violated ICFA

The alleged facts as pleaded by President Trump demonstrates that the publication and release of the Iowa Poll were *not* acts prohibited by ICFA. President Trump alleges only two bases under ICFA's list of prohibited acts: that Defendants' publication of the poll was (1) a prohibited "deception"; and (2) an "unfair act or practice." (Rev. Am. Compl. ¶¶ 105–06); *cf.* Iowa Code § 714H.3(1). But in fact, Defendants' conduct was neither. Indeed, the opposite is true: Defendants' actions—*i.e.*, conducting a political poll and publishing articles discussing, analyzing, and opining upon the results—are emphatically permissible and ***protected*** activities under the law.

25

1.     **Political Polls Are Non-Actionable Opinions and Therefore Cannot Constitute Actionable Statements of Material Fact or "Deception"**

President Trump claims that Defendants engaged in deceptive conduct by releasing the Iowa Poll results, which allegedly caused consumers to be misled as to who was leading the Iowa Presidential race. (Rev. Am. Compl. ¶ 105.) President Trump alleges that a poll result suggesting "who is winning the race in question and by how much" constitutes a statement of "material fact[]." (*Id.*) But President Trump entirely misunderstands ICFA's standards and definitions: the Iowa Poll and results are ***non-actionable opinions***, not "material facts."

Under ICFA, "'[d]eception' means an act or practice that is likely to mislead a substantial number of consumers as to a material fact or facts." Iowa Code § 714H.2(5). The statute thereby requires that any statement constituting an act of deception must be a statement of *fact*.

The determination of whether a statement is an opinion or actionable statement of fact is a question of law for this Court to decide. *Others First, Inc. v. Better Bus. Bureau of Greater St. Louis, Inc.*, 829 F.3d 576, 580–81 (8th Cir. 2016); *see Andrew v. Hamilton Cnty. Pub. Hosp.*, 960 N.W.2d 481, 489 (Iowa 2021) (noting that "[w]hether a statement is one of fact or opinion" is to be determined by the court). Courts will assess the totality of the circumstances to determine whether a statement is a fact or opinion. *Others First*, 829 F.3d at 580–81. Among the factors to be considered are "the precision and specificity of the statement"; "the verifiability of the statement"; and "the literary context in which the statement was made." *Harrington v. Wilber*, 353 F. Supp. 2d 1033, 1041 (S.D. Iowa 2005) (citing *Jones v. Palmer Commc'ns, Inc.*, 440 N.W.2d 884, 891–92 (Iowa 1989)).

The Iowa Poll and articles discussing its results are not actionable statements of material fact under ICFA for several reasons: first, they are the product of an expert's opinion as to a proper methodology in collecting and analyzing statistical data; second, they are simply snapshots in time

26

of randomized samples, neither predictions of the future nor a guarantee of any outcome; and third, they did not motivate or inform any alleged consumer purchase of merchandise by President Trump.

First, the Iowa Poll methodology and the data comprising its results are reflections of Selzer's opinion of her preferred procedures in conducting a presidential poll in the State of Iowa in 2024. Even among expert, respected professional pollsters, there is disparity on how a poll is conducted. For example, pollsters make different choices about weighting response data. "All good polling relies on statistical adjustment called 'weighting,' which makes sure that the survey sample aligns with the broader population on key characteristics." Pew Research Center, *Key things to know about U.S. polling in 2024* (Aug. 28, 2024), *available at* https://www.pewresearch.org/short-reads/2024/08/28/key-things-to-know-about-us-election-polling-in-2024/. "[P]olls by Gallup and The New York Times/Siena College adjusted on eight and 12 variables, respectively," and Pew "typically adjust[s] on 12 variables." *Id.* By contrast, for the Iowa Poll, Selzer weighted data based on three variables: age, sex, and congressional district. (Ex. H.) Insofar as there are multiple ways to conduct a poll—including, *inter alia*, how and when to collect the underlying data and how to weight and assess that data—each polling expert's decision about their methodology and analysis will necessarily affect the results. In other words, poll results are definitionally expert opinions, not statements of fact.

Second, the Iowa Poll, and indeed all polls in general, are not intended to be—and self-evidently cannot be—a guarantee of a future election performance. *See Scott v. Roberts*, 612 F.3d 1279, 1283 (11th Cir. 2010). Rather, polls are a collection, collation, and analysis of statistical data collected through randomized samples; they merely reflect a snapshot of that randomized sample at a particular moment in time. *See id.* ("[O]pinion polls of random selections of voters are

*snapshots with margins of error*, and campaigns are, to say the least, dynamic projects.")
(emphasis added); *see also* CBS News, *Expert Says Polling Is A Snapshot, Not A Predictor, Of What Happens On Election Day* (Sept. 10, 2020) (quoting expert statements that "[p]olls are only as good as their methodology," that they are "snapshots in time," and that "[t]hey may or may not predict what happens with Election Day"), *available at* https://www.cbsnews.com/pittsburgh/news/ expert-says-polling-a-snapshot-of- what-happens-on-election-day/.

Integral to the publication of the poll, Defendants published an extensive write-up about how the Iowa Poll was performed, the questions that comprised the poll, the tabulated results from the poll respondents, and the factors upon which Selzer weighted the responses. (*See generally* Exs. C, F, I, K.) President Trump does *not* allege that any of the underlying polling data is incorrect or that the published methodology was not implemented precisely as described. This is fatal to his ICFA deception claim. *See, e.g.*, *Bass v. J.C. Penney Co., Inc.*, 880 N.W.2d 751, 764 (Iowa 2016) (rejecting an ICFA claim alleging misrepresentations as to shipping and handling charges when underlying documentation "plainly demonstrated" exactly what those charges would be). Readers and commentators were free to accept, question, or entirely reject the poll's results to the extent they agreed or disagreed with its conclusions.

President Trump identifies no defect in the poll's methodology or Defendants' disclosures that would stray into the realm of an actionable statement of fact. Instead, President Trump merely contends that *something* must be amiss because the poll results deviated from the final election results. But this is the logic of conspiracy, not of law; and this contention is not and cannot be pleaded with the particularity required by Rule 9(b). Defendants never claimed, nor has President

Trump alleged that Defendants claimed, that the Iowa Poll would definitively match the final election results.

