**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

PRESIDENT DONALD J. TRUMP, an individual,

     Plaintiff,

       v.

J. ANN SELZER, an individual, SELZER &
COMPANY, DES MOINES REGISTER AND
TRIBUNE COMPANY, and GANNETT CO.,
INC.,

     Defendants.

Case No.: 4:24-cv-00449-RGE-WPK

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS DES MOINES REGISTER AND TRIBUNE COMPANY AND
<u>GANNETT CO.'S MOTION TO DISMISS THE REVISED AMENDED COMPLAINT</u>**

## TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ................................................................................ 1

II.   BACKGROUND ................................................................................................... 2

   A.   Procedural History ....................................................................................... 2

   B.   Facts Set Forth in President Trump's Revised Amended Complaint ........................ 3

III.  LEGAL STANDARD .......................................................................................... 8

   A.   Rule 12(b)(6) ................................................................................................. 8

   B.   Rule 9(b) ....................................................................................................... 9

IV.   ARGUMENT ...................................................................................................... 9

   A.   The Heightened Pleading Standard Under Rule 9(b) Has Been Met ...................... 9

   B.   President Trump's Claims Are Not Barred by the First Amendment ..................... 11

      1.   The Defendant Polls are False Speech Not Immunized by the First
         Amendment .............................................................................................. 13

      2.   The Defendant Polls are Commercial Speech Not Warranting Any
         Heightened First Amendment Protection ................................................... 15

      3.   DMR and Gannett's First Amendment Cases Are Distinguishable ................ 16

   C.   President Trump's Claims are Sufficiently Pled .............................................. 17

   1.   President Trump Properly Pled a Claim for Violation of The Iowa Consumer
      Fraud Act...................................................................................................... 17

   2.   President Trump Properly Pled a Claim for Fraudulent Misrepresentation ........... 19

        a)   Defendants Made Representations When They Published their Polls in the
          Des Moines Register .......................................................................... 19
        b)   Defendants' Representations Were False......................................................... 19
        c)   The False Representations Made by Defendants Were Material .................... 20
        d)   Defendants Made the False Representations With Scienter ........................... 20
        e)   Defendants Intended to Deceive With Their False Representations................ 21
        f)   Plaintiff Justifiably Relied on Defendants' False Representations ................ 22
        g)   Plaintiff Was Injured as a Result of Defendants' Misrepresentations ........... 23

   3.   President Trump Properly Pled a Claim for Negligent Misrepresentation ............. 23

V.    CONCLUSION .................................................................................................. 27

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Cyanamid Co. v. McGhee,*
   317 F.2d 295 (5th Cir. 1963) ................................................................................... 1

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ..................................................................................... 8, 14

*Bagelmann v. First Nat. Bank,*
   823 N.W.2d 18 (Iowa 2012) ........................................................................... 23

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ........................................................................................ 8

*Bill Johnson's Restaurants, Inc. v. NLRB,*
   461 U.S. 731 (1983) ...................................................................................... 13

*Board of Trustees of State Univ. of N.Y. v. Fox,*
   492 U.S. 469 (1989) ...................................................................................... 15

*Braden v. Wal-Mart Stores,*
   588 F.3d 585 (8th Cir. 2009) ........................................................................... 8

*Brewster v. United States,*
   542 N.W.2d 524 (Iowa 1996) ........................................................................ 26

*Burbach v. Radon Analytical,*
   652 N.W.2d 135 (Iowa 2002) ........................................................................ 25

*Burson v. Freeman,*
   504 U.S. 191 (1992) ...................................................................................... 12

*Chappelle v. Beacon Commc'ns Corp.,*
   84 F.3d 652 (9th Cir. 1996) ............................................................................. 1

*Cincinnati v. Discovery Network,*
   507 U.S. 410 (1993) ...................................................................................... 15

*Cold Front Logistics, LLC v. Auto-Owners (Mut.) Ins. Co.,*
   2025 WL 1908980 (W.D. Mo. July 10, 2025) ............................................... 9

*D.C. Elecs., Inc. v. Nartron Corp.,*
   511 F.2d 294 (6th Cir. 1975) ........................................................................... 1

*Davidson & Jones, Inc. v. New Hanover Cnty.*,
　41 N.C. App. 661, 255 S.E.2d 580 (1979) ............................................................ 25

*Florida Bar v. Went For It, Inc.*,
　515 U.S. 618 (1995) ............................................................................................... 15

*Foss v. Fed. Intermediate Credit Bank of St. Paul*,
　808 F.2d 657 (8th Cir. 1986) ................................................................................... 1

*Garrison v. Louisiana*,
　379 U.S. 64 (1964) ................................................................................................. 16

*Gertz v. Robert Welch, Inc.*,
　418 U.S. 323 (1974) ......................................................................................... 13, 15

*Griggs v. Provident Consumer Discount Co.*,
　459 U.S. 56 (1982) ................................................................................................... 1

*Herbert v. Lando*,
　441 U.S. 153 (1979) ............................................................................................... 13

*IBEW v. NLRB*,
　341 U.S. 694 (1951) ............................................................................................... 13

*Illinois ex rel. Madigan v. Telemarketing Associates, Inc.*,
　538 U.S. 600 (2003) ............................................................................................... 14

*K.C. 1986 Ltd. P'ship v. Reade Mfg.*,
　473 F.3d 1009 (8th Cir. 2007) ................................................................................. 1

*Keeton v. Hustler Magazine, Inc.*,
　465 U.S. 770 (1984) ............................................................................................... 15

*Marrese v. Am. Acad. of Orthopaedic Surgeons*,
　470 U.S. 373 (1985) ................................................................................................. 1

*Meardon v. Register*,
　994 F.3d 927 (8th Cir. 2021) ................................................................................. 22

*Meredith v. Medtronic, Inc.*,
　2019 WL 6330677 (S.D. Iowa Oct. 25, 2019) ........................................................ 8

*Midwest Home Distributor, Inc. v. Domco Indust. Ltd.*,
　585 N.W.2d 735 (Iowa 1998) ................................................................................ 19

*Mohsen v. Veridian Credit Union,*
   733 F. Supp. 3d 754 (N.D. Iowa 2024) .................................................................. 26

*Murphy v. Aurora Loan Servs., LLC,*
   699 F.3d 1027 (8th Cir. 2012) ................................................................................. 9

*New York Times Co. v. Sullivan,*
   376 U.S. 254 (1964) .............................................................................................. 14

*Ohralik v. Ohio State Bar Assn.,*
   436 U.S. 447 (1978) .............................................................................................. 15

*Peel v. Atty. Registration & Disciplinary Comm'n,*
   496 U.S. 91 (1990) ................................................................................................ 15

*Pitts v. Farm Bureau Life Ins. Co.,*
   818 N.W.2d 91 (Iowa 2012).............................................................................. 23, 24

*Rice v. Paladin Enters.,*
   128 F.3d 233 (4th Cir. 1997) ................................................................................. 13

*Safeguard Bus. Sys., Inc. v. Hoeffel,*
   907 F.2d 861 (8th Cir. 1990) ................................................................................... 1

*Streambend Props. II, LLC v. Ivy Tower Minneapolis, LLC,*
   781 F.3d 1003 (8th Cir. 2015) ................................................................................. 9

*Summerhill v. Terminix, Inc.,*
   637 F.3d 877 (8th Cir. 2011) .............................................................................. 9, 11

*Topchian v. JPMorgan Chase Bank, N.A.,*
   760 F.3d 843 (8th Cir. 2014) ................................................................................... 8

