**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

PRESIDENT DONALD J. TRUMP, an individual,

    Plaintiff,

      v.

J. ANN SELZER, an individual, SELZER &
COMPANY, DES MOINES REGISTER AND
TRIBUNE COMPANY, and GANNETT CO.,
INC.,

    Defendants.

Case No.: 4:24-cv-00449-RGE-WPK

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS J. ANN SELZER AND SELZER & COMPANY'S
<u>MOTION TO DISMISS THE REVISED AMENDED COMPLAINT</u>**

## TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT .................................................................................... 1

II.   BACKGROUND ......................................................................................................... 2

  A.  Procedural History ........................................................................................... 2

  B.  Facts Set Forth in President Trump's Revised Amended Complaint ........................... 3

III.  LEGAL STANDARD ................................................................................................. 8

  A.  Rule 12(b)(6) ................................................................................................. 8

  B.  Rule 9(b) ...................................................................................................... 9

IV.  ARGUMENT ............................................................................................................. 9

  A.  The Heightened Pleading Standard Under Rule 9(b) Has Been Met ........................... 9

  B.  President Trump's Claims Are Not Barred by the First Amendment ....................... 11

      1.  The Defendant Polls are False Speech Not Immunized by the First
         Amendment .......................................................................................... 12

      2.  The Defendant Polls are Commercial Speech Not Warranting Any
         Heightened First Amendment Protection.................................................... 15

      3.  The Selzer Defendants' First Amendment Cases Are Distinguishable............... 16

  C.  President Trump's Claims are Sufficiently Pled ................................................. 20

      1.  President Trump Sufficiently Alleges Recoverable Damages ........................... 20

      2.  President Trump Properly Pled a Claim for Violation of The Iowa Consumer
         Fraud Act............................................................................................. 22

      3.  President Trump Properly Pled a Claim for Fraudulent Misrepresentation .... 23

         a)  Defendants Made Representations When They Published their Polls in the
           Des Moines Register ....................................................................... 23
         b)  Defendants' Representations Were False........................................... 23
         c)  The False Representations Made by Defendants Were Material.................... 24
         d)  Defendants Made the False Representations With Scienter ......................... 24
         e)  Defendants Intended to Deceive With Their False Representations................ 25
         f)  Plaintiff Justifiably Relied on Defendants' False Representations ................. 26
         g)  Plaintiff Was Injured as a Result of Defendants' Misrepresentations ............ 27

      4.  President Trump Properly Pled a Claim for Negligent Misrepresentation ....... 27

  D.  President Trump Has Alleged Facts and Claims Justifying Piercing the Corporate
     Veil and so Claims Against Selzer as an Individual Should Not Be Dismissed .......... 31

V.   CONCLUSION .......................................................................................................... 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Cyanamid Co. v. McGhee*,
   317 F.2d 295 (5th Cir. 1963) ................................................................................... 1

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................................. 8

*Bagelmann v. First Nat. Bank*,
   823 N.W.2d 18 (Iowa 2012) ............................................................................... 27

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................................. 8

*Bill Johnson's Restaurants, Inc.*,
   461 U.S. 731 (1983) ........................................................................................... 12

*Blackstone Realty LLC v. F.D.I.C.*,
   244 F.3d 193 (1st Cir. 2001) .............................................................................. 14

*Board of Trustees of State Univ. of N.Y. v. Fox*,
   492 U.S. 469 (1989) ........................................................................................... 15

*Braden v. Wal-Mart Stores*,
   588 F.3d 585 (8th Cir. 2009) ............................................................................... 8

*Brandt v. Weather Channel, Inc.*,
   42 F. Supp. 2d 1344 (S.D. Fla. 1999) ......................................................... 18, 19

*Brewster v. United States*,
   542 N.W.2d 524 (Iowa 1996) ............................................................................ 31

*Briggs Transp. Co. v. Starr Sales Co.*,
   262 N.W.2d 805 (Iowa 1978) ............................................................................ 31

*Burbach v. Radon Analytical*,
   652 N.W.2d 135 (Iowa 2002) ............................................................................ 30

*Chappelle v. Beacon Commc'ns Corp.*,
   84 F.3d 652 (9th Cir. 1996) ................................................................................. 1

*Cincinnati v. Discovery Network*,
   507 U.S. 410 (1993) ........................................................................................... 15

*Cold Front Logistics, LLC v. Auto-Owners (Mut.) Ins. Co.*,
  2025 WL 1908980 (W.D. Mo. July 10, 2025) ........................................................ 9

*D.C. Elecs., Inc. v. Nartron Corp.*,
  511 F.2d 294 (6th Cir. 1975) ............................................................................... 1

*Davidson & Jones, Inc. v. New Hanover Cnty.*,
  41 N.C. App. 661, 255 S.E.2d 580 (1979) .......................................................... 30

*Doe v. McKesson*,
  71 F.4th 278 (5th Cir. 2023) ............................................................................... 14

*Durnford v. MusclePharm Corp.*,
  907 F.3d 595 (9th Cir. 2018) ........................................................................ 14, 15

*Florida Bar v. Went For It, Inc.*,
  515 U.S. 618 (1995) ........................................................................................... 15

*Foss v. Fed. Intermediate Credit Bank of St. Paul*,
  808 F.2d 657 (8th Cir. 1986) ............................................................................... 1

*Frisby v. Schultz*,
  487 U.S. 474 (1988) ........................................................................................... 14

*Garrison v. Louisiana*,
  379 U.S. 64 (1964) ............................................................................................. 14

*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323 (1974) ...................................................................................... 12, 13

*Greatbatch v. Metropolitan Federal Bank*,
  534 N.W.2d 115 (Iowa App.1995) ....................................................................... 28

*Griggs v. Provident Consumer Discount Co.*,
  459 U.S. 56 (1982) ............................................................................................... 1

*Grosjean v. American Press Co.*,
  297 U.S. 233 (1936) ........................................................................................... 18

*Herbert v. Lando*,
  441 U.S. 153 (1979) ........................................................................................... 12

*Hollander v. CBS News*,
  2017 WL 1957485 (S.D.N.Y. May 10, 2017) ................................................. 17, 18

*IBEW v. NLRB*,
   341 U.S. 694 (1951) ................................................................................................ 13

*Illinois ex rel. Madigan v. Telemarketing Associates, Inc.*,
   538 U.S. 600 (2003) ................................................................................. 13, 14, 15

*K.C. 1986 Ltd. P'ship v. Reade Mfg.*,
   473 F.3d 1009 (8th Cir. 2007) ................................................................................ 1

*Keeton v. Hustler Magazine, Inc.*,
   465 U.S. 770 (1984) ................................................................................................ 13

*Marrese v. Am. Acad. of Orthopaedic Surgeons*,
   470 U.S. 373 (1985) ................................................................................................ 1

*Meardon v. Register*,
   994 F.3d 927 (8th Cir. 2021) ................................................................................. 26

*Meredith v. Medtronic, Inc.*,
   2019 WL 6330677 (S.D. Iowa Oct. 25, 2019) ...................................................... 8

*Midwest Home Distributor, Inc. v. Domco Indust. Ltd.*,
   585 N.W.2d 735 (Iowa 1998) ................................................................................ 23

*Mohsen v. Veridian Credit Union*,
   733 F. Supp. 3d 754 (N.D. Iowa 2024) ................................................................ 30

*Murphy v. Aurora Loan Servs., LLC*,
   699 F.3d 1027 (8th Cir. 2012) ................................................................................ 9

*Nat'l Inst. of Fam. & Life Advocs. v. Raoul*,
   685 F. Supp. 3d 688 (N.D. Ill. 2023) ................................................................... 17

*Ohralik v. Ohio State Bar Assn.*,
   436 U.S. 447 (1978) ................................................................................................ 15

*Peel v. Atty. Registration & Disciplinary Comm'n*,
   496 U.S. 91 (1990) ................................................................................................. 16

*Pitts v. Farm Bureau Life Ins. Co.*,
   818 N.W.2d 91 (Iowa 2012) ............................................................................ 27, 28

*Rice v. Paladin Enters.*,
   128 F.3d 233 (4th Cir. 1997) ................................................................................ 13

*Safeguard Bus. Sys., Inc. v. Hoeffel*,
　907 F.2d 861 (8th Cir. 1990) ..................................................................... 1

*State ex rel. Att'y Gen. of Iowa v. Autor*,
　991 N.W.2d 159 (Iowa 2023) .................................................................. 22

*State ex rel. Miller v. Hydro Mag, Ltd.*,
　436 N.W.2d 617 (Iowa 1989) .................................................................. 22

*State ex rel. Miller v. Pace*,
　677 N.W.2d 761 (Iowa 2004) .................................................................. 22

*Streambend Props. II, LLC v. Ivy Tower Minneapolis, LLC*,
　781 F.3d 1003 (8th Cir. 2015) ................................................................... 9