Indeed, the very article publishing the poll conceded that "[a] victory for Harris **would be a shocking development**." (Ex. A at A-1 (emphasis added).) Furthermore, the results of the poll itself also found that the gap between the two presidential candidates was less than the margin of error, meaning it was within the contemplation of the poll results that President Trump could win the election. (*Id.* at A-2.) And by President Trump's own admission, he is fully aware that the poll could not possibly purport to guarantee a future outcome: President Trump refers to three other instances over the preceding six years in which Selzer's poll results did not match final election results. (Rev. Am. Compl. ¶¶ 30–32.)

The Revised Amended Complaint leaves no doubt that the Iowa Poll was understood by all, including President Trump, to be nothing more than a statement of opinion based upon an analysis of a set of randomly sampled statistical data collected over a short three-day period. Under no reading of the Revised Amended Complaint can the poll results be described as a statement of fact.

Third, even if the Iowa Poll results *could* be considered statements of "fact," such statements nevertheless do not satisfy ICFA's requirement that they concern a "material fact." In the Revised Amended Complaint, President Trump alleges that the "only material facts that matter when it comes to polling [are] who is winning the race and by how much." (*Id.* ¶ 105.) However, under ICFA, "material" does not mean merely "important," "newsworthy," "interesting," or any other generic term subject to President Trump's misuse; rather, it is a legally defined term of art. A statement of fact is only "material" under ICFA if it creates "misleading impression . . . involv[ing] information that is important to consumers and, hence, likely to affect their choice of,

or conduct regarding, a product." *State ex rel. Miller v. Vertrue, Inc.*, 834 N.W.2d 12, 34 (Iowa 2013) (citation and internal quotations omitted). In *Vertrue*, the Iowa Supreme Court held that "underlying performance terms of [a] membership offer were material as they presumably constituted ***the most important factor*** affecting consumers' decisions to enter into a long-term obligation to pay . . . monthly premiums." *Id.* at 37 (emphasis added).

In this case, of course, President Trump makes no allegations whatsoever that the Iowa Poll results affected his "choice of, or conduct regarding" *The Register* or any other consumer product or merchandise. *Cf. id.* Again, President Trump does not plead that he purchased—or even considered purchasing—*The Register*.

On the face of the Revised Amended Complaint, the Iowa Poll and its results did not affect President Trump's consumer behavior in any way, whether with respect to *The Register* (the alleged merchandise at issue) or otherwise. As a result, President Trump has alleged no statement of ***material*** fact as required for a colorable claim of deception under ICFA.

In consideration of the totality of the circumstances, therefore, it is clear that President Trump has failed to allege any actionable predicate deceptive conduct by any Defendant. On their face, the substance and context of the published poll results made clear exactly what the poll did and did not represent. The poll results reflected a snapshot in time, capturing data from a randomized sample and applying expert opinion and methodology thereto. (Ex. F.) The results merely opined as to what happen in a future election, noted that the applicable margin of error exceeded either presidential candidate's lead, and conceded that a hypothetical victory for then-Vice President Harris "would be . . . shocking." (Ex. A at A-1.) The poll results did ***not*** state that Ms. Harris was guaranteed to win or make any other specific, verifiable assertion of fact. *Cf. Harrington*, 353 F. Supp. 2d at 1041 (considering "the precision and specificity of" and

"verifiability of the statement" in determining whether a statement is of fact or opinion). And the literary context in which the statements were made, *i.e.*, the newspaper article reporting the poll results, provides all the necessary background to its readers to make absolutely clear that the poll results are a statement of opinion. *See id.*

President Trump's claim that Defendants engaged in an act of "deception" under ICFA is entirely unsupported by either the facts as pleaded or the law, and the claim must be dismissed. (Rev. Am. Compl. ¶ 105.)

### 2.    Publication of the Iowa Poll Results Is Not an "Unfair Act or Practice"

Just as the publication of the Iowa Poll and its results is not actionable "deception" under ICFA, it is not an actionable "unfair act or practice." (Rev. Am. Compl. ¶ 106.) Under ICFA, "[u]nfair practice means an act or practice which causes substantial, unavoidable injury to consumers that is not outweighed by any consumer or competitive benefits which the practice produces." Iowa Code §§ 714.16(1)(i), 714H.2(9). Here again, ICFA reinforces its applicability to *consumer* harm and requires (1) "unfair" business conduct, and (2) a consumer injury that is not only "substantial," but also "***unavoidable***." *Id.* § 714.16(1)(i) (emphasis added).

As to the requirement of unfair commercial conduct, Iowa law is clear that the statute prohibits "unscrupulous ***business*** practices," such as a sale or advertisement. *State ex rel. Miller v. Cutty's Des Moines Camping Club, Inc.*, 694 N.W.2d 518, 525 (Iowa 2005) (emphasis added); *see also Vertrue, Inc.*, 834 N.W.2d at 34 (applying the statute to advertising and marketing conduct). The only alleged "unfair" conduct in this case is the publication of newspaper articles about Selzer's poll—not the sale or advertisement of the newspaper. As discussed above, the publication of the articles is a protected speech activity, is not an inherently commercial act, and bears no qualities of general "unfairness." *Cutty's*, 694 N.W.2d at 525.

31

Further, as to the requirement of a substantial and unavoidable consumer harm, President Trump helpfully enumerates his alleged "injuries," none of which is a consumer harm, demonstrably substantial, or remotely unavoidable. The only injuries alleged are (1) President Trump's feeling that he "was badly deceived and misled"; and (2) President Trump's decision to "divert campaign and financial resources to Iowa" after reading the poll. (Rev. Am. Compl. ¶ 106.) At the outset, as discussed above, none of these are consumer injuries giving rise to an ICFA claim. They are—at most—conceptual and self-inflicted injuries based on President Trump's own apparent misunderstanding of the nature of political polls, which are simple expert opinions as discussed above.[6]

---

[6] President Trump's new allegation that *the Register's* reporting of polling results in other Iowa political races caused him "even more" harm than it caused the candidates in those races, (Rev. Am. Compl. ¶ 112), is not only nonsensical, but the inclusion of such allegation—which was added for the first time as part of President Trump's Revised Amended Complaint—plainly violates the Court's May 23, 2025 Order. (ECF No. 65). The Court's Order directed President Trump to "file a revised version of the Amended Complaint . . . omitting Bradley Zaun and Miller-Meeks as plaintiffs and deleting any allegations included solely to support their claims" and, in doing so, expressly ordered that "[n]o other alterations to the Amended Complaint filed on January 31, 2025 are permitted." (*Id* at 11.) The Court went on to further clarify the express limits it was placing on President Trump with respect to his Revised Amended Complaint, directing that "Trump may not add new parties, allegations, or claims in the refiled amended complaint." (*Id.*)