*United States v. Alvarez,*
   567 U.S. 709 (2012) .............................................................................................. 19

*U.S. ex rel. Raynor v. Nat'l Rural Utils. Co-op. Fin. Corp.,*
   690 F.3d 951 (8th Cir. 2012) ................................................................................... 9

*Van Sickle Const. Co. v. Wachovia Com. Mortg.,*
   783 N.W.2d 684 (Iowa 2010)................................................................................. 24

*Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,*
   425 U.S. 748 (1976) .............................................................................................. 15

*Wash. League for Increased Transparency & Ethics v. Fox News*,
   2021 WL 3910574 (Wash. Ct. App. Aug. 30, 2021).................................................................. 16

*Young ex rel. Young v. Rally Appraisal, L.L.C.*,
   928 N.W.2d 660, 2019 WL 1486608 (Iowa Ct. App. 2019)..................................................... 22

*Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*,
   471 U.S. 626 (1985) ............................................................................................................... 15

**Statutes**

28 U.S.C. § 1332 ........................................................................................................................... 2

28 U.S.C. § 1441 ........................................................................................................................... 2

28 U.S.C. § 1446 ........................................................................................................................... 2

**Rules**

Fed. R. App. P. 5(d)(2) .................................................................................................................. 1

Fed. R. Civ. P. 41(a)(1).................................................................................................................. 1

Fed. R. Civ. P. 54(b) ..................................................................................................................... 1

Fed R. Civ. P. 12(b)(6).............................................................................................................. 1, 3, 8

Fed R. Civ. P. 9(b) ................................................................................................................... 9, 11

**Other Authorities**

Restatement (Second) of Torts §§ 525-552 ................................................................................ 14

## I.    PRELIMINARY STATEMENT

Plaintiff, President Donald J. Trump ("President Trump" or "Plaintiff"), submits this Memorandum of Law in Opposition to the Motion to Dismiss the Revised Amended Complaint ("RAC") pursuant to Fed R. Civ. P. 12(b)(6) (the "Motion") filed by Defendants Des Moines Register and Tribune Company ("DMR") and Gannett Co., Inc. ("Gannett"). [Dkt. 95].[1] All arguments herein apply with equal force against and should be considered by this Court with respect to the Motion to Dismiss filed by Defendants J. Ann Selzer ("Selzer") and Selzer & Company ("S&C"). [Dkt. 94].

In summary, DMR and Gannett's First Amendment arguments are red herrings that are inapplicable to the well-pled allegations in President Trump's RAC [ECF 88], or in the alternative, are premature in the absence of any factual discovery. Furthermore, many of DMR and Gannett's arguments go to the sufficiency and weight of the evidence that will be adduced as the case moves forward, and not to the adequacy of Plaintiff's allegations of wrongdoing against Defendants, which are all assumed to be true at this stage. DMR and Gannett try to reframe and trivialize Plaintiff's well-pleaded consumer fraud, fraudulent misrepresentation, and negligent

---

[1] Plaintiff expressly maintains that he properly dismissed this case by notice under Rule 41(a)(1)(A)(i) on June 30, 2025. As the Supreme Court has held, "jurisdiction is transferred from a district court to a court of appeals upon the filing of a notice of appeal." *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982). In the interlocutory appeal context, however, jurisdiction remains in the district court until the court of appeals grants permission to appeal. *See Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 379 (1985); *Chappelle v. Beacon Commc'ns Corp.*, 84 F.3d 652, 886 (9th Cir. 1996) (citing Fed. R. App. P. 5(d)(2)) ("a notice of appeal for an interlocutory order is deemed to be filed upon the issuance of an order by a court of appeals permitting an appellant to bring an interlocutory appeal"). Thus, a district court retains authority to reconsider or modify interlocutory orders until permission to appeal is granted. Fed. R. Civ. P. 54(b); *K.C. 1986 Ltd. P'ship v. Reade Mfg.*, 473 F.3d 1009, 1017 (8th Cir. 2007). Because no petition was granted and no fee paid, the district court's jurisdiction remained intact, and Plaintiff exercised his absolute right to dismiss before any answer or motion for summary judgment was filed. *See* Fed. R. Civ. P. 41(a)(1)(A)(i); *Foss v. Fed. Intermediate Credit Bank of St. Paul*, 808 F.2d 657, 669 (8th Cir. 1986); *Safeguard Bus. Sys., Inc. v. Hoeffel*, 907 F.2d 861, 863 (8th Cir. 1990). As the Fifth Circuit explained, "Rule 41(a)(1) is the shortest and surest route to abort a complaint when it is applicable . . . . That document itself closes the file. *There is nothing the defendant can do to fan the ashes of that action into life and the court has no role to play.*" *Am. Cyanamid Co. v. McGhee*, 317 F.2d 295, 297 (5th Cir. 1963) (emphasis added); *see also D.C. Elecs., Inc. v. Nartron Corp.*, 511 F.2d 294, 298 (6th Cir. 1975).

misrepresentation claims as non-actionable "fraudulent news" grievances, while hiding behind a blanket First Amendment immunity defense created from whole cloth. DMR and Gannett's Memorandum of Law ("Def. Mem.") [Dkt. 95], p. 1. But no such blanket immunity exists. Accordingly, DMR and Gannett's Motion must be denied in its entirety.

## II.    BACKGROUND

### A. Procedural History

On December 16, 2024, President Trump commenced this action by filing a petition against Defendants Selzer, S&C, DMR, and Gannett in the Iowa District Court for Polk County. R. Doc. 1-1. The state court petition contained one claim: a count under the Iowa Consumer Fraud Act, Iowa Code Chapter 714H, including § 714H.3(1) and related provisions. On December 17, 2024, before any Defendant had been served, Gannett filed its Notice of Removal and associated documents pursuant to 28 U.S.C. §§ 1332, 1441, and 1446. R. Doc. 1. Gannett invoked the district court's diversity jurisdiction, asserting that "[t]here is complete diversity of citizenship between the parties" R. Doc. 1 at ¶ 4, and that "President Trump seeks a wide array of damages, including actual damages, statutory damages, and injunctive relief that would have a significant impact on Gannett and DMR's operations. The Notice of Removal asserted that the combined value of the claimed damages in this case would exceed $75,000, exclusive of costs and interest." *Id*. ¶ 10. While Gannett acknowledged the forum-defendant rule, it asserted that pre-service removal— typically referred to as "snap removal"—was a proper exception to the rule. *Id.*

On January 31, 2025, President Trump, U.S. Representative Mariannette Miller-Meeks, and Former Iowa State Senator Bradley Zaun filed their amended complaint against all Defendants. ECF 23. President Trump first obtained leave of the district court and consent of the Defendants to file and serve a first amended complaint ("FAC") with joined plaintiffs. ECF 20 at ¶¶ 1–2, ECF 22 at ¶¶ 1–2. Pursuant to the Court's order, "1. President Trump and any other parties

joined as plaintiffs may file an Amended Complaint on or before January 31, 2025; 2. If President Trump and any other parties joined as plaintiffs file an Amended Complaint, all Defendants will accept service of the Amended Complaint in accordance with the Federal Rules of Civil Procedure and waive any defenses or objections relating to service of process…" *Id.*

The FAC, like the state court petition, contained one count under the Iowa Consumer Fraud Act, but added two claims under Iowa common law for fraudulent misrepresentation and negligent misrepresentation. As explained in the FAC, Representative Miller-Meeks and Zaun are citizens of Iowa. FAC ¶¶ 21–22. Because Selzer, S&C, and DMR are also citizens of Iowa, there was no longer complete diversity of citizenship in the lawsuit. Then, on February 21, 2025, Plaintiffs moved to remand to state court due to the lack of diversity jurisdiction. ECF 30. That same day, Defendants filed their respective Motions to Dismiss pursuant to FED. R. CIV. P. 12(b)(6). ECF 33, 35.