*Summerhill v. Terminix, Inc.*,
　637 F.3d 877 (8th Cir. 2011) ............................................................... 9, 11

*The Conveyor Co. v. Sunsource Tech. Servs.*,
　398 F. Supp. 2d 992 (N.D. Iowa 2005) ................................................... 28

*Topchian v. JPMorgan Chase Bank, N.A.*,
　760 F.3d 843 (8th Cir. 2014) ..................................................................... 8

*United States v. Alvarez*,
　567 U.S. 709 (2012) ................................................................................ 19

*U.S. ex rel. Raynor v. Nat'l Rural Utils. Co-op. Fin. Corp.*,
　690 F.3d 951 (8th Cir. 2012) ..................................................................... 9

*Van Sickle Const. Co. v. Wachovia Com. Mortg.*,
　783 N.W.2d 684 (Iowa 2010) ............................................................ 28, 29

*Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
　425 U.S. 748 (1976) ................................................................................ 13

*Wash. League for Increased Transparency & Ethics v. Fox News*,
　2021 WL 3910574 (Wash. Ct. App. Aug. 30, 2021) ......................... 17, 18

*Young ex rel. Young v. Rally Appraisal, L.L.C.*,
　928 N.W.2d 660, 2019 WL 1486608 (Iowa Ct. App. 2019) ................... 26

*Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*,
　471 U.S. 626 (1985) ................................................................................ 15

**Statutes**

28 U.S.C. § 1332 ................................................................................................................. 2

28 U.S.C. § 1441 ................................................................................................................. 2

28 U.S.C. § 1446 ................................................................................................................. 2

**Rules**

Fed. R. App. P. 5(d)(2) ...................................................................................................... 1

Fed. R. Civ. P. 41(a)(1) ...................................................................................................... 1

Fed. R. Civ. P. 54(b) .......................................................................................................... 1

Fed R. Civ. P. 12(b)(6) ................................................................................................ 1, 3, 8

Fed R. Civ. P. 9(b) ........................................................................................................ 9, 11

**Other Authorities**

SB 1909 .............................................................................................................................. 19

Restatement (Second) of Torts ........................................................................................... 27

## I.    PRELIMINARY STATEMENT

Plaintiff, President Donald J. Trump ("President Trump") submits this Memorandum of Law in Opposition to the Motion to Dismiss the Revised Amended Complaint ("RAC") filed pursuant to Fed R. Civ. P. 12(b)(6) (the "Motion") by Defendants J. Ann Selzer ("Selzer") and Selzer & Company ("S&C") (collectively the "Selzer Defendants") [ECF 94].[1] All arguments herein apply with equal force against and should be considered by this Court with respect to the Motion to Dismiss filed by the other Defendants, Des Moines Register and Tribune Company ("DMR") and Gannett Co., Inc. ("Gannett") [ECF 95].

In summary, the Selzer Defendants' First Amendment arguments are red herrings that are ultimately inapplicable to the well-pled allegations in President Trump's RAC [ECF 88], or in the alternative, are premature in the absence of any factual discovery. Furthermore, many of the Selzer Defendants' arguments go to the sufficiency and weight of the evidence that will be adduced as the case moves forward, and not to the adequacy of President Trump's allegations of wrongdoing against Defendants, which under Rule 12(b)(6), are all assumed to be true at this stage. The Selzer Defendants try to reframe and trivialize President Trump's well-pleaded consumer fraud, fraudulent misrepresentation, and negligent misrepresentation claims as non-actionable

---

[1] Plaintiff expressly maintains that he properly dismissed this case by notice under Rule 41(a)(1)(A)(i) on June 30, 2025. As the Supreme Court has held, "jurisdiction is transferred from a district court to a court of appeals upon the filing of a notice of appeal." *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982). In the interlocutory appeal context, however, jurisdiction remains in the district court until the court of appeals grants permission to appeal. *See Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 379 (1985); *Chappelle v. Beacon Commc'ns Corp.*, 84 F.3d 652, 886 (9th Cir. 1996) (citing Fed. R. App. P. 5(d)(2)) ("a notice of appeal for an interlocutory order is deemed to be filed upon the issuance of an order by a court of appeals permitting an appellant to bring an interlocutory appeal"). Thus, a district court retains authority to reconsider or modify interlocutory orders until permission to appeal is granted. Fed. R. Civ. P. 54(b); *K.C. 1986 Ltd. P'ship v. Reade Mfg.*, 473 F.3d 1009, 1017 (8th Cir. 2007). Because no petition was granted and no fee paid, the district court's jurisdiction remained intact, and Plaintiff exercised his absolute right to dismiss before any answer or motion for summary judgment was filed. *See* Fed. R. Civ. P. 41(a)(1)(A)(i); *Foss v. Fed. Intermediate Credit Bank of St. Paul*, 808 F.2d 657, 669 (8th Cir. 1986); *Safeguard Bus. Sys., Inc. v. Hoeffel*, 907 F.2d 861, 863 (8th Cir. 1990). "Rule 41(a)(1) is the shortest and surest route to abort a complaint when it is applicable . . . . That document itself closes the file. *There is nothing the defendant can do to fan the ashes of that action into life and the court has no role to play*." *Am. Cyanamid Co. v. McGhee*, 317 F.2d 295, 297 (5th Cir. 1963) (emphasis added); *see also D.C. Elecs., Inc. v. Nartron Corp.*, 511 F.2d 294, 298 (6th Cir. 1975).

"fraudulent news" grievances, while hiding behind a non-persuasive, blanket First Amendment immunity defense. But no such blanket immunity exists. Accordingly, the Selzer Defendants' Motion must be denied in its entirety.

## II.    BACKGROUND

### A.  Procedural History

On December 16, 2024, President Trump commenced this action by filing a petition against Defendants Selzer, S&C, DMR, and Gannett in the Iowa District Court for Polk County. R. Doc. 1-1. The state court petition contained one claim: a count under the Iowa Consumer Fraud Act, Iowa Code Chapter 714H, including § 714H.3(1) and related provisions. On December 17, 2024, before any Defendant had been served, Gannett filed its Notice of Removal and associated documents pursuant to 28 U.S.C. §§ 1332, 1441, and 1446. R. Doc. 1. Gannett invoked the district court's diversity jurisdiction, asserting that "[t]here is complete diversity of citizenship between the parties" R. Doc. 1 at ¶ 4, and that "President Trump seeks a wide array of damages, including actual damages, statutory damages, and injunctive relief that would have a significant impact on Gannett and DMR's operations. The Notice of Removal asserted that the combined value of the claimed damages in this case would exceed $75,000, exclusive of costs and interest." *Id.* ¶ 10. While Gannett acknowledged the forum-defendant rule, it asserted that pre-service removal— typically referred to as "snap removal"—was a proper exception to the rule. *Id.*

On January 31, 2025, President Trump, U.S. Representative Mariannette Miller-Meeks, and Former Iowa State Senator Bradley Zaun filed their amended complaint against all Defendants. ECF 23. President Trump first obtained leave of the district court and consent of the Defendants to file and serve a first amended complaint ("FAC") with joined plaintiffs. ECF 20 at ¶¶ 1–2, ECF 22 at ¶¶ 1–2. Pursuant to the Court's order, "1. President Trump and any other parties joined as plaintiffs may file an Amended Complaint on or before January 31, 2025; 2. If President

Trump and any other parties joined as plaintiffs file an Amended Complaint, all Defendants will accept service of the Amended Complaint in accordance with the Federal Rules of Civil Procedure and waive any defenses or objections relating to service of process…" *Id*.

The FAC, like the state court petition, contained one count under the Iowa Consumer Fraud Act, but added two claims under Iowa common law for fraudulent misrepresentation and negligent misrepresentation. As explained in the FAC, Representative Miller-Meeks and Zaun are citizens of Iowa. FAC ¶¶ 21–22. Because Selzer, S&C, and DMR are also citizens of Iowa, there was no longer complete diversity of citizenship in the lawsuit. Then, on February 21, 2025, Plaintiffs moved to remand to state court due to the lack of diversity jurisdiction. ECF 30. That same day, Defendants filed their respective Motions to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6). ECF 33, 35.