Though Paragraph 112 of the Revised Amended Complaint is arguably the most egregious example, the Revised Amended Complaint is littered with a host of other additions that likewise violate this Court's express directives. (*See, e.g.*, Rev. Am. Compl. ¶ 7, 35, 61, 103, 112, subtitle at p. 5 (adding allegations that change President Trump's claim from being "impacted" by the Poll to being "harmed" by the Poll), ¶ 25 (adding allegations that the action "was not between citizens of different states" and that Representative Miller-Meeks and Zaun were added as plaintiffs in the Amended Complaint, thereby improperly continuing President Trump's argument in support of remand), ¶ 63 (adding the phrase "the triumph of other Republicans in Iowa"), ¶¶ 4, 13, 75–89, 81, 85, 103, 105-8, 115, 121, 123–25, 145, subtitle at p. 15, Plaintiff's prayer for relief (expanding the scope of Plaintiff's claims from just the polling regarding the presidential race to include other polling as well as media coverage regarding the other polling). Press Defendants respectfully urge the Court to disregard each of these allegations or strike them pursuant to Federal Rule of Civil Procedure 12(f)(1).

The first alleged injury—being "badly deceived and misled"—is contradicted by President Trump's own allegations stating definitively that he knew all along that he "certainly could not have trailed Harris by three points in Iowa at any time in the 2024 cycle." (Rev. Am. Compl. ¶ 3.) As discussed further below, President Trump does *not* allege that he credited the poll results or relied on them to make any consumer decision; he does not allege this in the Revised Amended Complaint because he in fact did no such thing. President Trump was not in fact "deceived" by the Iowa Poll and was perfectly capable of disregarding its analysis and conclusion based on his own certainty of its inaccuracy. To the extent he was "deceived and misled," such an injury was easily avoidable if he (together with his very well-staffed and capable campaigns) simply read the published underlying polling data and reached his own conclusions about their import.

The second alleged injury—the Trump campaign's purported diversion of "campaign and financial resources to Iowa"—is not a consumer injury suffered by President Trump in his individual capacity, nor does it flow from the publication of the poll. (*See id.* ¶ 106.) To the extent President Trump and his campaign made any strategic decision to expend time and campaign funds in Iowa, those expenditures were not paid to any of the Defendants nor were they in any other way beneficial to the Defendants.

Simply put, in order to state a claim based on an alleged unfair act or practice, ICFA requires President Trump to plead both a *plausible* fraudulent act by the Defendants and a ***plausible*** concrete consumer injury that was both substantial and unavoidable. President Trump has failed to do either in this case. President Trump has not sufficiently pleaded any conduct by Defendants that is prohibited by ICFA. The Revised Amended Complaint fails to identify any predicate act by

any of the Defendants that could plausibly be deemed to be "deception" or "unfair acts or practices" under the statute.[7] Accordingly, all ICFA claims must be dismissed in their entirety.

### D. President Trump Does Not Allege the Publication of the Poll Was in Connection with the Sale or Advertisement of Consumer Merchandise

President Trump fails to state a cognizable ICFA claim because he does not plead any plausible basis upon which this Court could conclude that Defendants' actions in conducting and publishing the Iowa Poll were done in connection with the sale of consumer merchandise.

The purpose of ICFA's private right of action is to protect individual consumers, and the statute therefore requires that the allegedly wrongful conduct to have a direct relational nexus to a consumer activity. *Mannino*, 2024 WL 4884440, at *3 (citing *Deng v. White*, No. 18-1672, 2019 WL 6358427, at *5 (Iowa Ct. App. Nov. 27, 2019)). The statutory language itself enforces this requirement by mandating that consumer plaintiffs demonstrate that the conduct that allegedly violates ICFA was done "in connection with the advertisement, sale, or lease of consumer merchandise[.]" Iowa Code § 714H.3.

ICFA and Iowa case law define the relevant terms and phrases incorporated into this commerce requirement. "'[C]onsumer merchandise' means merchandise offered for sale or lease, or sold or leased, primarily for personal, family, or household purposes." Iowa Code § 714H.2(4).[8]

---

[7] In a strained "kitchen-sink" pleading effort, the Revised Amended Complaint states that the poll was "deceptive, misleading, unfair, and *the result* of concealment, suppression, and omission of material facts[.]" (*See* Rev. Am. Compl. ¶ 108 (emphasis added).) This smattering of general verbiage is not consistent with the language of the statute and states no claim thereunder. *Cf.* Iowa Code § 714H.3 (no mention of a prohibitive practice that is the "result" of something). Rather, the Revised Amended Complaint's only pleaded (but insufficient) claims of violative conduct are that the poll was a "deception" or an "unfair act or practice." (*See* Rev. Am. Compl. ¶¶ 105–06.) To the extent Plaintiff intended to plead additional forms of allegedly violative conduct, he did not do so with sufficient particularity to meet the standard set forth in Rule 9(b).

[8] Because the entire thrust of Plaintiff's Revised Amended Complaint is that the "merchandise" harmfully impacted their respective careers as politicians, it is a stretch for them to claim that they used it "primarily for *personal, family, or household purposes*." *Id.* (emphasis

For purposes of this lawsuit, President Trump alleges the "merchandise" at issue consists of *The Register*'s "physical newspapers" and "online newspapers."[9] (Rev. Am. Compl. ¶ 104.)

The term "'[s]ale' means any sale or offer for sale of consumer merchandise for cash or credit." Iowa Code § 714H.2(8). The term "[a]dvertisement' includes the attempt by publication, dissemination, solicitation, or circulation to induce directly or indirectly any person to enter into any obligation to acquire any title or interest in any merchandise." Iowa Code § 714H.2(2) (incorporating the definition of the term as set forth in Iowa Code § 714.16(1)(a)).[10]

Finally, the phrase "in connection with," as explained by the Iowa Supreme Court, "is commonly defined as 'related to, linked to, or associated with,'" and in the context of a consumer fraud claim, requires a showing of "some relation or nexus" between the prohibited act and the merchandise in question. *Cutty's Des Moines Camping Club*, 694 N.W.2d at 526 (citations and quotations omitted).