On May 23, 2025, the Court entered an order, denying Plaintiffs' Motion for Remand, and further, directing President Trump to "to file a revised version of the Amended Complaint, ECF No. 23, omitting Bradley Zaun and Miller-Meeks as plaintiffs, and deleting any allegations included solely to support their claims." ECF 65. Pursuant to the Court's May 23 Order, President Trump filed the RAC against all Defendants on July 25, 2025. ECF 88-1.[2]

**B.  Facts Set Forth in President Trump's Revised Amended Complaint**

This action, which arises under the Iowa Consumer Fraud Act, Iowa Code Chapter 714H, including § 714H.3(1) and related provisions, as well as under Iowa common law, including

---

[2] In their Motion to Dismiss the RAC, Defendants incorrectly assert that the RAC "includes additional allegations and revisions in excess of the parameters of the Court's Order." Motion at 1. Contrary to Defendants' flimsy allegation, President Trump substantially complied with the Court's May 23 Order in good faith. Notably, by removing the Iowa Plaintiffs pursuant to the Court's order, the poll discussed herein *infra* relating to Representative Miller-Meeks was no longer directly actionable and rather became evidentiary in nature, together with three other congressional polls conducted during the relevant period; the revisions applied to the RAC are reflective of this change. President Trump respectively draws the Court's attention to the redlined version of the RAC (ECF 88-2), which speaks for itself.

fraudulent misrepresentation and negligent misrepresentation, relates to Defendants' deliberate publication of multiple manipulated and incorrect polls mere days before Election Day last year.

The first poll at issue was conducted by Selzer and S&C, and published online by DMR and Gannett in the *Des Moines Register* and other Gannett-owned outlets including nationally distributed *USA Today*, on November 2, 2024, and in print on November 3, 2024, relating to the presidential race between President Trump and former Vice President Kamala Harris ("Harris") (the "Harris Poll"). RAC ¶ 1. Contrary to reality and tortiously defying credulity, Defendants' Harris Poll, published three days before Election Day, purported to show Harris leading President Trump in Iowa by three points (47%-44%). *Id.* ¶ 2. The ensuing election results would reveal that this Poll was nothing more than a sham and intentionally misleading. Notably, President Trump won Iowa by *over thirteen* points (56%-42.7%). *Id*. ¶ 2. Before this astonishing *sixteen-point* polling miss, Selzer brazenly claimed: "It's hard for anybody to say they saw this coming . . . Harris has clearly leaped into a leading position." *Id*. However, as Selzer knew, there was a perfectly good reason nobody "saw this coming"—because a three-point lead for Harris in deep-red Iowa was not reality; it was election-manipulating fiction. *Id*.

As pled in the RAC, there is overwhelming evidence that the Harris Poll was not a statistical anomaly but instead was deliberately manipulated. *Id*. ¶¶ 68-69. As Manhattan Institute senior fellow James Pierson wrote, Selzer's "miss" was *beyond* extreme:

> The Selzer Poll, with a margin of error of 3.4, missed the real outcome by 16 points, or by as many as five standard deviations from the true result as revealed on election day. What are the odds of drawing such a sample by legitimate means? Answer: roughly one time in 3.5 million trials. In other words, given these odds, the results in the Iowa poll likely did not come about by "honest error."

Selzer's deceptive "miss" caused extensive harm:

> It is more likely that someone deliberately manipulated the sample so that it included too many Democrats, or simply made up the numbers as they came in for

> the purpose of giving confidence to Harris voters and worry for Trump supporters, or to bring national attention to a poll taken in a state not regarded as competitive. The poll did receive national attention and was widely discussed. Selzer appeared on television interviews to talk about the poll and its implications. If the goal was to promote the poll, then the gambit succeeded—at least until election day, when it was revealed to be ridiculously far off the mark.

*Id.* (quoting James Piereson, *Statistical questions about the Iowa poll,* THE NEW CRITERION (Nov. 12, 2024)), https://newcriterion.com/dispatch/statistical-questions-about-the-iowa-poll/).

Moreover, the Harris Poll was not only premised upon a statistical improbability, but it was also plagued by unprecedented and foreseeable security breaches.

First, President Trump won Iowa by over eight points and nearly ten points, respectively, in the 2020 and 2016 Presidential Elections. President Trump certainly could not have trailed Harris by three points in Iowa at any time in the 2024 cycle. RAC ¶ 3.

Second, Selzer's polling in the presidential race was completely disconnected from all other mainstream polling. Although Selzer had polled President Trump leading Joe Biden by eighteen points, she suddenly claimed after Harris supplanted Biden that President Trump's lead was only four points. *Id.* ¶¶ 45-47. Meanwhile*, every other* mainstream Iowa poll showed President Trump comfortably ahead, and by a significantly wider margin than Selzer presented. A poll conducted between September 27-28, 2024 by Cygnal showed President Trump ahead by seven points; a poll conducted between November 1-2, 2024 by Emerson College showed President Trump ahead by nine points; a poll conducted between November 2-3, 2024 by InsiderAdvantage showed President Trump ahead by seven points; a poll conducted between November 2-3, 2024 by SoCal Strategies showed President Trump ahead by seven points; and a second poll conducted between November 2-3, 2024 by SoCal Strategies showed President Trump ahead by eight points. *Id.* ¶ 48.

Third, even Harris's internal polling showed that she never led President Trump. *Id.* ¶ 49.

Fourth, in each of the highest-stakes races—President, Governor, and Senator—from 2016 to 2022, the Republican won in Iowa and did so by a convincing margin. *Id*. ¶ 50. A three-point lead by a Democrat candidate for President would have been remarkably out of line compared to election results in the prior four cycles. *Id*.

Fifth, other pollsters who frequently work in swing states, such as Quinnipiac University, did not even poll Iowa in 2024, assuming, correctly, that it was a lock for President Trump. When major news outlets reported on swing states, Iowa was never included. *Id*. ¶ 51.