On May 23, 2025, the Court entered an order, denying Plaintiffs' Motion for Remand, and further, directing President Trump to "to file a revised version of the Amended Complaint, ECF No. 23, omitting Bradley Zaun and Miller-Meeks as plaintiffs, and deleting any allegations included solely to support their claims." ECF 65. Pursuant to the Court's May 23 Order, President Trump filed the RAC against all Defendants on July 25, 2025. ECF 88-1.[2]

**B. Facts Set Forth in President Trump's Revised Amended Complaint**

This action, which arises under the Iowa Consumer Fraud Act, Iowa Code Chapter 714H, including § 714H.3(1) and related provisions, as well as under Iowa common law, including

---

[2] In their Motion to Dismiss the RAC, Defendants incorrectly assert that the RAC "includes additional allegations and revisions in excess of the parameters of the Court's Order." Motion at 1. Contrary to Defendants' flimsy allegation, President Trump substantially complied with the Court's May 23 Order in good faith. Notably, by removing the Iowa Plaintiffs pursuant to the court's order, the poll discussed herein *infra* relating to Representative Miller-Meeks was no longer directly actionable and rather became evidentiary in nature, together with three other congressional polls conducted during the relevant period; the revisions applied to the RAC are reflective of this change. President Trump respectively draws the Court's attention to the redlined version of the RAC (ECF 88-2), which speaks for itself.

fraudulent misrepresentation and negligent misrepresentation, relates to Defendants' deliberate publication of multiple manipulated and incorrect polls mere days before Election Day last year.

The first poll at issue was conducted by Selzer and S&C, and published online by DMR and Gannett in the *Des Moines Register* and other Gannett-owned outlets including nationally distributed *USA Today*, on November 2, 2024, and in print on November 3, 2024, relating to the Presidential race between President Trump and former Vice President Kamala Harris ("Harris") (the "Harris Poll"). RAC ¶ 1. Contrary to reality and tortiously defying credulity, Defendants' Harris Poll, published three days before Election Day, purported to show Harris leading President Trump in Iowa by three points (47%-44%). *Id.* ¶ 2. The ensuing election results would reveal that this Poll was nothing more than a sham and intentionally misleading. Notably, President Trump won Iowa by *over thirteen* points (56%-42.7%). *Id*. ¶ 2. Before this astonishing *sixteen-point* polling miss, Selzer brazenly claimed: "It's hard for anybody to say they saw this coming . . . Harris has clearly leaped into a leading position." *Id*. However, as Selzer knew, there was a perfectly good reason nobody "saw this coming"—because a three-point lead for Harris in deep-red Iowa was not reality; it was election-manipulating fiction. *Id*.

As pled in the RAC, there is overwhelming evidence that the Harris Poll was not a statistical anomaly but instead was deliberately manipulated. *Id*. ¶¶ 68-69. As Manhattan Institute senior fellow James Pierson wrote, Selzer's "miss" was *beyond* extreme:

> The Selzer Poll, with a margin of error of 3.4, missed the real outcome by 16 points, or by as many as five standard deviations from the true result as revealed on election day. What are the odds of drawing such a sample by legitimate means? Answer: roughly one time in 3.5 million trials. In other words, given these odds, the results in the Iowa poll likely did not come about by "honest error."

Selzer's deceptive "miss" caused extensive harm:

> It is more likely that someone deliberately manipulated the sample so that it included too many Democrats, or simply made up the numbers as they came in for

the purpose of giving confidence to Harris voters and worry for Trump supporters, or to bring national attention to a poll taken in a state not regarded as competitive. The poll did receive national attention and was widely discussed. Selzer appeared on television interviews to talk about the poll and its implications. If the goal was to promote the poll, then the gambit succeeded—at least until election day, when it was revealed to be ridiculously far off the mark.

*Id.* (quoting James Piereson, *Statistical questions about the Iowa poll,* THE NEW CRITERION (Nov. 12, 2024)), https://newcriterion.com/dispatch/statistical-questions-about-the-iowa-poll/).

Moreover, the Harris Poll was not only premised upon a statistical improbability, but it was also plagued by unprecedented and foreseeable security breaches.

First, President Trump won Iowa by over eight points and nearly ten points, respectively, in the 2020 and 2016 Presidential Elections. President Trump certainly could not have trailed Harris by three points in Iowa at any time in the 2024 cycle. RAC ¶ 3.

Second, Selzer's polling in the Presidential race was completely disconnected from all other mainstream polling. Although Selzer had polled President Trump leading Joe Biden by eighteen points, she suddenly claimed after Harris supplanted Biden that President Trump's lead was only four points. *Id.* ¶¶ 45-47. Meanwhile*, every other* mainstream Iowa poll showed President Trump comfortably ahead, and by a significantly wider margin than Selzer presented. A poll conducted between September 27-28, 2024 by Cygnal showed President Trump ahead by seven points; a poll conducted between November 1-2, 2024 by Emerson College showed President Trump ahead by nine points; a poll conducted between November 2-3, 2024 by InsiderAdvantage showed President Trump ahead by seven points; a poll conducted between November 2-3, 2024 by SoCal Strategies showed President Trump ahead by seven points; and a second poll conducted between November 2-3, 2024 by SoCal Strategies showed President Trump ahead by eight points. *Id.* ¶ 48.

Third, even Harris's internal polling showed that she never led President Trump. *Id.* ¶ 49.

Fourth, in each of the highest-stakes races—President, Governor, and Senator—from 2016 to 2022, the Republican won in Iowa and did so by a convincing margin. *Id.* ¶ 50. A three-point lead by a Democrat candidate for President would have been remarkably out of line compared to election results in the prior four cycles. *Id.*

Fifth, other pollsters who frequently work in swing states, such as Quinnipiac University, did not even poll Iowa in 2024, assuming, correctly, that it was a lock for President Trump. When major news outlets reported on swing states, Iowa was never included. *Id.* ¶ 51.

Sixth, evidence of Defendants' brazen 2024 election interference was not limited to the Harris Poll. RAC ¶ 76. Also on November 2, 2024 and November 3, 2024, DMR and Gannett published another poll in the online and print versions of the *Des Moines Register*, which purported to show that incumbent Representative Miller-Meeks trailed by sixteen points (53%-37%) against Democrat challenger Christina Bohannan in the race for Iowa's 1st Congressional District; Representative Miller-Meeks ultimately won the 1st District by two-tenths of a point (50.1%-49.9%), with 206,955 votes to 206,156 for Bohannan. *Id.* Given that Representative Miller-Meeks defeated Bohannan by nearly seven points in 2022 (53.4%-46.6%), Selzer's projection that Bohannan led Miller-Meeks by sixteen points in the rematch constituted a *twenty-three-point swing* in Bohannan's favor—a statistical improbability and an absurd inference given the absence of any significant events or developments that might explain such a dramatic change. *Id.* ¶ 81. Even a poll from a few weeks earlier (Sept. 30 to Oct. 1, 2024) by the Democrat Party had Bohannan up only four points (50%-46%); a poll from the end of August by Normington, Petts & Associates *for the Bohannan Campaign* had showed the race tied at 47% each—Selzer's Congressional Poll was twelve points off from even the Democrats' optimistic projection; indeed, Iowa's 1st District is normally an R+3 seat, according to the Cook Political Report, as confirmed

by the fact that President Trump had won it in 2020 by three points, and Governor Kim Reynolds won it in 2018 by three points. *Id*. ¶¶ 82-85. Defendants also falsely claimed (1) Democrat challenger Lanon Baccam had a seven-point lead over incumbent Republican Zach Nunn in Iowa's 3rd Congressional District, when Nunn prevailed by four points, *id*. ¶¶ 87-88; (2) Republican incumbent Ashley Hinson had a narrow three-point lead over Democrat challenger Sarah Corkery in Iowa's 2nd Congressional District, when Hinson ultimately won by fifteen points, *id*. ¶¶ 89-90; and (3) Republican incumbent Randy Feenstra had a sixteen-point lead over Democrat challenge Ryan Melton, when Feenstra ultimately won by thirty-four points, *id*. ¶¶ 90-91. The entire series of wildly erroneous Congressional polls shows not only that Defendants must have known their data was wrong, but that their attempt to deceive the public was systematic and widespread.

And, to top it all off, Defendants leaked the Harris Poll to Democrat operatives before publication. *Id*. ¶ 57. Selzer also leaked the Harris Poll to her nephew, an intern at Gallup. *Id*. ¶ 60. This was the only time Defendants breached their policy of secrecy with Selzer's polls. *Id*. ¶ 53.

The fabricated Harris Poll and Defendants' other misleading Congressional polls (the "Defendant Polls") had the foreseeable and intended effect of influencing voter behavior, demoralizing Republican supporters, and distorting media narratives in the final stretch before voting. *Id*. ¶¶ 34–42. Defendants, led by Selzer, fanned the flames even further by grabbing national headlines with a carefully orchestrated all-out media blitz. *Id*. ¶¶ 62-63.

President Trump was damaged by the Defendant Polls, in multiple respects. Specifically, President Trump sustained actual damages by having to expend extensive time and resources, including direct federal campaign expenditures, to mitigate and counteract the harms of the Defendants' conduct, when ultimately, his victory in the Iowa race was never truly in question. *Id*. ¶ 114.

Defendant Selzer ultimately retired in disgrace less than two weeks after the election, a tacit admission of her culpability. *Id*. ¶¶ 5, 64. The RAC, on its face, sufficiently sets forth President Trump's case for damages in the wake of Defendants' choice to weaponize polling as a tool for manipulating elections and securing increased profit. *Id*. ¶ 13.