---

added). To allow Plaintiff to bring a claim based on alleged professional use of a good or service would be an improper (and huge) expansion of the reach of ICFA.

[9] Plaintiff also nominally alleges that the merchandise in this case includes any "other content that contained the [poll]." (Rev. Am. Compl. ¶ 104.) This allegation, however, is impermissibly vague and wildly overbroad. Plaintiff's claim would then encompass every article, interview, podcast, political advertisement, opinion piece, or book that discusses (even unfavorably) the Iowa Poll and its results, written or spoken by anyone (including non-parties) in any medium or forum. Defendants cannot possibly know, let alone have control over, all of the potential "content that contained" the results of the poll at issue, nor is every such piece of "content" consumer merchandise. Plaintiff's only cognizable allegation regarding any "merchandise" in this lawsuit, therefore, covers only *The Register*'s physical and digital newspaper.

[10] Unlike "sale" and "advertisement," ICFA does not define the term "lease"; however, the widely understood and plain language meaning of the term is "a contract by which one conveys real estate, equipment, or facilities for a specified term and for a specified rent." *See Lease*, Merriam-Webster Dictionary, *available at* https://www.merriam-webster.com/dictionary/lease. No construction of the Revised Amended Complaint can conceivably implicate any "lease" under the statute, nor does the Revised Amended Complaint make any such allegation.

Synthesizing these definitions, the law is clear: President Trump must plead that he was harmed by Defendants' prohibited conduct that was ***related to the sale or advertisement of The Register's newspaper*** in order to state a claim for an ICFA violation. President Trump has not done so. To the contrary, in fact, President Trump affirmatively claims that the allegedly violative conduct was ***politically***—not commercially—motivated. President Trump alleges (however implausibly) that the publication of the poll was for the sole purpose of "manufacturing fake support for Democrat candidates to interfere in the elections." (Rev. Am. Compl. ¶ 33.) And the gravamen of President Trump's alleged harm is that he was "misled" by this poll as to his position in the presidential election. (Rev. Am. Compl. ¶¶ 105–08.) Even if that were true (though it plainly is not), it only confirms that neither the alleged harmful conduct—*i.e.*, publishing and releasing the poll—nor the alleged harm itself—*i.e.*, President Trump's professed fear of losing the election—were "in connection with" the "sale" or "advertisement" of "consumer merchandise." *Cf.* Iowa Code § 714H.3.

Furthermore, President Trump did not plead that the publication of the Iowa Poll had any nexus whatsoever to his purchase of *The Register*. Indeed, President Trump never alleged that he purchased *The Register* at all.

Moreover, President Trump concedes that the articles and poll results were made freely and publicly available, meaning he was not required to engage in any consumer purchase whatsoever to read the articles about the results of the poll. (*Id.* ¶¶ 1 n.1, 107, 123, 143.) Therefore, the publication of the poll results was not an act in connection with the sale or advertisement of the merchandise as required by ICFA.

Finally, President Trump does not plead that the publication of the Iowa Poll had any nexus to any advertisement for *The Register*. As is clear from its definition, the purpose of an

36

advertisement is meant to induce a consumer to enter into a transaction to purchase merchandise. *See* Iowa Code § 714H.2(2); *State v. Cutsick*, 84 N.W.2d 554, 556 (Iowa 1957) ("[A]dvertising is a method, in a broad sense, of soliciting the public to purchase the wares advertised."); *see also* Note, *Consumer Protection Under the Iowa Consumer Fraud Act*, 54 IOWA L. REV. 319, 325 (1968) ("Virtually every type of *sales appeal* made to *customers* . . . can be brought within the 'advertisement' definition [under ICFA]." (emphasis added)). There is nothing in the Iowa Poll or the articles referencing it that amounts to any attempt to "induce" President Trump to purchase *The Register*—it simply is not a call to action to purchase anything at all. President Trump admits as much in his Revised Amended Complaint, as he claims that the purpose of Press Defendants' release of the poll was alleged "election inference," (Rev. Am. Compl. ¶ 1), not an attempt to sell newspapers or gain subscribers. And relevant here again is the fact that the articles were admittedly published and available to the public *free of charge*, which vitiates any claim that the publication of the poll was meant to incite their purchase. The Revised Amended Complaint therefore fails to allege a connection to any advertisement under ICFA.[11]

In short, President Trump has failed to plead the foundational requirement that the allegedly wrongful conduct has a relational nexus to the sale or advertisement of any consumer

---

[11] If Plaintiff nevertheless attempts to claim the publication of the Iowa Poll and its results was somehow an "advertisement," ICFA then specifically exempts the claims. It provides:

> This chapter *shall not apply* to . . . the newspaper, magazine, publication, or other print media in which the advertisement appears, including the publisher of the newspaper, magazine, publication, or other print media in which the advertisement appears, . . . including an employee, agent, or representative of the publisher, newspaper, magazine, publication or other print media . . . .

*Id.* § 714H.4(1)(c) (emphasis added). It is undisputed that *The Register* is a newspaper and that the Des Moines Register is its publisher. (Rev. Am. Compl. ¶ 18.) Gannett, as owner of the Des Moines Register, (*id.* ¶ 19), is also a publisher under the statute. Should the Court entertain the idea that the Iowa Poll is an "advertisement" for *The Register* for purposes of ICFA, this exception fully bars Plaintiff's ICFA claim.

37

merchandise. Nor has President Trump sufficiently pleaded that he was harmed "in connection with" the "sale" or "advertisement" of *The Register*. *Cf.* Iowa Code § 714H.3. Therefore, President Trump's ICFA claim must be dismissed.

### E.    President Trump Does Not Allege That He Relied on the Iowa Poll

ICFA also requires any claimed damages be proximately caused by the prohibited conduct. Iowa Code § 714H.5(1); § 714.16(2)(a). The statute does not independently define "proximate cause," but the Iowa Supreme Court has held that the question of "proximate cause" is also rightly framed as a "scope-of-liability issue," *i.e.*, that liability must be limited to "'harms that result from risks created by the actor's wrongful conduct, but for no others.'" *Thompson v. Kaczinski*, 774 N.W.2d 829, 838 (Iowa 2009) (quoting Restatement (Third) of Torts § 29, cmt. e). In other words, when there is no wrongful conduct pleaded (as in the present case), there are no attendant risks of harm that would satisfy the proximate cause requirement under ICFA.