Sixth, evidence of Defendants' brazen 2024 election interference was not limited to the Harris Poll. RAC ¶ 76. Also on November 2, 2024 and November 3, 2024, DMR and Gannett published another poll in the online and print versions of the Des Moines Register, which purported to show that incumbent Representative Miller-Meeks trailed by sixteen points (53%-37%) against Democrat challenger Christina Bohannan in the race for Iowa's 1st Congressional District; Representative Miller-Meeks ultimately won the 1st District by two-tenths of a point (50.1%-49.9%), with 206,955 votes to 206,156 for Bohannan. *Id*. Given that Representative Miller-Meeks defeated Bohannan by nearly seven points in 2022 (53.4%-46.6%), Selzer's projection that Bohannan led Miller-Meeks by sixteen points in the rematch constituted a *twenty-three-point swing* in Bohannan's favor—a statistical improbability and an absurd inference given the absence of any significant events or developments that might explain such a dramatic change. *Id*. ¶ 81. Even a poll from a few weeks earlier (Sept. 30 to Oct. 1, 2024) by the Democrat Party had Bohannan up only four points (50%-46%); a poll from the end of August by Normington, Petts & Associates *for the Bohannan Campaign* had showed the race tied at 47% each—Selzer's Congressional Poll was twelve points off from even the Democrats' optimistic projection; indeed, Iowa's 1st District is normally an R+3 seat, according to the Cook Political Report, as confirmed

by the fact that President Trump had won it in 2020 by three points, and Governor Kim Reynolds won it in 2018 by three points. *Id*. ¶¶ 82-85.   Defendants also falsely claimed (1) Democrat challenger Lanon Baccam had a seven-point lead over incumbent Republican Zach Nunn in Iowa's 3rd Congressional District, when Nunn prevailed by four points, *id*. ¶¶ 87-88; (2) Republican incumbent Ashley Hinson had a narrow three-point lead over Democrat challenger Sarah Corkery in Iowa's 2nd Congressional District, when Hinson ultimately won by fifteen points, *id*. ¶¶ 89-90; and (3) Republican incumbent Randy Feenstra had a sixteen-point lead over Democrat challenge Ryan Melton, when Feenstra ultimately won by thirty-four points, *id*. ¶¶ 90-91. The entire series of wildly erroneous Congressional polls shows not only that Defendants must have known their data was wrong, but that their attempt to deceive the public was systematic and widespread.

And, to top it all off, Defendants leaked the Harris Poll to Democrat operatives before publication. *Id*. ¶ 57. Selzer also leaked the Harris Poll to her nephew, an intern at Gallup. *Id*. ¶ 60. This was the only time Defendants breached their policy of secrecy with Selzer's polls. *Id*. ¶ 53.

The fabricated Harris Poll and Defendants' other misleading Congressional polls (the "Defendant Polls") had the foreseeable and intended effect of influencing voter behavior, demoralizing Republican supporters, and distorting media narratives in the final stretch before voting. *Id*. ¶¶ 34–42. Defendants, led by Selzer, fanned the flames even further by grabbing national headlines with a carefully orchestrated all-out media blitz. *Id*. ¶¶ 62-63.

President Trump was damaged by the Defendant Polls, in multiple respects. Specifically, President Trump sustained actual damages by having to expend extensive time and resources, including direct federal campaign expenditures, to mitigate and counteract the harms of the Defendants' conduct, when ultimately, his victory in the Iowa race was never truly in question. *Id*. ¶ 114.

Defendant Selzer ultimately retired in disgrace less than two weeks after the election, a tacit admission of her culpability. *Id*. ¶¶ 5, 64. The RAC, on its face, sufficiently sets forth President Trump's case for damages in the wake of Defendants' choice to weaponize polling as a tool for manipulating elections and securing increased profit. *Id*. ¶ 13.

## III.    LEGAL STANDARD

### A.    Rule 12(b)(6)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up); *accord Braden v. Wal-Mart Stores*, 588 F.3d 585, 594 (8th Cir. 2009). "The essential function of a complaint under the Federal Rules of Civil Procedure is to give the opposing party fair notice of the nature and basis or grounds for a claim, and a general indication of the type of litigation involved." *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 848 (8th Cir. 2014) (cleaned up). The Court must accept as true all factual allegations in the complaint, but not its legal conclusions. *Iqbal*, 556 U.S. at 678–79.

A plausible claim for relief "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678. A plaintiff must "nudge their claims across the line from conceivable to plausible, else their complaint must be dismissed." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (cleaned up). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (cleaned up). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Meredith v. Medtronic, Inc.*, No. 3:18-cv-127-RGE-HCA, 2019 WL 6330677, at *3 (S.D. Iowa Oct. 25, 2019) (providing a recitation of the standard on Fed. R. Civ. P. 12(b)(6) motions to dismiss).

### B. Rule 9(b)

Under Rule 9(b), to plead fraud with particularity, "the complaint must plead such facts as the time, place, and content of the defendant's false representations, as well as the details of the defendant's fraudulent acts, including when the acts occurred, who engaged in them, and what was obtained as a result." *U.S. ex rel. Raynor v. Nat'l Rural Utils. Co-op. Fin. Corp.*, 690 F.3d 951, 955 (8th Cir. 2012). Where multiple defendants are involved, the complaint must "inform each defendant of the nature of his alleged participation in the fraud," and "specify the time, place, and content of" each defendant's false representations. *Streambend Props. II, LLC v. Ivy Tower Minneapolis, LLC*, 781 F.3d 1003, 1013 (8th Cir. 2015). In short, the complaint must allege the "who, what, when, where, and how" of the alleged fraud. *Summerhill v. Terminix, Inc.*, 637 F.3d 877, 880 (8th Cir. 2011).

## IV. ARGUMENT

### A. The Heightened Pleading Standard Under Rule 9(b) Has Been Met

As a threshold matter, to the extent that Rule 9(b) is applicable to the case at bar, it is not relevant to President Trump's claim against Defendants for negligent misrepresentation. *See Cold Front Logistics, LLC v. Auto-Owners (Mut.) Ins. Co.*, No. 2:25-CV-04085-MDH, 2025 WL 1908980, at *3 (W.D. Mo. July 10, 2025) (citing *Murphy v. Aurora Loan Servs., LLC*, 699 F.3d 1027, 1031 (8th Cir. 2012)) ("the Eighth Circuit does not require district courts to apply Rule 9(b) to [negligent misrepresentation] claims"). Nevertheless, President Trump has satisfied any heightened pleading standards that may apply in the present case to the remaining claims alleged in the RAC. In fact, despite Defendants' claims to the contrary, the RAC satisfies the Rule 9(b) standard in full. Specifically, RAC alleges that Defendants Selzer and her company S&C created the Harris Poll and other polls relating to the congressional races, and then actually manipulated them. RAC ¶¶ 1–4, 45, 76–77, 87-93. It further alleges that DMR and Gannett purchased those

Defendant Polls for publication and used them to boost profits, e.g., by driving subscriptions and web traffic. *Id.* ¶¶ 18–19, 66. Selzer is alleged to have acted with knowledge of the falsity of the Defendant Polls, including to inflate Democratic support, and by altering her methodology to favor Harris and other Democratic candidates. *Id.* ¶¶ 66–74. DMR and Gannett are alleged to have knowingly disseminated those results despite their inaccuracy. *Id.* ¶¶ 1-2, 18–19, 54, 65, 104. These false representations—which Defendants disseminated for their audience to rely upon—are detailed at length in the RAC: the Harris Poll falsely reported that Harris was leading President Trump in Iowa by three points, when President Trump ultimately won by more than thirteen points. *Id.* Separately, the other polls regarding congressional races falsely portrayed the state of those races: Defendants falsely claimed that Democrat Bohannan led Representative Miller-Meeks by sixteen points, when Miller-Meeks won by 0.2%, *id.* ¶ 3; Defendants projected Democrat Baccam had a seven-point lead over Republican Nunn, when Nunn prevailed by four points, *id.* ¶¶ 87-88; Defendants projected Republican Hinson with a narrow three-point lead over Corkery where Hinson ultimately won by fifteen points, *id.* ¶¶ 89-90; and Defendants projected Republican Feenstra with a sixteen-point lead over Democrat Melton where Feenstra ultimately won by thirty-four points, *id.* ¶¶ 90-91. These representations were published on November 2 and 3, 2024—just three days before the Election—and were featured prominently in the DMR's print and online editions. *Id.* ¶¶ 1–3.