## III.    LEGAL STANDARD

### A.  Rule 12(b)(6)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up); *accord Braden v. Wal-Mart Stores*, 588 F.3d 585, 594 (8th Cir. 2009). "The essential function of a complaint under the Federal Rules of Civil Procedure is to give the opposing party fair notice of the nature and basis or grounds for a claim, and a general indication of the type of litigation involved." *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 848 (8th Cir. 2014) (cleaned up). The Court must accept as true all factual allegations in the complaint, but not its legal conclusions. *Iqbal*, 556 U.S. at 678–79.

A plausible claim for relief "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678. A plaintiff must "nudge their claims across the line from conceivable to plausible, else their complaint must be dismissed." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (cleaned up). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (cleaned up). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Meredith v. Medtronic, Inc.*, No. 3:18-cv-127-RGE-HCA, 2019 WL 6330677, at *3 (S.D. Iowa Oct. 25, 2019) (providing a recitation of the standard on Fed. R. Civ. P. 12(b)(6) motions to dismiss).

### B. Rule 9(b)

Under Rule 9(b), to plead fraud with particularity, "the complaint must plead such facts as the time, place, and content of the defendant's false representations, as well as the details of the defendant's fraudulent acts, including when the acts occurred, who engaged in them, and what was obtained as a result." *U.S. ex rel. Raynor v. Nat'l Rural Utils. Co-op. Fin. Corp.*, 690 F.3d 951, 955 (8th Cir. 2012). Where multiple defendants are involved, the complaint must "inform each defendant of the nature of his alleged participation in the fraud," and "specify the time, place, and content of" each defendant's false representations. *Streambend Props. II, LLC v. Ivy Tower Minneapolis, LLC*, 781 F.3d 1003, 1013 (8th Cir. 2015). In short, the complaint must allege the "who, what, when, where, and how" of the alleged fraud. *Summerhill v. Terminix, Inc.*, 637 F.3d 877, 880 (8th Cir. 2011).

## IV.    ARGUMENT

### A. The Heightened Pleading Standard Under Rule 9(b) Has Been Met

As a threshold matter, to the extent that Rule 9(b) is applicable to the case at bar, it is not relevant to President Trump's claim against Defendants for negligent misrepresentation. *See Cold Front Logistics, LLC v. Auto-Owners (Mut.) Ins. Co.*, No. 2:25-CV-04085-MDH, 2025 WL 1908980, at *3 (W.D. Mo. July 10, 2025) (citing *Murphy v. Aurora Loan Servs., LLC*, 699 F.3d 1027, 1031 (8th Cir. 2012)) ("the Eighth Circuit does not require district courts to apply Rule 9(b) to [negligent misrepresentation] claims"). Nevertheless, President Trump has satisfied any heightened pleading standards that may apply in the present case to the remaining claims alleged in the RAC. In fact, despite Defendants' claims to the contrary, the RAC satisfies the Rule 9(b) standard in full. Specifically, RAC alleges that Selzer and her company S&C created the Harris Poll and other polls relating to the congressional races, and then actually manipulated them. RAC

¶¶ 1–4, 45, 76–77). It further alleges that DMR and Gannett purchased those Defendant Polls for publication and used them to boost profits, e.g., by driving subscriptions and web traffic. *Id*. ¶¶ 17–19, 66. Selzer is alleged to have acted with knowledge of the falsity of the Defendant Polls, including to inflate Democratic support, and by altering her methodology to favor Harris and other Democratic candidates. *Id*. ¶¶ 68–69. DMR and Gannett are alleged to have knowingly disseminated those results despite their inaccuracy. *Id*. ¶¶ 1, 18–19, 54. These false representations—which Defendants disseminated for their audience to rely upon—are detailed at length in the RAC: the Harris Poll falsely reported that Harris was leading President Trump in Iowa by three points, when President Trump ultimately won by more than thirteen points. *Id*. ¶ 2. Separately, the other polls regarding congressional races falsely portrayed the state of those races: Defendants falsely claimed that Democrat Bohannan led Representative Miller-Meeks by sixteen points, when Miller-Meeks won by 0.2%, *id*. ¶ 3; Defendants projected Democrat Baccam had a seven-point lead over Republican Nunn, when Nunn prevailed by four points, *id*. ¶¶ 87-88; Defendants projected Republican Hinson with a narrow three-point lead over Corkery where Hinson ultimately won by fifteen points, *id*. ¶¶ 89-90; and Defendants projected Republican Feenstra with a sixteen-point lead over Democrat Melton where Feenstra ultimately won by thirty-four points, *id*. ¶¶ 90-91. These representations were published on November 2 and 3, 2024—just three days before the Election—and were featured prominently in the DMR's print and online editions. *Id*. ¶¶ 1–3.

The RAC provides substantial detail as to why these representations were not merely inaccurate but fraudulent including that the polls contradicted every other major poll conducted at the time. RAC ¶ 48. Even Harris's internal polling never showed her leading. *Id*. ¶ 49. Selzer's own prior polling had shown Trump leading Biden by eighteen points—yet, suddenly and without

explanation, she claimed Trump's lead had reversed to a three-point deficit against Harris. *Id*. ¶¶ 2, 46.

Taken together, these allegations provide far more than the minimal detail required by Rule 9(b). President Trump has identified (1) the who—Selzer, S&C, DMR, Gannett; (2) the what—the false polling data presented in the Defendant Polls; (3) the when—November 2–3, 2024, (4) the where—published in DMR and elsewhere; and (5) the how—manipulated data, improper leaks, and financial motive. That is more than sufficient to meet the heightened pleading standards for fraud. *Summerhill*, 637 F.3d at 880 (8th Cir. 2011).

### B. President Trump's Claims Are Not Barred by the First Amendment

Selzer and S&C argue that President Trump's "claims are barred by the First Amendment," purportedly because "there is no such thing as a claim for 'fraudulent news.'" Motion at 1. But, as discussed further *infra,* it is black letter law that misrepresentations in the commercial context are not protected under the First Amendment.

President Trump alleges that Seltzer manufactured the false Harris Poll, which she commoditized to her advantage, and to the detriment of President Trump and the consuming public—a classic consumer-protection violation. Defendants cannot immunize the fraud by conveying it through words, nor can they evade the law by peddling the fraud through legacy media. In reality, it is these Defendants who fabricate a "cause of action" for an imaginary tort of "fraudulent news," when in fact, President Trump has not brought a claim for "fraudulent news" or for that matter, *any claim* involving news—Defendants were not engaged in any news reporting. Rather, Defendants intentionally (or at minimum, negligently) disseminated false polling data for increased profit and readership.  As Selzer herself said: "*And the polling industry is predicated on getting people to pay money for their products*." RAC ¶ 66 (emphasis added). Defendants were selling a *product* to consumers—polls—not reporting the news. This is why President Trump's

claims are justifiably pled as statutory consumer fraud, fraudulent misrepresentation, and negligent misrepresentation—not as a disagreement with a news story. Merely because false material (in this case the for-profit Defendant Polls) appeared in a newspaper does not transform that material into news. In fact, one does not *promote* the news. One *reports* the news. Selzer did not engage in reporting—she went on a whirlwind promotional tour across numerous mainstream media outlets to advertise and hype the Defendant Polls. *Id*. ¶¶ 62, 70-73. Her business, and the business of S&C, is for-profit polling, and the business of DMR and Gannett is selling newspapers and subscriptions for profit. *Id*. ¶¶ 17-18, 104. Selzer's sensationalized and fabricated Defendant Polls helped Defendants do exactly that—sell products and profit. Simply put, the Defendant Polls were *false* speech, and *commercial* speech at that. The Defendant Polls were, on their own, not news events in any sense of the word "news"; these Polls, like any other poll, were for-profit *products* that were paid for by DMR and Gannett, and *created* by Selzer and S&C in exchange for payment.

### 1.    The Defendant Polls are False Speech Not Immunized by the First Amendment

As an initial matter, the RAC pleads extensive facts that at minimum, give rise to an inference that the Defendant Polls were false.  And, at the motion to dismiss stage, the issue is not whether the Defendant Polls *were* false, but whether President Trump has *pled* that the Polls were false, since a plaintiff's allegations must be treated as true.

It has long been settled that "false statements are not immunized by the First Amendment right to freedom of speech." *Bill Johnson's Restaurants, Inc.*, 461 U.S. 731, 743 (1983); s*ee also Herbert v. Lando*, 441 U.S. 153, 171 (1979) ("Spreading false information in and of itself carries no First Amendment credentials."); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974) ("there is no constitutional value in false statements of fact."). Moreover, it is equally well settled that the First Amendment does not protect aiding, abetting, or committing a tort or other civil violation.