Furthermore, ICFA itself indicates what would be required to show proximate cause: reliance on the fraudulent act by the consumer when entering into a consumer transaction. Prior to the existence of the private right of action under ICFA, the Iowa AG was expressly ***not*** required to prove its own reliance on the fraudulent act; however, the private right of action statute removed that exception. *Compare* Iowa Code § 714.16(7) ("[I]t is not necessary in an action for reimbursement or an injunction, to allege or to prove reliance . . . ."), *with* Iowa Code § 714H.3 (requiring that a defendant have the "intent that others rely" on the fraudulent conduct to be liable). The requirement that private plaintiffs establish proximate cause can only be understood to require such reliance. Iowa Code § 714H.3, 714.2(a).

"The Iowa Consumer Fraud Act was patterned after the Illinois Consumer Fraud Act[,]" so we may look to Illinois courts' application of their own consumer fraud act for guidance. *See State ex rel. Miller v. Hydro Mag, Ltd.*, 436 N.W.2d 617, 621 (Iowa 1989). And the Illinois

DMS_US.372387465.1

Supreme Court recently confirmed that reliance is **required** to prevail on a private right of action under the statute: "In order to establish the element of proximate causation, a plaintiff must prove that it was actually deceived by the misrepresentation. If the plaintiff has neither seen nor heard a deceptive statement, it cannot have relied on the statement and, consequently, cannot prove that the statement was the proximate cause of its injury." *Tri-Plex Tech. Servs., Ltd. v. Jon-Don, LLC*, 241 N.E.3d 454, 462 (Ill. 2024) (citation omitted).

Simply put, President Trump does not plead that he relied on the Iowa Poll when engaging in any consumer conduct, much less that any such reliance was justified. President Trump does not even superficially plead that he relied on the articles or poll data, nor does he allege that the underlying poll data was inaccurate. Only approximately 72 hours passed between the first publication of the poll and the close of the election in Iowa. (*See* Rev. Am. Compl. ¶¶ 1–2.) President Trump does not identify a single act from that period that demonstrates his reliance on the articles in question to make a consumer purchase decision of any kind.[12]

President Trump does not and cannot plead reliance on the Iowa Poll in any consumer decision. Therefore, he can neither plead nor show proximate cause, and his claims must be dismissed. *Cf.* Iowa Code § 714H.5; § 714.16(2)(a).

---

[12] The obvious reason Plaintiff does not allege any acts of reliance is because no such reliance in fact occurred. President Trump publicly made clear that he affirmatively rejected—not relied upon—the results of the poll. The Revised Amended Complaint cites directly to an article in Forbes that reports President Trump's dismissal the Iowa Poll within 24 hours of its publication as "a fake poll done by a Trump hater who oversampled, by a lot, Democrats." (*See* Rev. Am. Compl. ¶ 62 (citing Sara Dorn, *Why Outlier Poll Showing Harris Winning Iowa Could Spell Trouble for Trump*, Forbes (Nov. 3, 2024).)

**F.    President Trump Asserts No Plausible Claim for Fraudulent Misrepresentation**

In addition to his attempt to manipulate the purpose and use of ICFA, President Trump also attempts to abuse Iowa's common law of fraudulent misrepresentation to avoid the constitutional protections of free speech and free press. To assert a claim for fraudulent misrepresentation, a plaintiff must plead and ultimately prove the following: "'(1) representation, (2) falsity, (3) materiality, (4) scienter, (5) intent to deceive, (6) reliance, and (7) resulting injury and damage.'" *Van Sickle Const. Co. v. Wachovia Com. Mortg., Inc.*, 783 N.W.2d 684, 687 (Iowa 2010) (*quoting Lloyd v. Drake Univ.*, 686 N.W.2d 225, 233 (Iowa 2004)).

At minimum, President Trump has failed to sufficiently plead several of those elements. As with the ICFA claim, this Court must reject President Trump's attempt to use the tort of fraudulent misrepresentation to silence speech they do not like.

**1.    President Trump Did Not Plead an Actionable Representation**

President Trump pleads that the alleged misrepresentations at issue are the Iowa Poll results, where there were allegedly "false misrepresentations of the state of the [presidential and congressional] races." (Rev. Am. Compl. ¶ 119.) This contention demonstrates a fundamental misunderstanding both of the concept of opinion polling and the law of fraudulent misrepresentation.

As stated in detail above, the Iowa Poll is not an actionable representation, because it is an *opinion*. (*See supra* Section IV(C)(1).) This is underscored by President Trump's understanding that other "mainstream" polls published at the time showed different results. (Rev. Am. Compl. ¶ 48.) A poll result cannot be a "fact" if the result can vary based on who conducted the poll, and how.

"[U]nder Iowa law, 'a mere statement of honest opinion' does not give rise to a claim for fraud." *Tralon Corp. v. Cedarapids, Inc.*, 966 F. Supp. 812, 827 (N.D. Iowa 1997) (quoting *Hoefer v. Wisc. Educ. Assoc. Ins. Tr.*, 470 N.W.2d 336, 340 (Iowa 1991) (citing *West v. W. Cas. and Sur. Co.*, 846 F.2d 387, 393 (7th Cir. 1988) ("A statement that merely expresses an opinion . . . does not constitute an actionable misrepresentation.")). The Iowa Poll was just that: an opinion. As such, it, as a matter of law, is not an actionable "representation" for the purpose of a fraudulent misrepresentation claim.

### 2.    President Trump Did Not Plead Any Justifiable Reliance on the Iowa Poll

To state a claim for fraudulent misrepresentation, President Trump must allege that he "acted in reliance on the truth of the representation and [were] justified in relying on the representation[.]" *Gibson v. ITT Hartford Ins. Co.*, 621 N.W.2d 388, 400 (Iowa 2001). There can be no liability unless the alleged misrepresentation "increased the risk" of a plaintiff acting in reliance on it. *See Spreitzer v. Hawkeye State Bank*, 779 N.W.2d 726, 736 (Iowa 2009). In other words, to show reliance, a plaintiff must plead that they took an action (or refrained from taking an action) because of the representation at issue.