The RAC provides substantial detail as to why these representations were not merely inaccurate but fraudulent including that the polls contradicted every other major poll conducted at the time. RAC ¶ 48. Even Harris's internal polling never showed her leading. *Id.* ¶ 49. Selzer's own prior polling had shown Trump leading Biden by eighteen points—yet, suddenly and without

explanation, she claimed Trump's lead had reversed to a three-point deficit against Harris. *Id*. ¶¶ 2, 46.

Taken together, these allegations provide far more than the minimal detail required by Rule 9(b). President Trump has identified (1) the who—Selzer, S&C, DMR, Gannett; (2) the what—the false polling data presented in the Defendant Polls; (3) the when—November 2–3, 2024, (4) the where—published in DMR and elsewhere; and (5) the how—manipulated data, improper leaks, and financial motive. That is more than sufficient to meet the heightened pleading standards for fraud. *Summerhill*, 637 F.3d at 880 (8th Cir. 2011).

### B. President Trump's Claims Are Not Barred by the First Amendment

DMR and Gannett argue that "[t]his lawsuit is prohibited by the First Amendment." (Def. Mem. at 15). But, as discussed further *infra*, it is black letter law that misrepresentations in the commercial context are not protected under the First Amendment. President Trump alleges that DMR and Gannett published the Selzer-manufactured false Harris Poll, which she commoditized to Defendants' advantage, and to the detriment of President Trump and the consuming public—a classic consumer-protection violation. Defendants cannot immunize the fraud by conveying it through words, nor can they evade the law by peddling the fraud through legacy media. Defendants argue that the Defendant Polls were "careful, accurate, and objective reporting" that is being "bootstrapped within commercial fraud principles . . . ." *Id*. DMR and Gannett then offer a multi-page discussion framing the Defendant Polls as purely political speech (*Id*. at 15-18) and argue that Plaintiff's interpretation of the Iowa Consumer Fraud Act would fail strict scrutiny (*Id*. at 18-22). But they conveniently gloss over a critical point—this case has nothing to do with the government attempting to chill private speech. DMR and Gannett's references to a "general government power to punish alleged political falsehoods" is inapplicable here. (Def. Mem. at 18). Therefore, Plaintiff need not demonstrate that their interpretation of the Act is "necessary to serve

a compelling state interest and . . . is narrowly drawn to achieve that end." (Def. Mem. at 19 (citing *Burson v. Freeman*, 504 U.S. 191, 1998 (1992)).

Indeed, Plaintiff has not brought a claim involving government suppression of political speech. Plaintiff is a private party who was deceived and otherwise harmed in material ways by the profit-driven actions of DMR and Gannett and their accomplices, Selzer and S&C. Defendants intentionally (or at minimum, negligently) disseminated false polling data for increased profit and readership. As Selzer herself said: "*the polling industry is predicated on getting people to pay money for their products*." (RAC ¶ 66) (emphasis added). DMR and Gannett were selling a *product* to consumers—polls—not reporting the news. This is why Plaintiff's claims are justifiably pled as statutory consumer fraud, fraudulent misrepresentation, and negligent misrepresentation—not as a disagreement with a news story. Merely because false material (in this case the for-profit Defendant Polls) appeared in newspapers owned by DMR and Gannett does not transform that material into news. In fact, one does not *promote* the news. One *reports* the news. There is no allegation or indication in this case that the Defendant Polls, which were published by DMR and Gannett, were ever subjected to governmental suppression of any kind. No government actor is seeking to suppress DMR and Gannett's legitimate and unquestioned right to publish their newspapers and to include whatever bona fide news and opinion content they wish on the pages of the publications. No amount of reframing by DMR and Gannett can change the fact that this is not a case about government overreach or attack on speech; this is a case about private actors, including DMR and Gannett, who knowingly published false non-news content to unwitting consumers. Just as the business of Selzer and S&C is for-profit polling, the business of DMR and Gannett is selling newspapers and subscriptions for profit. *Id.* ¶¶ 18, 19, 66, 104. Selzer's sensationalized and fabricated Defendant Polls helped DMR and Gannett to do exactly that—sell

products and profit. Simply put, the Defendant Polls were *false* speech, and *commercial* speech at that. The Defendant Polls were, on their own, not news events in any sense of the word "news"; these Polls, like any other poll, were for-profit *products* that were *paid for* by DMR and Gannett, and created by Selzer and S&C in exchange for payment. And at no point in this case has government suppression of speech ever been an issue. This is a red herring dangled by DMR and Gannett. The issue all along has been, and remains, knowing dissemination of falsehoods for commercial purposes by Defendants who knew better than to pass off Polls indicating impossible outcomes as the products of a thorough and rigorous scientific polling process.

### 1.    The Defendant Polls are False Speech Not Immunized by the First Amendment

As an initial matter, the RAC pleads extensive facts which at minimum, give rise to an inference that the Defendant Polls were false. And, at the motion to dismiss stage, the question before the Court is not whether the Polls *were* false, but whether Plaintiff has *adequately pled* that the Polls were false, since Plaintiff's allegations must be treated as true. Setting aside the sufficiency of Plaintiff's pleadings, which as discussed at length *supra*, is easily established, Defendants' attempt to usurp the First Amendment for use as a shield over the dissemination of false information in commerce fails.   It has long been settled that "false statements are not immunized by the First Amendment right to freedom of speech." *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 743 (1983); s*ee also Herbert v. Lando*, 441 U.S. 153, 171 (1979) ("Spreading false information in and of itself carries no First Amendment credentials."); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974) ("there is no constitutional value in false statements of fact."). Moreover, the First Amendment equally fails to protect aiding, abetting, or committing a tort or other civil violation. *IBEW v. NLRB*, 341 U.S. 694, 705 (1951); *Rice v. Paladin Enters*., 128 F.3d 233, 267 (4th Cir. 1997). And, pertinent here, the First Amendment does not protect the

myriad conduct associated with fraudulent speech. *Illinois ex rel. Madigan v. Telemarketing Associates, Inc.*, 538 U.S. 600, 612 (2003) ("the First Amendment does not shield fraud").

There are many species of fraud: common law fraud, statutory types of fraud, and the torts of intentional misrepresentation and negligent misrepresentation (Restatement (Second) of Torts §§ 525-552). At issue here is Iowa statutory consumer fraud and fraudulent misrepresentation. False statements—whether they are circulated in printed form on the pages of a newspaper or by other means—are a species of fraud and do not enjoy immunity from tort liability when the speaker makes the statements with knowledge of falsity or reckless disregard for truth or falsity, as Plaintiff has more than sufficiently pleaded here.

In light of the context above, Defendants' characterization of Plaintiff's claims as a "frontal assault on the First Amendment" and a threat to "the principle that debate on public issues should be uninhibited, robust, and wide-open," Def. Mem. at 16 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)) is not only disingenuous, but improperly suggests that Plaintiff, who like Defendants is a private actor, must overcome a strict scrutiny analysis. This is not so. Rather, it is well-settled that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. Applying the correct standard articulated in *Ashcroft* to this motion, it is clear that Plaintiff has plausibly alleged his claims, and therefore, Defendants' motion to dismiss should be denied.

As alleged in detail in the RAC, Defendants disseminated the Defendant Polls to their numerous consumers—including Plaintiff—which were so utterly divorced from reality, so

statistically unsupportable, and so inconsistent with any objective data, in addition to becoming subjects to known security breaches, that it can reasonably be inferred that Defendants knew or should have known that the content of the polls was false. (RAC ¶¶ 1-3, 45-51, 53, 65, 76). Misconduct of this nature has nothing to do with the First Amendment and everything to do with spreading falsehoods to unsuspecting consumers for profit. For this reason alone, Plaintiff has already carried his burden in order to survive Defendants' Motion.