*See IBEW v. NLRB*, 341 U.S. 694, 705 (1951); *see also Rice v. Paladin Enters.*, 128 F.3d 233, 248 (4th Cir. 1997) ("we are confident that the First Amendment poses no bar to the imposition of civil (or criminal) liability for speech acts which the plaintiff (or the prosecution) can establish were undertaken with specific, if not criminal, intent." And, pertinent here, the First Amendment does not protect the myriad conduct associated with fraudulent speech. *Illinois ex rel. Madigan v. Telemarketing Associates, Inc.*, 538 U.S. 600, 612 (2003) ("the First Amendment does not shield fraud").

Among the many species of fraud, false statements—whether on the pages of a newspaper or elsewhere—do not enjoy immunity from tort liability when the speaker makes the statements with knowledge of falsity or reckless disregard for truth or falsity, as President Trump has more than sufficiently pleaded in the case at bar. As alleged in the RAC, Defendants disseminated to President Trump and other consumers multiple polls—including the Defendant Polls—that were so utterly divorced from reality, so statistically unsupportable, and so inconsistent with any objective data, and on top of that, subject to unprecedented security breaches, that it can reasonably be inferred that Defendants knew, or at a minimum, should have known that the content of the polls was false. *See* RAC ¶¶ 52-53, 57-60, 65, 68-69, 93). Misconduct of this nature has nothing to do with the First Amendment and everything to do with selling falsehoods to unsuspecting consumers for profit.

The Supreme Court has articulated the ultimate guiding principle underpinning false speech: "[t]here is 'no constitutional value in false statements of fact.'" *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 776 (1984) (quoting *Gertz*, 418 U.S. at 340). Thus, "untruthful speech" is not "protected for its own sake." *Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 (1976). In summary, "the knowingly false statement

and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection." *Garrison v. Louisiana*, 379 U.S. 64, 75 (1964).

"An affirmative defense is grounds for dismissal at the pleading stage only if the plaintiff pleads itself out of court—that is, admits all the ingredients of an impenetrable defense." *Durnford v. MusclePharm Corp.*, 907 F.3d 595, 603 n.8 (9th Cir. 2018). The complaint must "leave no doubt" that the plaintiff's action is barred by the asserted defense. *Blackstone Realty LLC v. F.D.I.C.*, 244 F.3d 193, 197 (1st Cir. 2001). But because a First Amendment defense must be assessed "action-by-action" and "defendant-by-defendant" it cannot be a categorical bar to suit. *Doe v. McKesson*, 71 F.4th 278, 292 (5th Cir. 2023) (reversing dismissal of negligence claims on First Amendment grounds against protest leader by police officer injured in protest related violence). Taken to its logical conclusion, Defendants' assertion of a First Amendment defense in a motion to dismiss could defeat any tort claim so long as a spoken word or document was involved. But "even protected speech is not equally permissible in all places and at all times." *Frisby v. Schultz*, 487 U.S. 474, 479 (1988).

Consider *Illinois, ex rel. Madigan v. Telemarketing Associates, Inc.*, 538 U.S. 600 (2003). The Illinois Attorney General brought state law fraud claims against purported fundraisers for charities where the fundraisers retained 85% of the funds collected. *Id.* at 607-08. The fundraisers moved to dismiss the fraud claims on First Amendment grounds. *Id.* at 609. The state courts agreed. But the U.S. Supreme Court reversed. While "[t]he First Amendment protects the right to engage in charitable solicitation…the First Amendment does not shield fraud." *Id.* at 611-12. "Like other forms of public deception, fraudulent charitable solicitation is unprotected speech." *Id.* at 612.

While the Court's earlier cases had struck down state laws that prohibited excessive fees for fundraisers and that required upfront disclosure of fees to potential donors, those cases "took

care to leave a corridor open for fraud actions to guard the public against false or misleading charitable solicitations." *Id.* at 617. "[T]here are differences critical to First Amendment concerns between fraud actions trained on representations made in individual cases and statutes that categorically ban solicitations when fundraising costs run high." *Id.* Because the Illinois Attorney General's fraud complaints asserted facts "our precedent does not place under the First Amendment's cover," the Court reversed the dismissal of the cases. *Id.* at 618.

Defendants cannot show there are no set of facts under which they can be held liable for their fraudulent conduct. Because President Trump has not pleaded himself "out of court," *Durnford*, 907 F.3d at 603 n.8, he is entitled to discovery and, eventually, a trial of his claims on their merits. Defendants will no doubt contest his claims vigorously. But all of that is for a later date. Defendants' Motion should be denied.

### 2.    The Defendant Polls are Commercial Speech Not Warranting Any Heightened First Amendment Protection

"[C]ommercial speech [enjoys] a limited measure of protection, commensurate with its subordinate position on in the scale of First Amendment values,' and is subject to 'modes of regulation that might be impermissible in the realm of noncommercial expression.'" *Board of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 477 (1989) (quoting *Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447, 456 (1978)); *see also Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 620 (1995). "There is no longer any room to doubt that what has come to be known as 'commercial speech' is entitled to the protection of the First Amendment, albeit to protection somewhat less extensive than that afforded 'noncommercial speech.'" *Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*, 471 U.S. 626, 637 (1985). And, "much of the material in ordinary newspapers is commercial speech." *Cincinnati v. Discovery Network*, 507 U.S. 410, 423 (1993). Specifically in the cases involving commercial speech, it is well known that the government may in appropriate

circumstances regulate both "inherently misleading" speech and even "potentially misleading" speech. *Peel v. Atty. Registration & Disciplinary Comm'n*, 496 U.S. 91, 110 (1990).

Here, the Selzer Defendants argue that the Defendant Polls were political speech. Motion at 9-10. But, contrary to this assertion, the Defendant Polls amount to commercial speech—and false speech at that. As set forth *supra*, Defendants were not engaged in the action of reporting news. Selzer and S&C created the false Defendant Polls, then promoted them, in a manner no different than one would employ to promote any other commercial product. Selzer's media blitz across numerous mainstream media outlets in the aftermath of the release of the Harris Poll provides ample evidence of these commercial promotional efforts. *See e.g.*, RAC ¶¶ 70-73. For example, on Rachel Maddow's MSNBC television program, Selzer breathlessly declared of the Harris Poll: "I don't see how anybody would look at those numbers and the history in Iowa in the past eight to twelve years and think that these numbers could have been foretold." *Id*. ¶ 73. Selzer's numerous television and other media appearances were in the service of promoting her polling and her polling business. Merely because the Defendant Polls garnered news coverage does not mean the Polls themselves were news; the Polls were created by Selzer's for-profit polling business, S&C, which, as Selzer admits "*is predicated on getting people to pay money for their products*." *Id*. ¶ 66 (emphasis added).

### 3.    The Selzer Defendants' First Amendment Cases Are Distinguishable

Selzer Defendants cite multiple cases in support of their erroneous assertion that President Trump's claims are barred by the First Amendment. They hide behind their blanket assertion that the Defendant Polls are "news," even though the Polls were—by Selzer's own admission—for-profit products created to attract attention and revenue. Selzer and S&C seek to retroactively characterize the Polls as bona fide "news" (*see* Motion at 6-12) rather than as the paid-for, consumer-focused products that the Defendant Polls really are and were intended to be from the

time they were contrived. Indeed, the Selzer Defendants' position that the Polls were "news" is impossible to square with the fact that Gannett and DMR *paid* Selzer and S&C to create the subject Polls; and for that matter, they pay Selzer and S&C for *all* the polls that they create for Gannett and DMR because creating polls is Selzer's job. The Selzer Defendants urge this Court to accept the notion that the paid polling products and services they provide are somehow "news." But legitimate "news" *is not bought and paid for*, or created in exchange for money; rather, legitimate "news" involves events of public interest that occur at the local, regional, national, or world levels. Newspapers report on events that occur due to the actions of *other* parties ranging from ordinary people to world leaders—but creating a product for public consumption, such as a sensationalized incorrect poll that attracts attention, does not transform such a product into "news." Newspapers cannot create "news" out of thin air by paying for a consumer product to fill their pages. Ironically, the Selzer Defendants argue that "Plaintiff tries to pound a square peg into a round hole without any attempt to reconcile the constitutional mismatch," Motion at 6; but it is Defendants who are moving the goal posts as to what constitutes "news' by trying to fit their square peg of a for-profit consumer product into a round hole of "news."