But acting in reliance on an alleged misrepresentation is not enough: a plaintiff must also plead that the reliance was ***justified***. *See id.* at 737; *Hammes v. JCLB Props. LLC*, 764 N.W.2d 552, 556 (Iowa Ct. App. 2008); *Lockard v. Carson*, 287 N.W.2d 871, 878 (Iowa 1980). In determining whether a plaintiff's reliance on a defendant's alleged misrepresentation was justified, Iowa courts do not apply an objective standard of care; rather, Iowa courts employ a subjective test, considering whether "plaintiffs, ***in view of their own information and intelligence***, had a right to rely on the representations" when taking or refraining from a particular action. *Hammes*, 764 N.W.2d at 556 (emphasis added); *Lockard*, 287 N.W.2d at 878; *Spreitzer*, 778 N.W.2d at 737

("[T]he justified standard followed in Iowa means the reliance does not necessarily need to conform to the standard of a reasonably prudent person, but depends on the qualities and characteristics of the particular plaintiff and the specific surrounding circumstances.").

In the Revised Amended Complaint, President Trump makes the bold allegation that he "justifiably relied on the [Iowa Poll]." (Rev. Am. Compl. ¶ 124.) However, simply reciting the element is not sufficient to state a claim that satisfies the *Iqbal/Twombley* standard, much less one that comports with Rule 9(b).

First, as discussed above, President Trump does not plead any facts to support the claim that he took any particular action of any kind in reliance on the article or poll results. But Iowa law requires that he affirmatively "***acted*** in reliance on the truth of the representation." *See Gibson*, 621 N.W.2d at 400 (emphasis added). It is not enough for President Trump to allege he was personally "deceived" by the poll results. (Rev. Am. Compl. ¶ 103.) The facts in the Revised Amended Complaint, taken as true, reveal that President Trump took no detrimental action of any kind in reliance on the poll results.

Furthermore, even if President Trump pleaded that he took some action in reliance on the published poll results, he does not plead that this reliance was ***justified***. *See Spreitzer*, 779 N.W.2d at 736. In fact, President Trump alleges that the poll results were unreliable on their face such that President Trump could not have justifiably relied on them. (Rev. Am. Compl. ¶¶ 48–52.) President Trump's allegations thereby defeat his own fraudulent misrepresentation claim. He alleges that the Iowa Poll was "so implausible that no objective pollster could honestly have advanced it," (*id.* ¶ 46), and that "*every other* mainstream Iowa poll also showed President Trump comfortably ahead." (*Id.* ¶ 48 (emphasis in original).) He further alleges his understanding of multiple previous Selzer polls that did not match the final election results, including the 2022 Iowa Attorney General

DMS_US.372387465.1

election, the 2018 Iowa governor election, and Iowa's 2020 U.S. Senate race. (*Id.* ¶¶ 30–32.) In other words, President Trump alleges ***both*** (1) that Selzer's polling was  not credible because it departed from other polls available at the time and she had other historical misses; ***and*** (2) that President Trump was nevertheless justifiably deceived by it. (*Compare id.* ¶ 124, with *id.* ¶¶ 48–52.) Both cannot be true.

The allegations in President Trump's Revised Amended Complaint, taken together, demonstrate that President Trump took no direct action in reliance on the publication of the poll results, and furthermore, would not have been justified in doing so.

### 3. President Trump's Alleged Injuries Are Not Redressable by a Claim for Fraudulent Misrepresentation

President Trump alleges he was harmed by the publication of the poll results based on a vaguely purported negative impact on their campaigns and on the electoral process more generally. President Trump alleges he was "injured by the fraudulence of the [Iowa] Poll . . . [because] as a reader of the *Des Moines Register* and Selzer's polls, [he was] entitled to accurate information, not to be misled by fraudulent misrepresentations." (Rev. Am. Compl. ¶ 125.) However, these are not the kinds of harms a claim for fraudulent misrepresentation can redress. Rather, Iowa law recognizes two forms of damages in fraudulent misrepresentation cases: (1) out-of-pocket damages and (2) benefit-of-the-bargain damages (plus consequential damages). *See Midwest Home Distrib., Inc. v. Domco Indus. Ltd.*, 585 N.W.2d 735, 739–41 (Iowa 1998). Neither exists on the face of the pleaded facts.

First, out-of-pocket damages allow a plaintiff to recover a "pecuniary loss suffered as a result of the recipient's reliance upon the misrepresentation[.]" *Putman v. Walther*, 973 N.W.2d 857, 864 (Iowa 2022). They are calculated by giving "the defrauded party the difference between the value of what the party has parted with and the value of what the party has received." *Midwest*

43

*Home Distrib.*, 585 N.W.2d at 739; *see also Cornell v. Wunschel*, 408 N.W.2d 369, 380 (Iowa 1987). President Trump does not plead that he "parted with" anything in his individual capacity as a result of the poll, nor that he failed to receive the expected return value. President Trump claims that he paid "direct federal campaign expenditures," though he does not allege the nature of the expenditures, where they were incurred, to whom they were paid, whether the expenditures were paid by him individually or by his campaign, or whether his campaign didn't receive the political campaign value for what they paid. (*Cf.* Rev. Am. Compl. ¶ 114.) He has failed to state any claim for out-of-pocket damages.

Second, benefit-of-the-bargain damages are intended to place "the defrauded party 'in the same financial position as if the fraudulent misrepresentation had been in fact true." *Cornell*, 408 N.W.2d at 380 (quoting Dan B. Dobbs, *Handbook on the Law of Remedies* § 9.2, at 595 (1973)). Benefit-of-the-bargain damages are available for economic injuries and are generally awarded when a fraudulent misrepresentation occurs in the context of a transaction. *See id.* at 382 (quoting Dobbs, § 9.2, at 602)("'[D]eceit is an economic, not a dignitary tort, and resembles, in the interests it seeks to protect, a contract claim more than a tort claim.'"); *Midwest Home Distrib.*, 585 N.W.2d at 741–42 (distributor agreement); *Putman*, 973 N.W.2d at 864 (sale of property); *Bates v. Allied Mut. Ins. Co.*, 467 N.W.2d 255, 260 (Iowa 1991) (insurance agreement); *Lloyd*, 686 N.W.2d at 232–33 (employment agreement).