### 2. The Defendant Polls are Commercial Speech Not Warranting Any Heightened First Amendment Protection

"[C]ommercial speech [enjoys] a limited measure of protection, commensurate with its subordinate position on in the scale of First Amendment values,' and is subject to 'modes of regulation that might be impermissible in the realm of noncommercial expression.'" *Board of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 477 (1989) (quoting *Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447, 456 (1978)); *see also Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 620 (1995)."There is no longer any room to doubt that what has come to be known as 'commercial speech' is entitled to the protection of the First Amendment, albeit to protection somewhat less extensive than that afforded 'noncommercial speech.'" *Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*, 471 U.S. 626, 637 (1985). And, "much of the material in ordinary newspapers is commercial speech." *Cincinnati v. Discovery Network*, 507 U.S. 410, 423 (1993). With commercial speech, the government may in appropriate circumstances regulate both "inherently misleading" speech and even "potentially misleading" speech. *Peel v. Atty. Registration & Disciplinary Comm'n*, 496 U.S. 91, 110 (1990). Moreover, the Supreme Court articulated the guiding principle underpinning false speech: "There is 'no constitutional value in false statements of fact.'" *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 776 (1984) (quoting *Gertz*, 418 U.S. at 340). Thus, "untruthful speech" is not "protected for its own sake." *Virginia Bd. of Pharmacy v.*

*Virginia Citizens Consumer Council, Inc*., 425 U.S. 748, 771 (1976). In summary, "the knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection." *Garrison v. Louisiana*, 379 U.S. 64, 75 (1964).

Here, DMR and Gannett argue that the Defendant Polls were political speech. Def. Mem. at 16-18. But the Defendant Polls were commercial speech—and false speech at that. As set forth *supra*, Defendants were not reporting news. Selzer and S&C created the Defendant Polls, then DMR and Gannett promoted them together with Selzer and S&C, no different than the promotion of any other commercial product. Selzer's media blitz across numerous mainstream media outlets in the aftermath of the release of the Harris Poll, all with the blessing and help of DMR and Gannett, provides ample evidence of these commercial promotional efforts. RAC ¶¶ 70. For example, on Rachel Maddow's MSNBC television program, Selzer breathlessly declared of the Harris Poll: "I don't see how anybody would look at those numbers and the history in Iowa in the past eight to twelve years and think that these numbers could have been foretold." *Id*. ¶ 73. Selzer's numerous television and other media appearances were in the service of promoting not only her polling and her polling business, but also her benefactors DMR and Gannett. Merely because the Defendant Polls garnered news coverage does not mean the Polls themselves were news; the Polls were created for DMR and Gannett, with their full consent and knowledge, by Selzer's for-profit polling business, S&C, which, as Selzer admits "*is predicated on getting people to pay money for their products*." *Id*. ¶ 66 (emphasis added).

### 3.    DMR and Gannett's First Amendment Cases Are Distinguishable

DMR and Gannett's first amendment cases are distinguishable from the present case because the cases they cite involve reporting on actual news, not a product created by the media defendants themselves. DMR and Gannett provide a long explanation about *Wash. League for Increased Transparency & Ethics v. Fox News* in their brief. Def. Mem. 17-19 (*citing* 2021 WL

3910574, at *1). But this case involved grievances about the manner of reporting about COVID-19, one of the most substantial and legitimate news stories in recent history.

Additionally, Defendants' reliance on *United States v. Alvarez* (Def. Mem. at 17) to support invoking the First Amendment as a blanket shield for disseminating the fraudulent Defendant Polls is misplaced. There, the Court found that "respondent's statements were but a pathetic attempt to gain respect that eluded him. The statements do not seem to have been made to secure employment or financial benefits or admission to privileges." 567 U.S. 709, 714 (2012). In short, the respondent's alleged misdeed was essentially victimless. In contrast, as President Trump alleges in the instant case, "[b]ecause of Defendants' false, misleading, and deceptive conduct, President Trump has sustained actual damages by having to expend extensive time and resources, including direct federal campaign expenditures, to mitigate and counteract the harms of the Defendants' conduct." RAC ¶ 144.

In sum, none of the cases relied upon by DMR and Gannett relate to a product or service that any of the media outlets in question created for profit; instead, these cases relate either to impermissible restraints on legitimate news reporting, or to plainly protected expressive conduct lacking any element of fraud or falsity. Defendant Polls are not news reporting and the conduct as pled clearly sounds in fraud. Thus, DMR and Gannett's arguments fail.

### C.  President Trump's Claims are Sufficiently Pled

#### 1.  President Trump Properly Pled a Claim for Violation of The Iowa Consumer Fraud Act

DMR and Gannett's primary argument with respect to Plaintiff's claim for violation of the Iowa Consumer Fraud Act is that Plaintiff did not suffer damages. [ECF 95, pp. 22-25]. This is not true—Plaintiff adequately pled harm in support of his claim under the Iowa Consumer Fraud Act.

Plaintiff seeks redress for the significant harm he suffered not only as an ordinary consumer, but as a consumer with a dramatically heightened interest in the subject matter, since he was a candidate for public office that was directly impacted by the Defendant Polls, and suffered harm directly attributable to Defendants' choice to weaponize polling as a tool for manipulating elections and driving profits. RAC ¶¶ 13, 20, 34-43, 65, 114.

The Harris Poll falsely portrayed that Harris was leading Plaintiff President Trump in Iowa by 3 points, just days before the election, despite President Trump ultimately winning the state by 13%. *Id.* ¶¶ 1-2. This false representation created a misleading narrative of Democratic momentum leading into election day and harmed President Trump's reputation, his image, and his viability as a candidate. *Id.* ¶¶ 2, 13, 34-43, 79, 114. It was an issue he had to address publicly at a moment when he was tremendously strained for time and each minute of his day had a direct impact on his personal and political future. *Id.* ¶¶ 2, 9-10, 20, 112. The Harris Poll was intended to and did in fact dampen enthusiasm and turnout among Republican voters, impacting an extensive effort by President Trump to do the exact opposite.[3] *Id.* ¶¶ 34, 42, 79. As a politician, President Trump's individual reputation is very much interrelated and tied up in his professional reputation, and so the damage to him politically also hurt him individually, and vice versa. As alleged in the RAC, "[b]ecause of Defendants' false, misleading, and deceptive conduct, President Trump has sustained actual damages by having to expend extensive time and resources, including direct federal campaign expenditures, to mitigate and counteract the harms of the Defendants' conduct."

---

[3] *See e.g.,* Samantha J. DeRagon, Tracy Osborn, and Michael S. Lewis-Beck, *The 2024 Iowa Poll for President: A Cautionary Tale*, The Center for Politics (December 12, 2024), https://centerforpolitics.org/crystalball/the-2024-iowa-poll-for-president-a-cautionary-tale/ ("Besides receiving national news coverage, this poll had a significant impact on the expectations of Iowans themselves. Such dramatic public findings, which this Iowa Poll represents, can mislead voters and undermine trust in the polling enterprise itself.")

*Id*. ¶ 114. Finally, President Trump read the false poll in the *Des Moines Register* and was harmed as a deceived consumer of Defendants' product. *Id*. ¶¶ 13, 20, 112.