Notably, none of the cases cited by the Selzer Defendants change this paradigm. *See* Motion at 1, 6 (citing *Hollander v. CBS News*, 2017 WL 1957485 (S.D.N.Y. May 10, 2017), *aff'd but vacated on other grounds sub nom. Hollander v. Garrett*, 710 Fed. App'x. 35 (2d Cir. 2018) (dismissal of RICO claim predicated on alleged wire fraud against various news organizations for their reporting on the 2016 Presidential Election); *Wash. League for Increased Transparency & Ethics v. Fox News*, 2021 WL 3910574 (Wash. Ct. App. Aug. 30, 2021) (affirming dismissal of claims under the Washington Consumer Protection Act against Fox News for allegedly false reporting about COVID-19); *Nat'l Inst. of Fam. & Life Advocs. v. Raoul*, 685 F. Supp. 3d 688, 695

(N.D. Ill. 2023) (enjoining application of Illinois Consumer Fraud Act to anti-abortion advocacy); *Grosjean v. American Press Co*., 297 U.S. 233, 245-50 (1936) (striking down "tax on lying" against newspapers); *Brandt v. Weather Channel, Inc*., 42 F. Supp. 2d 1344, 1345-46 (S.D. Fla. 1999), *aff'd*, 204 F.3d 1123 (11th Cir. 1999) (seeking to hold the Weather Channel liable for incorrect forecast). The cases cited by Selzer are distinguishable. They reference cases involving (i) grievances about *reporting* on legitimate *news* matters, not on a matter that a newspaper itself created out of thin air to generate profit, (ii) nakedly content-based speech discrimination by the government, (iii) taxation of speech, or (iv) speech that was alleged to be intentionally false or fraudulent.

In *Hollander*, the plaintiff labeled "various articles, commentary, and broadcasts" as "wire fraud," but could not establish his RICO case because he failed to identify any "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises[.]" 2017 WL 1957485, at *4. In sum, the plaintiff's grievance related to reporting about actual news, not to a product created by the media defendants themselves. *Hollander* is also not relevant because RICO is a theory of recovery that involves establishing a predicate *crime*, not a statutory cause of action for consumer fraud. *Id*. Similarly, *Wash. League for Increased Transparency* also involved grievances about the manner of reporting about COVID-19, one of the most substantial and legitimate news stories in recent history. 2021 WL 3910574, at *1. *Grosjean* was a challenge by newspaper publishers to a Louisiana state law that required them to pay a tax for the mere privilege of engaging in their business, an impermissible government restraint on the freedom of the press. 297 U.S. at 245. Additionally, *Brandt* is distinguishable because there was no allegation there of intentional fraud or falsity, and in any event, weather is

clearly a news event that occurs naturally rather than by creation of a service provider. 42 F. Supp.2d at 1345-46.

 *Raoul* is also distinguishable, but for a different reason: it involved an application for a preliminary injunction in the context of a facial challenge to a particular provision of the Illinois Consumer Fraud Act known as SB 1909, which regulated statements about reproductive health made by "limited service pregnancy centers" but did not regulate such statements by abortion clinics and other medical providers, making the law a form of content-based discrimination that was not narrowly tailored, a claim unlike President Trump's consumer fraud and common law claims. 685 F. Supp. at 696, 703. If anything, *Raoul* supports President Trump's position that consumer fraud laws *do* apply to deceptive statements, as the court in this case held that Illinois's Consumer Fraud Act *would* still apply to regulating false statements by the pregnancy centers so long as there was no content-based discrimination. *Id*. at 704-705 (explaining Illinois' consumer fraud statute, without pregnancy center specific amendments, could reach fraudulent conduct without content and viewpoint discrimination concerns).

 Lastly, Defendants' reliance on *United States v. Alvarez* (Motion at 2) to support invoking the First Amendment as a blanket shield for creating and disseminating the fraudulent Defendant Polls is misplaced. There, the Court found that "respondent's statements were but a pathetic attempt to gain respect that eluded him. The statements do not seem to have been made to secure employment or financial benefits or admission to privileges." 567 U.S. 709, 714 (2012). In short, the respondent's alleged misdeed was essentially victimless. In contrast, as President Trump alleges in the instant case, "[b]ecause of Defendants' false, misleading, and deceptive conduct, President Trump has sustained actual damages by having to expend extensive time and resources,

including direct federal campaign expenditures, to mitigate and counteract the harms of the Defendants' conduct." RAC ¶ 144.

In sum, none of foregoing cases which Selzer Defendants rely upon in support of their Motion relate to a product or service that any of the media outlets in question created for profit; instead, these cases relate either to impermissible restraints on legitimate news reporting or— which the Defendant Polls are not— to plainly protected expressive conduct lacking any element of fraud or falsity. Thus, for this reason too, Selzer Defendants' arguments fail, and the Motion should be denied.

### C. President Trump's Claims are Sufficiently Pled

#### 1.    President Trump Sufficiently Alleges Recoverable Damages

Selzer Defendants' primary argument in support of their contention that President Trump's claims in the RAC are "[f]acially [d]efficient," is that he "does not plead legally cognizable damages." Motion at 14-15. This argument fails because it ignores those portions of the RAC where President Trump has pled legally cognizable damages in support of each claim asserted.

As detailed throughout the RAC, President Trump seeks redress for the significant harm he suffered not only as an ordinary consumer of the Defendant Polls, but as a consumer with a dramatically heightened interest in the subject matter, due to his then-status as a candidate for the highest public office in the country—the Presidency—and thus, as an individual directly impacted by the Defendant Polls. The RAC sufficiently alleges that President Trump suffered harm which is directly attributable to Defendants' choice to weaponize polling as a tool for manipulating elections and driving profits. *See* RAC ¶¶ 9–13, 79, 112.

First, with respect to Plaintiff President Trump, the Harris Poll falsely indicated that Harris was leading President Trump in Iowa by three points, just days before the election, despite President Trump ultimately winning the state by over 13%. *Id*. ¶¶ 2, 9-10. This false representation

created a misleading narrative of Democratic momentum leading into election day and harmed President Trump's reputation, his image, and his viability as a candidate. It was an issue he had to address publicly at a moment when he was tremendously strained for time and each minute of his day had a direct impact on his personal and political future. *Id*. The Harris Poll (and the other Defendant Polls) were intended to and did in fact dampen enthusiasm and turnout among Republican voters, counteracting an extensive effort by President Trump to do the exact opposite.[3] *Id*. It is no secret that as a politician, President Trump's individual reputation is very much intertwined with his professional reputation, and accordingly, the political damage inflicted upon him by Defendants also hurt him individually, and vice versa. As alleged in the RAC, "[b]ecause of Defendants' false, misleading, and deceptive conduct, President Trump has sustained actual damages by having to expend extensive time and resources, including direct federal campaign expenditures, to mitigate and counteract the harms of the Defendants' conduct." *Id*. ¶ 114.

In sum, Defendants' manipulation of Congressional races harmed President Trump even more than it harmed the candidates in those races, in multiple respects: by negatively influencing voter turnout, by damaging and tarnishing the Republican brand, and by creating false portraits of Congressional races that were also germane to President Trump's race. *Id*. ¶ 112. Finally, President Trump read the false poll in the *Des Moines Register* and was harmed as a deceived consumer of Defendants' product. *Id*. ¶ 20.

---

[3] *See e.g.,* Samantha J. DeRagon, Tracy Osborn, and Michael S. Lewis-Beck, *The 2024 Iowa Poll for President: A Cautionary Tale*, The Center for Politics (December 12, 2024), https://centerforpolitics.org/crystalball/the-2024-iowa-poll-for-president-a-cautionary-tale/ ("Besides receiving national news coverage, this poll had a significant impact on the expectations of Iowans themselves. Such dramatic public findings, which this Iowa Poll represents, can mislead voters and undermine trust in the polling enterprise itself.")

**2.     President Trump Properly Pled a Claim for Violation of The Iowa Consumer Fraud Act**

Defendants' assertion that President Trump "has no claim under the ICFA against Selzer because he does not allege that he purchased or leased anything from Selzer.," Motion at 16, is without merit. The Supreme Court of Iowa has recognized that ICFA claims "are not the same as common law fraud actions." *State ex rel. Att'y Gen. of Iowa v. Autor*, 991 N.W.2d 159, 167 (Iowa 2023) (quoting *State ex rel. Miller v. Hydro Mag, Ltd.*, 436 N.W.2d 617, 622 (Iowa 1989) ("We conclude the Iowa Consumer Fraud Act was not merely a codification of common-law fraud . . . [it] provides broader protection to the citizens of Iowa by eliminating common-law fraud elements of reliance and damages."). Simply stated, it is well-settled that the ICFA "permits relief upon a lesser showing that the defendant made a misrepresentation or omitted a material fact with the intent that others rely upon the . . . omission." *State ex rel. Miller v. Pace*, 677 N.W.2d 761, 770 (Iowa 2004) (cleaned up). Here, President Trump has certainly carried his burden of making such a showing and thus, has adequately pleaded his ICFA claim against Defendants in the RAC. As discussed *supra*, the RAC specifically alleges that Selzer and her company S&C created a manipulable Harris Poll and Congressional Poll, and then actually manipulated them. RAC ¶¶ 1–4, 45, 76–77). It further alleges that DMR and Gannett purchased those Defendant Polls for publication and used them to boost profits, e.g., by driving subscriptions and web traffic. *Id*. ¶¶ 17–19, 66. Selzer is alleged to have acted with knowledge of the falsity of the Defendant Polls—which Defendants disseminated for their audience to rely upon—to inflate Democratic support, by altering her methodology to favor Harris and other Democratic candidates. *Id*. ¶¶ 68–69. Thus, when considered under the proper standard articulated by the Iowa Supreme Court, Selzer Defendants' Motion to Dismiss President Trump's ICFA claim must be denied.