Moreover, the Restatement provision adopted by Iowa courts limits the application of benefit-of-the-bargain damages in fraudulent misrepresentation cases by requiring that such damages be based on an underlying contract ***with the defendant***. Restatement (Second) of Torts § 549; *see also, e.g.*, *Cornell*, 408 N.W.2d at 380 (noting Iowa's adoption of Section 549 of the Restatement). "When the plaintiff has not entered into any transaction with the defendant but has

44

suffered his pecuniary loss through reliance upon the misrepresentation in dealing with a third person," then benefit-of-the-bargain damages are not the appropriate measure of damages. Restatement (Second) of Torts § 549, cmt. g. In other words, where the plaintiff and the defendant are not parties to an underlying contract, only out-of-pocket damages apply, and not benefit-of-the-bargain damages. *See, e.g.*, *Dier v. Peters*, 815 N.W.2d 1, 9–11 (Iowa 2012) (deeming financial support of child paid by man allegedly misled to believe he was the father as "out-of-pocket" damages). This categorically applies to any expense paid out for any reason to non-parties to this action in relation to President Trump's campaign activities.

The goal of benefit-of-the-bargain damages is to put a plaintiff "in the same financial position as if the fraudulent misrepresentation ***had in fact been true***." *Cornell*, 408 N.W.2d at 380 (emphasis added) (quoting Dobbs, § 9.2, at 595). This principle of the law reveals the complete mismatch between President Trump's claims and the available remedies. As discussed above, political polls cannot be "true" or "false" vis-à-vis final election results. Even assuming the poll results could have been "true" in the way President Trump pleads, the counterfactual means that the goal of the damages would be to put President Trump in the financial position he would have been in if he had *lost* the election. This calculation of damages is neither pleaded nor calculable.

In sum, President Trump simply is not eligible for out-of-pocket *or* benefit-of-the-bargain damages because the publication of the poll results was not made within the context of any transaction or ongoing business relationship between him and Defendants, and he did not incur any out-of-pocket expenses as a result of that publication.

### G.    The Lawsuit Does Not State a Claim for Negligent Misrepresentation

President Trump also asserts a claim for negligent misrepresentation against Defendants for their publication of the Iowa Poll, the elements of which are:

(1) the defendant was in the business or profession of supplying information to others; (2) the defendant intended to supply information to the plaintiff or knew that the recipient intended to supply it to the plaintiff; (3) the information was false; (4) the defendant knew or reasonably should have known that the information was false; (5) the plaintiff reasonably relied on the information in the transaction that the defendant intended the information to influence; (6) and the false information was the proximate cause of damage to the plaintiff.

*McLeodUSA Telecomm. Servs., Inc. v. Qwest Corp.*, 469 F. Supp. 2d 677, 692 (N.D. Iowa 2007)

("*McLeod*"). The Revised Amended Complaint's mere incantation of some of these elements are

both conclusory and fail as a matter of law, and the claim for negligent misrepresentation should

accordingly be dismissed.

### 1.    Defendants Are Not in the Business or Profession of Supplying Information as Construed by Iowa Law

President Trump implies that Defendants operate "in the business or profession of

supplying information to others." (Rev. Am. Compl. ¶ 131 (quoting *Sain v. Cedar Rapids Cmty.*

*Sch. Dist.*, 626 N.W.2d 115, 123 (2001)), and as such owed a duty of care to "foreseeable third

parties [specifically, President Trump] as members of a limited class of persons who would be

contemplated to use and rely upon the [Iowa Poll]." (Rev. Am. Compl. ¶ 130 (quoting *Sain*, 626

N.W.2d at 123).) President Trump evidently presumed that this element would be satisfied simply

because Press Defendants are publishers of a newspaper. But upon analysis of the law, the Court

will find that Press Defendants do ***not*** operate in the business or profession of supplying

information to others as that element is applied under Iowa law, and the claim for negligent

misrepresentation therefore fails.

Whether a defendant operated in the business of supplying information to others is a fact-

specific inquiry. *Sain*, 626 N.W.2d 115 at 125. This inquiry establishes whether "the defendant

was under the 'duty' necessary to sustain the claim" for negligent misrepresentation. *McLeod*, 469

F. Supp. 2d at 692 (citing *Conveyor Co. v. Sunsource Tech. Servs.*, Inc., 398 F.Supp.2d 992, 1013

46

(N.D. Iowa 2005)). Accordingly, Iowa law examines the nature of the relationship between the purveyor and consumer of information, and "not the subject matter of the transaction between the plaintiff and the defendant[.]" *Sain*, 626 N.W.2d 115 at 125. On this basis, Iowa courts have "recognized professionals such as accountants, abstractors, [] attorneys," and high-school guidance counselors as individuals in the business or profession of supplying information who thus have the requisite duty of care. *Sain*, 626 N.W. 2d at 123 (citing *Ryan v. Kanne*, 170 N.W.2d 395, 402 (Iowa 1969)). And, critically, "a person in the profession of supplying information for the guidance of others acts *in an advisory capacity* and is manifestly aware of the use that the information will be put, and *intends* to supply it *for that purpose*." *Conveyor Co.*, 398 F.Supp.2d at 1014 (emphases added).

Defendants cannot be said to be "recognized professionals" who acted in an "advisory capacity" for President Trump. They were not retained by President Trump (or anyone) to conduct and publish the Iowa Poll for any individual's advisory benefit. President Trump does not plead (and cannot plead) that Defendants conducted the poll and published its results *for the purpose and intent of advising* President Trump or his campaign. Accordingly, while Press Defendants are publishers of a newspaper, they were not "in the business or profession of supplying information" under Iowa law. On this basis alone, President Trump's claims for negligent misrepresentation should be dismissed.

### 2.   Defendants Did Not Supply the Iowa Poll to President Trump for His Benefit or Guidance

President Trump claims that, as a "foreseeable third part[y] as [a] member[] of a limited class of persons who would be contemplated to use and rely upon" the Iowa Poll were entitled to a duty of care by Defendants to publish accurate polling. (Rev. Am. Compl. ¶ 130.) President Trump once again misapprehends Iowa law. Although the Iowa Supreme Court recognizes an

47

advisor's duty to third parties, it only extends "to persons for whose benefit and guidance the [professional advisor] *knows* the information is *intended*." *Sain*, 626 N.W.2d at 123 (quoting *Ryan*, 170 N.W.2d at 403) (emphasis added). "Instead of using foreseeability of harm to limit the scope of the duty of care, [Iowa courts] rel[y] upon a stricter standard of knowledge." *Id*.