### 2. President Trump Properly Pled a Claim for Fraudulent Misrepresentation

The allegations detailed in the RAC provide sufficient support for President Trump's claim for fraudulent misrepresentation against Defendants. The elements of fraudulent misrepresentation are: (1) representation; (2) falsity; (3) materiality; (4) scienter; (5) intent to deceive; (6) justifiable reliance; and (7) resulting injury. *Midwest Home Distributor, Inc. v. Domco Indust. Ltd.*, 585 N.W.2d 735 (Iowa 1998). Each of the factors for fraudulent misrepresentation are plausibly and compellingly alleged with specificity in the RAC.

### a) Defendants Made Representations When They Published their Polls in the Des Moines Register

Defendants made express representations to consumers, including President Trump, in the most attention-grabbing manner possible. RAC ¶¶ 57, 60-62. The Defendant Polls were presented as authoritative, data-driven assessments of voter preferences. *Id*. ¶¶ 41-43, 70. Defendants promoted these Polls with headlines and editorial commentary endorsing their accuracy. *Id*. The foregoing conduct undeniably constitutes a representation under applicable Iowa law. *Midwest Home Distributor*, 585 N.W.2d at 735.

### b) Defendants' Representations Were False

The false nature of Defendants' representations in the Defendant Polls is clear. President Trump won Iowa by more than thirteen points, consistent with all available election data, electoral reality, and the findings of all mainstream polling other than Selzer, demonstrating that the Harris Poll—and the three-point deficit reported therein—was false information. RAC ¶ 2. As another example of the falsity of Defendants' representations in their polls, Representative Miller-Meeks won her race by a margin of 0.2%, a result that is irreconcilable with the sixteen-point deficit

reflected in the Congressional Poll. *Id*. ¶ 3. Defendants also projected Democrat Baccam had a seven-point lead over Republican Nunn, when Nunn prevailed by four points. *Id*. ¶¶ 87-88. They projected Republican Hinson with a narrow three-point lead where she ultimately won by fifteen points. *Id*. ¶¶ 89-90. And they projected Republican Feenstra with a sixteen-point lead where he ultimately won by thirty-four points. *Id*. ¶¶ 90-91. Thus, the results of the Polls were false.

c)   *The False Representations Made by Defendants Were Material*

The materiality of the false representations made by Defendants in the Defendant Polls as alleged in the RAC is undeniable. It is commonly known that election polling affects voter turnout and enthusiasm; for at least this reason, Defendants employed a deliberate strategy regarding the timing and manner of realizing the Defendant Polls, to maximize the damaging effect of their release on President Trump. RAC ¶¶ 34, 53, 57–48, 70). Notably, Selzer was known for her extraordinary influence over expectations for the results of Iowa and national elections. *Id*. ¶ 36. Political strategists and campaign advisors explicitly acknowledged that Selzer's polling shaped voter perception. *Id*. ¶¶ 37–38. The false polling data was released strategically just three days before the election, styled as a "leak," and employed the use of social media, all demonstrating a design to make the poll results go "viral" and be as impactful as possible. *Id*. ¶¶ 1-3, 57-58. The strategy was in fact effective, and the Harris Poll dominated national and international headlines in the days before the election, *Id*. ¶ 62, causing President Trump to expend valuable resources on an Iowa election race which he ultimately won by a considerable margin once the final polls were tallied.

d)   *Defendants Made the False Representations With Scienter*

As alleged throughout the RAC, Defendants knew that their polling results were implausible and contradicted by all reliable information available at the time. *Id*. ¶¶ 30, 48-52, 72. Statistical analysis conducted after the inaccuracy of the polls was exposed, indicates that the odds

of Selzer's 2024 polling errors occurring by chance were 1 in 3.5 million. *Id*. ¶ 68. This alone is certainly demonstrative of scienter sufficient to proceed past the motion to dismiss stage.

But the facts as pled show far more than just likelihood with respect to Defendants' scienter. Selzer has engaged in a growing pattern of polling errors which all favored Democrats in recent years. *Id*. ¶ 30. She inaccurately reported outcomes in 2018, 2020, and 2022 races—always in favor of Democratic candidates. *Id*. ¶¶ 30–32. This is a pattern of inaccuracy that a professional pollster like Selzer could not have plausibly failed to observe. It shows that Selzer—and Defendants generally—knew or should have known her polling process was broken and no longer yielding accurate results. This is important context, because when Selzer obtained such an unrealistic result in the Harris Poll and Congressional Poll—far beyond the scope of what could be considered reasonable—her choice to release the results despite her knowledge of her growing pattern of unreliability shows exactly the type of scienter required under Iowa law for a claim of fraudulent misrepresentation. Selzer's abrupt retirement from her career of polling within two weeks of the election lends further support to substantiate Defendants' scienter in making such false representations. *Id*. ¶¶ 5, 64.

*e)*    *Defendants Intended to Deceive With Their False Representations*

Defendants had an intent to deceive the public and improperly influence the elections when they published the false polling data in the *Des Moines Register*. As set forth in the RAC, the Harris Poll was prematurely leaked by Defendants to Democratic operatives in violation of Defendants' long-established confidentiality practices. *Id*. ¶ 57. For the same reasons explained above with respect to the scienter requirement, Selzer knew that the polling information was false. Despite this knowledge, Defendants engaged in an organized and concerted effort—which included a media blitz—to maximize the impact of the false and fraudulent poll information, to President Trump's detriment. *Id*. ¶¶ 70-73.

*f)      Plaintiff Justifiably Relied on Defendants' False Representations*

President Trump, like millions of other citizens, justifiably relied on the Defendant Polls during his 2024 Presidential Election campaign. Importantly, President Trump consumed (i.e. read) the Defendant Polls through the *Des Moines Register*. *Id*. ¶ 15. As a threshold issue, "[a]lthough Defendants argue reliance was clearly unjustified, the Iowa Supreme Court's approach appears to acknowledge the importance of permitting discovery and development of the record to assess the nuanced question of whether reliance is justified." *Meardon v. Register*, 994 F.3d 927, 939 (8th Cir. 2021). Thus, because President Trump plausibly allege[s] justifiable reliance as required to support claims of fraud," this Court should not "hold as a matter of law that [that] reliance is not justified" the case at bar. *Id*. (quotations omitted).

To the extent that this Court decides to consider the merits of Selzer Defendants' assertion that President Trump fails "to plead element (6), justifiable reliance," Motion at 19—it is non-persuasive. The Selzer Defendants argue that "[a] person may not justifiably rely on a professional representation if 'red flags' signal such reliance is unwarranted." Motion at 19 (citing *Young ex rel. Young v. Rally Appraisal, L.L.C.*, 928 N.W.2d 660, 2019 WL 1486608, at *4 (Iowa Ct. App. 2019)). However, the Eight Circuit has explicitly recognized that to meet his burden of demonstrating reliance on a defendant's false representations, a plaintiff must only demonstrate that he "utilized his opportunity to make a cursory examination or investigation." *Meardon*, 994 F.3d at 939. Here, President Trump read and relied on the election coverage at issue, and had every right to do so, given Defendants' once sterling reputation for providing insightful and accurate polling figures. A "cursory examination or investigation," *Id*., would reveal that the Defendant Polls were published in a manner that elicited trust from readers—including President Trump—due to Selzer's previous industry-wide reputation for accuracy, which the Selzer Defendants traded on. RAC ¶ 28. Selzer's polling for DMR and Gannett had long been thought of as the gold standard,

and thus, President Trump's reliance on the data presented in the false Defendant Polls was certainly justified in every sense of the word.

g)    *Plaintiff Was Injured as a Result of Defendants'*
      *Misrepresentations*

As detailed at length *supra,* President Trump was harmed as a direct result of Defendants' production and dissemination of the false Defendant Polls. To avoid redundancy, and in the interest of judicial efficiency, President Trump respectfully incorporates these arguments by reference and will not repeat them here.