### 3. President Trump Properly Pled a Claim for Fraudulent Misrepresentation

The allegations detailed in the RAC provide sufficient support for President Trump's claim for fraudulent misrepresentation against Defendants. The elements of fraudulent misrepresentation are: (1) representation; (2) falsity; (3) materiality; (4) scienter; (5) intent to deceive; (6) justifiable reliance; and (7) resulting injury. *Midwest Home Distributor, Inc. v. Domco Indust. Ltd.*, 585 N.W.2d 735 (Iowa 1998). Each of the factors for fraudulent misrepresentation are plausibly and compellingly alleged with specificity in the RAC.

#### a) *Defendants Made Representations When They Published their Polls in the Des Moines Register*

Defendants made express representations to consumers, including President Trump, in the most attention-grabbing manner possible. RAC ¶¶ 57, 60-62. The Defendant Polls were presented as authoritative, data-driven assessments of voter preferences. *Id*. ¶¶ 41-43, 70. Defendants promoted these Polls with headlines and editorial commentary endorsing their accuracy. *Id*. The foregoing conduct undeniably constitutes a representation under applicable Iowa law. *Midwest Home Distributor*, 585 N.W.2d at 735.

#### b) *Defendants' Representations Were False*

The false nature of Defendants' representations in the Defendant Polls is clear. President Trump won Iowa by more than thirteen points, consistent with all available election data, electoral reality, and the findings of all mainstream polling other than Selzer, demonstrating that the Harris Poll—and the three-point deficit reported therein—was false information. RAC ¶ 2. As another example of the falsity of Defendants' representations in their polls, Representative Miller-Meeks won her race by a margin of 0.2%, a result that is irreconcilable with the sixteen-point deficit reflected in the Congressional Poll. *Id*. ¶ 3. Defendants also projected Democrat Baccam had a seven-point lead over Republican Nunn, when Nunn prevailed by four points. *Id*. ¶¶ 87-88. They

projected Republican Hinson with a narrow three-point lead where she ultimately won by fifteen points. *Id*. ¶¶ 89-90. And they projected Republican Feenstra with a sixteen-point lead where he ultimately won by thirty-four points. *Id*. ¶¶ 90-91. Thus, the results of the Polls were false.

*c)    The False Representations Made by Defendants Were Material*

The materiality of the false representations made by Defendants in the Defendant Polls as alleged in the RAC is undeniable. It is commonly known that election polling affects voter turnout and enthusiasm; for at least this reason, Defendants employed a deliberate strategy regarding the timing and manner of realizing the Defendant Polls, to maximize the damaging effect of their release on President Trump. RAC ¶¶ 34, 53, 57–48, 70). Notably, Selzer was known for her extraordinary influence over expectations for the results of Iowa and national elections. *Id*. ¶ 36. Political strategists and campaign advisors explicitly acknowledged that Selzer's polling shaped voter perception. *Id*. ¶¶ 37–38. The false polling data was released strategically just three days before the election, styled as a "leak," and employed the use of social media, all demonstrating a design to make the poll results go "viral" and be as impactful as possible. *Id*. ¶¶ 1-3, 57-58. The strategy was in fact effective, and the Harris Poll dominated national and international headlines in the days before the election, *Id*. ¶ 62, causing President Trump to expend valuable resources on an Iowa election race which he ultimately won by a considerable margin once the final polls were tallied.

*d)    Defendants Made the False Representations With Scienter*

As alleged throughout the RAC, Defendants knew that their polling results were implausible and contradicted by all reliable information available at the time. *Id*. ¶¶ 30, 48-52, 72. Statistical analysis conducted after the inaccuracy of the polls was exposed, indicates that the odds of Selzer's 2024 polling errors occurring by chance were 1 in 3.5 million. *Id*. ¶ 68. This alone is certainly demonstrative of scienter sufficient to proceed past the motion to dismiss stage.

24

But the facts as pled show far more than just likelihood with respect to Defendants' scienter. Selzer has engaged in a growing pattern of polling errors which all favored Democrats in recent years. *Id*. ¶ 30. She inaccurately reported outcomes in 2018, 2020, and 2022 races—always in favor of Democratic candidates. *Id*. ¶¶ 30–32. This is a pattern of inaccuracy that a professional pollster like Selzer could not have plausibly failed to observe. It shows that Selzer—and Defendants generally—knew or should have known her polling process was broken and no longer yielding accurate results. This is important context, because when Selzer obtained such an unrealistic result in the Harris Poll and Congressional Poll—far beyond the scope of what could be considered reasonable—her choice to release the results despite her knowledge of her growing pattern of unreliability shows exactly the type of scienter required under Iowa law for a claim of fraudulent misrepresentation. Selzer's abrupt retirement from her career of polling within two weeks of the election lends further support to substantiate Defendants' scienter in making such false representations. *Id*. ¶¶ 5, 64.

### e)     *Defendants Intended to Deceive With Their False Representations*

Defendants had an intent to deceive the public and improperly influence the elections when they published the false polling data in the *Des Moines Register*. As set forth in the RAC, the Harris Poll was prematurely leaked by Defendants to Democratic operatives in violation of Defendants' long-established confidentiality practices. *Id*. ¶ 57. For the same reasons explained above with respect to the scienter requirement, Selzer knew that the polling information was false. Despite this knowledge, Defendants engaged in an organized and concerted effort—which included a media blitz—to maximize the impact of the false and fraudulent poll information, to President Trump's detriment. *Id*. ¶¶ 70-73.

*f)*    *Plaintiff Justifiably Relied on Defendants' False Representations*

President Trump, like millions of other citizens, justifiably relied on the Defendant Polls during his 2024 Presidential Election campaign. Importantly, President Trump consumed (i.e. read) the Defendant Polls through the *Des Moines Register*. *Id*. ¶ 15. As a threshold issue, "[a]lthough Defendants argue reliance was clearly unjustified, the Iowa Supreme Court's approach appears to acknowledge the importance of permitting discovery and development of the record to assess the nuanced question of whether reliance is justified." *Meardon v. Register*, 994 F.3d 927, 939 (8th Cir. 2021). Thus, because President Trump plausibly allege[s] justifiable reliance as required to support claims of fraud," this Court should not "hold as a matter of law that [that] reliance is not justified" the case at bar. *Id*. (quotations omitted).

To the extent that this Court decides to consider the merits of Selzer Defendants' assertion that President Trump fails "to plead element (6), justifiable reliance," Motion at 19—it is non-persuasive. The Selzer Defendants argue that "[a] person may not justifiably rely on a professional representation if 'red flags' signal such reliance is unwarranted." Motion at 19 (citing *Young ex rel. Young v. Rally Appraisal, L.L.C.*, 928 N.W.2d 660, 2019 WL 1486608, at \*4 (Iowa Ct. App. 2019)). However, the Eight Circuit has explicitly recognized that to meet his burden of demonstrating reliance on a defendant's false representations, a plaintiff must only demonstrate that he "utilized his opportunity to make a cursory examination or investigation." *Meardon*, 994 F.3d at 939. Here, President Trump read and relied on the election coverage at issue, and had every right to do so, given Defendants' once sterling reputation for providing insightful and accurate polling figures. A "cursory examination or investigation," *Id*., would reveal that the Defendant Polls were published in a manner that elicited trust from readers—including President Trump— due to Selzer's previous industry-wide reputation for accuracy, which the Selzer Defendants traded on. RAC ¶ 28. Selzer's polling for DMR and Gannett had long been thought of as the gold standard,

26

and thus, President Trump's reliance on the data presented in the false Defendant Polls was certainly justified in every sense of the word.

g)    *Plaintiff Was Injured as a Result of Defendants'*
*Misrepresentations*

As detailed at length *supra,* President Trump was harmed as a direct result of Defendants' production and dissemination of the false Defendant Polls. To avoid redundancy, and in the interest of judicial efficiency, President Trump respectfully incorporates these arguments by reference and will not repeat them here.

In view of the foregoing, President Trump has sufficiently pled a plausible claim for fraudulent misrepresentation under Iowa law, and accordingly, Defendants' Motion should be dismissed.