President Trump does not claim that the Iowa Poll was conducted and published for the intent of his own individual consumption, nor that Defendants had knowledge of any such intent. The Iowa Poll was *not* intended for President Trump—he concedes that the Iowa Poll was published to the *general public*. (Rev. Am. Compl. ¶ 1.) Moreover, President Trump does not claim that Defendants *knew* President Trump would rely upon the Polls in making campaign-related decisions and/or expenditures. No facts, whether alleged in the Revised Amended Complaint or otherwise true, suggest that Defendants knew or intended that President Trump would rely on the Iowa Poll for "guidance." *See Sain*, 626 N.W.2d at 123.

Courts have consistently dismissed negligent misrepresentation claims against general circulation newspapers for precisely this reason. *See Gutter v. Dow Jones, Inc.*, 490 N.W.2d 898, 900 (Ohio 1986) (holding that "a newspaper reader . . . does not fall within a special limited class" of permissible plaintiffs); *see also Ginsburg v. Agora, Inc.*, 915 F. Supp. 733, 739 (D. Md. 1995) ("The publication is offered to the general public and the information provided in the publication is of a general nature, that is, it is not specifically tailored to [the] financial situation of any individual subscriber."); *Stancik v. CNBC*, 420 F.Supp.2d 800, 807–08 (N.D. Ohio 2006). A contrary result would in effect extend liability to all the world, risking unbounded exposure and imposing on the press "the 'intolerable burden' of demonstrating . . . that its efforts to determine the accuracy of any given report were reasonable." *Ginsburg*, 915 F. Supp at 19 (citing *Daniel v.*

*Dow Jones & Co., Inc.*, 520 N.Y.S. 2d 334, 339 (N.Y. Civ. Ct. 1987); *see also Time Inc. v. Hill*, 385 U.S. 374, 389 (1967).

Because President Trump does not and cannot plead that the Iowa Poll was for his "benefit and guidance," nor that Defendants had actual knowledge that the President Trump's campaign would rely on the Iowa Poll, his claim for negligent misrepresentation fails.

### 3. President Trump Does Not Plead Reasonable Reliance on the Polls or Proximately Caused Damages Therefrom

To state a claim for negligent misrepresentation, President Trump must also plead that he "reasonably relied on the information in the transaction that the [Defendants] intended the information to influence[.]" *McLeod*, 469 F. Supp. 2d at 692. Importantly, like a claim for fraudulent misrepresentation, reliance must be ***justified***. *See Union Cnty., IA v. Piper Jaffray & Co., Inc.*, 741 F. Supp. 2d 1064, 1112 (S.D. Iowa 2010) (citing *Pollmann v. Belle Plaine Livestock Auction, Inc.*, 567 N.W.2d 405, 409–10 (Iowa 1997); *Midwest Home Distrib., Inc.*, 585 N.W.2d at 743. As detailed above in Section IV(F)(2) herein, President Trump does not plead any reliance on the Iowa Poll, justified or otherwise. Accordingly, his claim for negligent misrepresentation fails.

Furthermore, President Trump must also demonstrate that the allegedly "false information was the proximate cause of damage to the plaintiff." *McLeod*, 469 F. Supp. 2d at 692. Put differently, President Trump must establish "that, but for [Defendants'] negligence . . . [P]laintiff['s] injury would not have occurred." *Boone Cnty. Comm. Credit Union v. Masel*, 665 N.W.2d 440 (Table), 2003 WL 1050344, at *4 (Iowa Ct. App. Mar. 12, 2003) (citing *Hasselman v. Hasselman*, 596 N.W.2d 541, 545 (Iowa 1999)). As discussed above, President Trump has identified no compensable damages whatsoever, much less any support for a claim that

any damages were proximately caused by Defendants' conduct. (*See supra* Sections IV(B), (F)(3).) As such, President Trump's claims for negligent misrepresentation should be dismissed.

### 4. First Amendment Considerations Bar President Trump's Negligent Misrepresentation Claim

In addition to President Trump's failure to sufficiently plead all elements of a negligent misrepresentation claim, First Amendment and common law considerations coalesce to impose a critical limitation on tort claims sounding in negligent misrepresentation. Because President Trump is a public official, heightened First Amendment protections apply to all torts involving speech about him, including those arising out of allegedly negligent statements. *See Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 129 (2d Cir. 2013) (holding public figures may sustain a claim premised on speech "only if the statement was made 'with knowledge that it was false or with reckless disregard of whether it was false or not,'" which is true "regardless of the claim at issue" (quoting *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 52 (1988))). Indeed, "a public figure cannot circumvent [this] strict actual malice standard imposed by the First Amendment by calling his claim for defamation by a different name (tort)." *Id.* at 128 (citations omitted). Put simply, negligence is not enough. President Trump must plausibly allege that Press Defendants published the Iowa Poll with actual malice. President Trump has not done so and *cannot* do so.

Accordingly, President Trump's claim for negligent misrepresentation fails as a matter of law and should be dismissed.

## V. CONCLUSION

For the reasons stated above, this Court should grant Defendants Des Moines Register and Tribune Company and Gannett Co., Inc.'s Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6) and dismiss the Revised Amended Complaint with prejudice.

DMS_US.372387465.1

Defendants Des Moines Register and Tribune Company and Gannett Co., Inc. respectfully request to be heard at oral argument on this Motion.

Dated July 28, 2025

**FAEGRE DRINKER BIDDLE & REATH LLP**

/s/ Nick Klinefeldt
Nicholas A. Klinefeldt, AT0008771
David Yoshimura, AT0012422
801 Grand Avenue, 33rd Floor
Des Moines, IA, 50309
Telephone: (515) 248-9000
Fax: (515) 248-9010
Email: *Nick.Klinefeldt@Faegredrinker.com*
         *David.Yoshimura@Faegredrinker.com*

**ATTORNEYS FOR DEFENDANTS DES MOINES REGISTER AND TRIBUNE COMPANY AND GANNETT CO., INC.**

51