In view of the foregoing, President Trump has sufficiently pled a plausible claim for fraudulent misrepresentation under Iowa law, and accordingly, Defendants' Motion should be dismissed.

### 3.    President Trump Properly Pled a Claim for Negligent Misrepresentation

"Iowa has adopted the definition of the tort of negligent misrepresentation found in the Restatement (Second) of Torts." *Bagelmann v. First Nat. Bank*, 823 N.W.2d 18, 30 (Iowa 2012) (citing *Pitts v. Farm Bureau Life Ins. Co.*, 818 N.W.2d 91, 111 (Iowa 2012). The elements include:

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

*Id*. The Supreme Court of Iowa has explicitly held that when it comes to negligent misrepresentation, "those liable are only those who supply information in an advisory capacity and are manifestly aware of how the information will be used and intend to supply it for that purpose." *Van Sickle Const. Co. v. Wachovia Com. Mortg.*, 783 N.W.2d 684, 691 (Iowa 2010) (cleaned up).

While the breakdown of the elements differs, essentially all the analysis with respect to Plaintiff having properly pled a claim for fraudulent misrepresentation applies to the claim for negligent misrepresentation, and for the sake of brevity, will not be repeated.

In addition, Plaintiff notes that Defendants were acting in their professional capacity when they prepared and published the Defendant Polls, and there can be no dispute that the facts as pled support that Defendants each had a pecuniary interest in the Polls. RAC ¶¶ 17–19, 66, 104. Specifically, Selzer and S&C prepared the Defendant Polls for DMR and Gannett to help DMR and Gannett sell newspapers and digital subscriptions and each Defendant was doing their job with the underlying goal of making money on the polling enterprise. *Id*. ¶¶ 18–19, 66, 104. Selzer has even admitted the financial incentive behind her work—"*[a]nd the polling industry is predicated on getting people to pay money for their products*." *Id*. ¶ 66. Defendants intended and succeeded in generating enormous buzz across the nation and around the world just days before a presidential election from their publication of the false poll data. *Id*. ¶¶ 62–63, 70–73. Under the circumstances, Defendants were exactly the type of entities that "supply information in an advisory capacity . . . [and] are in a position to weigh the use for the information against the magnitude and probability of the loss that might attend the use of the information if it is incorrect." *Van Sickle Const. Co. v. Wachovia Com. Mortg.*, 783 N.W.2d 684, 691 (Iowa 2010).

Further, the facts pled in Plaintiff's RAC also establish that, even assuming *arguendo* that Defendants can establish there was no intentional misconduct, there can be no doubt that their conduct was grossly negligent and breached a duty owed to Plaintiff.

First, the results of the Defendant Polls were so absurdly inaccurate that—while best explained by intentional conduct—are impossible to explain without at least negligent conduct in designing, executing, and analyzing the data from the Polls. *Id*. ¶¶ 2–3, 65, 69, 76. Selzer herself was unable to explain the inaccuracy of the Harris Poll or otherwise provide an explanation to the public—leaving no explanation other than intentional misconduct or negligence. *Id*. ¶¶ 65-66. Thus, the facts as pled establish that Defendants were at least negligent in preparing the Defendant Polls. *See, e.g. Burbach v. Radon Analytical Lab'ys*, 652 N.W.2d 135, 138 (Iowa 2002), *as amended on denial of reh'g* (Oct. 25, 2002) (explaining that the lower court erred in dismissing a negligent misrepresentation case where the Defendants had "knowledge that its report would be reviewed and potentially relied upon by a limited but foreseeable class of persons.").

Second, there are ample facts pled supporting Defendants' negligence in protecting the poll from leaking. First, as pled by Plaintiff, DMR had a "longstanding policy of secrecy" and there were likewise industry standards for protection of polling information, a policy they didn't adhere to in this case. RAC ¶¶ 53, 61. Selzer admitted she showed the poll to her nephew. *Id*. ¶ 60. She did this, despite knowing her nephew worked at a competing polling company, and that the information was highly valuable and sensitive. *Id.* Such conduct is a clear breach of even the lowest standards of care for protecting sensitive information. *Id. See, e.g. Davidson & Jones, Inc. v. New Hanover Cnty.*, 41 N.C. App. 661, 667, 255 S.E.2d 580, 584 (1979) (explaining that "a complete binding contract between the parties is not a prerequisite to a duty to use due care in one's actions . . . [and an] architect, in the performance of his contract with his employer, is required to exercise

the ability, skill, and care customarily used by architects upon such projects."); *see also Mohsen v. Veridian Credit Union*, 733 F. Supp. 3d 754, 763 (N.D. Iowa 2024) ("[A] party collecting private data from its customers has a duty to take reasonable measures to safeguard that data.").

Moreover, both the results of the Defendant Polls and the subsequent leak of the Harris Poll are the types of events that would not have occurred absent a failure to exercise ordinary care, and so the doctrine of *res ipsa loquitur* applies here to both forms of negligence. A *res ipsa* inference is appropriate where "(1) the injury is caused by an instrumentality under the exclusive control of the defendant, and (2) the occurrence is such as in the ordinary course of things would not happen if reasonable care had been used." *Brewster v. United States*, 542 N.W.2d 524, 529 (Iowa 1996). Here, Defendants alone possessed the polling data since they themselves collected, analyzed, and published this information. RAC ¶¶ 1, 18. In addition, the statistical odds of the error, 1 in 3.5 million, make the results of poll something that cannot be explained absent intentional conduct or negligence. *Id.* ¶ 76. Likewise, despite a thorough investigation into the matter after the fact, Defendants have not publicly suggested that there was any hack or other interference by third parties that could explain the leak of the Harris Poll absent negligence. *Id.* ¶¶ 65, 66. Thus, Plaintiff has adequately pled Defendants' negligent conduct, and in general, properly pled a claim for negligent misrepresentation.

## V.    CONCLUSION

For the foregoing reasons, the Court should deny DMR and Gannett's Motion in its entirety.

Date: August 25, 2025                      Respectfully Submitted,

By:

/s/ Edward Andrew Paltzik

Edward Andrew Paltzik (*pro hac vice*)
**TAYLOR DYKEMA PLLC**
925 E. 25th Street
Houston, Texas 77009
516-526-0341
edward@taylordykema.com

/s/ Alan R. Ostergren
ALAN R. OSTERGREN
Attorney at Law
Alan R. Ostergren, PC
500 East Court Avenue
Suite 420
Des Moines, Iowa 50309
(515) 297-0134
alan.ostergren@ostergrenlaw.com

*Counsel to Plaintiff President Donald J. Trump*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 25, 2025, I caused a true and correct copy of the foregoing Plaintiff's Memorandum of Law in Opposition to Defendants Des Moines Register and Tribune Company and Gannett Co.'s Motion to Dismiss the Revised Amended Complaint to be served on all counsel of record via the Court's CM/ECF system.


Dated: August 25, 2025                    /s/ Alan R. Ostergren
                                          Alan R. Ostergren