### 4.    President Trump Properly Pled a Claim for Negligent Misrepresentation

"Iowa has adopted the definition of the tort of negligent misrepresentation found in the Restatement (Second) of Torts." *Bagelmann v. First Nat. Bank*, 823 N.W.2d 18, 30 (Iowa 2012) (citing *Pitts v. Farm Bureau Life Ins. Co.*, 818 N.W.2d 91, 111 (Iowa 2012)). Under the Restatement, the elements include:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
>
> (2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered
>
> > (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

27

> (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

*Id*. The Supreme Court of Iowa has explicitly held that in cases involving allegations of negligent misrepresentation, "those liable are only those who supply information in an advisory capacity and are manifestly aware of how the information will be used and intend to supply it for that purpose." *Van Sickle Const. Co. v. Wachovia Com. Mortg.*, 783 N.W.2d 684, 691 (Iowa 2010) (cleaned up).

The Selzer Defendants contend that President Trump's claim for negligent misrepresentation must be dismissed because they "owed Plaintiff no legal duty," because President Trump "does not allege Selzer "intended to supply information" to him or knew any recipients intended to supply it to him," and finally, because President Trump "does not allege Selzer intended to influence his decision-making, nor does he allege adequate facts supporting justifiable reliance." Motion at 22. Yet, Iowa courts recognize no such prerequisites for a successful negligent misrepresentation claim. On the contrary, it is well settled that that "[n]o clear guideline exists to define whether a party is in the business of supplying information." *The Conveyor Co. v. Sunsource Tech. Servs.*, 398 F. Supp. 2d 992, 1015 (N.D. Iowa 2005) (quoting *Greatbatch v. Metropolitan Federal Bank*, 534 N.W.2d 115, 117 (Iowa App.1995)). The court concluded that "the court, not the jury, decides whether defendants were in the business of supplying information as a matter of law, in light of the facts, because the defendants' duty is always a matter for the court to decide." *Id*. (quotations omitted).

Here, the Court should make the common sense finding that Defendants are parties "in the business of supplying information." *Id.,* and thus, supplied the false Defendants polls to their consumers, including President Trump. As publishers in the private sector, Defendants are the very embodiment of "professional purveyors of information." *Id*. at 1016.

In addition, the Selzer Defendants were acting in their professional capacity when they prepared and published the Defendant Polls, and there can be no dispute that the facts as pled support that Defendants each had a pecuniary interest in the Harris Poll. RAC ¶¶ 1-4. Specifically, Selzer and S&C prepared the poll for DMR and Gannett to help them sell newspapers and digital subscriptions, with the underlying goal of making money on the polling enterprise—to the detriment of President Trump. *Id.* ¶¶ 1, 16–19. Selzer has even admitted the financial incentive behind her work—"*[a]nd the polling industry is predicated on getting people to pay money for their products*." *Id*. ¶ 66. Defendants intended and succeeded in using the Defendant Polls to generate enormous buzz across the nation, and around the world mere days before a Presidential Election. Under the circumstances, Defendants were exactly the type of entities that "supply information in an advisory capacity . . . [and] are in a position to weigh the use for the information against the magnitude and probability of the loss that might attend the use of the information if it is incorrect." *Van Sickle Const. Co. v. Wachovia Com. Mortg.*, 783 N.W.2d 684, 691 (Iowa 2010).

Further, the facts pled in the RAC also establish that, even assuming *arguendo*, that Defendants can establish a lack intentional misconduct, there can be no doubt that the alleged conduct was grossly negligent and breached the duty owed to President Trump, and consumers of Defendants' work at large.

First, the results of the Defendant Polls were so absurdly inaccurate that—while best explained by intentional conduct—are impossible to explain without at least negligent conduct in designing, executing, and analyzing the data from the Polls. RAC ¶¶ 2-4, 68. Selzer herself was unable to explain the inaccuracy of the Harris Poll or otherwise provide an explanation to the public—leaving one to conclude that it was the result of intentional misconduct or at best, negligence. *Id*. ¶¶ 65-66. Thus, the facts as pled establish that Defendants were at least negligent

in preparing the Defendant Polls. *See, e.g. Burbach v. Radon Analytical Lab'ys*, 652 N.W.2d 135, 138 (Iowa 2002), *as amended on denial of reh'g* (Oct. 25, 2002) (holding on appeal that the lower court erred in dismissing a negligent misrepresentation case where the defendants had "knowledge that its report would be reviewed and potentially relied upon by a limited but foreseeable class of persons.").

Second, there are ample facts pled in the RAC to support the allegations of Defendants' negligence in failing to protect the Harris Poll from being distributed prematurely. First, DMR had a "longstanding policy of secrecy" and there were likewise industry standards for protection of polling information, a policy they did not adhere to in this case. RAC ¶¶ 53, 60. Selzer even admitted that she showed the Harris Poll to her nephew. *Id.* ¶ 68. She did this, despite knowing her nephew worked at a competing polling company, and that the information contained in the Harris Poll was highly valuable and sensitive, due to the potential impact the data could have on the 2024 Presidential Election *Id.* ¶ 53, 57-58, 60. Such conduct is a clear breach of even the lowest standards of care for protecting sensitive information. *Id.*; s*ee, e.g. Davidson & Jones, Inc. v. New Hanover Cnty.*, 41 N.C. App. 661, 667, 255 S.E.2d 580, 584 (1979) (explaining that "a complete binding contract between the parties is not a prerequisite to a duty to use due care in one's actions . . . [and an] architect, in the performance of his contract with his employer, is required to exercise the ability, skill, and care customarily used by architects upon such projects."); *see also Mohsen v. Veridian Credit Union*, 733 F. Supp. 3d 754, 763 (N.D. Iowa 2024) ("[A] party collecting private data from its customers has a duty to take reasonable measures to safeguard that data."). Moreover, both the results of the Defendant Polls, and the subsequent leak of the Harris Poll, are the types of events that would not have occurred absent a failure to exercise ordinary care, and so the doctrine of *res ipsa loquitur* applies here to both forms of negligence. Such an inference is appropriate

where "(1) the injury is caused by an instrumentality under the exclusive control of the defendant, and (2) the occurrence is such as in the ordinary course of things would not happen if reasonable care had been used." *Brewster v. United States*, 542 N.W.2d 524, 529 (Iowa 1996). Here, Defendants alone possessed the polling data since they themselves collected, analyzed, and published this information. RAC ¶ 3. In addition, the statistical odds of the error, 1 in 3.5 million, make the results of poll something that cannot be explained absent intentional conduct or negligence. *Id*. ¶ 68. Likewise, despite a thorough investigation into the matter after the fact, Defendants have not publicly suggested that there was any hack or other interference by third parties that could explain the leak of the Harris Poll absent negligence. *Id*. ¶ 57. Thus, President Trump has adequately pled Defendants' negligent conduct, and in general, properly pled a claim for negligent misrepresentation.

### D. President Trump Has Alleged Facts and Claims Justifying Piercing the Corporate Veil and so Claims Against Selzer as an Individual Should Not be Dismissed

The Court should not dismiss President Trump's claims against Selzer as an individual. Defendants' primary argument in support of dismissal against Selzer individually is that the circumstances for piercing do not apply here and that President Trump has not pled facts in support of piercing the corporate veil. Motion at 23. This is not true. Defendants Selzer and S&C misstate and misapply the law. "A corporate officer is individually liable for fraudulent corporate acts which he or she participated in or committed." *Briggs Transp. Co. v. Starr Sales Co.*, 262 N.W.2d 805, 808 (Iowa 1978). Here, Selzer is accused of fraud no less than eight times in the RAC—it is the very basis of the entire lawsuit. RAC ¶¶ 1-5, 10, 11, 30, 33, 68, 69). As just one example, President Trump pled that the results of the various races, compared to the Defendant Polls, showed that "Defendants, led by Selzer, were manufacturing fake support for Democrat candidates

in order to interfere in the elections." *Id.* ¶ 33. Having pled sufficient facts for piercing the corporate veil, there is no basis to dismiss the claims against Selzer individually.

## V.    CONCLUSION

For the foregoing reasons, the Court should deny the Selzer Defendants' Motion in its entirety.

Date: August 25, 2025                                        Respectfully Submitted,

By:

/s/ Edward Andrew Paltzik
Edward Andrew Paltzik (*pro hac vice*)
**TAYLOR DYKEMA PLLC**
925 E. 25th Street
Houston, Texas 77009
516-526-0341
edward@taylordykema.com

/s/ Alan R. Ostergren
ALAN R. OSTERGREN
Attorney at Law
Alan R. Ostergren, PC
500 East Court Avenue
Suite 420
Des Moines, Iowa 50309
(515) 297-0134
alan.ostergren@ostergrenlaw.com

*Counsel to Plaintiff President Donald J. Trump*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 25, 2025, I caused a true and correct copy of the foregoing Plaintiff's Memorandum of Law in Opposition to Defendants J. Ann Selzer and Selzer & Company's Motion to Dismiss the Revised Amended Complaint to be served on all counsel of record via the Court's CM/ECF system.

Dated: August 25, 2025                    /s/ Alan R. Ostergren
                                          Alan R. Ostergren